EMERGENCY PETITION FOR WRIT OF MANDAMUS CIRCUIT RULE 27-5

Case No. 15-35963

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

IN RE: DENISE SUBRAMANIAM

---

DENISE SUBRAMANIAM
Defendant – Petitioner
v.
LNV CORPORATION
Plaintiff – Respondent

Gabrielle D. Richards
Respondent

UNITED STATES DISTRICT COURT for the
District of Oregon Portland Division
Respondent

Judge Michael W. Mosman
Respondent

---

From the United States District Court
District of Oregon Portland Division
Judge Michael W. Mosman Presiding
Case No. 3:14-cv-01836

---

EMERGENCY PETITION FOR WRIT OF MANDAMUS CIRCUIT RULE 27-5
PURSUANT TO 18 U.S.C. § 3771(D)(3)

---

Denise Subramaniam
c/o 1905 SE 24th Ave
Portland OR 97214
503-764-5300

Pro se Petitioner

Gabrielle D. Richards
Martin & Richards, LLP
111 SW Fifth Ave, Suite 3150
Portland, OR 97204
503-444-3449
Fax: 503-296-5834
Email: gabby@cascadialawyers.com
ATTORNEY TO BE NOTICED

Counsel for LNV Corporation

Erick J. Haynie
Perkins Coie, LLP
1120 NW Couch Street
10th Floor
Portland, OR 97209-4128
503-727-2017
Fax: 503-727-2222
Email: ehaynie@perkinscoie.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Counsel for LNV Corporation


Jeffrey M. Peterson
Perkins Coie, LLP
1120 NW Couch Street
10th Floor
Portland, OR 97209-4128
503-727-2075
Email: jeffreypeterson@perkinscoie.com
ATTORNEY TO BE NOTICED

Counsel for LNV Corporation

---

TABLE OF CONTENTS

PETITIONER IS A CRIME VICTIM ..................................................................4

AN EMERGENCY EXISTS ............................................................................5

INTRODUCTION & RELATED CASES............................................................6

DISCRIMINATION AGAINST PETITIONER DUE TO DISABILLITIES .....................15

INTENTIONAL EXPLOITATION OF PETITIONER'S DISABILLITIES......................17

RELEVANT FACTS & ISSUES PRESENTED..................................................19

CONSTITUTIONAL QUESTIONS..................................................................47

JUDICIAL MISCONDUCT WARRANTING DISQUALIFICATION ..............................48

RELIEF SOUGHT......................................................................................50

PETITIONER HAS NO OTHER ADEQUATE REMEDY FOR RELIEF ........................51

PETITIONER AND OTHERS WILL BE HARMED IN A
WAY NOT CORRECTABLE ON APPEAL ......................................................53

AUTHORITIES

CASES

*United States of America v. Lorraine Brown*. Case No. 3:12-cr-198-J-25
MCR. (MD. Fla.)...........................................................................................

*Beal Bank, SSB v. Sarich,* No. 05-2-11440-1SEA (King County
Super. Ct. Sept. 8, 2006) ...........................................................................

*Yvanova v. New Century Mortgage Corporation,* Supreme Court of
California, No. S218973, Filed February 18, 2016 ....................................21

*Rick Slorp v. Lerner, Sampson & Rothfuss, et al* Sixth Circuit Court of
Appeals Case No. 13-3402*, reversed* Originating Case No. : 2:12-cv-00498 ............24

*Pomeroy's Equity Jurisprudence § 397* at 90 (5th Ed 1941)........................................30

*Joyce v. United States*, 474 F. 2d 215, United States Court of Appeals,
Third Circuit, 1973. ....................................................................................33

*State v. Rodriguez*, 725 A.2d 635 (Md. Ct. Spec. App. 1999) ....................................33

*State of MAINE et al., Petitioners, v. Joline THIBOUTOT, et vir., etc.*;
448 U.S. 1 (100 S.Ct. 2502, 65 L.Ed.2d 555) ...........................................33

*Melo v. US*, 505 F2d 1026. No. 74-1169, United States Court of Appeals,
Eighth Circuit, 1974 ...................................................................................33

STATUTES

18 U.S.C. § 3771(D)(3) ................................................................................

18 U.S.C. § 4 ................................................................................................

18 U.S. Code § 242 ......................................................................................

18 U.S. Code Chapter 96...............................................................................

18 U.S. Code § 1962 ....................................................................................

42 U.S. Code § 12101 ............................................................................7, 18

42 U.S. Code Chapter 45...............................................................................19

NRS 78.020(2)..............................................................................................31

NRS 76.100(1)(a) .........................................................................................31

NRS 78.030(1)..............................................................................................45

NRS 78.747(1)..............................................................................................47

NRS 78.747(2)..............................................................................................47

NRS 78.747(3)..................................................................................47

F.R.Civ.P. 12(h)(3)............................................................................32

28 U.S. Code § 144 ......................................................................48, 51

28 U.S. Code § 455(a).....................................................................48, 51

Federal Rules 28 U.S.C. § 2403 and 5.1 (a)( I).................................47

---

## PETITIONER IS A CRIME VICTIM

Petitioner is a victim of a crime as defined by the Crime Victims' Rights Act, 18 U.S.C. §

3771(e) (2)(A) which defines a crime victim as:

> "The term "crime victim" means a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia."

Nothing in the language of this Act limits the rights of crime victims to just victims of violent

crimes, in fact the FBI specifically identifies victims of federal crimes who have been harmed

emotionally or financially and not just physically as having rights under 18 U.S.C. § 3771; the

FBI website states:

> "A crime victim means a person who has been directly and proximately harmed (physically, emotionally, or financially) as a result of the commission of a federal offense or an offense in the District of Columbia." https://www.fbi.gov/stats-services/victim_assistance/victim_rights

Petitioner has claimed, and substantiated with evidence, throughout her pro se pleadings that she

is the victim of a federal crime, and there are many other victims of the crimes of the same

parties.  [Doc # 59] [Doc # 64] [Doc # 64-1] [Doc # 69] [Doc # 52] [Doc # 68] [Doc # 89] Doc #

105]  Specifically she and the other Beal/LNV victims were first victims of the crimes of

Lorraine Brown convicted in favor of the United States.  *United States of America v. Lorraine*

*Brown*. Case No. 3:12-cr-198-J-25 MCR. (MD. Fla.)  The United States criminal complaint

against Brown states:

"…the defendant herein, did knowingly and willfully combine, conspire, confederate and agree with others to commit certain offenses, to wit:

a.  execute and attempt to execute a scheme and artifice to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, by utilizing the United States mail and private and commercial interstate carriers, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1341; and,

b.  execute and attempt to execute a scheme and artifice to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, by transmitting and causing to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, visual pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343…

In mid-2005, Jacksonville, Florida based Fidelity National Financial, Inc. ("FNF") purchased DocX from Brown and her partners. Through corporate reorganizations within FNF, DocX later fell under ownership of Fidelity National Information Services, Inc. ("FNIS"). In mid-2008, FNIS spun off a number of business lines into a new publicly-traded entity, Lender Processing Services, Inc. ("LPS"), based in Jacksonville, Florida. At that time, DocX was rebranded as "LPS Document Solutions, a Division of LPS." Following this spin-off, Brown was the President and Senior Managing Director of LPS Document Solutions, which constituted DocX's operations in Alpharetta. At all times relevant to this Information, Brown was the chief executive of the DocX operations…

The exact number of documents created by DocX with fraudulent signature and notarizations is presently unknown. It is estimated, however, that between 2003 and 2009 well over 1 million such documents were executed and filed with property recorders' offices across the nation."

Brown's Plea Agreement states:

"The defendant shall enter a plea of guilty to Count One of the Information. Count One charges the defendant with Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 371."

The United States convicted Brown of Conspiracy to Commit Mail and Wire Fraud.  The United

States identified Fidelity subsidiaries and LPS as corporate vehicles through which Brown

committed her conspiracy crimes.  The United States acknowledges that more than 1 million

false, fraudulent assignments and other mortgage documents were recorded between 2003 and

2009 as a result of Brown's conspiracy crimes. Although only Brown has been convicted to date, the existence of other co-conspirators is adjudicative fact.

Petitioner and the other Beal/LNV victims have evidence that shows Brown's co-conspirators are still committing the same conspiracy crimes through the LPS network of law firms, and the purported mortgage sub-servicer Dovenmuehle Mortgage Inc. ("DMI") and the LPS Desktop database software system; and that Respondent LNV and other Beal entities are knowingly and willfully submitting the fraudulent products of their crimes to courts as genuine with intent to deceive for purposes of showing standing to foreclose with intent to foreclose on Petitioner's and other Beal/LNV targets/victims properties, when no such standing exists and these LPS and Beal entities, as well as Respondent Gabrielle D. Richards, ("Ms. Richards"), who acted as counsel in behalf of Respondent LNV in No. 3:14-cv-01836 MO all know standing does not exist.

Specific to Petitioner's property are the following fraudulent products of the conspiracy crimes of Brown and her co-conspirators recorded in Washington County Oregon:

**2006-077542**  Recorded on 06/28/2006 – An Assignment of Deed of Trust executed on December 29, 2005 endorsed by Dana Lantry assigning beneficial interest from People's Choice Home Loan, Inc. ("PCHL") to Homecomings Financial Network, Inc. ("HFN");

**2008-073971**  Recorded on 08/27/2008 – An Assignment of Deed of Trust executed on April 3, 2006 endorsed by Masse Adjetry assigning beneficial interest from HFN to Residential Funding Company LLC, ("RFC");

**2008-073972**  Recorded on 08/27/2008 – An Assignment of Deed of Trust executed on **March 10, 2008** endorsed by Betty Wright assigning beneficial interest from RFC to LNV;

Respondent LNV's purported genuine "Original" Note includes two false Allonges:

1. An undated Dana Lantry endorsed Allonge conveying the Note to RFC would have also occurred on December 29, 2005.

2. No Allonge exists conveying the Note from HFN to RFC.

3. An undated Jason J. Vecchio endorsed Allonge conveying the Note from RFC to LNV would have also been executed on March 10, 2008.

These facts on the face of these instruments show falsehood. Additional evidence and argument as to why these instruments and the purported genuine "Original" Note and Deed of Trust submitted by Respondent LNV and its Counsel Respondent Ms. Richards to Respondent District Court are forgeries made with intent to deceive are on pages 30 to 36 of this Writ.

Respondent LNV and its sole controlling director, D. Andrew Beal, uses LPS affiliated companies because he knows these LPS companies will willfully conspire with him to participate in a scheme to produce such fraudulent documents and to then submit them to courts as genuine so he can foreclose on the properties of his targets for his own personal gain.

DMI was named as a defendant in Petitioner's earlier case No.3:12-CV-1681 MO TER. (Note: although DMI and Respondent LNV were served summons in that case they failed to make an appearance, only MGC Mortgage Inc. ("MGC") made an appearance and in MGC's pleadings it claimed Respondent LNV was merely an affiliate of MGC when in fact both MGC and LNV are owned and fully controlled by D. Andrew "Andy" Beal, also named as a defendant in case No.3:12-CV-1681 MO TE but who evaded service.) Northwest Trustee Services and RCO Legal are LPS service providers and were involved in the 2012 foreclosure attempt against Petitioner's property and also named as defendants in case No.3:12-CV-1681 MO TER. The law firms of Codilis & Stawiarski P.C. Counsel for LNV in the Breitlings' case; Freedman Anselmo Lindberg & Rappe LLC and Codilis & Associates, P.C.; Counsels for LNV in the Swift case; Trott & Trott, P.C. Counsels for LNV in the Sadler case; McCarthy & Holthus, LLP Counsel for LNV in the Tuli Molina-Wohl case; Shapiro & Kirsch LLP (TN) and McCurdy & Candler, LLC Counsels for LNV in the Catherine Gebhardt case; Dean Morris, LPP Counsel for LNV in the

Cammy Depew case are all LPS affiliated law firms. (See **Exhibit AA** attached hereto and

Petitioners Notice of Related Cases and [Doc # 59]) Quality Loan Service Corp. involved in the

2011 foreclosure attempt against Petitioner's property is also and LPS affiliated company; and

LSI of Oregon is a subsidiary of LPS also involved in past foreclosure attempts on Petitioners

property; both these companies were named as defendants in case No.3:12-CV-1681 MO TER.

Petitioner has claimed, and substantiated with evidence, throughout her pro se pleadings that

there are numerous other victims of Respondent LNV Corporation ("LNV") and other Beal

entities and that many of them were first victims of the crimes of Lorraine Brown (i.e. an earlier

Assignment of security instrument recorded in their county was a product of Brown's crimes)

then Respondent LNV exploited the break this made in their chains of title and manufactured

additional false Assignments and caused them to be recorded in their counties by mail or wire.

Respondent LNV then manufactured false forged Allonges and forged Mortgage Notes to give

the appearance that the Beal targets/victims' mortgages had been conveyed to LNV, when they

had not. Respondent LNV's mortgage servicers MGC and/or DMI the misappropriated

mortgage payments made by many of the Beal targets/victims' so as to make a claim that they

defaulted on their mortgages when they had not with intent to initiate a wrongful foreclosure.

Then Respondent LNV submits the forged instruments as genuine to courts with intent to harm

Petitioner and the other Beal targets/victims by deceiving these courts and depriving Petitioner

and the others of their properties for the personal gain of LNV's owner D. Andrew Beal.

Petitioner has claimed and substantiated her claims with evidence throughout her pro se

pleadings that Respondent LNV willfully uses "robosigned" mortgage instruments and

"robosigned" false Affidavits and Declarations to deceive courts, including the false Affidavits

of Beal employee Bret Maloney in the Gebhardt, Breitling, Gates, Hamm, Youngblood, Harris,

and numerous other cases; false and "robosigned" Affidavits of DMI employee Edward J.

Bagdon in the Breitling and Howard cases; the false Declaration of Beal employee Michelle

Conner in Petitioner's case, all willfully produced and submitted to courts with intent to deceive.

[Doc # 59] [Doc # 59-1] [Doc # 60] [Doc # 64] [Doc # 69] [Doc # 69-1] [Doc # 95] [Doc # 96]

[Doc # 105] [Doc # 123] [Doc #s 101, 101-1 to 101-6] [Docs # 102, 102-1 to 102-21]

Petitioner has claimed, and substantiated with evidence, throughout her pro se pleadings the

following facts:

1. A significant percentage of the Beal targets/victims are seniors, disabled, minorities and single females;
2. Many of the Beal targets/victims had considerable equity in their homes;
3. Troubles began for many of the Beal targets/victims when they tried to refinance;
4. Most of the Beal targets/victims were intentionally put into false defaults by servicers who misappropriated their mortgage payments;
5. A pattern of willful abuse of judicial process is apparent by attorneys for Respondent LNV in most Beal/LNV foreclosure cases which has harmed Beal targets/victims;

Mail and wire fraud are prohibited activities under 18 U.S. Code § 1962. And 18 U.S. Code §

1964 provides for Civil remedies and states:

(a) *The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons...*

(d) *A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.*

Respondent District Court not only failed to prevent and restrain these aforementioned violations

of section 1962, but treated Petitioner as if she were the criminal. Respondent Judge Mosman in

spite of 18 U.S. Code § 1964(d) dismissed her <u>Case No. 3:15-cv-02002-MO TER</u> that named

Lorraine Brown as a defendant. It appears Respondent Judge Mosman may not have read

Petitioner's pleadings or reviewed the ample evidence submitted with her pleadings or the

Affidavits of other Beal/LNV targets/victims or the evidence submitted with their Affidavits; or

it appears he may have had a more sinister motive for apparently disregarding all this evidence of

fraud and Respondent LNV's lack of genuine standing. Either way Petitioner was deprived of

her property without due process, equal protection of law or a jury trial in violation of the fifth,

fourteenth and seventh amendments to the United States Constitution. This equates to her being

deprived of her civil rights under color of law in violation of 42 U.S. Code § 1985 and 18 U.S.

Code § 242. Unfortunately the other pro se Beal/LNV victims seem to have similarly become

victims as well of the very judges they turn to for relief. See **Exhibit AAA** attached hereto.

**Petitioner Apology**

Petitioner sincerely apologizes to this Honorable Court of Appeals because she is unable to

do a better job of conforming to procedures because she suffers from disabilities that

interfere with her abilities to do so, see in pages 12 to 26 of this Writ. The fact that she has

such disabilities is substantiated by her medical records included **Exhibit B** to this writ. Her

medical records validate the fact that Petitioner's disabilities negatively affect her ability to

write such complicated pleadings with any consistency. Even though she created a table of

contents for this Writ she hasn't been able to match the content to it exactly because she has

to do it manually. She's running out of time and is working under extremely difficult

circumstances because she's been made homeless and doesn't have steady access to

electricity and internet or even to a safe chemical free place to sit comfortably and write for

extended periods of time. Her brain has been going foggy as a result and even though she

started strong she's just not able to finish it well. Please forgive the irregular and perhaps difficult to follow manner that Petitioner wrote this Writ.  As imperfect as Petitioner knows this Writ remains she prays this court will not discriminate against her as a disabled pro se litigant and will review the merits of her claims, the evidence in the District Court record and the additional evidence attached hereto which strengthens the evidence already in court record.  She prays the questions she brings before this Honorable Court of Appeals and not dismissed or her Writ be denied for procedural imperfections as apparently Respondent UNITED STATES DISTRICT COURT for the District of Oregon Portland Division, ("District Court") and Respondent Judge Michael W. Mosman, ("Judge Mosman") have done.

She also prays that if this Honorable Court of Appeals thinks that her Writ doesn't qualify as a Rule 27-5 Writ of Mandamus Pursuant to 18 U.S.C. § 3771(D)(3); that this Honorable Court of Appeals will please consider it as a regular Rule 27-3 Writ of Mandamus.

## <u>AN EMERGENCY EXISTS</u>

Petitioner has wrongfully been made homeless by the egregious acts of Respondents.  Pursuant to Circuit Rule 27-3 or Rule 27-5 Pursuant to 18 U.S.C. § 3771(D)(3) Petitioner makes this petition for Emergency Writ of Mandamus to give her and others injured by Respondents immediate relief from the suffering they've had to endure since being forcibly removed from Petitioner's home around February 10, 2016.  Due specifically to their disabilities they have had no safe place to go and as a result their general health and well being has become precarious.

Respondent LNV lacked standing to foreclose on Petitioner's property. Respondent District Court was lacking in jurisdiction to grant Respondent LNV the equitable relief they sought through their complaint for foreclosure. See facts and arguments on pages 31 to 54 of this Writ.

Respondent District Court was lacking in jurisdiction when Respondent Judge Mosman issued three orders [Doc # 125] [Doc # 126] [Doc # 127] on January 28, 2016 denying Petitioner the relief she sought from a pending Sheriff's Sale of her home. The three motions filed by Petitioner on January 28, 2016 were:

1. [Doc # 120] Ex Parte Motion for Emergency Injunctive Relief to Stay Sheriff's Sale as a Stay of Proceedings Pending Appeal pursuant to FRCvP Rule 62
2. [Doc # 122] Rule 60 Motion for Relief from Unconstitutional Summary Judgment Order. (RE: Order on motion for summary judgment, 111 , Judgment 116 )
3. [Doc # 124] Motion to Disqualify Judge Mosman

As a pro se litigant Petitioner did not know at the time jurisdiction rested with this Honorable Court of Appeals, Respondent Judge Mosman should have known this. Respondent District Court and Respondent Judge Mosman, the chief judge, has repeatedly denied Petitioner's motions for relief. She has nowhere else to turn for relief.

After dismissing Petitioner's related case, 3:15-cv-02002-MO TER, Respondent Judge Mosman blocked Petitioner's access to the electronic filing system for Respondent District Court and issued an Order instructing his clerks not to accept anything Petitioner attempted to file if it appeared frivolous or repetitious.

Respondent Judge Mosman did not merely err in granting Respondent LNV's motion for summary judgment to foreclose on Petitioner's property his conduct and apparent personal bias against Petitioner crosses the line into judicial abuse of discretion and misconduct.

## <u>INTRODUCTION & RELATED CASES</u>

Around February 10, 2016 Petitioner was wrongfully illegally unconstitutionally and unconscionably evicted from her home that provided specific accommodation for her disabilities due to the fact that Respondent LNV initiated and perfected an eviction action in her county court without serving her. Specifically due to her disabilities Petitioner is now forced to live in her car and as a result experiences increased pain and other physical symptoms associated with her disabilities. Linnie Messina who lived with Petitioner in her home and whose disability was also accommodated by Petitioner's home was also evicted and has also been made homeless. She is currently living in a situation that has a detrimental impact on her health. She has provided an affidavit in support of this Writ.

Three directly related cases exist in this matter in Respondent District Court and all were presided over by Respondent Judge Mosman. These cases are: <u>Case No.3:12-CV-1681 MO TER</u>, <u>Case No. 3:14-cv-01836 MO</u>, and <u>Case 3:15-cv-02002-MO TER</u>.

Additionally Petitioner filed a Notice of Related Case specific to the Swift, Fauley, Gebhardt, Molina-Wohl, Hardwick and Breitling cases [Doc # 59].

Respondent Ms. Richards acted as counsel in behalf of Respondent LNV in <u>No. 3:14-cv-01836 MO</u> and Ms. Richards referenced in her pleadings <u>Case No.3:12-CV-1681 MO TER</u> [Doc 5-3] where Petitioner was the plaintiff. These three referenced related cases are intricately interwoven. Related to <u>Case 3:15-cv-02002-MO TER</u>, was assigned to a different judge but Respondent Judge Mosman had the case reassigned to himself and promptly dismissed it with prejudice before the defendants were even served.

Petitioner, Denise Subramaniam, is a pro se litigant with a long well documented history of diagnosed disabilities that include Attention Deficit Hyperactivity Disorder, ("ADHD"), arthritis, asthma, fibromyalgia and an acute form of Multiple Chemical Sensitivities Syndrome ("MCS"). Each one of these disabilities includes symptoms of mental dysfunction that interfere with Petitioner's ability to represent herself in such complex litigation. Petitioner also has physical symptoms associated with her disabilities and has need for medical stays or continuances and Respondent Judge Mosman has shown insensitivity to these needs. He denied Petitioner's motion for a medical continuance in Case No.3:12-CV-1681 MO TER and then summarily dismissed her case with prejudice. Petitioner should have been provided the reasonable accommodation of time extensions as needed to accommodate her disabilities and her medical needs pursuant to the Americans with Disability Act, 42 U.S. Code § 12101.

It is well known that ADHD is a brain disorder that affects memory and the ability to concentrate and to organize thoughts.  Concentration and the ability to organize thoughts are essential and necessary for tasks such as legal research and writing legal pleadings.  ADHD also interferes with the ability to learn and the Hyperactivity component of ADHD interferes with the ability to control impulses. ADHD also affects the ability to prioritize and make distinctions about what's most important and what's superfluous.  The ability to make such distinctions is imperative to writing concise clear and understandable legal pleadings that focus on facts and provide a logical organization events and arguments.  The ability to learn is essential to a pro se litigant who must read, absorb and understand volumes of legal materials in order to write pleadings that conform to court procedures and norms.  Impulsivity and the other symptoms of ADHD are detrimental to the writing of effective legal pleadings without accommodation.

The National Institute of Mental Health (http://www.nimh.nih.gov/health/topics/attention-deficit-hyperactivity-disorder-adhd/index.shtml) defines ADHD as:

> "Attention-deficit/hyperactivity disorder (ADHD) is a brain disorder marked by an ongoing pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development."

Fibromyalgia is a chronic pain condition. A common symptom of fibromyalgia that most people might not know about is mental fogginess that affects the ability to think coherently. The National Institute of Arthritis and Musculoskeletal and Skin Diseases defines fibromyalgia (http://www.niams.nih.gov/Health_Info/Fibromyalgia/fibromyalgia_ff.asp) as:

> "Fibromyalgia is a disorder that causes muscle pain and fatigue (feeling tired). People with fibromyalgia have pain and tenderness throughout the body.
>
> People with fibromyalgia may also have other symptoms, such as:
>
>> Trouble sleeping
>> Morning stiffness
>> Headaches
>> Painful menstrual periods
>> Tingling or numbness in hands and feet
>> Problems with thinking and memory (sometimes called 'fibro fog')"

Petitioner experiences fibro fog during periods of high stress and after periods of pro-longed physical activities. Petitioner's fibromyalgia intensifies her arthritis pain; some days the pain Petitioner experiences makes it difficult to get out of bed.  Typically when she experiences fibro fog she also experiences chronic fatigue so severe she remains in bed for days or even weeks at a time until the symptoms subside.  The best way Petitioner can describe the affect of this symptom on her ability to function is that she pretty much shuts down and cannot mentally process or cope with anything beyond basic daily survival tasks. Extended periods of mental fog, physical pain and chronic fatigue so severe that it incapacitates Petitioner for days or weeks at a time has had a detrimental impact on Petitioner's ability to represent herself as a pro se litigant.

Petitioner tries to avoid the triggers (high stress and intense physical activities) that bring on these extremely debilitating symptoms, but her legal battle that has extended nearly ten (10) years to protect her home that accommodates her MCS disabilities from fraudulent foreclosure severely undermines such efforts. She experienced nearly constant anxiety during this time due to intense fear because she knew another chemically safe and affordable place to live would be nearly impossible to find.  She knows this because so many MCS sufferers have been unable to do so and end up living in tents to avoid becoming so ill and incapacitated that they can't function at all. The situation is a catch twenty two; Petitioner's doctors say she must reduce stress but how can she under such circumstances?

In addition to these two aforementioned debilitating disabilities, Petitioner's MCS symptoms severely limit her life, where she can go and what she can do.  MCS also has a serious mental component; when Petitioner is exposed to even minute amounts of chemicals in everyday products used by most people who are not affected by these chemicals she immediately experiences inflammation in her sinuses, a burning sensation in the back of her throat, dry and sometimes irritated eyes, sometimes redness and burning on her skin. If she remains in the environment where she is exposed to chemicals that cause these symptoms for very long she will experience more severe symptoms that include headaches that often turn into migraines, asthma attacks, a type of bronchitis referred to as "chemical bronchitis" caused by inflammation of her lung tissues from chemical irritants which produces a thick mucus inside the lungs that makes breathing more difficult; severe burning skin rashes and inflammation, and a mental fogginess even worse than fibro fog.

Petitioner wears a mask in most public places to protect herself from these symptoms.  She's unable to visit friends and family because their homes are too toxic for her.  She has to avoid a

lot of public places, especially places where a lot of people congregate because Petitioner is highly reactive to chemical fragrances in perfumes and colognes and in personal care products such as hand lotions, cosmetics, deodorant, shampoo and hair rinses, and especially to chemical fragrances in laundry products.

The best way Petitioner can think of to substantiate her claims about having these debilitating disabilities and about how they impact her mental functioning and the consistency of her ability to perform the tasks associated with legal self representation is to attach Petitioner's medical records as **Exhibit A** hereto. Some of these records were submitted to Respondent District Court in <u>Case No. 3:12-cv-01681-MO</u> as an "in camera" attachment to a motion for medical continuance that Respondent Judge Mosman denied after which he issued a summary judgment order and dismissed Petitioner's complaint with prejudice.

When Petitioner was served the summons in <u>Case No. 3:14-cv-01836 MO</u> she had been suffering from severe pain in her shoulder and arm for a couple months. She was unable to do much of anything, and specifically unable sit up and type. When she did type she could only use one hand. This slowed down her speed considerably. This pain was eventually diagnosed as herniated discs in her neck, and ultimately it was discovered she had suffered nerve damage due to her arthritis that caused damage to her spine and constricted the openings where the nerves come out from the spinal cord to the extremities. Her past experience with Respondent Judge Mosman made her fearful of having another summary judgment issued against her if she could not get extensions of time to respond. Petitioner felt she was completely dependent on getting opposing counsel to agree to such extensions and ideally getting them to write the joint motions for such since it caused her so much pain to type. She sent Respondent LNV's counsel her medical records so they would understand the medical reason for such extensions. She explained

to them that she might need surgery and was undergoing tests. Petitioner was concerned when each time opposing counsel agreed to an extension and wrote the joint motion they never mentioned the extension was due to medical need but she felt helpless and could only agree to whatever they wrote.

When Petitioner's doctors completed the tests they determined she needed surgery and scheduled it for March 17, 2015. Petitioner phoned and emailed opposing counsel, including Respondent Ms. Richards several times to ask if they would agree to a medical continuance so she could have her surgery and time to recover. They never returned Petitioner's calls or emails so she had no choice but to write her own motion for medical continuance and filed it on March 2, 2015. [Doc # 24]. Respondent Ms. Richards and/or another opposing counsel on record wrote an objection [Doc # 25] stating they had no knowledge of any medical need and that the letter Petitioner's doctor wrote to the court looked like Petitioner had written it. On Wednesday March 11, 2015 Respondent Judge Mosman denied Petitioner's motion for medical continuance [Doc # 26]. Also on March 11, 2015 he denied Petitioner's motion for judicial notice of the Lorraine Brown criminal conviction [Doc # 28]. This order violated FRCP Rule 201. When the material to be noticed is "accurately and readily determined from sources whose accuracy cannot reasonably be questioned" (adjudicative facts are such) then Rule 201(c)(2) states: "The court must take judicial notice if a party requests it and the court is supplied with the necessary information." Respondent Judge Mosman pursuant to Rule 201(c)(2) did not have discretion to deny Petitioner's motion.

On March 11, 2015 Petitioner filed a response to LNV's objection [Doc # 31] and while she was at the clerk's office she was handed the two denial orders. Petitioner was shocked. She prepared and filed on March 11, 2015 an ex parte motion for a hearing for Friday March 13, 2015 which

was the last day possible because on Monday, the day before her surgery Petitioner had to coordinate with hospital staff to assure she had accommodation for her MCS. The ex parte motion doesn't show up on the docket so a copy is attached hereto as **Exhibit A**.

The denial order [Doc # 26] stated Petitioner needed an affidavit. On Thursday March 12, 2015 Petitioner filed a second motion for medical continuance [Doc # 35].  The hospital didn't have a notary so it wasn't possible to have the doctor's new letter he'd written on letterhead in affidavit form notarized.  The next day Petitioner wrote an affidavit and had it notarized to support her doctor's letter and her second motion for medical continuance and filed it on Friday March 13, 2015 [Doc # 37] and she filed a motion to dismiss [Doc # 36].

Unknown to Petitioner because the clerk didn't give her the order granting her continuance [Doc # 33] when she was there to file her second motion for medical continuance on March 12, 2015, Respondent Judge Mosman on March 12, 2015 had granted her medical continuance but only until April 7, 2015 in spite of the fact that Petitioner's doctor had written that she would need at least 90 days to recover.

The week before Petitioner's spinal surgery should have been a time for her to relax and prepare for surgery she instead was made extremely anxious and had to make numerous trips back and forth to and from her doctors offices, not just for medical purposes, but to acquire letters and medical records, and then back and forth to the courthouse to try to get a medical continuance that should have been granted as a matter of course.  In addition to anxiety and stress, these trips back and forth caused Petitioner to suffer excruciating physical pain. Petitioner believes it is unlikely an attorney or the client of an attorney with a medical need for a stay would have been treated this way.  This is not equal protection of the law.

Repeatedly Respondent District Court has deprived Petitioner of information specific to proper procedure which resulted in Petitioner being denied access to justice and her claims never being heard on their merit. Had Petitioner known in 2013 when she motioned the court for a medical continuance that she needed an affidavit from her doctors she could have obtained such and perhaps Case No. 3:12-cv-01681-MO would have not been summarily dismissed.

Petitioner filed a motion to dismiss [Doc # 36] on March 12, 2015 that she had been working on ever since she was served the summons. It was far from perfected but because she feared Respondent Judge Mosman would again deny her motion for continuance due to medical need she filed it. In spite of this being a poorly written pleading it raised the question of Respondent LNV's standing and therefore Respondent District Court's subject matter jurisdiction. Respondent Judge Mosman denied this motion for being untimely (procedural error not merits) [Doc # 72]. Petitioner has read that questions of standing and jurisdiction can be raised at any time. Respondent District Court made no attempt to address these questions.

Respondent Judge Mosman when he ordered a stay for medical reasons failed to extend discovery to correspond to the duration of the medical stay. Petitioner, as any reasonable person would, assumed when a stay is issued that discovery would extend with the stay so that after the stay ends nothing would be lost to Petitioner and she would still have the amount of time for discovery she would have had if the stay was not been needed. This was an act of discrimination against Petitioner as a pro se litigant and it caused her harm. If Petitioner needed to do something to preserve her right of discovery, Respondent Judge Mosman knew or should have known that as a pro se litigant she did not know this. Respondent Judge Mosman took a constitutionally mandated Oath of Office to uphold the United States Constitution. Petitioner and the Public believe this means he has a fiduciary duty to protect their rights to due process

and equal protection of the law when they are not in a position to do so themselves because they are too poor to afford an attorney; and/or too disabled to adequately protect their own interests; particularly when it comes to something as serious as losing one's property and their only home. Even though Respondent Judge Mosman finally did grant Petitioner an extension of discovery he severely and unfairly limited the scope of this discovery. Pro se litigants are disadvantaged in the arena of discovery. Petitioner had motioned Respondent District Court presided by Respondent Judge Mosman in Case No: <u>Case No. 3:12-cv-01681-MO</u> to appoint a pro bono counsel to assist her with discovery for this very reason. Respondent Judge Mosman did not appoint a pro bono counsel to assist Petitioner and no attempt was apparently made to do so. Had Petitioner been provided with such counsel the outcome of Case No: <u>Case No. 3:12-cv-01681-MO</u> would likely have been very different.  And because of this past experience Petitioner felt it was useless to ask in the present case.

Petitioner is not just disadvantage because she is a pro se litigant in litigation against a financially powerful opponent; her ability to effectively or even adequately represent herself is compromised by her disabilities.  By refusing to acknowledge and accommodate for her disabilities and her medical needs that directly result from her disabilities Respondent District Court and Respondent Judge Mosman have deprived Petitioner of meaningful access to justice and have deprived her of her right to a jury trial and to due process and to equal protection of law before depriving her of her property in violation of the seventh, fifth, and fourteenth amendments to the United States Constitution.  They have therefore deprived her of her civil rights under color of law.

## <u>DISCRIMINATION AGAINST PETITIONER DUE TO HER DISABILLITIES</u>

Petitioner's disabilities are referred to as "invisible" or "hidden" disabilities. This is because by looking at her other people do not perceive she's disabled. People with "invisible" disabilities face the same discrimination as those with obvious physical disabilities, but they face additional discrimination specific to their disabilities being "invisible" to others.

From the website (http://www.naric.com/?q=en/node/88) for the National Rehabilitation Information Center:

> "Most physical disabilities are usually visibly apparent. However, there are disabilities whose symptoms are less obvious and are considered to be invisible. Examples of these "invisible" disabilities include: mental conditions such as depression, anxiety, or schizophrenia; cognitive impairments related to stroke, brain injury, or Alzheimer's disease; and chronic pain conditions and autoimmune diseases such as fibromyalgia syndrome, reflex sympathetic dystrophy syndrome, lupus, rheumatoid arthritis, and various others.
>
> Individuals with invisible disabilities face the same issues in function, quality of life and discrimination as individuals with obvious physical disabilities. These issues include stigmatization; interpersonal relationships with friends, family, significant others, and co-workers; employment/job retention; and educational attainment. The primary difference is additional stigmatization they face because their disability is not readily apparent. Since many individuals with invisible disabilities appear able-bodied and/or healthy they receive constant scrutiny about their disability status from family, friends, co-workers, loved-ones, and society in general."

Included in Petitioner's **Exhibit B** is a letter written by Dr. Robin Bernhoft on April 22, 2012, as well as some of Petitioner's medical records from 2007 through 2012. Dr. Bernhoft reviewed Petitioner's medical records going back to the 1980s and provides a summary of her medical history from this time. Also included in **Exhibit B** is a letter written by Dr. Bernhoft on February 6, 2009 asking Petitioner's employer at the time to accommodate her disabilities. These letters and medical records explain how Petitioner's MCS symptoms have affected her work history. A letter dated November 19, 2008 is included in **Exhibit B** that Petitioner wrote to the apartment management for an apartment she rented when she worked in Los Angeles that shows that she required housing accommodations for her MCS disabilities in 2009; and continues to require

special housing accommodations. (Note: Petitioner paid $1,700/month in rent so when you have money you usually get what you ask for, but now she has a monthly income barely more than $1,000/month and the average rent for a small apartment in the Portland area is $1,000/month. This is causes a dilemma for many people on limited incomes but that dilemma is much worse what you have MCS and need special accommodation.) And finally included in **Exhibit B** are portions of a 1989 Qualitative Neuropsychological Evaluation by the St. Louis University Medical Center that resulted in Petitioner's ADHD diagnosis. This medical evaluation shows this Honorable Court of Appeals just impaired the tests show Petitioner is in terms of her memory and learning functions, her psychomotor functions, and her motor functions.  Quoting from this evaluation:

> "Her performance on the Wechsler Memory Scale-Revised, at first glance, suggest that her reported College performance is quite good given her very poor verbal memory index. Closer analysis suggests that she does indeed have difficulty with verbal memory probably secondary to problems with attention and concentration which seemed to have little effect on her visual memory functions.... It seems likely that she would have less trouble with the written information because of the visual input involved… At least one compensatory mechanism was in evidence during the assessment through her very structured way of organizing tasks when the opportunity was available. This Behavior tends to reduce distraction and would facilitate her learning. In all, this does suggest that she must work very hard for the grades that she gets and that her current compensatory mechanisms and motivations serve her well."

Petitioner in fact does work very hard to accomplish what others might be able do with much less effort.  She managed to excel in software and build a successful career when her college counselors thought she'd never achieve anything so lofty.  However, as Petitioner's ongoing medical records show her achievements were constantly overshadowed by the debilitating impact of her disabilities. She always struggled to achieve consistent performance; and it always eluded her.  As she aged the severity of her disabilities increased.  Petitioner is severely

handicapped as a pro se litigant; and as a result has been denied meaningful access to the court and to justice.

Petitioner believes Respondent District Court and Respondent Judge Mosman have discriminated against her because of the nature of her disabilities. Petitioner further believes that Respondent LNV intentionally exploited the "invisible" nature of Petitioner's disabilities with intent to cause Respondent District Court and Respondent Judge Mosman to discriminate against her.

## INTENTIONAL EXPLOITATION OF PETITIONER'S DISABILLITIES

It appears Respondent LNV intentionally selected an attorney, Respondent Ms. Richards, who is a c5 c6 quadriplegic to assure that Respondent District Court and Respondent Judge Mosman would have no empathy for Petitioner as a person with "hidden" or "invisible" disabilities.

Respondent LNV's motive was to cause prejudice against Petitioner by the stark contrast between Respondent Ms. Richards visible disabilities who still has the ability to function as a high powered attorney in contrast to Petitioner's "hidden" disabilities that severely impact her cognitive functioning and therefore her ability to effectively represent herself without accommodations; but whose impairment is invisible. The dichotomy between Ms. Richards' highly visible physical disabilities with her sharp mental capabilities compared to Petitioner's invisible disabilities that cause her unexpected and prolonged periods of mental fogginess and dysfunction was intentionally set up by Respondent LNV and resulted in exactly the kind of "unfair scrutiny" about Petitioner's disability status referred to on the National Rehabilitation Information Center's website. Respondent LNV encouraged the "additional stigmatization" faced by people like Petitioner "because their disability is not readily apparent" to others by contrasting Petitioner's claims of disability which others can't see against Respondent Ms.

Richards' obvious disabilities and her ability to overcome them and support herself as an attorney. This created unfair prejudice against Petitioner, as was Respondent LNV's intent when they selected Respondent Ms. Richards as their counsel against Petitioner.

It's estimated that around 17% of the population has mild symptoms of MCS. This means that many people know someone with milder forms of MCS. People with milder forms can still work and pretty much function in society. Petitioner had the milder form of MCS for many years and was able to function and hold down a good paying job. A much smaller percentage of the population has acute MCS that Petitioner now has; and Petitioner's roommate Linnie Messina has. The tendency is for the public to minimize the MCS symptoms of those with the more acute form of MCS because they know someone with MCS who can still function. The public doesn't understand how debilitating the acute form of MCS is and since people with acute MCS tend to be isolated from society because of the very nature of their symptoms that prevent them from socializing and being noticed; they are invisible members of society.

Petitioner had pled her disabilities in her original complaint in Case No. 3:12-cv-01681-MO and went into detail about how her home accommodated her MCS. She added as an exhibit to her complaint a memorandum legal opinion issued by HUD about MCS being a disability requiring accommodation under the Americans with Disabilities Act, ("ADA") and the Fair Housing Act. (42 U.S. Code Chapter 45 ) This HUD legal memorandum is attached as **Exhibit C**. Although Respondent LNV was named as a defendant in that case, LNV never made an appearance only MGC did, but MGC and LNV are both owned and controlled by D. Andrew Beal.

The reason Petitioner now has to live in her car is that she, like so many others with acute MCS, can't find a safe place to live where she won't be exposed to chemicals in the space where she

sleeps and spends most of her time. New construction materials are highly toxic to people with MCS. Petitioner's home was built in the 1950s before the widespread use of toxic building materials. No chemicals have been used inside the house or in the yard for many years.

Respondent Ms. Richards was made aware of the extent of Petitioner's disabilities and how they affected her ability to keep up with her emails and even her mail. Respondent Ms. Richards had complained in the past about Petitioner not responding to an email she sent. Petitioner explained to her that she gets hundreds of emails a day and if she is too sick for a day or a few days to check her email then important email gets lost in the hundreds of unimportant ones. Petitioner has told Respondent Ms. Richards that she needs to phone her when there is something important for her to know about – specifically because of Petitioner's disabilities. Respondent Ms. Richards intentionally exploited the symptoms of Petitioner's disabilities.

The intentional exploitation of Petitioner's known disabilities is what caused the egregious and completely unexpected displacement of Petitioner and Ms. Messina from Petitioner's home on or around February 10, 2016 while this appeal was still pending. Unknown to Petitioner because she was never served any summons, Respondent Ms. Richards on behalf of Respondent filed an eviction case in the Washington County District Court for the State of Oregon. If Petitioner had been given proper notice of this eviction case she most certainly would have made an appearance and defended her interests. Respondent Ms. Richards knew or should have know Petitioner was unaware of such court proceedings by the fact that she made no appearance to defend her interests.

After Respondent District Court/Judge Mosman granted Respondent LNV summary judgment to foreclose on Petitioner's home, and her appeal was terminated because:

1. she couldn't check the status of her appeal because Respondent Judge Mosman had blocked her from the District Court website and EFC system;

2. then she discovered after calling the 9th circuit they were awaiting payment of her fees (She assumed she was approved to file in forma pauperis since she was at the District Court but was told she needed to reapply);

3. then because of the holidays the 9th circuit support staff didn't register her with the 9th circuit EFC system in a timely way so she could upload her application to file in forma pauperis;

4. then as she was preparing to mail it they called to say she was given access but she wasn't able to upload it due to some technical problem with the system and she learned once approved she wasn't permitted to file any other way;

5. and then again due to the holidays the EFC support staff failed to respond timely causing her appeal to be terminated;

Petitioner became excessively despondent and stressed. On Dec 5th 2015 Petitioner experienced left side chest pains and her roommate, Linnie Messina, convinced her to go to the emergency room fearing she might be having a heart attack. The ER doctor detected a heart arrhythmia so Petitioner was admitted to the hospital. Later she was sent home with a Holt monitor and instructions to see a cardiologist who later determined what the ER doctor saw was a "pseudo arrhythmia" caused by muscle spasms caused by stress; and the Holt monitor detected she was having episodes of rapid heartbeat, which the cardiologist also attributed to high stress. (This is shown in Petitioner's medical records in **Exhibit B**. Around December 15th Petitioner fell in a way that twisted her leg and popped her knee causing a painful sprained ligament. And on December 20, her beloved dog who had been her constant companion for more than 15 years died. All these things together caused Petitioner to suffer an emotional and physical breakdown lasting several weeks.

## RELEVANT FACTS AND ISSUES PRESENTED

Petitioner, a pro se litigant, raised the question of whether Respondent LNV, a Nevada Corporation, had standing to foreclose on her property throughout her numerous pro se pleadings

in Case No.3:12-CV-1681 MO TER and Case No. 3:14-cv-01836 MO in Respondent District Court. Respondent Judge Mosman presided over both cases. Respondent Ms. Richards acted as counsel in behalf of Respondent LNV in No. 3:14-cv-01836 MO and referenced in her pleadings Case No.3:12-CV-1681 MO TER [Doc 5-3] where Petitioner was the plaintiff. These two cases are intricately interwoven and are in fact directly related cases. These two cases are also directly related to Case 3:15-cv-02002-MO TER, assigned to a different judge but where Respondent Judge Mosman had the case reassigned to himself and promptly dismissed it with prejudice before the defendants were even served.

The question of Respondent LNV's standing was raised by Petitioner in both Case No.3:12-CV-1681 MO TER and No. 3:14-cv-01836 MO   Whether LNV had standing was never fully addressed or adjudicated by Respondent Judge Mosman who was condescending towards Petitioner at the July Status Conference hearing. [Doc # 92-1]  Respondent Judge Mosman apparently thought Petitioner's challenge to Respondent LNV's standing rested solely on the authenticity of the Note and specifically the questioned authenticity of the Dana Lantry endorsement on what LNV submitted to the court as the genuine "Original" Note. Due to her disabilities Petitioner was unable to effectively express herself because she does poorly in verbal communications, even so what she did say at that hearing indicates to a reasonable person she was concerned with the authenticity of the assignments of deed of trust too.

A significant ruling specific to standing in foreclosure actions was recently issued from the California Supreme Court *YVANOVA v. NEW CENTURY MORTGAGE CORPORATION, Supreme Court of California, No. S218973, Filed February 18, 2016,* which overturned the Court of Appeal's decision and addressed standing to foreclose and homeowners standing to

challenge the authenticity of assignments of deed and a foreclosing party's standing to foreclose.

Quoting from the Order:

"The Court of Appeal concluded leave to amend was not warranted. Relying on _Jenkins v. JPMorgan Chase Bank, N.A._ (2013) 216 Cal.App.4th 497 (Jenkins), the court held plaintiff's allegations of improprieties in the assignment of her deed of trust to Deutsche Bank were of no avail because, as an unrelated third party to that assignment, she was unaffected by such deficiencies and had no standing to enforce the terms of the agreements allegedly violated. The court acknowledged that plaintiff's authority, _Glaski v. Bank of America, supra, 218 Cal.App.4th 1079 (Glaski),_ conflicted with Jenkins on the standing issue, but the court agreed with the reasoning of Jenkins and declined to follow Glaski.

We granted plaintiff's petition for review, limiting the issue to be briefed and argued to the following: 'In an action for wrongful foreclosure on a deed of trust securing a home loan, does the borrower have standing to challenge an assignment of the note and deed of trust on the basis of defects allegedly rendering the assignment void?'…

In itself, the principle that only the entity currently entitled to enforce a debt may foreclose on the mortgage or deed of trust securing that debt is not, or at least should not be, controversial. It is a "straightforward application of well-established commercial and real-property law: a party cannot foreclose on a mortgage unless it is the mortgagee (or its agent)." (_Levitin, The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title_ (2013) 63 Duke L.J. 637, 640.) Describing the copious litigation arising out of the recent foreclosure crisis, a pair of commentators explained: 'While plenty of uncertainty existed, one concept clearly emerged from litigation during the 2008-2012 period: in order to foreclose a mortgage by judicial action, one had to have the right to enforce the debt that the mortgage secured. It is hard to imagine how this notion could be controversial.' (_Whitman & Milner, Foreclosing on Nothing: The Curious Problem of the Deed of Trust Foreclosure Without Entitlement to Enforce the Note_ (2013) 66 Ark. L.Rev. 21, 23, fn. omitted.)

Unlike a voidable transaction, a void one cannot be ratified or validated by the parties to it even if they so desire. (_Colby v. Title Ins. and Trust Co., supra, 160 Cal. at p. 644; Aronoff v. Albanese, supra, 446 N.Y.S.2d at p. 370._) Parties to a securitization or other transfer agreement may well wish to ratify the transfer agreement despite any defects, but no ratification is possible if the assignment is void ab initio. In seeking a finding that an assignment agreement was void, therefore, a plaintiff in Yvanova's position is not asserting the interests of parties to the assignment; she is asserting her own interest in limiting foreclosure on her property to those with legal authority to order a foreclosure sale. This, then, is not a situation in which standing to sue is lacking because its "sole object . . . is to settle rights of third persons who are not parties." (_Golden Gate Bridge etc. Dist. v. Felt_ (1931) 214 Cal. 308, 316.)

Defendants argue a borrower who is in default on his or her loan suffers no prejudice from foreclosure by an unauthorized party, since the actual holder of the beneficial interest on the deed of trust could equally well have foreclosed on the property…

In deciding the limited question on review, we are concerned only with prejudice in the sense of an injury sufficiently concrete and personal to provide standing, not with prejudice as a possible element of the wrongful foreclosure tort. (*See fn. 4, ante.*) As it relates to standing, we disagree with defendants' analysis of prejudice from an illegal foreclosure. A foreclosed-upon borrower clearly meets the general standard for standing to sue by showing an invasion of his or her legally protected interests (*Angelucci v. Century Supper Club (2007) 41 Cal.4th 160, 175*)—the borrower has lost ownership to the home in an allegedly illegal trustee's sale. (See *Culhane, supra, 708 F.3d at p. 289 [foreclosed-upon borrower has sufficient personal stake in action against foreclosing entity to meet federal standing requirement].*) Moreover, the bank or other entity that ordered the foreclosure would not have done so absent the allegedly void assignment. Thus '[t]he identified harm—the foreclosure—can be traced directly to [the foreclosing entity's] exercise of the authority purportedly delegated by the assignment.' (*Culhane, at p. 290.*)

Nor is it correct that the borrower has no cognizable interest in the identity of the party enforcing his or her debt. Though the borrower is not entitled to object to an assignment of the promissory note, he or she is obligated to pay the debt, or suffer loss of the security, only to a person or entity that has actually been assigned the debt. (*See Cockerell v. Title Ins. & Trust Co., supra, 42 Cal.2d at p. 292* [party claiming under an assignment must prove fact of assignment].) The borrower owes money not to the world at large but to a particular person or institution, and only the person or institution entitled to payment may enforce the debt by foreclosing on the security.

It is no mere "procedural nicety," from a contractual point of view, to insist that only those with authority to foreclose on a borrower be permitted to do so. (*Levitin, The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title, supra, 63 Duke L.J. at p. 650.*) 'Such a view fundamentally misunderstands the mortgage contract. The mortgage contract is not simply an agreement that the home may be sold upon a default on the loan. Instead, it is an agreement that if the homeowner defaults on the loan, the mortgagee may sell the property pursuant to the requisite legal procedure.' (*Ibid., italics added and omitted.*)

The logic of defendants' no-prejudice argument implies that anyone, even a stranger to the debt, could declare a default and order a trustee's sale—and the borrower would be left with no recourse because, after all, he or she owed the debt to someone, though not to the foreclosing entity. This would be an 'odd result' indeed. (*Reinagel, supra, 735 F.3d at p. 225.*) As a district court observed in rejecting the no-prejudice argument, '[b]anks are neither private attorneys general nor bounty hunters, armed with a roving commission to seek out defaulting homeowners and take away their homes in satisfaction of some other bank's deed of trust.' (*Miller v. Homecomings Financial, LLC (S.D.Tex. 2012) 881 F.Supp.2d 825, 832.*)

Defendants note correctly that a plaintiff in Yvanova's position, having suffered an allegedly unauthorized nonjudicial foreclosure of her home, need not now fear another creditor coming forward to collect the debt. The home can only be foreclosed once, and the trustee's sale extinguishes the debt. (*Code Civ. Proc., § 580d; Dreyfuss v. Union Bank of California, supra, 24 Cal.4th at p. 411.*) But as the Attorney General points out in her amicus curiae brief, a holding that anyone may foreclose on a defaulting home loan borrower would multiply the risk for homeowners that they might face a foreclosure at some point in the life of their loans. The possibility that multiple parties could each foreclose at some time, that is, increases the borrower's overall risk of foreclosure.

Defendants suggest that to establish prejudice the plaintiff must allege and prove that the true beneficiary under the deed of trust would have refrained from foreclosing on the plaintiff's property. Whatever merit this rule would have as to prejudice as an element of the wrongful foreclosure tort, it misstates the type of injury required for standing. A homeowner who has been foreclosed on by one with no right to do so has suffered an injurious invasion of his or her legal rights at the foreclosing entity's hands. No more is required for standing to sue. (*Angelucci v. Century Supper Club, supra,* 41 Cal.4th at p. 175.)…

For these reasons, we conclude Glaski, supra, 218 Cal.App.4th 1079, was correct to hold a wrongful foreclosure plaintiff has standing to claim the foreclosing entity's purported authority to order a trustee's sale was based on a void assignment of the note and deed of trust. Jenkins, supra, 216 Cal.App.4th 497, spoke too broadly in holding a borrower lacks standing to challenge an assignment of the note and deed of trust to which the borrower was neither a party nor a third party beneficiary. Jenkins's rule may hold as to claimed defects that would make the assignment merely voidable, but not as to alleged defects rendering the assignment absolutely void.[13]

In embracing Glaski's rule that borrowers have standing to challenge assignments as void, but not as voidable, we join several courts around the nation. (Wilson v. HSBC Mortgage Servs., Inc., supra, 744 F.3d at p. 9; Reinagel, supra, 735 F.3d at pp. 224-225; Woods v. Wells Fargo Bank, N.A. (1st Cir. 2013) 733 F.3d 349, 354; Culhane, supra, 708 F.3d at pp. 289-291; Miller v. Homecomings Financial, LLC, supra, 881 F.Supp.2d at pp. 831-832; Bank of America Nat. Assn. v. Bassman FBT, LLC, supra, 981 N.E.2d at pp. 7-8; Pike v. Deutsche Bank Nat. Trust Co. (N.H. 2015) 121 A.3d 279, 281; Mruk v. Mortgage Elec. Registration Sys., Inc., supra, 82 A.3d at pp. 534-536; Dernier v. Mortgage Network, Inc. (Vt. 2013) 87 A.3d 465, 473.) Indeed, as commentators on the issue have stated: "[C]ourts generally permit challenges to assignments if such challenges would prove that the assignments were void as opposed to voidable." (Zacks & Zacks, Not a Party: Challenging Mortgage Assignments (2014) 59 St. Louis U. L.J. 175, 180.)

That several federal courts applying California law have, largely in unreported decisions, agreed with Jenkins and declined to follow Glaski does not alter our conclusion. Neither Khan v. Recontrust Co. (N.D.Cal. 2015) 81 F.Supp.3d 867 nor Flores v. EMC Mort. Co. (E.D.Cal. 2014) 997 F.Supp.2d 1088 adds much to the discussion. In Khan, the district court found the borrower, as a nonparty to the pooling and servicing agreement, lacked standing to challenge a foreclosure on the basis of an unspecified flaw in the loan's securitization; the court's opinion does not discuss the distinction between a void assignment and a merely voidable one. (Khan v. Recontrust Co., supra, 81 F.Supp.3d at pp. 872-873.)…

In further support of a borrower's standing to challenge the foreclosing party's authority, plaintiff points to provisions of the recent legislation known as the California Homeowner Bill of Rights, enacted in 2012 and effective only after the trustee's sale in this case. (*See Leuras v. BAC Home Loans Servicing, LP (2013) 221 Cal.App.4th 49, 86, fn. 14.*)[14] Having concluded without reference to this legislation that borrowers do have standing to challenge an assignment as void, we need not decide whether the new provisions provide additional support for that holding….

We conclude a home loan borrower has standing to claim a nonjudicial foreclosure was wrongful because an assignment by which the foreclosing party purportedly took a beneficial

interest in the deed of trust was not merely voidable but void, depriving the foreclosing party of any legitimate authority to order a trustee's sale...

The judgment of the Court of Appeal is reversed and the matter is remanded to that court for further proceedings consistent with our opinion."

Petitioner filed a motion for judicial notice of adjudicated fact in another recent decision by the Sixth Circuit Court of Appeals Case No. 13-3402, *Rick Slorp v. Lerner, Sampson & Rothfuss, et al* Originating Case No. : 2:12-cv-00498 [Doc # 60] also denied by Respondent Judge Mosman specific to a party's standing to foreclose and quoted by Petitioner in [Doc # 59 page 15] and again quoted here:

> *The district court held that Slorp lacked standing because he sustained no injury as a result of the assignment. In its view the foreclosure action "was filed because of his default under the terms of the Note and Mortgage; not because of the creation of the allegedly 'false' Assignment." Although the foreclosure action caused Slorp to incur legal fees, the court stated, he incurred those fees because he defaulted, "not because of the Assignment." Thus the district court held that Slorp sustained no injury attributable to the allegedly fraudulent assignment.*
>
> *This analysis suffers from one key error: It mistakes the source of the injury alleged in Slorp's complaint. Slorp does not attribute his injuries to the false assignment of his mortgage; rather, he attributes his injuries to the improper foreclosure litigation. According to the complaint, Bank of America (through LSR) filed a foreclosure action against Slorp despite its lack of interest in the mortgage; the defendants misled the trial court by fraudulently misrepresenting Bank of America's interest in the suit; and Slorp incurred damages when he was compelled to defend his interests. If Bank of America had no right to file the foreclosure action, it makes no difference whether Slorp previously had defaulted on his mortgage. Slorp's suit to recover damages caused by Bank of America's lawsuit satisfies each of the three components of Article III standing. That is all that is required for count one, which alleged a violation of the FDCPA—a federal statute. See Hollingsworth v. Perry, 133 S. Ct. 2652, 2667 (2013) (stating that "standing in federal court is a question of federal law, not state law"); see also Coyne v. Am. Tobacco Co., 183 F.3d 488, 495 (6th Cir. 1999). Slorp has established standing to seek relief under the FDCPA, and the district court erred when it held otherwise.*

To reintegrate, Petitioner's challenge to Respondent LNV's standing never rested solely on the questioned authenticity of the Dana Lantry endorsement on what LNV submitted to the court as the genuine "Original" Note.

**Petitioners Multiple Challenges to LNV's Standing Must Be Determined as a Whole**

The question of standing never rested solely on the questioned authenticity of the Dana Lantry endorsement on LNV's purported "Original" Note. The Dana Lantry Declaration [Doc 108] did not settle the question of authenticity specific to this endorsement because Dana Lantry admitted she did not recall signing the particular instruments pertaining to Petitioner's Mortgage.

Additionally the Dana Lantry Declaration completely contradicts what she said in the audio tape Petitioner submitted to Respondent District Court [Doc # 104]. Apparently Respondent Judge Mosman didn't listen to the audio tape. [Doc # 101-2] Dana Lantry very definitively said that she would not have signed any Allonges or Assignments for People's Choice Home Loans Inc. ("Peoples") in stark contradiction to what she stated in her declaration favoring Respondent LNV, not just because she was not an executive officer for Peoples, but because Peoples used MERS exclusively and MERS would have handled this. The Declaration of William J. Paatalo [Doc # 91 Case No. Case No.3:12-CV-1681 MO TER] shows that Petitioner's mortgage was at one point registered in MERS, yet there had never been an Assignment of Petitioner's deed of trust either to or from MERS recorded with Petitioner's county. The Paatalo declaration also definitively shows no Assignments of deed of trust were filed prior to Washington County instrument number **2006-077542**. (Note the Paatalo declaration was also filed as an exhibit to one of Petitioner's pleadings in Case No. 3:14-cv-01836 MO but Petitioner is unable to remember which pleading.)

This is important because instrument number **2006-077542** is suspect. It is an Assignment of Deed of Trust also endorsed by Dana Lantry. The fact that Respondent Ms. Richards failed to show Dana Lantry this suspect 2006 Assignment of Deed of Trust [Doc 108-1] also endorsed with her signature when she obtained the Dana Lantry Declaration shows intent to deceive

Respondent District Court because the Allonge that was shown to Dana Lantry conveys the Note to <u>Residential Funding Company LLC</u> ("RFC") while the 2006 Assignment of Deed of Trust [Doc 18-1 Exhibit C] **<u>NOT</u>** shown to Dana Lantry executed on December 29, 2005 assigns the Deed of Trust to <u>Homecomings Financial Network Inc.</u> ("HFN").

Respondent Ms. Richards and Respondent Judge Mosman both knew, or should have known, Petitioner challenged the authenticity of this 2006 Assignment. [Doc # 101-1 pg 2] And they both knew or should have known the implications this fact has on the issue of LNV's standing to foreclose on Petitioner's property. The appearance is that they attempted to cover this fact up by focusing exclusively on Petitioner's challenge to the authenticity of the Dana Lantry endorsement on the Note.

Although it has long been the law throughout the United States that when a note secured by a mortgage is transferred the transfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter. However in this case we have an Assignment of the security instrument to <u>HFN</u> that directly contradicts the corresponding Allonge that purports to convey the Note to <u>RFC</u>. Both these instruments are endorsed by the same person, Dana Lantry. Logic dictates that one or the other of these instruments must be a falsehood.

On August 27, 2008 two Assignments of the security instrument were recorded in Petitioner's county. Respondent Ms. Richards on behalf of Respondent LNV only submitted into Respondent District Court's record one of these two assignments; this omission also appears to have been made with intent to deceive. Petitioner has consistently challenged the authenticity of these two Assignments recorded in 2008 and has submitted copies of them into Respondent

District Court's record multiple times in both Case 3:12-CV-1681-MO TER and Case 3:14-cv-01836-MO. Attached hereto as **Exhibit D** are true and accurate copies of:

**2006-077542**  <u>Recorded on 06/28/2006</u> – An Assignment of Deed of Trust <u>executed on December 29, 2005</u> endorsed by Dana Lantry assigning beneficial interest from People's Choice Home Loan, Inc. ("PCHL") to HFN;

**2008-073971**  <u>Recorded on 08/27/2008</u> – An Assignment of Deed of Trust <u>executed on April 3, 2006</u> endorsed by Masse Adjetry assigning beneficial interest from HFN to RFC;

**2008-073972**  <u>Recorded on 08/27/2008</u> – An Assignment of Deed of Trust <u>executed on **March 10, 2008**</u> endorsed by Betty Wright assigning beneficial interest from RFC to LNV;

Facts stated on the face of these instruments are material to the question of whether Respondent LNV has standing to foreclose on Petitioner's property; and whether Respondent District Court had subject matter jurisdiction to grant LNV equitable relief.

Review of these three Assignments together, along with the suspect Allonges demonstrates that what Respondent LNV and Respondent Ms. Richards claim is the "Original" Note is more likely a forgery manufactured with intent to deceive and to harm Petitioner by depriving her of her rightful property.  Facts on the face of these instruments that defeat Respondent LNV's claims to standing specific to the authenticity of the suspect Note are:

1. **2006-077542** assigns security instrument from <u>PCHL</u> to <u>HFN</u> on December 29, 2005.  If a transfer of the note carries with it the security; then it can only be deduced the undated Dana Lantry endorsed Allonge conveying the Note to <u>RFC</u> would have also occurred on December 29, 2005. However this is impossible because…

2. **2008-073971** assigns security instrument from <u>HFN</u> to <u>RFC</u> on April 2, 2006.  No Allonge exists conveying the Note from <u>HFN</u> to <u>RFC</u>.  Respondent LNV submitted no such Allonge to its Complaint against Petitioner.  Respondent LNV cannot at any later date claim such Allonge exists because Petitioner saw no such Allonge when she

viewed and photographed what LNV claimed was her "Original" Note in Respondent Ms. Richards' office in August 2015. And Respondent LNV did not submit to Respondent District Court any such Allonge with its true and accurate copy of the "Original" Note [Doc # 1-1] [Doc # 5-1]. Michelle Connor in her Declaration [Doc # 54] also states:

> "People's Choice transferred the Note to Residential Funding Company, LLC ("RFC") by endorsing the Note to the order of RFC in an allonge and delivering the Note and allonge to RFC. Ex. 1, p. 6. RFC, in turn, transferred the Note to LNV by endorsing it to the order of LNV in an allonge and delivering the Note and allonges to LNV. Ex. 1, p. 7. Through the allonges, LNV became the holder of the Note."

This then verifies the fact that the Note was never a conveyed to or from <u>HFN</u>…

3. **<u>2008-073972</u>** assigns the security instrument from <u>RFC</u> to <u>LNV</u> on **March 10, 2008**. It can only be deduced the undated Jason J. Vecchio endorsed Allonge conveying the Note from <u>RFC</u> to <u>LNV</u> would have also been executed on **March 10, 2008**. However this is also impossible because Respondent LNV did not exist on **<u>March 10, 2008</u>**.

A non-entity, non-person lacks legal capacity to enter into a contract. Although corporations have the right to enter into contracts with other parties and to sue or be sued in court in the same way as natural persons or unincorporated associations of persons; the situation here is that Respondent LNV had not yet been incorporated on **<u>March 10, 2008</u>**. Respondent LNV entering into a contract with RFC on **<u>March 10, 2008</u>** as purported by instrument **<u>2008-073972</u>** prior to its date of incorporation would be on par with Petitioner entering into a contract before the date she was born. If a party sued a natural person for breach of contract where that contract on its face showed it was executed prior to the birth of the natural person, a court would have no trouble determining that the contract on its face is void (not voidable but void) because the

natural person had no capacity to enter into a contract before he/she was born. Since corporations are treated by courts as if they were natural persons, then just like with a natural person a corporation lacks legal capacity to contract before its birth (i.e. date of incorporation). Applying any other standard to this situation would result in an unequal and unconstitutional application of law.

Respondent LNV's certified Articles of Incorporation [Doc # 102-8], Nevada Secretary of State Document Number 20070180715-22, shows that Respondent LNV was not incorporated as an entity with capacity to contract until March 17, 2008. Petitioner raised these issues in [Doc # 89] and Respondent District Court made no attempt to resolve the question of whether Respondent LNV had legal capacity to contract pursuant to Nevada Statutes. If Respondent LNV had no capacity to contract on **March 10, 2008** then neither Petitioner's Note nor Petitioner's security instrument could have been legally been conveyed to Respondent LNV.

**THEREFORE** Respondent LNV lacked standing to foreclose on Petitioner's property; and lack of standing precludes jurisdiction so Respondent District Court lacked jurisdiction and should have dismissed Respondent LNV's complaint against Petitioner with prejudice.

Even if Respondent District Court concluded that Respondent LNV somehow had capacity to contract prior to its existence; Respondent LNV still operated outside Nevada law because it lacked the requisite business license to conduct business. [Doc # 102-8] The earliest date Respondent LNV could have obtained a Nevada business license was **April 14, 2008.** [Doc # 102-9]

If Respondent LNV conducted or transacted business with RFC outside the law, which it did as evidenced by the Assignment of deed of trust recorded in Washington County as instrument

number **2008-073972** that was executed on **March 10, 2008** then Respondent District Court was barred from jurisdiction via the Doctrine of Unclean Hands. Respondent District Court should have dismissed Respondent LNV complaint against Petitioner with prejudice.

As a Nevada corporation Respondent LNV is subject to Nevada law. Respondent District Court made no determination as to whether on **March 10, 2008** Respondent LNV was a legal entity with capacity to contract pursuant to applicable Nevada law. Nor did Respondent District Court make any determination as to whether Respondent LNV legally operated within the boundaries of applicable Nevada statutes. Such a determination of fact and conclusion of law is mandated to determine whether Respondent LNV operated legally and had "clean hands" which affects standing and jurisdiction.

### The Doctrine of Unclean Hands Defeats Respondent LNV's Claim of Standing

Foreclosure is considered an equitable remedy. The law requires a plaintiff seeking equitable relief to have "clean hands". A party who has violated an equitable principle is described as having "unclean hands." Someone who violates equitable norms cannot then seek equitable relief or claim a defense based in the law of equity. The doctrine of unclean hands applies to close the doors to equitable relief.

*Pomeroy's Equity Jurisprudence § 397* at 90 (5th Ed 1941) gives the full title to the doctrine as "He who comes into equity must come with clean hands" and explains at pages 91-2:

> "'It says that whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' (Emphasis in original.)"

And at pages 93-4:

> "'This fundamental principle is expressed in the maxim, He who comes into a court of equity must come with clean hands; and although not the source of any distinctive doctrines, it furnishes a most important and even universal rule affecting the entire administration of equity jurisprudence as a system of remedies and remedial rights.' See also *Martin v. Tikka*, 263 Or. 350, 500 P.2d 1209 (1972); *Merimac Co. v. Portland Timber*, 259 Or. 573, 488 P.2d 465 (1971); *Robinson et ux v. Manning et al*, 233 Or. 392, 378 P.2d 277 (1963); *Taylor et ux v. Grant et al*, 204 Or. 10, 279 P.2d 479, 279 P.2d 1037, 281 P.2d 704 (1955)."

The question of whether Respondent LNV had "unclean hands" in this matter requires a judicial determination as to whether LNV violated Nevada statutes by engaging in business transactions on **March 10, 2008** the date when Petitioner's Mortgage Note was conveyed to LNV as per the Jason J. Vecchio Allonge and Washington County instrument number **2008-073972** Assignment of Petitioner's deed of trust.

**Applicable Nevada Statutes**

Respondent LNV incorporated on **March 17, 2008** [Doc # 102-8] pursuant to ***NRS 78.020(2)*** which states:

> *"No trust company, savings and loan association, thrift company or corporation organized for the purpose of conducting a banking business may be organized under this chapter."*

Respondent LNV consistently refers to itself as a "bank" with courts and in its communications with Petitioner and other Beal/LNV/LPP victims and their attorneys, and with courts and other government agencies. Respondent LNV by its own admission conducts banking business; yet it incorporated as a non-banking entity in willful violation of ***NRS 78.020(2)***.

***NRS 76.100(1)(a)*** states:

> *"A person shall not conduct a business in this State unless and until the person obtains a state business license issued by the Secretary of State. If the person is an entity required to file an initial or annual list with the Secretary of State pursuant to this title, the person must obtain the state business license at the time of filing the initial or annual list."*

The Nevada Secretary Of State has verified that Respondent LNV is an entity required to file an initial or annual list of officers; and Respondent LNV filed its initial list of officers on April 14, 2008. [Doc # 102-9]  Therefore the earliest possible date Respondent LNV was legally authorized to conduct business in Nevada is **April 14, 2008**.  Dozens of assignments of security instruments executed on **March 10, 2008**, including the questioned Assignment of Petitioner's security instrument, attached as **Exhibit E** hereto show that Respondent LNV did in fact conduct business prior to April 14, 2008 in violation of NRS 76.100(1)(a).  These numerous **March 10, 2008** Assignments were filed into Respondent District Court's record, [Doc # 102-7] [Doc # 89] [Doc # 77] and Petitioner made arguments specific to LNV's standing as per Nevada statute, but Respondent Judge Mosman ignored them.

Respondent Judge Mosman knew, or should have known, Petitioner's claims as to Respondent LNV's standing to foreclose on her property included the fact that Respondent LNV did not exist as an entity or person with capacity to contract on **March 10, 2008** and that pursuant to *NRS 76.100(1)(a)* Respondent LNV was not permitted to conduct business prior to **April 14, 2008**.  If Respondent LNV did in fact conduct business prior to **April 14, 2008** it did so in violation of *NRS 76.100(1)(a)*.  This fact precluded Respondent District Court from jurisdiction. Respondent District Court and Respondent Judge Mosman should have dismissed Respondent LNV's complaint for foreclosure against Petitioner with prejudice.

"Where there is no jurisdiction over the subject matter, there is, as well, no discretion to ignore that lack of jurisdiction. See F.R.Civ.P. 12(h)(3), supra note 1." *Joyce v. United States, 474 F. 2d 215, United States Court of Appeals, Third Circuit, 1973.*

"A trial court acts without jurisdiction when it acts without 'inherent or common law authority, nor any authority by virtue of statute or rule....' *Webster*, 119 Md.App. at 598-99, 705 A.2d 151 (quoting *Cardinell*, 335 Md. at 391, 644 A.2d 11)." <u>*State v. Rodriguez*</u>, 725 A.2d 635 (Md. Ct. Spec. App. 1999). "When it clearly appears that the court lacks jurisdiction, the court has no authority to reach the merits. In such a situation the action should be dismissed for want of jurisdiction." <u>*Melo v. US*</u>, 505 F2d 1026. No. 74-1169, United States Court of Appeals, Eighth Circuit, 1974.

United States Supreme Court in <u>*State of MAINE et al., Petitioners, v. Joline THIBOUTOT, et vir., etc.*</u>; 448 U.S. 1 (100 S.Ct. 2502, 65 L.Ed.2d 555):

> "'When questions of jurisdiction have been passed on in prior decisions sub silentio, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.' Hagans v. Lavine, 528, 535, n. 5, 94 S.Ct. 1372, 1378, n. 5, 39 L.Ed.2d 577 (1974); see Monell v. New York City Dept. of Social Services, 436 U.S., at 663, 98 S.Ct., at 2022; United States v. More, 3 Cranch 159, 172, 2 L.Ed. 397 (1805). This rule applies with even greater force to questions involving the availability of a cause of action, because the question whether a cause of action exists—unlike the existence of federal jurisdiction—may be assumed without being decided. Burks v. Lasker, 441 U.S. 471, 476, and n. 5, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 404 (1979). Thus, the Court's ruling finds no support in past cases in which the issue was not squarely raised. Here, as in Hagans v. Lavine, supra, 415 U.S., at 535, n. 5, 94 S.Ct., at 1378, we must approach the question 'as an open one calling for a canvass of the relevant . . . considerations.'"

Although Petitioner raised the question of whether Respondent District Court had jurisdiction throughout her pro se pleadings, Respondent Judge Mosman ignored her jurisdictional question and proceeded to make rulings in this matter without determining jurisdiction. Petitioner now asks this Honorable Court of Appeals to adjudicate the question of whether Respondent District Court had subject matter jurisdiction to proceed in this case; and if not to vacate all Respondent Judge Mosman's orders in this matter and in Petitioner's related cases intertwined in this matter

and to immediately return possession of her property to her, and provide her restitution for the damages she has suffered from this ordeal.

Quoting the United States Supreme Court in _Rhode Island v. Massachusetts_, 37 U.S. 657, 718, 9L.Ed. 1233 (1838):

> "...now before us for consideration on a motion by the defendant to dismiss the bill for want of jurisdiction in the cause... However late this objection has been made or may be made in any cause in an inferior or appellate court of the United States, it must be considered and decided, before any court can move one further step in the cause; as any movement is necessarily the exercise of jurisdiction. Jurisdiction is the power to hear and determine the subject matter in controversy between parties to a suit, to adjudicate or exercise any judicial power over them; the question is whether on the case before a court, their action is judicial or extrajudicial, with or without the authority of law, to render a judgment or decree upon the rights of the litigant parties."

Petitioner believes this Honorable Court of Appeals will, as a matter of law, determine that Respondent District Court lacked subject matter jurisdiction based on LNV being a non-entity, non-person on **March 10, 2008** without capacity to contract when it purportedly acquired Petitioner's mortgage from RFC via the Allonge endorsed by Jason J. Vecchio and the Assignment of deed of Trust endorsed by Betty Wright and notarized by Diane M. Meistad.

Further Petitioner believes this Honorable Court of Appeals will, as a matter of law, determine that Respondent District Court lacked subject matter jurisdiction because Respondent LNV was not licensed to transact business until on or after April 14, 2008 and therefore conducted the transaction of conveyance on **March 10, 2008** as evidenced by the aforementioned instruments in violation of Nevada law invoking the doctrine of unclean hands to preclude Respondent District Court from jurisdiction.

However, just in case the Honorable Court of Appeals concludes Respondent LNV somehow had capacity to contract before it came into existence. And that even though Respondent LNV

transacted a contract or agreement with RFC before it was licensed to legally transact business in violation of <u>NRS 76.100(1)(a)</u> there are still other facts that undermine Respondent LNV's standing to foreclose on Petitioner's property. Petitioner humbly requests this Honorable Court of Appeals to adjudicate the following issues, even if it determines the aforementioned facts defeated LNV's standing, because these issues presented below have significant public interest.

## Other Facts Undermining the Authnticity of LNV's "Original" Note and Deed of Trust

Several additional facts evidenced in Respondent District Court's records in this case and in its related cases substantiate Petitioner's claim that the mortgage instruments Respondent LNV purport to be "Original" are in fact forgeries. Forged instruments convey nothing. Forgery is also a crime; and Petitioner and the Beal/LNV/MGC/LPP victims want the parties responsible for this crime criminally prosecuted and punished to the fullest extent of the law.

## LNV's Exhibits to its Complaint [Doc 1-2] and [Doc 5-2]

These two documents are the same. To illustrate the fraud apparent on the face of the instruments that Respondent LNV claims are "Original" and submitted to Respondent District Court as genuine Petitioner has attached as **Exhibit F** a copy of [Doc 5-2] with red boxes around the features on the face of this instrument that cause suspicion in the mind of any reasonable person as to its authenticity. Comments in red text have also been added to point out how these features throw into question the authenticity of this instrument and indicate that it is a digitally altered forgery.

Petitioner throughout her pleadings has claimed that these instruments are forgeries manufactured through the use of graphic arts software such as Adobe PhotoShop© by applying color to a black and white copy and printing the altered document in color to give

the appearance that the document is an genuine original instrument. Respondent LNV's exhibit to its amended complaint [Doc 5-2] shows characteristics of being just that.

Characteristics on [Doc 5-2] that indicate it is a forgery are that on the pages where writing or signatures exist in blue ink Petitioner's initials are also in blue ink, but on pages without any other writing or signatures in blue ink Petitioner's initials are black. Petitioner did not, and no reasonable person would have, switched back and forth between a black and a blue ink pen when signing the genuine instrument.

Discrepancies between Respondent LNV's claims and what can been seen on the face of the questioned instrument [Doc 5-2] would cause any reasonable person to suspect its authenticity. These discrepancies raise genuine questions of material fact specific to Respondent LNV's standing. Questions of material fact as to the authenticity of [Doc 5-2] warrant further discovery and not a summary judgment order favoring Respondent LNV as issued by Respondent Judge Mosman. [Doc # 111] [Doc # 116]

**Petitioner's Photographs of LNV's purported "Original" Note**

On August 21, 2015 Petitioner viewed and photographed a document Respondent LNV claims is Petitioner's genuine "Original" Note. Respondent LNV entered a black and white copy of this document into Respondent District Court's record [Doc # 1-1] and [Doc # 5-1].

Petitioner took close-up high resolution color photographs of the signatures and of her initials on this document because they appeared suspicious. These photographs are attached hereto as **Exhibit G**. Petitioner already submitted some of these color photographs to Respondent District Court [Doc # 101-1]. In [Doc # 101] Petitioner pointed out the fact that on the Dana

Lantry endorsement on the Note where it states "PAY TO THE ORDER OF Without recourse PEOPLE' CHOICE HOME LOAN, INC" the "S" appears to have been cut off. Part of the "S" is showing but the remainder of it is missing. In **Exhibit G** she has made a close-up of this endorsement on page 5 specifically showing this feature that is typical of electronically captured and "copied and pasted" or otherwise digitally altered images.

**\*\*\* NOTE\*\*\*** These photographs must be viewed in electronic format or printed in high resolution on photo quality paper to see the evidence of forgery being pointed out.

Petitioner's initials are at the bottom right corner of page 3 of **Exhibit G**. Inside the insert at the bottom of this page is a close up photograph of the same initials photographed with the camera set at its highest resolution and shown at 25% of its actual size. On page 6 of the **Exhibit G** is the same photograph at about 70% of its actual size. (Note Petitioner is uncertain how to submit the original photographs in .jpg format to this Honorable Court of Appeals otherwise she would do so because what she points out here is even more apparent in the full size images.)  The high resolution photograph of Petitioner's initials shows a distinctive black outline with an almost iridescent blue color inside the black outline.  An authentic pen stroke made with a blue ink pen should show an even color of blue throughout the stroke.  This black outline is indicative of digital alteration of a black and white digital copy filled with blue color to make it appear as if it were made with colored ink.

This raises a genuine question of material fact specific to the authenticity of what Respondent LNV claims is the genuine "Original" Note.  Such questions of material fact warrant examination by an expert in forensic document authentication and not a summary judgment order favoring Respondent LNV as issued by Respondent Judge Mosman.

**Suspect Jason J. Vecchio endorsed Allonge**

The authenticity of the Allonge endorsed by Jason J. Vecchio purporting to convey

Petitioner's Note to LNV is also highly suspect. In addition to the discrepancies already

pointed out with the suspect Dana Lantry endorsed instruments (i.e. the Allonge conveys to

RFC while the Assignment was to HFN; and the total lack of any conveyance of the Note to

HFN) several other Beal/LNV victims have **March 10, 2008** Assignments endorsed by either

Michael Mead or Betty Wright and notarized by Diane M. Meistad and Allonges conveying

their Notes to LNV endorsed by Jason J. Vecchio. Four of these Allonges to the Swift, the

Molina-Wohl, the Hardwick and the Gebhardt Notes were examined by Robin D. Williams

of OMNI Document Examinations ("OMNI"). On December 4, 2014 OMNI issued a

Preliminary Report [Doc # 101-3] with the following opinion:

> "The characteristics within the questioned signature Item Q-1, an Allonge to a
> Promissory Note for Chris and Marcia Swift and the evidence within the comparison
> documents, A-1, A-2 and A-3, Allonges for Tuli M. Wohl, Rhonda L. Hardwick and
> Catherine Gebhardt depicts that the signatures are duplicates of one another."

After these four, i.e. the Swift, the Molina-Wohl, the Hardwick and Gebhardt Allonges were

given to OMNI for examination Respondent LNV submitted the Jason J. Vecchio endorsed

Allonges to Respondent District Court in Petitioner's case and in the Robynne A. Fauley case

in the Respondent District Court (Case No: 3:13-cv-00581-MO and 3:15-cv-01422-HZ).

Photographs of these two Allonges, along with copies of the other four Allonges, and known

authenticate signatures of Jason J. Vecchio are included in attached **Exhibit H**. The

authenticated Jason J. Vecchio signatures include his authenticate Notary signature and his

signature on his own mortgage. These authenticate Jason J. Vecchio signatures do not

resemble the duplicate signatures on the questioned Allonges.

Also included in **Exhibit H** is a court document that shows in September 2010 the Hennepin County District Court of Minnesota granted Jason Vecchio's application for a change of name. On **March 10, 2008** when the questioned Allonges were purportedly signed by Jason J. Vecchio, his legal name was "Jason J. Vecchio-Smith" casting further doubt on the authenticity of Respondent LNV's Allonges; and not just in Petitioner's case but in the cases of the Swifts, Tuli Molina-Wohl, Rhonda Hardwick, Catherine Gebhardt and Robynne A. Fauley.

A genuine question of material fact exists specific to the authenticity of all these Allonges. This is just the tip of the iceberg because Petitioner and the other Beal/LNV/MGC/LPP victims have dozens of **March 10, 2008** Assignments all endorsed by either Betty Wright or Michael Mead and notarized by Diane M. Meistad assigning from RFC or MERS to Respondent LNV. Betty Wright, Michael Mead and Diane M. Meistad were all purportedly GMAC employees in 2008. A sampling of these additional Assignments is included in **Exhibit I**.

## Other Factors Relevant to Whether LNV Had Clean Hands

The dozens of other **March 10, 2008** Assignments are material to Petitioner's claims, as are the other Allonges purporting to convey the Swift, Fauley, Gebhardt, Molina-Wohl and Hardwick Notes to LNV with the duplicated Jason J. Vecchio signatures because they show the magnitude of illegal business transactions and potential fraud that Respondent LNV has engaged in; and gives evidence to a massive scheme to defraud, not just Petitioner, but dozens if not hundreds or thousands of other homeowners and courts.

Respondent LNV might attempt to excuse what has happened in Petitioner's case as accidental error or mistake, but a pattern of similar "errors" or misrepresentations shows willfulness and rebuts such a claim. Any reasonable person would consider it preposterous to think hundreds of **March 10, 2008** Assignments and Allonges are "errors".

Willful inequitable conduct invokes the Doctrine of Unclean Hands.  Illegality and fraud invoke the Doctrine of Unclean Hands.  Forgery is a crime in every state.  Mail and wire fraud are federal crimes.

Petitioner submitted into Respondent District Court a letter dated October 4, 2010  to MGC (servicer for LNV) from the Texas Attorney General [Doc # 69 pg 5] [Doc # 69-1 pgs 5 – 10] warning MGC that foreclosing using "robosigned" mortgage related documents was a violation of numerous Texas civil statutes as well as Texas penal code.  Attorney Peter G. Weinstock of Hunton & Williams LLP in a letter dated October 31, 2010 and cced to Beal employee Robert Ackerman stated: "MGC does not use 'robosigners' in its foreclosure process." [Doc # 69 pgs 5] [Doc # 69-1 pg 8 pp 3 under section 1. 2nd sentence & under section 2. 3rd sentence] attorney Weinstock states:

> "DMI advised MGC that DMI does not conduct foreclosures with affidavits with such characteristics."

To contradict this claim [Doc # 69 pg 7]:

> "In the Breitling case LNV submitted to the court an affidavit of Edward J. Bagdon to support its motion for summary judgment in _LNV v. Breitlings; Case No. DC-14-0405_.  The Beal victims collectively researched Edward J. Bagdon and located more than 100 mortgage related documents signed by him.  A comparison of 57 of these signatures show a high probability that at least five different individuals made these signatures.  Additionally Edward J. Bagdon signed these documents as a top executive officer of numerous different financial institutions when he was in fact not employed by any of them, but was an employee of DMI.  (Interestingly in his affidavit submitted to the court by the LPS affiliated law firm, Codilis & Stawiarski, in the Breitling case he fails to identify any employer.)  This behavior

by Edward J. Bagdon is consistent with the manner and means used by Lorraine Brown in the commission of her crimes where the United States claimed and the judges of the U.S. District Court for the Middle District of Florida determined Brown and her co-conspirators allowed other individuals to mimic their signatures and sign mortgage related documents without the requisite authority to do so. This collection of signatures consistent with "robosigning" purportedly made by Edward J. Bagdon, an employee of DMI, also disputes Beal/MGC attorney Weinstock's statement on page 2, number 2 of his letter: "DMI advised MGC that DMI does not conduct foreclosures with affidavits with such characteristics."

The numerous apparently "robosigned" **March 10, 2008** Assignments and Allonges containing the duplicated Jason J. Vecchio signatures along with the Texas Attorney General's warning to MGC shows the willfulness with which Respondent LNV violates civil statutes and penal code.

## Respondent LNV Connection with Crimes of Lorraine Brown

Petitioner filed a Motion for Judicial Notice of Information and criminal indictment and pleas agreement of Lorraine Brown _United States of America v. Lorraine Brown_, *Case No. 3:12-cr-198-J-25 MCR. (MD. Fla.)* [Doc # 64] [Doc # 64-1]

Lorraine Brown was indicted and convicted of for "Conspiracy to Commit Mail and Wire Fraud" pursuant to 18 U.S.C. 18 § 1341 and 18 U.S.C. 18 § 1343. Adjudicative facts in the criminal conviction of Lorraine Brown include:

1. Lorraine Brown committed her crimes through Lender Processing Services, ("LPS"). At the direction of Brown and other co-conspirators employees of LPS began forging and falsifying signatures of mortgage-related documents and filed them with property recorders offices across the country.

2. Lorraine Brown's co-conspirators used other unauthorized employees to sign mortgage-related documents on their behalf knowing that the documents would be notarized as if the co-conspirator has signed the document, when he/she had not.

3. Between 2003 and 2009 it is estimated that over I million fraudulently signed and notarized mortgage-related documents were produced through the crimes of Lorraine Brown and her co-conspirators and filed with property recorders' offices across the country.

Adjudicative facts from the Lorraine Brown criminal conviction are relevant to Petitioner's case because her property records recorded in Washington County Oregon show evidence that they were products of Lorraine Brown's, or her co-conspirators' crimes.

Agents for LNV and MGC include LPS Service Providers Northwest Trustee Services, RCO Legal, Codilis & Stawairski, Dovenmuhlhe Mortgage Inc. ("DMI") and many other law firms. DMI is referenced as a sub-servicer for MGC in the October 31, 2010 letter written by Attorney Peter G. Weinstock of Hunton & Williams LLP in response to the October 10, 2010 letter from the Texas Attorney General warning MGC about foreclosing using "robosigned" mortgage related documents. [Doc # 69-1 pages 5 to 10] MGC and DMI were both named as defendants in Petitioners 2012 complaint [Case No. 3:12-CV-1681 MO TER]. Former MGC employee, Bret Maloney verified that Respondent LNV uses the LPS Desktop computer system to create mortgage documents to perfect foreclosures in a deposition in the Swift case. The transcript of this deposition is attached as **Exhibit J**. In general the Bret Maloney deposition shows deception on the part of the Beal entities. Petitioner at the July 8, 2015 status conference hearing said she wanted to depose Bret Maloney [Doc # 92-1 Page 9 lines 3 - 10] as well as Michelle Conner. Petitioner also said she wanted to subpoena documents specific to the purchase agreement between GMAC-RFC and LNV. [Doc # 92-1 Page 9 lines 3 - 10] Respondent Judge Mosman asked Respondent Ms. Richards whether she thought interviewing Mr. Maloney would be relevant and Ms. Richards responded that she didn't know because she didn't "know who Mr. Maloney is." [Doc # 92-1 Page 16 lines 20 - 24] A couple hours later Respondent Ms. Richards emailed Ms. Dawn Stephans at the District Court and said "Mr. Maloney is a current employee of MGC Mortgage, a loan servicer for LNV" see **Exhibit K** attached hereto. Beal/LNV/MGC victims Samuel and JoAnn Breitling filed a clarification on July 13, 2015 and entered the Bret

Maloney transcript from the Swift case as an exhibit, [Doc # 53] in _Breitlings v. LNV et al_, Case No. 3:15-cv-00703-B in the U.S. District Court for the Northern District of Texas Dallas Division. On July 16, 2015 Respondent Ms. Richards sent another email to Ms. Stephans stating: "By way of update, Mr. Maloney is no longer an employee of MGC Mortgage, as of this morning." **Exhibit K**

**Bret Maloney Deposition**

Bret Maloney claimed to work at 7195 Dallas Parkway Plano Texas, [page 4 lines 22 & 23] but this address is an empty lot. [Doc # 56 pg 1 pp 6] [Doc # 102-15] Maloney later testifies in response to the question: "At 7195 Dallas Parkway there is actually a building?" Ans. "At the corner of 7195 Dallas Parkway and 6000 Legacy Drive Plano Texas there is a building, yes." Google maps (and other resources) show that the empty lot at 7195 Dallas Parkway is located across Tennyson Parkway so these two addresses cannot meet on the corner of Dallas Parkway and Legacy Drive. [Doc # 102-15] Bret Maloney later in the deposition testified that "They share the same location; LNV though is shown as being 7195 Dallas Parkway. 6000 Legacy Drive is actually the same physical address." [Page 123 lines 1 – 11] So why use different addresses? Unless it is to deceive and give the appearance that LNV and MGC are separate entities from Beal Bank, Beal Financial Corp., etc.

Bret Maloney confirms Respondent LNV and MGC are owned by the same party, Beal Financial Corporation. [Page 7 line 12 through page 8 line 17] Bret Maloney confirms MGC services mortgages for LPP Mortgage Ltd. ("LPP"), Respondent LNV and Beal Bank USA. [Page 9 lines 3 – 10] Bret Maloney says that CLMG Corp. is the custodian of the original loan documents and that CLMG, Property Acceptance Corporation and "LAC" Loan Acceptance Corporation are also affiliated companies underneath the same corporate structure. [Page 10 lines 2 – 19]

Bret Maloney agreed that when MGC as a servicer accepts payments from individual borrowers at some point MGC makes a lump sum payment to the owner of the loan. [Page 12 lines 6 – 21] However this contradicts what is shown by the Gebhardt $6,000 check made payable to MGC which was processed by and paid directly to Beal Bank SSB. [Doc # 59-1] [Doc # 69-2] [Doc # 102-11] The Gebhardt Jason J. Vecchio Allonge and her **March 10, 2008** Assignment of security instrument conveys her mortgage from RFC to Respondent LNV and not to Beal Bank SSB. MGC did not make a payment to any party in the Gebhardt case because the check stated on its face payable to MGC was deposited directly into an account for Beal Bank SSB.  This shows a co-mingling of assets between different Beal entities, in this case MGC and Beal Bank SSB; and not a mortgage servicing relationship between MGC and Respondent LNV.

Bret Maloney testified about the use of the LPS Desktop computer system [Page 18 lines 1 – 24] and confirms that the LPS Desktop system includes a "document scanning image system" and is a reporting system where "letters would be generated off the system". [Page 22 lines 3 to page 26 line 17]  This testimony connects Respondent LNV and its "mortgage servicer" MGC to Lorraine Brown's LPS.  (Respondent LNV submitted an Allonge in the Swift Case endorsed by Carol Chapman, who is on a list of "robosigners" from Sussex County Massachusetts Register of Deeds John L. O'Brien Jr.'s Office, and Carol Chapman is an author with LPS employees of a "how-to" manual for creating such fraudulent documents, and Carol Chapman's authentic signature on her notary application doesn't match her signature on the Swift Allonge and on dozens of other instruments she purported endorsed.  See **Exhibit KK** attached hereto.  Also in this exhibit is the Assignment to LNV in the Depew case endorsed by Bill Koch, also on John O'Brien's list of "robosigners.")

Bret Maloney testified that he is the only Senior Vice President of MGC [Page 28 lines 2 – 14] yet Michelle Conner signed a declaration under penalty of perjury as "Senior Vice President" of MGC in the Petitioner's case. [Doc # 54]

Bret Maloney states the Swift loan was "purchased from Residential Funding at or about April of 2008" [Page 32 lines 22 to page 33 line 21] yet the Swift Assignment of security instrument, as well as Petitioner's, Gebhardt's, Molina-Wohl's, Hardwick's, Fauley's, and dozens more, are all dated **March 10, 2008**.  Maloney claimed he knows the Swift loan was purchased at or around April 2008 because of the sales and purchase agreement.  (It's possible he was told to say this by Beal higher-ups who know LNV wasn't supposed to be conducting business before April 2008.)  This is why Petitioner wanted to subpoena this purchase agreement. [Doc # 92-1 Page 9 lines 3 - 10]  Petitioner in her motion to compel asked Respondent District Court to compel Respondent LNV to produce this sales and purchase agreement. [Doc # 89]

Bret Maloney was asked about a mark on the Allonge he brought to the deposition [Page 108 lines 16 – 24, and Page 172 – notice the floating "j"] this mark is a small lower case letter "j" and has been found on other Beal produced Allonges.  Attached as **Exhibit L** are photographs of the floating "j" phenonomen on the Youngblood Allonges.  These photographs also show how the same shade of blue is used for signatures on what Respondent LNV submitted to Respondent District Court as genuine "Original" Notes in Petitioner's case, in the Fauley case, the Youngblood cases; and in other Beal/LNV/LPP/MGC victim's cases.  (Petitioner went with Ms. Fauley to view and photograph her purported "Original" Note [Doc 69 pgs 6 & 7].)  None of these victims recall signing their genuine notes with a pen having that shade of blue ink. The fact that signatures on all these "genuine" Notes signed years and miles apart from each other are the same shade of blue is highly suspicious.

**Nevada Statutes Prohibit Establishing A Corporation for Fraudulent Intent**

*NRS 78.030(1)* states:

> *"A person shall not establish a corporation for any illegal purpose or with the fraudulent intent to conceal any business activity, or lack thereof, from another person or a governmental agency."*

Respondent LNV's address filed with the Nevada SOS and with its foreign corporation filing and license in Oregon and many other states is: 7195 Dallas Parkway, Plano, TX 75024.  This address is an empty lot.  [Doc # 56 pg 1 pp 6] [Doc # 102-15]  Mail sent to this address is force delivered to 6000 Legacy Drive, Plano, TX 75024 the address for Beal Bank SSB, Beal Financial Services, Beal Service Corporation and hundreds of other Beal corporate entities.

The 7195 Dallas Parkway, Plano, TX 75024 address is also the corporate address for Andy Beal's MGC [Doc # 102-15] which purports to be a mortgage servicer, but which appears to not have an IRS EIN number.  MGC provided consumers with numerous addresses for mailing their mortgage payments in addition to the 7195 Dallas Parkway, Plano, TX address; and many of these addresses are bogus.  Checks made payable to MGC show they were processed by and paid to entities other than MGC.  MGC in many cases claimed these consumers did not make their payments and proceeded to foreclosures based on such trumped up defaults.  One blatant example of this is the $6,000 check sent to MGC by Catherine Gebhardt on October 24, 2008; that was paid to Beal Bank SSB on October 29, 2008 [Doc # 59-1] [Doc # 69-2] [Doc # 102] [Doc # 102-11] and which MGC claimed in a letter to Gebhardt's Congressman that Gebhardt never paid. [Doc # 56 pg 1 pp 6] [Doc # 102-12]  The most obvious motive for using an empty lot for a corporate address and bogus addresses for consumers to send payments to would be to deceive.

**D. Andrew Beal is the sole director of LNV**

D. Andrew Beal is the sole director of LNV Corporation as evidenced by the Secretary

Certificate indorsed by Stephen J. Costas and the document titled: "Written Consent of the Sole

Director of LNV Corporation" identifying D. Andrew Beal as the "sole member of the Board of

Directors (the 'Board') of LNV Corporation, a Nevada corporation" and further identifying LNV

Corporation as the "Mortgage Loan Owner" verifying that LNV Corporation as an entity

engaging in banking activities, see **Exhibit M** attached hereto.

**Nevada Statutes And Corporate Fictions Or Alter Egos**

*NRS 78.747(1)* provides an exception for individual liability of a stockholder, director or officer
of a corporation when he acts as the alter ego of the corporation. *NRS 78.747(2)* states:

> *"A stockholder, director or officer acts as the alter ego of a corporation if:*
>> *(a) The corporation is influenced and governed by the stockholder, director or officer;*
>> *(b) There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and*
>> *(c) Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice."*

*NRS 78.747(3)* states:

> *"The question of whether a stockholder, director or officer acts as the alter ego of a corporation must be determined by the court as a matter of law."*

Respondent District Court and Respondent Judge Mosman made no such determination.

## CONSTITUTIONAL QUESTIONS

Pursuant to Federal Rules 28 U.S.C. § 2403 and 5.1 (a)( I) Petitioner raised a challenge to the

constitutionality of summary judgments. [Doc # 123] [Doc # 69] [Doc # 69-1] [Doc # 69-2]

Respondent District Court has not adjudicated the issue of whether summary judgments are

unconstitutional. This is a matter of great public interest. Petitioner has been injured multiple

times by summary judgments issued against her by Respondent Judge Mosman that resulted in the deprivation of her property without due process, without equal protection of law and without a jury trial in violation of the fifth, the seventh and fourteenth amendments to the United States Constitution.

Summary judgments are much more likely to be ordered against pro se litigants.  Petitioner has seen reports stating that more than 90% of pro se cases are summarily decided against the pro se litigants due to procedural err. Numerous pro se litigants across the country have been injured in the same way as Petitioner has. The questions and issues raised in [Doc # 123] [Doc # 69] [Doc # 69-1] [Doc # 69-2] warrant this Honorable Court of Appeal's attention.

On September 29, 2015 Petitioner went to the U.S. Attorney's Office in the federal courthouse and asked whether they had been notified about her Notice of Constitutional Questions. They had not so she gave an attorney her case number. Within ten (10) days of this visit Respondent Judge Mosman struck his Order granting Petitioner 30 days discovery to get an affidavit from Dana Lantry. [Doc # 109] [Doc # 110]  Then Respondent Judge Mosman issued his Opinion and Order granting LNV's motion for summary judgment [Doc # 111] [Doc # 112] ultimately ordering a Judgment of Foreclosure that included a monetary award on the Note. [Doc # 116].

It wasn't until after these judgments were issued that Petitioner learned Respondent Judge Mosman worked at the U.S. Attorney's Office in Portland before becoming a judge.  His drastic turn-around in the case after Petitioner's visit to the U.S. Attorney's Office appears to be more than just a coincident.

## JUDICIAL BIAS, ABUSE OF DISCRETION, AND MISCONDUCT WARRANTING DISQUALIFICATION

Respondent Judge Mosman should be disqualified pursuant to 28 U.S. Code § 144 and 28 U.S. Code § 455(a) from Petitioner's cases and all his orders should be vacated in Case No. 3:12-CV-1681 MO TER, Case No. 3:14-cv-01836 MO and Case No. 3:15-cv-02002-MO TER because his behavior towards Petitioner in this case gives cause for an objective observer to question his impartiality. He overstepped jurisdiction by ruling on Petitioner's motions [Doc # 120], [Doc # 122], and [Doc # 124]. Jurisdiction was with this Honorable Court of Appeals.

Furthermore Respondent Judge Mosman should be disqualified because he appears to have violated a mandatory recusal policy before proceeding to adjudicate Petitioner's cases beginning with Case No.3:12-CV-1681 MO TER.

Testimony of the Honorable Judge M. Margaret McKeown, United States Court of Appeals Ninth Circuit, Chair, Committee on Codes of Conduct of the Judicial Conference of the United States before the House Committee on the Judiciary Subcommittee on Courts and Competition Policy, Hearing on December 10, 2009:

> "First concerning financial interests, in the federal system – unlike in some state judicial codes – there is no "de minimis" exception for recusal based on a financial interest. Even owning a single share of stock in a party requires recusal. This bright line rule avoids any ambiguity about recusal as a result of equity holdings.
>
> Second, a judge cannot avoid recusal by placing assets in a blind trust, or by avoiding knowledge of the judge's financial holdings. The Code and recusal statue require a judge to be informed about the judge's and the judge's family members' financial interests…
>
> As an overlay to the random assignment process, the Judicial Conference requires all judges to use an electronic conflicts screening system to ensure that judges do not inadvertently fail to recuse based on financial interest in a party. Under this mandatory policy, each judge must develop a list of financial interests that would trigger recusal. Special conflicts-screening software is used to compare a judge's recusal lists with information filed in each case. The system flags potential conflicts, which enables the judge to decline an assignment or, if the case has been assigned, to recuse if necessary."

See Attached **Exhibit N** for full testimony

Petitioner named numerous corporate and financial industry related parties as Defendants in Case No.3:12-CV-1681 MO TER yet no evidence exists to suggest that Respondent Judge Mosman participated in this "mandatory policy" or used the special conflicts-screening software to determine whether he or a family member had a financial interest in any of the nearly 90 Defendants named in Petitioner's original complaint in 2012; or even in the twenty or so remaining Defendants named in her amended complaint.

Further quoting the testimony of the Honorable Judge McKeown:

> "In addition to the five specific mandatory recusal situations, Section 455 and Canon 3C also include a mandatory general disqualification requirement whenever the judge's impartiality might reasonably be questioned. The standard for determining disqualification under this principle is based on an objective determination. Thus the question is not whether the judge believes there is an issue of impartiality but rather whether an objective observer, or "reasonable person," might reasonably question the judge's impartiality."

There is not even a hint of impartiality in a situation where a judge accused of being biased against a party rules on that party's motion to disqualify as Respondent Judge Mosman did with Petitioner's motion. [Doc # 124] [Doc # 125]

Respondent Judge Mosman also granted Respondent LNV a monetary award on Petitioner's Mortgage Note when the debt on the Note was discharged through a Chapter 7 Bankruptcy on December 21, 2011. [Case No. 11-38010-tmb7] Quality Loan Servicing ("Quality") was the party attempting to collect mortgage payments from Petitioner. They failed to respond to Petitioner's qualified written requests pursuant to RESPA asking Quality to provide an accurate payment history and proof it had standing to collect payments from Petitioner. Petitioner had been so ill throughout most of 2010 and 2011 that she didn't even know there was a trustee sale scheduled on her home on September 16, 2011. Her former bankruptcy attorney called to inform her just days before the sale and filed the Chapter 7 in her behalf to stop the sale. Although

Petitioner was unaware that the debt on her Mortgage Note had been discharged Respondent Judge Mosman should have known this might have been the case and checked before issuing his order because Petitioner mentioned bankruptcies in her pleadings.

## **RELIEF SOUGHT**

1.  Petitioner seeks an Emergency Writ Of Mandamus from this Honorable Court of Appeals directing Respondents to immediately restore possession of Petitioner's property to her.

2.  Petitioner seeks a directive from this Honorable Court of Appeals to immediately vacate Respondent Judge Mosman's Order of Summary Judgment [Doc # 111] and Judgment [Doc # 116] because Respondent LNV never had standing to bring a complaint of equity against Petitioner, and as a result Respondent District Court was lacking in jurisdiction to grant such equitable relief.

3.  Petitioner seeks the disqualification of Respondent Judge Mosman pursuant to 28 U.S. Code § 144 and 28 U.S. Code § 455(a) from Petitioner's cases and the vacating of his orders in all three related cases because his behavior towards Petitioner gives cause for an objective observer to question his impartiality. Petitioner also seeks sanctions against Respondent Judge Mosman.

4.  Petitioner asks this Honorable Court of Appeals to sanction Respondent Ms. Richards for intentionally exploiting Petitioner's disabilities to orchestrate an eviction of Petitioner from her home without serving her so she had an opportunity to defend her interests.

5.  Petitioner asks this Honorable Court of Appeals to direct the Washington County recorder to purge the People's Choice Deed of Trust and all subsequent false records following it so as to restore to Petitioner a clear and unclouded title to her property.

6.  Petitioner asks this Honorable Court of Appeals to direct Respondent LNV to pay restitution for the damages and mental anguish caused to Petitioner.

## PETITIONER HAS NO OTHER ADEQUATE REMEDY FOR RELIEF

### The Extraordinary Remedy Of An Emergency Writ Of Mandamus Is Warranted

Petitioner is being forced to live under deplorable circumstances ever since the illegal sale of her home to Respondent LNV. She cannot find a safe affordable place to stay that accommodates her MCS. She spends her days going between parks and outdoor spaces, coffee shops, health food stores and visiting the few friends with less toxic homes where she can shower, write and re-charge her computer and phone. She has to sleep in her car so she can breathe fresher air at least during the night. She's endured night temperatures in the low 30s. Practically non-stop rain makes it a challenge for Petitioner to keep dry and warm. It's been extremely painful with her arthritis and fibromyalgia, and with a sprained ligament in her knee from an injury in mid-December 2015 for her to climb from the front to the back of her car to sleep each night.

She was not permitted to even get her clothes from her house. Someone else was allowed to go into her home later to retrieve a few things but they didn't bring the correct items so Petitioner has had only a couple pairs of jeans and few tee shirts that she can wear with one jacket to keep her warm. She can't borrow clothes or blankets due to her acute reactions to chemicals in laundry products. She can't wash her clothes in a washer or dryer where laundry products that

she reacts to have been used so this limits how often, where and how she can wash her clothes. She can't buy anything new because it typically takes multiple washes to remove toxic substances left on clothing from the manufacturing process or that adhere them while hanging in a store. Petitioner's belongings were all packed by strangers and put into three (3) 10' x 20' storage units made from pressed board; highly toxic to her. So spending time there causes her to have headaches and other reactive symptoms. Some friends helped her the other day and with five people working they only managed to go through and re-pack the first ten (10) feet on one (1) of these storage units. She has yet to find the things that can help her survive right now, like warm clothing. She must remove everything from these storage units and get it into her own 12' x 25' storage unit that is costing her $289/month before the end of April or she will have to pay more than a $1,000/month for the ones LNV selected. With her disabilities this will be a huge challenge. The realtor she was told to coordinate with so she can remove her travel trailer and take it to someone who will help her finish building it has been unresponsive and uncooperative.

Petitioner hasn't been able to cook or prepare her own food. With her dietary restrictions this is causing her to suffer gastro intestinal problems and she fears she's developing irritably bowel syndrome. Her head is full of sores. She's had sores inside her nose since the week she was evicted from her property that won't heal. She can't stretch her neck like she's supposed to because she seldom has a place to lay completely flat where she can use the machine her doctors got her. As a result she's experiencing neck pain she hasn't had in many months. She missed appointments for physical therapy and stress counseling during the couple weeks following eviction and hasn't been able to reschedule because she doesn't have the luxury of choosing how to spend her day.

Petitioner hasn't been able to visit with her precious twin grandbabies in more than two weeks, and has only been able to see them a couple times since being evicted because every moment that she can find access to a place to type, to electricity and to the internet she has to spend her time writing this pleading. This is emotionally devastating for Petitioner because her grandbabies are her source of joy in life and before being evicted from her own home she visited with them several times a week.

Linnie Messina is also now living in circumstances that have a negative impact on her health. She has provided an affidavit in support of this Writ.

## PETITIONER AND OTHERS WILL BE HARMED IN A WAY NOT CORRECTABLE ON APPEAL

The Appeal process can take a year or longer. Petitioner and Ms. Messina cannot continue to survive in the conditions they have been forced to endure since being evicted from Petitioner's home around February 10, 2016.

In addition to this harm already caused to Petitioner and Ms. Messina, Respondent LNV and Respondent Ms. Richard's former employer, Perkins Coie, who is representing Respondent LNV in the Fauley case are already using this case and Respondent Judge Mosman's Order of Summary Judgment [Doc # 111] and Judgment [Doc # 116] as precedence for the Fauley case. Respondent LNV's attorneys in the Gebhardt case did the same thing with Respondent Judge Mosman's Order of Summary Judgment in Case No.3:12-CV-1681 MO TER.

The scope and magnitude of harm already caused to Petitioner and others; and the harm that will continue to be caused to countless other Beal/LNV/MGC/LPP victims will become astronomical

if this Honorable Court of Appeals doesn't put an immediate end to the Beal/LNV fraud scheme. Petitioner and the other Beal/LNV/MGC/LPP victims deserve to be made whole again.

Petitioner admits she doesn't know how to make the right pleadings the way an attorney would, and this is probably all wrong, but the Supreme Court has make numerous decisions specifying that courts are to construe the pleadings of pro se litigants at a lesser standard that those of attorneys.

Petitioner prays this Honorable Court of Appeals will not dismiss her Emergency Writ because she didn't plead it right. She prays Your Honorable Justices will review it carefully. Petitioner thinks Respondent Judge Mosman didn't even bother to read most of her pleadings. Please think about what you would want done to make things right if this happened to you.

Respectfully Submitted,

/s/ Denise Subramaniam