IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Judge Carol A. Doyle |
| CHRISTOPHER T. SWIFT and) | |
| MARCIA A. SWIFT, ) | No. 12-35690 |
| ) | |
| Debtors. ) | Chapter 13 |

RULE 30(B)(6) DEPOSITION OF

BRET MALONEY

JULY 11, 2014

10:00 A.M.

Called as a witness herein, pursuant to the Federal Rules of Civil Procedure of the United States Bankruptcy Court, pertaining to the taking of depositions, before WENDY M. STRICKLER, C.S.R., License No. 084-003257, qualified and commissioned for the State of Illinois, taken at 900 Jorie Boulevard, Suite 150, Oak Brook, Illinois.


COUNSEL PRESENT:

    SULAIMAN LAW GROUP, by

    MR. PAUL M. BACH and

    MS. PENNY BACH

    900 Jorie Boulevard

    Suite 150

    Oak Brook, Illinois  60523


       appeared on behalf of the Debtors;



# CCR

# County Court Reporters, Inc.

County View Centre,  Suite 200
600 South County Farm Road  •  Wheaton, Illinois 60187
(630) 653-1622  •  FAX (630) 653-4119
CCR600@Ameritech.net

Bret Maloney
July 11, 2014

2

1  COUNSEL PRESENT: (Contd.)

2      FREEDMAN, ANSELMO, LINDBERG, by

       MR. CHRIS IARIA

3      1771 W. Diehl Road

       Suite 120

4      Naperville, Illinois  60563

5          appeared on behalf of the Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Bret Maloney
July 11, 2014

3

1                        I N D E X

2    WITNESS:                              PAGE

3    BRET MALONEY

4         Examination by Mr. Bach            4
          Examination by Ms. Bach          108
5         Examination by Mr. Iaria         122

6

7

                         E X H I B I T S

8

     Deposition Ex. No. 1                    5
9    Deposition Ex. No. 2                   38
     Deposition Ex. No. 3                   40
10   Deposition Ex. No. 4                   43
     Deposition Ex. No. 5                   61
11   Deposition Ex. No. 6                   63
     Deposition Ex. No. 7                   74
12   Deposition Ex. No. 8                   74
     Deposition Ex. No. 9                   74
13   Deposition Ex. No. 10                  83
     Deposition Ex. No. 11                  90
14   Deposition Ex. No. 12                  91

15

16

17

18

19

20

21

22

23

24

Bret Maloney
July 11, 2014

4

1    MS. REPORTER:  My name is Wendy Strickler.  I

2  am affiliated with County Court Reporters, Inc.  My

3  address is 600 S. County Farm Road, Wheaton, Illinois,

4  60187. The date is July 11, 2014.  The time is 10:05

5  a.m., and we are at 900 Jorie Boulevard, Oakbrook,

6  Illinois.  The deponent's name is Bret Maloney.

7                    (Witness sworn.)

8    MR. BACH:  Let the record reflect that this is

9  the Federal Rules of Bankruptcy Procedure, Rule 30(b)(6)

10  Deposition of Bret Maloney, which is taken pursuant to

11  Notice that was previously given and ordered to occur by

12  today by the Honorable Judge Cassling.

13                BRET MALONEY,

14  called as a witness herein, having been first duly

15  sworn, was examined and testified as follows:

16                EXAMINATION

17            BY MR. BACH:

18  Q.    Sir, could you please state your name.

19  A.    It's Bret Maloney.

20  Q.    Can you please spell it.

21  A.    B-R-E-T, M-A-L-O-N-E-Y.

**This address is an empty lot**

22  Q.    And what is your business address?

23  A.    7195 Dallas Parkway, Plano, Texas, 75024.

24  Q.    And who are you employed by?

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

5

1     **A.**   MGC Mortgage, Inc.

2     Q.   Okay. Do you know why you are here today?

3     **A.**   **Yes.**

4     Q.   And why is that?

5     **A.**   **For a deposition in regards to the Swift**

6 **bankruptcy.**

7                   **(WHEREUPON, Deposition Exhibit**

8                   **No. 1 was marked for**

9                   **Identification as of this**

10                 **date.)**

11 BY MR. BACH:

12    Q.   Okay. Now, before we get -- I am going to

13 show you what I have marked as Maloney Deposition 1,

14 which is here, and I have a copy for your Counsel, which

15 is just a Notice of Deposition.

16         Have you seen this document before?

17     **A.**   **I have.**

18     Q.   And when did you first see it?

19     **A.**   **I first saw it a couple of months ago, when I**

20 **was asked to be the witness to attend the deposition.**

21    Q.   Prior to seeing this document and hearing

22 about this deposition, had you ever had any contact with

23 the Swift case before?

24     **A.**   **Not that I am aware of, no.**

Bret Maloney
July 11, 2014

6

1    Q.   Have you ever talked to Marcia Shift or to

2  Chris Swift?

3    **A.   Not that I recall.**

4    Q.   Okay.  Now, have you reviewed that document?

5    **A.   Yes.**

6    Q.   Now, this document is pursuant to -- as you

7  heard me say just a couple minutes ago, pursuant to

8  Federal Rules of Civil Procedure 30(B)(6).  Do you know

9  what that means?

10   **A.   No.**

11   Q.   A 30(B)(6) deposition allows me to take a

12 statement from a designated officer, director of a

13 party, and it allows -- it has a list of inquiries to

14 which you are -- by disclosing you as a witness, you are

15 the most knowledgeable person, or the person able to

16 answer all of these.

17             Have you read the entire list of topics

18 that we intend to talk about today?

19   **A.   Yes.**

20   Q.   And are you prepared to talk about all those

21 topics?

22   **A.   Yes.**

23   Q.   What did you review today in order to prepare

24 for this deposition?

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

7

1     A.   I reviewed the original notes, I have reviewed

2  the mortgage, the assignments of mortgage.  I have

3  reviewed the servicing notes, the payment histories, the

4  foreclosure default letter, correspondence, the

5  pleadings, both bankruptcy docs., the bankruptcy plans.

6  I am trying to recall what else I reviewed.  I think

7  that's about it.

8     Q.   Okay.  Well, we will get into the actual list

9  in a second, and that you have seen it.  A lot of the

10  purpose of this deposition, as far as I am concerned, is

11  to clear up a lot of questions that I have regarding the

12  facts, okay?  Originally, there were documents by LNV

13  Corporation.  You have told me that you are employed by

14  MGC Servicing.

15          Let's start with you telling me about the

16  relationship between those two entities.

17     A.   Okay.  MGC Mortgage, Inc. is the servicer for

18  LNV Corporation.

19     Q.   Okay.  Is that always the case?

20     A.   Yes.

21     Q.   Is there -- Are they owned by the same

22  parties?

23     A.   Yes.

24     Q.   And who is that?

**Confirming MGC and LNV are owned by the same entity**

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

8

1    A.    Beal Financial Corp.

2    Q.    Beal Financial Corp.  I have also seen Beal

3    Bank U.S.A., and that is that is a Federal bank as far

4    as I could -- as far as I could tell.  Is that not

5    true?

6              MR. IARIA:  Can you define or -- It's kind of

7    ambiguous.  Can you define, "Federal bank?"  Do you mean

8    like FCC insured?

9              MR. BACH:  That's part of what I am saying.

10   But from what I am seen, it's called Beal Bank U.S.A.,

11   which usually means that it's a bank.  It's not an

12   important point, but what is the -- what is the

13   relationship between Beal Bank as well as the other two

14   entities that you have already mentioned?

15   A.    They are all affiliated companies under the

16   same corporate umbrella underneath Beal Financial

17   Corporation.

18   Q.    So if I understand that -- please correct me

19   if I am wrong -- that they are really one -- They are

20   different entities.  I understand that from a legal

21   perspective.  But there are different functions that are

22   carried out by each one.  Is that really what it is?

23   A.    No.  They are different entities that are made

24   up underneath that corporate umbrella.  I don't think

Bret Maloney
July 11, 2014

9

1   there is any -- I don't know as far as the functionality

2   goes.

3      Q.   Okay.  Does MGC only service for Beal Bank --

4   Beal -- I forgot the other entities that you

5   mentioned -- Beal, the management -- It sounds like

6   they are a parent company?

7      A.   MGC Mortgage, Inc. services for Beal Bank --

8      Q.   That's what I want to know.

9      A.   -- LLP Mortgage, LNV Corporation and Beal Bank

10  U.S.A.

11      Q.   Those are the only ones, correct?

12      A.   We do have a relationship where we are

13  servicing and own some loans that are, I believe, Fannie

14  Mae, but it's a very small number.

15      Q.   Meaning that they are owned by Fannie Mae or

16  that they are -- or they are Fannie Mae-type loans,

17  which are -- which are --

18      A.   They are owned by Fannie Mae, serviced by MGC.

19      Q.   Okay.  Do you have an idea of what percentage

20  of the business that that would be?

21      A.   Less than half a percent.  I mean, it's very

22  small.

23      Q.   Okay.  Is there also a relationship between

24  CLMG Corp.?

Bret Maloney
July 11, 2014

10

1      A.    There is.

2      Q.    And what is CLMG Corp.?

3      A.    CLMG Corp. is the commercial loan servicer

4  underneath that same corporate umbrella.  CLMG Corp.

5  also is the custodian of the original loan documents.

6      Q.    So they keep all original loan documents for

7  whom?

8      A.    For all of those different entities that I

9  have previously mentioned.

10     Q.    And how about Property Acceptance

11 Corporation?

12     A.    Also another affiliated company underneath

13 that same corporate structure.

14     Q.    Okay.  Are there any other -- besides the ones

15 we have talked about, besides that, any other affiliated

16 companies?

17     A.    LAC, Loan Acceptance Corporation.  Those are

18 the only ones that I am aware of that are tied to the

19 residential side.

20     Q.    And what does LAC, Loan Acceptance

21 Corporation, do?

22     A.    I am not quite sure, because I don't have very

23 much involvement with them, other than I know that they

24 purchase loans on behalf of the other entities.

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

11

1    Q.   Is there a reason why certain loans are held

2 by LNV or Beal Bank?

3    **A.   That, I am not aware of how that -- How the**

4 **loans go into which investor.**

5    Q.   Now, is there a contract between all of these

6 different entities on how this is one?

7    **A.   Again, I am not aware of that.**

8    Q.   So you don't know if there is a contract -- I

9 will just give you an example -- between MGC, who you

10 said that you were employed by, and Beal Bank?

11    **A.   No.  There is a servicing agreement between**

12 **Beal Bank and MGC.**

13    Q.   Okay.  Is this also the same servicing

14 agreement -- the same servicing agreement from LNV and

15 MGC?

16    **A.   Yes.**

17    Q.   It has the same sort of terms is what you're

18 saying?

19    **A.   As far as the servicing agreement, yes.**

20    Q.   And what sort of terms are those?  I am

21 looking for a general idea.

22    MR. IARIA:  Objection to vague.

23    THE WITNESS:  It's just talks about the

24 servicing of the loans and the relationship of MGC being

Bret Maloney
July 11, 2014

12

1  the servicer for those different entities.

2  BY MR. BACH:

3      Q.   Okay.  Does it include that MGC accepts funds

4  on behalf of the other companies and then writes them a

5  check for the loan payment?

6      A.   I would have to look at the agreement to see

7  specifically if that's mentioned in there.

8      Q.   I am just trying to understand.  Like if MGC

9  gets a loan payment from somebody, the Swifts, or

10  anybody else, and it's $2,000, okay, because I know a

11  lot of servicing agreements you don't have to pay to the

12  investors and people actually own the loan because

13  that's who would get the money.

14      A.   Right.

15      Q.   I would guess there is some sort of an

16  agreement that says that at that point MGC would then

17  write the check to the owner of the loan, which could be

18  in this case, Beal Bank U.S.A. or LMV or one of the

19  other companies you mentioned.  Does that sound about

20  right?

21      A.   It sounds about right.

22      Q.   Okay.  Now, besides the companies we

23  mentioned, you said, "on the residential side."  What

24  did you mean by that?

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

13

1     A.   I work on the residential side of MGC

2  Mortgage.  There is a commercial division under the

3  CLMG.  There may be different entities over there.  I

4  don't know all the different entities that they have or

5  investors that are set up under the CLMG side.

6     Q.   Now, do most of them have an address for 7195

7  Dallas Parkway?

8     A.   The LMV does, MGC does.  I believe Beal and

9  LPP is 6000 Legacy Drive.  It's actually the same

10  building, just two different streets that merge.  Some

11  are listed under 6000 Legacy Drive, the others are

12  listed under 7195 Dallas Parkway.

13     Q.   What's the difference between one or the

14  other, if you know?

15     A.   I don't.

16     Q.   At 7195 Dallas Parkway, there is actually a

17  building?

18     A.   At the corner of 7195 Dallas Parkway and 6000

19  Legacy Drive, there is a building, yes.

20     Q.   Now, before we get into a lot of other topics,

21  why don't you give me an idea about about your

22  educational history.

23     A.   Okay.  I have a Bachelor of Business

24  Administration, graduated in 1993 from Steven F. Austin

Bret Maloney
July 11, 2014

14

1   State University.  That's located in Nagodoches, Texas.

2       Q.   And you have had no education beyond

3   Bachelor's degree, correct?

4       A.   **That's correct.**

5       Q.   And how about your employment history?

6       A.   **How far do you want to go?**

7       Q.   Why don't you give me an idea, when did you

8   start with the Beal Group of companies.  I will just

9   call it that way.

10      A.   **December of 2000, I started, and I did leave**

11  **for one year, and that was from June 2007 through August**

12  **2008.  I worked for Saxon Mortgage in Fort Worth, and**

13  **then I came back.**

14      Q.   Why was that?

15      A.   **Because I --**

16          MR. IARIA:  Objection, relevance.

17          MR. BACH:  He mentioned it.

18      A.   **I enjoyed working for the Beal Corporation.**

19      Q.   That's all I expected you to really say.  It

20  was more just a curiosity.  You said you left, so it's a

21  little unusual to leave one firm and then come back to

22  another.  That's the point I was trying to make.

23              Before 2000, when you started working for

24  the Beal Group of companies, did you work for another

Bret Maloney
July 11, 2014

15

1    banking institution or do other types of jobs before

2    that?

3        A.   No, other types of jobs before that.

4        Q.   So the first time you had any access, any

5    experience with banking, was about 2000, correct?

6        A.   December 2000.

7        Q.   And why don't you give me an idea of the type

8    of positions that you have held.  I assume you have

9    always worked for MGC, correct?

10       A.   MGC, since August 2008 until present.

11       Q.   Okay.  So who did you technically work with

12   before August 2008?

13       A.   Saxon Mortgage from June 2007 to August 2008.

14   It was Beal Service Corporation from December of 2000

15   through June of 2007.

16       Q.   Was that just a change in name or was that a

17   separate company that no longer exists?

18       A.   There was a change in the name.  Beal Service

19   Corporation still does exist, but the residential side

20   change to MGC Mortgage in early 2008.

21       Q.   So it was more of a split between the

22   residential and the commercial, correct?

23       A.   Yes.

24       Q.   Now, getting back to the deposition, I

Bret Maloney
July 11, 2014

16

1  initially asked you when you first had -- you said a

2  couple months ago, okay.  We had agreed upon you had

3  some problems with your family I understood, correct?

4      A.   Yes.

5      Q.   With your father-in-law is what I understood,

6  correct?

7      A.   Yes.  He went in the hospital for three weeks

8  and then eventually passed.

9      Q.   I'm sorry to hear about it.  That's why we

10  kept continuing it, because family is much more

11  important than anything in law or a court case, and I

12  get that, and you have my condolences for that.

13      A.   And I appreciate that.  Thank you.

14      Q.   Then we set it for June 5th, and then we had

15  some legal issues that came up.  Did you have a plane

16  ticket to come here on June 5th?

17      A.   I did.

18      Q.   Okay.  So you were going to arrive on June 4th

19  of that day?

20      A.   Yes.

21      Q.   But you did have travel arrangements for that

22  day, correct?

23      A.   Yes.

24      Q.   Okay.  Now, we spent some time talking about

Bret Maloney
July 11, 2014

17

1    the Beal Group of companies in terms of the servicing

2    and all those sort of things.  Do they have the same

3    computer system that they share?

4         **A.   On the residential side, yes.  Commercial side**

5    **uses a totally different system.**

6         Q.   I am obviously more interested in the consumer

7    residential side.

8         **A.   Right.**

9         Q.   For obvious reasons.  So why why don't we just

10   confine ourselves to that for right now.

11        **A.   Okay.**

12        Q.   But it's the same computer -- from what I

13   understand, it's the same computer system, whether the

14   loan is technically owned by Beal Bank U.S.A. or it's

15   owned by LMV, correct?

16        **A.   That is correct.**

17        Q.   Now, in terms of computer systems, what

18   software is being used, LPS Mortgage Platform?  Did you

19   use LPS for any functions?

20             MR. IARIA:  Objection, vague.  I don't

21   understand the question.

22   BY MR. BACH:

23        Q.   By LPS, you mean Lender Processing Services,

24   correct?

Bret Maloney
July 11, 2014

18

1     **A.**   **Correct.**

2     Q.   Besides for the computer platform, do you use

3 them for -- Do you use them for anything else?

4         MR. IARIA:  Objection.  Ambiguous.  I don't

5 know where you're going with this, by functions or

6 anything else.  If you can just clarify.

7 BY MR. BACH:

8     Q.   You have a computer system that was written --

9 the software was written by LPS, correct?

10     **A.**   **Yes.**

11     Q.   You obviously get computer services from

12 them.  Do you use them for -- to find attorneys to

13 represent you in various matters?

14     **A.**   **You're talking about LPS Desktop?**

15     Q.   Yes.

16     **A.**   **Our subservicer does.**

17     Q.   Who is the subservicer?

18     **A.**   **Dovenmuehle.**

19     Q.   What's Dovenmuehle's -- I know they are --

20 dobin Mule is in not too far from here, in Lake Zurich.

21     **A.**   **That's correct.**

22     Q.   What is their function in all of this?  I got

23 some names we mentioned a little bit earlier.

24     **A.**   **They are the subservicers for our Legacy**

Bret Maloney
July 11, 2014

19

1    portfolio.  They handle all the day-to-day operations.

2        Q.    When you mean Legacy portfolio, what do you

3    mean?

4        A.    The loans that are owned by each of those

5    different entities, that there is no other -- Let me

6    clarify this.  I have two portfolios.  One is a Legacy

7    portfolio wholly owned between all those different

8    investors, then another portfolio that's under an

9    agreement with the FDIC with a loss-share agreement,

10   segregated with the different subservicers.

11       Q.    Also a different subserviceer?

12       A.    Cenlar.

13       Q.    Cenlar handles the one that has also shared

14   agreements is what you're saying?

15       A.    Correct.

16       Q.    That's a different -- every other loan is a

17   Legacy loan besides that, correct?

18       A.    That is correct.

19       Q.    Which meant -- just so I make sure we're on

20   the same page -- I understand it was a loss-share

21   agreement.  That usually means that the FDIC had taken

22   over another bank.  You bought assets from the FDIC,

23   correct?

24       A.    Correct.

Bret Maloney
July 11, 2014

20

1    Q.    And then the FDIC and who then who enters into

2 an agreement?  Would it be one of these companies that

3 we have talked about or were there specialized -- Is

4 there a certain -- It's only Cenlar you mentioned?

5          MR. IARIA:  Objection, relevance to this

6 case.

7          MR. BACH:  I am just trying to understand the

8 whole thing.

9    A.    The owners of the loss-share ones are under

10 Beal Bank and LPS Mortgage, and those are all being

11 serviced by Cenlar.

12    Q.    So Legacy could have any of the ones we

13 discussed already, correct, or Legacy is part of the

14 Legacy portfolio?

15    A.    Everything else outside of the FDIC loss

16 year.

17    A.    C-E-N-L-A-R.  Cenlar.

18    Q.    Who owns the LPS Mortgage Platform?  Is the

19 program actually sold to you or is it on a lease

20 agreement?

21          MR. IARIA:  Objection, relevance.

22          THE WITNESS:  I don't know.

23 BY MR. BACH:  That's fine.

24    Q.    What does LPS Mortgage Platform do on a

Bret Maloney
July 11, 2014

21

1   general basis, what kind of functions does it serve?

2            MR. IARIA:  Objection, vague and relevancy.

3            THE WITNESS:  It's where all loan information

4   is housed with regards to where payment applications are

5   made, where the notes are documented on the system.  It

6   has, you know, each of the different areas of

7   functionality, bankruptcy, loss mitigation, foreclosure,

8   the different templates that would be opened up for

9   those different areas.

10       Q.   So it basically takes care of any function

11  within -- that you would need to service a loan,

12  correct?

13       A.   Yes.

14       Q.   Is there anything it does not take care of?

15       A.   Can you be more specific?

16       Q.   I don't know.  I don't know much about

17  mortgage.  That's not my job.  I am just wondering.  It

18  takes care of all the functions basically that you would

19  need, it sounded like, but that was more just to

20  conclude that?

21       A.   I think everything that is needed for the

22  daily operations to servicing the loan would be in that

23  system.

24       Q.   So it takes care of accounting, management and

Bret Maloney
July 11, 2014

22

1    reporting, all of those things, correct?

2        A.    Correct.

3        Q.    Now within the plat -- the LPS Mortgage

4    Platform, how does it keep images or copies of documents

5    that are related to a particular file?

6        A.    Anything that's entered onto the records, such

7    as the notes or the payment history transactions, that

8    is kept on the system.  Any of the letters or any

9    letters, correspondence, all that would be in a document

10   scan imaging system that's separate from that system.

11       Q.    Can you access it from the LPS Platform?

12            MR. IARIA:  Objection.  Can you

13   specify, "accessed?"

14   BY MR. BACH:

15       Q.    Meaning if you're looking -- Let's just be

16   blunt, as I say.  If you're looking at the Swifts'

17   account, okay, if you're looking at the Swifts' account,

18   if there are letters that were sent to them, can someone

19   pull them up?

20       A.    Yes.  You would have access to that document

21   scanning image system, but not from inside the LPS

22   System.

23       Q.    How would you have to get them?

24       A.    You would have to have access to that

Bret Maloney
July 11, 2014

23

```
 1   platform.

 2        Q.   Okay.  So maybe I guess we will go back.  So

 3   copies of documents are kept on a different platform

 4   than the LPS Mortgage Platform?

 5        A.   Yes.  So if it shows that a letter was

 6   transmitted -- The letters would be generated off of the

 7   system if there was anything sent out to the loans.  The

 8   document would then be scanned and imaged into a

 9   document scanning imaging system, and then it would be

10   housed in that system.

11        Q.   So if someone wanted to get a copy of letters,

12   how would they do it?

13        A.   Would go into the document imaging system, put

14   in the loan number, and then it would pull up the list

15   of the documents, and you would go there and select the

16   document that you're requesting.

17        Q.   So it's not a difficult thing.  And how long

18   would that take?

19        A.   Seconds, minutes.

20        Q.   Now, is the same thing true is if as part of

21   the escrow -- I am just trying to understand your

22   system -- as part of the escrow you make -- you pay some

23   taxes, you pay some real estate taxes, right?

24        A.   Mm-hmm.
```

Bret Maloney
July 11, 2014

24

1      Q.    There is obviously -- at least if I am going

2  to pay something, I want to keep an invoice and I want

3  to have a copy of the check which shows that it was sent

4  out.  Is that done as well in the same way?

5      A.    It would be imaged, yes.

6      Q.    Okay.  Is that part of the LPS Platform or

7  part of the other platform that we were discussing?

8      A.    It would be -- the actual transaction would

9  take place in the transaction.  In the payment history

10 notes, it would show if a payment was disbursed.

11     Q.    Right.

12     A.    The checks and/or statements or invoices, as

13 you will, would have been scanned and imaged into the

14 document imaging system.

15     Q.    So you would have kept the invoice, correct,

16 or a copy of the bill that you were paying?

17     A.    Yes.

18     Q.    And it would be very easily accessible,

19 correct?

20     A.    It should be, yes.

21     Q.    And the same would be true if, for instance,

22 there was -- let's say many times mortgage servicers

23 choose to do property inspections of properties that are

24 in foreclosure, correct?

25

1    A.    Say that one more time.

2    Q.    Property inspections.

3    A.    Okay.

4    Q.    Okay.  I see them quite often on proof of

5    claims, that's why I know that they happen.

6    A.    Sure.

7    Q.    So you have a property inspection that takes

8    place, and obviously the person that goes out to the

9    property wants to make sure that they get paid for their

10   work.  They send you an invoice and you send them a

11   check.  Is the same information cataloged for that type

12   of transaction?

13   A.    Yes.

14   Q.    And it's easily accessible, as you said, all

15   someone has to do is just print it out?

16   A.    Yes.

17   Q.    Are there additional -- Strike that.  How does

18   the software system track delinquencies?  Does it tell

19   you when someone hasn't paid after the 15-day grace

20   period?  Do you get a report?

21   A.    Yeah.  I mean, you would have a report that

22   would, of course, pull it to see which loans are

23   actually delinquent at that point.  But, yes, it would

24   be report-generated.

Bret Maloney
July 11, 2014

26

Q.   Does the software automatically charge a fee
for like a late -- for like a late payment after 15
days, or does it require a human to actually assess it?

A.   The late fees are set up in the computer
system.  It's programmed in there.  I am not an IT tech
guy, so --

Q.   That's fine.

A.   I couldn't explain that, but it's set up based
on the terms of the note.  So if the note says on Day 16
that we need to assess a late fee of five percent of
whatever it says in the note, then it would assess that
to that loan at that point in time.

Q.   So we're going to come back to a little more
discussion because we're going to pull out the pay
history and go through it line by line in a little bit,
but let's move on to some of the other basic things that
I have.

MR. IARIA:  Paul, just as a -- Sorry to cut
you off here.  We do have some additional documents
regarding pay history and some other charts that you
weren't in possession of.  I don't know if you want to
go off the record for a second and take a look, and
maybe the version we have here is the numbers are done
in a way that's probably easier to follow for the

Bret Maloney
July 11, 2014

27

1    purposes of a deposition.

2             MR. BACH:  Is it the XLS spread sheet I have

3    heard so much about?  Looks sort of like that?

4        A.    Yes.

5        Q.    How many copies?

6        A.    I brought four or five copies of that.  There

7    is two separate ones.  Once includes from origination to

8    the first bankruptcy, and then everything subsequently

9    after it was dismissed.

10       Q.    Well, are there any other documents you

11   brought with you just so I know ahead of time?  Besides

12   the original stuff?  I can go get that.

13       A.    I did.  When you were talking about the

14   invoices before, we also put together this, and I can

15   take it out if you want me to, if you want to make

16   copies.  It shows the POC breakdown on the summary for

17   the charges and everything is color coated, and the

18   corresponding invoices that are tied to each one of

19   those different charges.

20       Q.    Okay.  And I can keep these, correct?

21       A.    Yeah.  This will be yours.  I have extras as

22   well.

23       Q.    Okay.  Leave that there.  Let's go through a

24   couple more of the basic things and then we can go back,

Bret Maloney
July 11, 2014

28

1 and I appreciate that.

2      A basic question is that I have is before

3 you got involved -- and obviously I can see from your

4 card that you are a senior vice president -- I am

5 guessing that's what SVP stands for, correct?

6     A.  **That is correct.**

7     Q.  Could be special vice president, but I didn't

8 think that they would do that to you.  But I assume that

9 you are pretty high up in the chain of command,

10 correct?

11     A.  **Within MGC, yes.**

12     Q.  How many -- I will ask this question.  How

13 many senior vice presidents are there?

14     A.  **Under MGC, I am the only one.**

15     Q.  Okay.  And you have default management because

16 that's basically what -- Are there any other functions

17 besides that that someone else takes care of or do you

18 take care of all the vice presidential type things, or

19 are there other vice presidents that takes of other

20 things which are not a senior vice president?

21     A.  **There is another vice president who is vice**

22 **president of operations and compliance, and then there**

23 **is my CCO who would be above me.**

24     Q.  Okay.  Mr. Beal has a position there, too?

Bret Maloney
July 11, 2014

29

1    A.    Owner.

2    Q.    Okay.  Owner.  But he doesn't have any items

3  of responsibilities type things?

4    A.    Not that I am aware of, no.

5    Q.    Do you have contact with him on a regular

6  basis?

7    A.    I do not.

8    Q.    Did anybody at MGC or any of the other Beal

9  companies assist you in getting ready for this

10  deposition?

11    A.    Yes.

12    Q.    And who with that be?

13    A.    Chris Whiteley.

14    Q.    How do you spell that, please?

15    A.    W-H-I-T-E-L-E-Y.

16    Q.    Okay.  Anybody else?

17    A.    Israel Brown.

18    Q.    Anybody else?

19    A.    No.

20    Q.    And what are both of their job functions?

21    A.    Chris is the bankruptcy quality control

22  analyst and Israel is a default analyst.

23    Q.    Are they located in the office in Texas?

24    A.    Yes.

Bret Maloney
July 11, 2014

30

1      Q.    They are both employees of MGC?

2      **A.    Correct.**

3      Q.    What was Israel's job again?  I'm sorry.

4      **A.    Default analyst.**

5      Q.    I'm sorry.  Before you got involved, who was

6    responsible for this file, meaning the Swifts' file?

7              MR. IARIA:  Objection.  Specify a time

8    period.

9    BY MR. BACH:

10     Q.    Let us say from the time the case -- let's go

11   from the time the case was filed.

12             MR. IARIA:  The second bankruptcy?

13   BY MR. BACH:

14     Q.    The second bankruptcy, meaning that would have

15   been in October of 2012, if I remember correctly.

16     **A.    I don't know who exactly was responsible for**

17   **this file.**

18     Q.    Was it being done out of Chicago, out of

19   Texas, meaning Dovenmuehle, is what I am getting at.

20     **A.    It would have been done out of Dovenmuehle.**

21     Q.    It was being done by someone at the facility

22   in Lake Zurich, correct?

23     **A.    Correct.**

24     Q.    I wanted to ask you about something.  I will

Bret Maloney
July 11, 2014

31

1  get to that in a second.  Who is Grant Hamilton?

2      A.    **Grant is the vice president of operations and**

3  **compliance, and he is also associated general counsel.**

4      Q.    Is he out of Texas as well?

5      A.    **He is.**

6      Q.    And all three have the same address as you,

7  correct?

8      A.    **That's correct.**

9      Q.    So sitting here today, you don't have any

10 knowledge about who at Dovenmuehle was handling the

11 Swifts' case, correct?

12     A.    **The specific person?**

13     Q.    Yeah,?

14     A.    **No.**

15     Q.    A department?

16     A.    **Their bankruptcy department.**

17     Q.    Okay.  Could you determine who at Dovenmuehle

18 was handling it?

19     A.    **I would be able to find out, yes.**

20     Q.    Okay.  Would that be available on the

21 servicing notes that you mentioned that you reviewed

22 today?

23     A.    **I don't think so.  I mean, there are notes**

24 **that are entered in there by multiple individuals.  So**

Bret Maloney
July 11, 2014

32

1  as far as who was specifically assigned that file, I

2  wouldn't be able to tell from the notes.

3      Q.    And maybe it's just my ignorance.  As you

4  probably have guessed, I am a debtors attorney.  I have

5  never worked in foreclosing mortgages or worked on that

6  side, so I am not trying to sound like I am being

7  condescending or anything like that.  Perhaps you can

8  explain to me in this type of a bankruptcy department

9  that's dealing with loans that are in default, is a

10  specific person assigned to them or is it more just a

11  general responsibility?

12      A.    I don't know.

13      Q.    Now, from -- we talked about -- now I am going

14  to take what we talked about.  We talked about during

15  the second bankruptcy you didn't know -- it was someone

16  at Dovenmuehle that was handling it up until the time

17  that this deposition was scheduled.  Now, before that,

18  during the first bankruptcy, do you know, was it

19  different than who was responsible for the Swifts' loan?

20      A.    The first bankruptcy, the loan was being

21  serviced by GMAC.

22      Q.    Okay.  So the Beal Group of companies did not

23  own the loan until when?

24      A.    The loan was purchased from Residential

Bret Maloney
July 11, 2014

33

1    Funding at or about April of 2008.

2        Q.    And how do you know that?

3        A.    The purchase and sales agreement that we

4    have.  Also, when we actually receive the original note,

5    it's documented in our master tracking system in our

6    document control department.  It shows you when the

7    original loan was actually received.

8        Q.    Which is that other company -- I put that

9    chart away -- was the other company that you mentioned,

10   the name, and I can't --

11       A.    CLMG.

12       Q.    GMAC, they bought it in April of 2008 is what

13   you testified?

14       A.    LNV purchased the loan.

15       Q.    In April of --

16       A.    At or around April 2008.

17       Q.    Why don't we just get into the -- You said

18   that you had the original note, correct, with you?

19       A.    Yes.

20       Q.    And why don't we get that out and go from

21   there and we can do that.

22       A.    I have a copy of the original note and

23   original allonge.

24       Q.    So what I have been handed -- let me just do

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

34

1    it for the record -- is a manila folder with a yellow

2    sticker on it with a date of 3-4 of 2012, and says, "One

3    of one.  Priority not assigned foreclosure files," and

4    it says, "Michelle Lewis."  What is that, the sticker?

5            MR. IARIA:  If I could, that's a sticker from

6    my firm.  Michelle Lewis is a document custodian at

7    Freedman Anselmo Lindberg.

8    BY MR. BACH:

9        Q.    That's what I wanted to know.  It's

10   written, "Swift/A" on it by your firm then, correct?

11           MR. IARIA:  Correct.  And I presume that that

12   would be a folder created by Michelle Louis, but I don't

13   know.

14           MR. BACH:  Okay.  I don't want to attach

15   this.  Perhaps we can make a paper copy that we can make

16   a deposition exhibit.

17           MR. IARIA:  If you want to.

18           MR. BACH:  I don't want her to have to keep

19   it.  I want to be able to give it back to you.

20           MR. IARIA:  Of course.

21           MR. BACH:  So perhaps we can have a copy made

22   of these documents without removing the staple and I

23   won't touch that.  Maybe we can do that.  Give me two

24   minutes and I will have that done so we have a

Bret Maloney
July 11, 2014

35

1   deposition exhibit and go through that.

2          MR. IARIA:  Sure.  The only thing I would

3   suggest is maybe if you're going to try and do copies of

4   all the originals, if we go through it.

5          MR. BACH:  That's fine.  Are there other

6   documents of originals?

7          MR. IARIA:  Correct.

8          MR. BACH:  Why don't we get them all out.

9   That's an excellent --

10         MR. IARIA:  I am going to have to go off the

11  record and watch the copying process.

12         MR. BACH:  I have no problem with that at

13  all.  So this is an additional --

14     A.   **This is an additional allonge from LNV to Beal**

15  **Bank U.S.A.**

16     Q.   Is there a mortgage?  Did we find the

17  mortgage?

18     A.   **We have a certified copy from the county.**

19     Q.   So we don't have the original, correct?

20         MR. IARIA:  My firm is not in possession of

21  the original.

22         MR. BACH:

23     Q.   Do you know if CLMG Corporation has the

24  original?

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

36

1    A.   No.

2    Q.   So as far as you know, the original is

3  missing?

4    A.   The original mortgage, yes.

5    Q.   Now, do we have the collateral file as well?

6    A.   It's right here.  That's why I am pulling some

7  of my orignal docs out of it.  Original assignment,

8  recorded assignment from LNV to Beal Bank, U.S.A.,

9  assignment of mortgage from MERS to LNV Corporation.

10           MR. IARIA:  Don't forget the exhibits.

11           THE WITNESS:  Sorry.

12           MR. BACH:  We are going to do this two

13  different ways.  We are going to make copies so we can

14  have an exhibit to that.  Let's go off the record for a

15  second.

16                        (Off the record.)

17           MR. BACH:  Let's go back on the record.  We

18  went off the record for a second, and I want to make it

19  for the sake of the record, what we did.  The deponent

20  brought -- the deponent and his attorney brought with

21  him some original documents, the note -- the note which

22  was, as I said before we went off the record, was

23  contained -- the original note was contained in a

24  document from Freedman, Anselmo, Lindberg, LLC, that was

Bret Maloney
July 11, 2014

37

1   kept probably -- I am guessing -- when the file was sent

2   to them for foreclosure purposes.

3           MR. IARIA:  I think that's an accurate

4   statement.  If you open up the first page, it has

5   actually more detailed information.  I think someone

6   signs for it.

7           MR. BACH:  It has a date of June 20, 2011?

8           MR. IARIA:  Correct.  I think that would be

9   their releases to us.

10          MR. BACH:  Okay.  And what we have done is --

11  so that the document, which is the original note, we did

12  not want to remove the staple of the way it is as --

13  when it was brought -- when it was brought in and shown

14  to me.  So we have taken a copy -- because it was

15  difficult to copy it.  We have taken a copy from the

16  Proof of Claim that was filed in this bankruptcy case,

17  which is 12 B 35690, and it's part of Claim 17-1, Part

18  3, which is the top of the document which we are going

19  to say is Deposition Exhibit No. 2.  And I am labeling

20  that Maloney Dep Exhibit 2.  Okay.  So this is Dep.

21  Exhibit 2.

22

23

24

Bret Maloney
July 11, 2014

38

1          (Whereupon, Deposition Exhibit

2          No. 2 was marked for

3          Identification as of this

4          date.)

5  BY MR. BACH:

6      Q.   Now, I am going to hand to you what we have

7  labeled Dep Exhibit No. 2, and the manila folder that

8  has the original note, and ask you to compare them and

9  tell me if there is anything different about them?

10     A.   Yes.

11     Q.   You're saying yes to what?

12     A.   There is a difference between the copy that

13  was provided in the claim and the actual original.

14     Q.   And what is that?

15     A.   There is an extra endorsement on here from RFC

16  to LNV Corporation, Inc., that is not attached to the

17  original note.

18     Q.   Okay.  So there is allonge missing that was

19  attached to the Proof of Claim, but it's not with the

20  original, correct?

21     A.   No.  The one -- the two that are attached here

22  are to LNV from RFC.  One of them was drawn up

23  incorrectly.  It included the LNV Corporation, Inc., so

24  when somebody sent these for the Proof of Claim, they

Bret Maloney
July 11, 2014

39

1   pulled it off of the document imaging screens that we

2   talked about earlier.  They pulled a copy of the note

3   and the allonges, which would have been under separate

4   categories in the document imaging system, so somebody

5   sent you an extra allonge that should have been included

6   because it's not attached to the note.

7        Q.   Okay.  Excuse my ignorance.  Does that happen

8   often?

9        A.   No.

10       Q.   Have you ever seen that happen before?

11       A.   I have one other time, yes.

12       Q.   And why was that or why -- That's not

13  important why the other one was there.  But why would

14  that have happened?

15       A.   You would have had a new employee who was not

16  used to the different investors and how they are

17  actually supposed to be styled on the allonges, and they

18  would have -- in this case the employee actually added

19  in that ink onto the back of it, but it's just LNV

20  Corporation.

21       Q.   Okay.  I am going to come back and we're going

22  to talk some more about the note.  I promise.

23       A.   Okay.

24       Q.   There is also another original -- Do we have

Bret Maloney
July 11, 2014

40

1   copies of this?  Let's call this Dep Exhibit 3.  This is
2   the original.  I am keeping them separate, I promise
3   you.  I am labeling this Maloney - as I said, we're
4   doing this so that the court reporter will be able to
5   have a full copy of the exhibits that we talked about
6   because we are not going to give the court reporter, for
7   the record, the original of a note in the mortgage.  I
8   think everybody can agree upon that.  So this document
9   will be Maloney Deposition No. 3.
10                          (WHEREUPON, Deposition Exhibit
11                          No. 3 was marked for
12                          Identification as of this
13                          date.)
14  BY MR. BACH:
15      Q.    Now I am going to hand to you Maloney
16  Deposition No. 3, the original and a copy.
17      A.    Okay.
18      Q.    That has been labeled as an exhibit.  Could
19  you tell us what that is?
20      A.    This is the Note Allonge between LNV to Beal
21  Bank, U.S.A.
22      Q.    Now, this particular allonge is not attached
23  to the note, correct?
24      A.    That is correct.

Bret Maloney
July 11, 2014

41

1    Q.   And what is the date of this allonge?  Is it

2    dated?

3        A.   It's not dated.

4    Q.   Okay.  To your knowledge, do you know what

5    date that allonge was executed?

6        A.   Yes.  Actually there is a document in the

7    collateral file which shows when this was actually

8    entered into the file.  And let's see when it was

9    managed into the file.  There is a date at the top that

10   says May 3, 2013.

11   Q.   Okay.  I don't like to -- Let me just ask you

12   a question.  I have been handed to me what says, "Beal

13   Imaging Department," which I am guessing is a department

14   that's used by all Beal Companies, and that's why it

15   says that.  And it says that the print date was 5-3 of

16   2013.  What does that mean?

17       A.   That was when a copy of the original allonge

18   was actually put into the actual collateral loan file.

19   Q.   Okay.  So it would not be wrong if we added --

20   if we made a copy of this document and we added it onto

21   Maloney Deposition Exhibit 3, which is this, because

22   they are really one in the same document that I was

23   handed out of the collateral file, correct?

24       A.   The original note allonge came out of the note

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

42

1  file jacket, which is separate from the collateral

2  file.  All the notes are housed in a fireproof safe.  So

3  what we will do is the originals would go in there, the

4  copies would go into the collateral file.  Only the note

5  and the allonges would go in that safe.

6       Q.   Okay.  Well, then what you're telling me

7  really is this piece of paper should be Deposition

8  Exhibit 4 and it should not be attached to the note,

9  correct?

10           MR. IARIA:  I have no objection to that.  I

11  don't think it's part of 3.  If you want to do 4, I have

12  no problem.

13           MR. BACH:  I am going to call that Deposition

14  Exhibit No. 4.  We will mark it later on.  I don't want

15  to stop.  We have already had enough stoppages.  Let's

16  move forward was the idea.  So Maloney Deposition

17  Exhibit 4 will be the green -- a copy of the green piece

18  of paper that says,"Beal Imaging Department," and then

19  has a print date of 5-3-2013 and has a Master Track

20  Number on here of 17105086.  And I think that would

21  sufficiently identify it so we all know what we're

22  talking about.  But that will be Maloney Deposition

23  Exhibit 4.  Okay?

24       A.   Okay.

Bret Maloney
July 11, 2014

43

1          (WHEREUPON, Deposition Exhibit

2          No. 4 was marked for

3          Identification as this date.)

4          MR. BACH:  Then we can do that.

5     Q.    I assume that there are -- is there a similar

6  type document that was in the collateral file regarding

7  the notes -- regarding the note and the allonges that

8  are a copy, which is Deposition Exhibit No. 2?

9     A.    With regards to the date of the original being

10  received, that's not in the collateral file.  I do have

11  that in another file which shows when the original note

12  was actually cataloged into the system as being

13  received.

14     Q.    Okay.  In the dock documents that you have or

15  in some -- You don't have it with you?

16     A.    I don't have it in the room here with me right

17  now, no.

18     Q.    So it's back in Texas is what you're saying?

19     A.    Yes.

20     Q.    That's all I want to know.  That's what I was

21  trying to get to.  Let us go back.  I am just going to

22  put this, for right now, Deposition Exhibit -- We are

23  going to have someone do that so we don't to stop.  Let

24  us go through -- let's take Deposition Exhibit No. 2,

Bret Maloney
July 11, 2014

44

1   which is the original note.

2       A.   Okay.

3       Q.   As I said, I am looking at a copy.  The

4   original is 8-1/2 X 14, which is the Proof of Claim

5   exhibit which I am talking about and has been reduced

6   down to 8-1/2 X 11.  Is that true?

7       A.   Correct.

8       Q.   So the original note is four pages long,

9   correct?

10      A.   Correct.

11      Q.   And then we have an endorsement to the left of

12  the signature, correct, on the last page of the note?  I

13  am looking at that endorsement first.

14      A.   Correct.

15      Q.   Now, on this one, it looks like a stamp was

16  originally put on there and, it looks like someone put a

17  different stamp that says, "Residential Funding

18  Company," correct?

19      A.   Correct.

20      Q.   LLC.  And it looks like someone by the name of

21  L. Gray signed it, who was a limiting signing officer,

22  bringing the note from the original payee, who was

23  listed as Ditech, is that correct?  The original payee

24  is Ditech?

Bret Maloney
July 11, 2014

45

1    A.    The original lender was GMAC Mortgage, LLC

2  d/b/a Ditech.com.

3    Q.    Okay.  So that's the Ditech I was talking

4  about.  Originally it was GMAC Mortgage, LLC.  And so am

5  I to understand -- just to understand it, it looks to me

6  like this endorsement was from GMAC to GMAC -- or to

7  another GMAC entity called Residential Funding Company,

8  LLC, correct?

9    A.    It was an endorsement from GMAC Mortgage, LLC

10  formerly known as GMAC Mortgage Corporation d/b/a

11  Ditech.com to Residential Funding Company, LLC.

12    Q.    Which is another GMAC Company.  Do you have

13  knowledge of that?

14    A.    I do not.

15    Q.    It was the lead debtor in their Chapter 11

16  bankruptcy.  That's why I know that.  It's not critical,

17  but that's what that endorsement does, correct?

18    A.    That is correct.

19    Q.    Do we know when that endorsement was placed on

20  there?  Do you have any information that could show when

21  that endorsement took place?  Would that be in the

22  collateral file?

23    A.    No.

24    Q.    So there is no information to know if that

Bret Maloney
July 11, 2014

46

1  took place right at the time of the initial loan or it

2  took place sometime thereafter?

3      A.   I would not have that knowledge.

4      Q.   Who would have that knowledge?

5      A.   Residential Funding Company or GMAC Mortgage.

6      Q.   But not any Beal company, correct?

7      A.   That's correct.

8      Q.   Okay.  And if the signature from L. Gray is

9  not genuine, you would have no knowledge of that either,

10 correct?

11         MR. IARIA:  Objection, calls for speculation.

12         THE WITNESS:  That's correct.

13 BY MR. BACH:

14     Q.   Just to follow up, you have no knowledge one

15 way or the other whether that's a genuine signature?

16     A.   I do not.

17     Q.   And there is nothing that you have seen in any

18 materials to indicate one way or the other that you

19 reviewed?

20     A.   No.

21     Q.   For the record, it's hard to read because of

22 the things I have been told.  It says J. Gray, not L.

23 Gray.  It's hard to read.

24     A.   Yeah, I agree.

Bret Maloney
July 11, 2014

47

1    Q.    Just so that we're on the second thing.  So as

2  we're going through this note in terms of the ownership,

3  in terms of not the ownership, but as we're going

4  through the note, then the next page, which is attached

5  to Deposition Exhibit No. 2, that is a Allonge to

6  Promissory Note.  Is this the one that's valid or the

7  one you said that was not valid?

8    **A.    The one that is valid.**

9    Q.    Okay.  And this is the one that you mentioned

10  you can tell the date, but you can't tell from here,

11  correct?  Is that what you're referring to?

12    MR. IARIA:  Just for the record, that was the

13  second one we were talking about the date.  Exhibit 4 is

14  for the second from LNV to Beal.  I don't think we're at

15  that one yet.

16    MR. BACH:  That's from the -- allison Martin

17  is the one we're talking about.  This one goes with the

18  Allison Martin one.  You are correct.

19    **A.    Okay.**

20    Q.    Too many documents.  I am trying to -- I

21  apologize.  So this allonge, to me, I am just trying to

22  make sure, lists the note date.  It doesn't have a date

23  on it.  I am not saying allonge is supposed to.  I am

24  just going through what's on here, and it appears to be

Bret Maloney
July 11, 2014

48

1   signed by someone by the name of Jason J. Vecchio, who

2   is from Residential Funding Company, LLC, is that true?

3        **A.   Yes.**

4        Q.   Okay.  And it looks like again to have two

5   stamps, one that was originally just an endorsement

6   stamp, and one which was put in the name of LNV

7   Corporation, correct?

8        **A.   Correct.**

9        Q.   Now, do you know or have any knowledge of when

10  that stamp was placed on there, either one of those

11  stamps?

12       **A.   It would have been at or around the time that**

13  **we had actually acquired the loan.**

14       Q.   Okay.  And what date was that?

15       **A.   When the note came in and it was documented as**

16  **being received, it was May 5, 2008.**

17       Q.   Now I think you said earlier that there was

18  some -- I am just guessing -- that there was not just

19  this note that was purchased from Residential Funding,

20  but there were a whole group of them most likely,

21  correct?  You mentioned an asset purchase agreement?

22            MR. IARIA:  Objection, relevance to this

23  case.

24  BY MR. BACH:

Bret Maloney
July 11, 2014

49

1    Q.   Yes?

2    **A.   Yes.**

3    Q.   So on May 5, 2008, you acquired this and other

4    notes and that's how you can say what the date is,

5    correct?

6    **A.   The date that I am referring to is the date**

7    **that was documented that the original note was received**

8    **and cataloged into our system of record.**

9    Q.   What sort of procedure is used when a loan is

10   purchased or a new note is received in terms of

11   protection?  Because obviously, as you stated earlier,

12   the original notes go into a fire-safe safe.  Can you

13   give me an idea of what the procedure is?

14          MR. IARIA:  Objection, relevance to this

15   case.  We have the original with us.

16          MR. BACH:  That's fine.  I want to know what

17   the procedure is.

18   **A.   Yeah.**

19   Q.   The chain of custody?

20   **A.   The seller would have sent the original loan**

21   **documents to the buyer, in this case, or the purchaser,**

22   **which would have been LNV Corporation.  They would have**

23   **sent him, you know, Fed Ex or some type of mass shipping**

24   **and cataloged, recorded boxes, what inventory had --**

Bret Maloney
July 11, 2014

50

1    what loans were in there.  As those would have come in,

2    then the employees of the document control department

3    would go through and review all those files and document

4    when it was actually received for each one of the

5    different loans that was purchased.  From that, they

6    would then develop the collateral files, scanned copies

7    of the original notes, put them in there, move the

8    original notes into the vault.  Of course everything is

9    bar coded so that they can track it under the system of

10   record, document what documents came in as of the date

11   it was actually cataloged as being received, and then

12   they would have started, at the same time, working on

13   the assignments of mortgage and also the allonges for

14   each of the different loans that was purchased in that

15   portfolio.

16        Q.   Now -- and I am going to go back to the chart

17   that you have.  And this is done by -- and this is done

18   by  CLMG Corp., correct, or is this done by LNV?

19        A.   No.  In 2008, MGC was the custodian of the

20   original loan documents, and then it changed in 2012 to

21   CLMG as being the custodian of the original one

22   document.  So at that point it would have been MGC.

23        Q.   Is there documentation in the collateral

24   file -- we will go through the collateral file in the

Bret Maloney
July 11, 2014

51

1 thing that shows the custody, who has the custody of the

2 note, like, for instance, when you send it out to -- for

3 the foreclosure, is there some sort of a chain of

4 custody that's kept?

5     A.   There is, yes.  It wouldn't be in this

6 collateral file for the original note.  It would be in

7 the note jacket that's on site.  It's in the vault.  But

8 I think there is a copy with the original note that

9 shows when it was actually sent to the firm.

10     Q.   Now, getting back to Maloney Deposition No. 2,

11 we have -- and I am just -- it looks like it says, "Pay

12 to the order of," then on an angle, it says, "LNV

13 Corporation."  It looks like that's a second stamp, not

14 the same stamp obviously, or a typed out, and it's kind

15 of at an angle, correct?

16     A.   I believe there is only one stamp.  I think

17 the, "Pay to the order of without recourse, Residential

18 Funding, LLC," and then the name of the post funding

19 manager.  That's all -- looks to me to be typed.

20     Q.   To be typed on like a word processor type

21 thing and printed out?

22     A.   The whole document was typed, and the only

23 things -- the LNV Corporation is a stamp and then you

24 have his original signature.

Bret Maloney
July 11, 2014

52

1    Q.   Can I see the original for one second?  I do

2  notice a difference between them and I am going to ask

3  you about it.  So here, what I am looking at, it also

4  has a bar code, okay?  What does that bar code mean?

5  That's not -- I know it's not on the copy of Deposition

6  Exhibit 2.

7         MR. IARIA:  Just for the record, Deposition

8  Exhibit 2 is different than my copy is.

9         MR. BACH:  Which I took right off the Proof of

10  Claim.  That's where I got it from.

11         MR. IARIA:  If I may offer some explanation to

12  that, that may be a redaction process by my office, it

13  includes the loan number, and that would be other

14  information that the law firm would typically redact,

15  but I don't know if -- and I am not going to kind of

16  testify -- but that may shed some light to it.

17         MR. BACH:  Okay.  I noticed that difference.

18  That's why I was asking.

19    Q.   Do you know, is that part of the normal

20  process that you have?

21    **A.   That, I don't know.  So normally your**

22  **documents don't have a bar code on it like that,**

23  **correct?**

24         MR. IARIA:  Objection.  You're looking at the

Bret Maloney
July 11, 2014

53

1  original.

2          MR. BACH:  Right.  But we have had a

3  discussion -- you're not under oath -- Your attorney

4  said that that may be part of his law firm placing it on

5  there.  I am asking --

6          MR. IARIA:  No.  I apologize.  I am not trying

7  to testify here.  My law firm's policy would be to

8  redact the loan numbers, not to add the bar code.

9          MR. BACH:  Yes.  But I all I trying training

10  to say is Deposition Exhibit No. 2 doesn't have anything

11  there.

12          MR. IARIA:  Correct.  That would be a PDF

13  system.

14          MR. BACH:  I am just trying to figure out

15  where it came from is what I am trying to say, if you

16  didn't redact it.

17      Q.  I am saying, is that bar code on original

18  documents normally?

19      A.  **On the ones from Residential Funding Company,**

20  **because this is their allonge document, I believe that's**

21  **how they all are drawn up.**

22      Q.  So what your understanding is is that is a

23  Residential Funding thing, not a Beal Company type

24  identification?

Bret Maloney
July 11, 2014

54

1    A.   Correct.

2    Q.   Okay.  That's what I am looking for.  Now I am

3 looking at the original.  Okay.  No.  I am looking at

4 the original which is a lot clearer than the other one.

5 But this appears to be an original signature, correct?

6    A.   Correct.

7    Q.   And it's much clearer than the other one, but

8 it's the same as Deposition Exhibit No. 2, correct, that

9 part is?

10    A.   Correct.

11    Q.   Now, would the LNV Corporation stamp have been

12 placed there by someone from your -- from Beal

13 Companies, or would it have been done by GMAC?

14    A.   **That would have been us.  It would have been**

15 **us.**

16    Q.   Then you testified on Deposition Exhibit

17 No. 3, the last page, the sixth page that's attached to

18 the Proof of Claim is -- you testified this was included

19 in error, attached to the Proof of Claim.  It has no

20 value, it is not in existence, correct?

21    A.   Correct.

22    Q.   There is no reliance, I assume, upon anybody

23 for any purpose in this sixth page, correct?

24    A.   Correct.

Bret Maloney
July 11, 2014

55

1    Q.    Then we get to the last -- the last allonge,

2  which is Deposition Exhibit No. 3, and then do you have

3  the original of that?

4    **A.    Sure.**

5    Q.    I don't want to lose it.

6    **A.    I don't either.**

7    Q.    In the maze of paper.  I am sure you will get

8  in big trouble if you do.  So then we have the note

9  allonge from LNV Corporation from Allison Martin.  Now

10 who is Allison Martin?  Let's start there.

11   **A.    She is the vice president of document**

12 **control.**

13   Q.    Okay.  It lists her as attorney-in-fact.  Why

14 wouldn't it say, "Vice President of Document Control"

15 instead of, "Attorney-in-fact?"

16           MR. IARIA:  Objection, calls for a legal

17 conclusion.

18           THE WITNESS:  I believe it's because there is

19 a POA which authorizes her to sign as an

20 attorney-in-fact.

21   Q.    Is her job primarily to sign documents?

22           MR. IARIA:  Objection, relevance.

23           THE WITNESS:  It is a part of her job

24 description, yes.

Bret Maloney
July 11, 2014

56

1   BY MR. BACH:

2      Q.   Approximately, to your knowledge, if you know,

3   how many -- does she sign -- how many of these does she

4   sign a day, a week, a year?

5         MR. IARIA:  Objection, relevance.

6         THE WITNESS:  That, I don't know.

7   BY MR. BACH:

8      Q.   How long have you known Allison Martin?

9         MR. IARIA:  Objection.  I don't know if he

10  testified that he personally knows her.

11  BY MR. BACH:

12      Q.   Do you know Allison Martin?  Let's start

13  there.

14      **A.   Yes.**

15      Q.   That's a good point. I can deal with that

16  correction.  How long have you known her?

17      **A.   Since I started with Beal back in December of**

18  **2000.**

19      Q.   Do you know how long she has worked there?

20      **A.   I think she came -- She was either there right**

21  **before me or right after.  So she has been there for**

22  **quite some time.**

23      Q.   How long has she been vice president, do you

24  know?

Bret Maloney
July 11, 2014

57

1     **A.    That, I don't know.**

2     Q.    Had she always been a vice president?  I mean,

3 if you don't know, you don't know.  I am just trying to

4 figure it out.

5     **A.    Yeah.  That, I don't know.**

6     Q.    You said she is also vice president.  Is her

7 office close to yours, on the same floor?

8         MR. IARIA:  Objection, relevance.  Where are

9 we going with this?

10        MR. BACH:  Let him answer the question.  I

11 will move on from there.

12    **A.    We are on the same floor, but opposite sides**

13 **of the building.**

14     Q.    Does she actually prepare the documents

15 herself or does someone else do that for her to your

16 knowledge?

17        MR. IARIA:  Objection.  You are having him

18 testify as to someone else.  Speculation.

19        MR. BACH:  That's why I said, "To your

20 knowledge."  If he doesn't know, he doesn't know.

21        MR. IARIA:  Objection, relevance.

22        THE WITNESS:  I don't know.

23 BY MR. BACH:

24     Q.    Does she also work for MGC?

Bret Maloney
July 11, 2014

58

1     A.    She works for CLMG.

2     Q.    But if she worked for CLMG, but she prepares

3 -- to your knowledge -- that's all I am asking --

4 documents for the other Beal entities or only for CLMG?

5     A.    No.  She does it for all the Beal entities,

6 and there were some earlier documents that she had done

7 under -- for MGC post closing as well.

8     Q.    Let's get back to Deposition Exhibit No. 3.

9 And I think earlier you mentioned that you knew a date

10 that this happened.  What date was that?

11     A.    At or around May 3, 2013.

12     Q.    Okay.  May 3, 2013.  And if you know, why

13 was -- why was this allonge done on May 3, 2013?

14     A.    I don't know.

15     Q.    Was it part of some sort of an asset purchase

16 between LNV and Beal Bank?

17     A.    Oh, it was -- the loan transferred ownership

18 from LNV Corporation to Beal Bank, U.S.A.  That happened

19 prior to this date.  However, because there were

20 multiple loans that transferred from that one investor

21 to another, all the allonges and all the assignment of

22 mortgages were being done simultaneously as that

23 transfer had occurred.  And this one was actually for

24 this particular loan done May 3, 2013.

Bret Maloney
July 11, 2014

59

1    Q.    So there was some sort -- I am just asking.
2  Was there an asset purchase agreement or was it done
3  informally?
4    A.    That, I don't know.
5    Q.    So at some time prior to that, the loan was
6  purchased by Beal Bank?  Is there actually money that
7  goes forward or is it just a transfer?
8         MR. IARIA:  Objection.  Can you specify a time
9  line on that question?
10 BY MR. BACH:
11   Q.    Let's go back.  I will come back to that
12 question in a second.
13   A.    Okay.
14   Q.    Do you know when this loan was actually
15 transferred?  You said it happened before May 5th of
16 2013.
17   A.    The transfer was supposed to be effective as
18 of December 2012.
19   Q.    December 1st?
20   A.    I don't recall the actual day.
21   Q.    Okay.  So just so I understand, what was
22 supposed to have happened was that sometime in December
23 2012, I am guessing the prior year, correct?
24   A.    December 2012, yeah.

Bret Maloney
July 11, 2014

60

1    Q.   You said '13. I want to make sure we are all

2 clear. Sometime in December 2012, the loan changed

3 ownership from LNV to Beal Bank. Is that what you're

4 telling me?

5    **A.   It was effective as of the December 2012 date,**

6 **the transfer from the LNV investor to the Beal Bank**

7 **U.S.A. investor.**

8    Q.   Is there a series of documents which shows

9 that transfer, or is there any documents that confirm

10 that, anything like that?

11    **A.   The Notice of Service or Notice of Ownership**

12 **Transfer that was dated January 20th or 29, 2013.**

13    Q.   So that's the only document which shows --

14 There is no internal documents which show a transfer of

15 ownership or anything like that?

16    **A.   Not that I am aware of.**

17    Q.   It was decided one day that it would be

18 transferred. But there is no internal documents that

19 would show it on the computer system on a certain date?

20 Would it be entered in the servicing notes?

21    **A.   It wouldn't have been documented on the LPS**

22 **System. It was an internal business decision to move**

23 **from LNV Corporation to Beal Paying U.S.A.**

24    Q.   What you were referring to is -- I will call

Bret Maloney
July 11, 2014

61

1  it Deposition Exhibit No. 5.  You got it.  Okay.  I will

2  give you the original one. I'm sorry.

3       A.    Okay.

4                         (WHEREUPON, Deposition Exhibit

5                         No. 5 was marked for

6                         Identification as of this

7                         date.)

8  BY MR. BACH:

9       Q.    You have the original.  Good.  Okay.  I didn't

10  know what happened to the allonge.  It's right there.

11  That's the original?

12       A.    Before you ask me questions, this is only a

13  portion.

14       Q.    Do you have a full copy of it?

15       A.    You know what, I'm sorry.  I am thinking of

16  something else.  This is the letter that was sent out.

17       Q.    Okay.  That's what I wanted --

18       A.    Sorry.

19       Q.    If I only have half of it, it's happened

20  before.  I am sure it will happen again.  Can you please

21  tell me what Maloney Deposition Exhibit No. 5 is?

22       A.    It is the Notification of Assignment, Sale or

23  Transfer of the mortgage loan.

24       Q.    Okay.  On here it mentions December 31st of

Bret Maloney
July 11, 2014

62

1   2012, true?  In the first paragraph?

2        A.   Correct.

3        Q.   Okay.  Now, could you tell me a little bit

4   about the preparation of this and how that's done?

5        A.   What do you mean?

6        Q.   Obviously what we talked about earlier is that

7   there was a transfer of ownership sometime in December

8   that references December 31st, okay?  Is this sent out

9   to a group of people who prepare these documents?

10       A.   I'm sorry.  Can you repeat the question?

11       Q.   I am looking for a little background on how --

12  what's the procedure when it's decided that you're going

13  to transfer a loan, such as this one, from LNV Bank

14  to -- Is there a procedure, someone who takes charge, to

15  make sure that these go out?

16       A.   Yes.

17       Q.   Okay.  What would that be?

18       A.   This one here would have been -- the

19  acquisitions group would have spearheaded the transfer.

20  The management would have been involved with making the

21  decision as to, you know, the letters, when they were

22  going to actually be sent out and the effective date of

23  the change.

24       Q.   Okay.  Now, the Proof of Claim is No. 6.

Bret Maloney
July 11, 2014

63

1                        (WHEREUPON, Deposition

2                        Exhibit No. 6 was marked

3                        for Identification as of

4                        this date.)

5   BY MR. BACH:

6        Q.   I am showing you what's been marked as Maloney

7   Deposition Exhibit No. 6, which is a copy of the Proof

8   of Claim.  If you want to take a look at that document

9   real quickly.

10        MR. IARIA:  My exhibit is missing -- the copy

11   I brought doesn't have all the attachments.  If you plan

12   on going over them, I think it's mostly the mortgage and

13   note on the back.

14        MR. BACH:  Yes.  Okay.  I just want to make

15   sure that you have seen it.

16        Q.   Now, again, as I told you, I represent a

17   debtor.  Most of the time I have been doing bankruptcy

18   work -- only a couple creditors here and there -- they

19   are usually not what I call commercial lenders, people

20   that normally service notes or anything like that.  So

21   all my questions may be things that are elementary and I

22   apologize for this.  Is there a procedure that when

23   someone files bankruptcy as to the Proof of Claim is

24   then sent out to a law firm in order to prepare that?

Bret Maloney
July 11, 2014

64

1   Is there a procedure for that?

2      **A.  Yes.**

3      Q.  Okay.  And what that procedure?

4      **A.  That is going to be DMI procedure, because**

5  **they are the ones that handle day-to-day with regards to**

6  **the filing of the POC claims.**

7      Q.  I am guessing DMI is Dovenmuehle?

8      **A.  Dovenmuehle.  Sorry.**

9      Q.  You said they are a subservicer and they take

10  care of that?

11      **A.  Correct.**

12      Q.  Now, if I want to ask someone at Dovenmuehle a

13  question about this, is there a person who is in charge

14  over there that would be a good person to ask?

15      **A.  It would be the manager of their bankruptcy**

16  **department.**

17      Q.  Do you know who that is?

18      **A.  I believe that's Scott, Burris, B-U-R-R-I-S.**

19      Q.  Any other names that you can think of?

20      **A.  Not off the top of my head, no.**

21      Q.  So someone from Scott Burris' department would

22  then send this to Freedman Anselmo with the information

23  for the amounts that are owed, is that correct?

24      **A.  Correct.**

Bret Maloney
July 11, 2014

65

1     Q.   The amounts that would be -- would there be be

2  attached any information regarding the loan to your

3  knowledge?

4         MR. IARIA:  Objection, calls for privileged

5  information.

6         MR. BACH:  How is that privileged?

7         MR. IARIA:  Well, the communication between

8  the client and what you're saying to the law firm.

9         MR. BACH:  I am asking what's it going to

10  include.  I am not asking for specifics, just in

11  general.  Does it include the amount?

12    **A.**   **The amount of what?**

13     Q.   The amount that's owed?  Where does that

14  information come from?  Does the law firm basically

15  calculate the amount that's owed or is it done by

16  Dovenmuehle?

17    **A.**   **It is provided by Dovenmuehle's counsel.**

18     Q.   What sort of information would be provided?

19         MR. IARIA:  Objection, calls for --

20  potentially calls for privileged information and work

21  product.

22         THE WITNESS:  The amount of the arrearages or

23  the amount of the total claim, the fees and costs that

24  have been assessed to the loan.

Bret Maloney
July 11, 2014

66

1   BY MR. BACH:

2       Q.   Would the mortgage be there, the note?

3       A.   In this case the note was already with counsel

4   based on the foreclosure action that was filed in July

5   of 2000 -- or June, July 2011.  Counsel would also have

6   had a copy of the mortgage at that point in time as

7   well.

8       Q.   Now, would it also include a direction on

9   whose behalf the Proof of Claim would be filed in?

10      A.   Yes.

11      Q.   Okay.  So that instruction would not come from

12  the law firm, that would come from Dovenmuehle,

13  correct?

14      A.   That would -- Yes, it would come from

15  Dovenmuehle.

16      Q.   The information provided from Dovenmuehle to a

17  law firm is anticipation of a -- for preparation of a

18  document, such as the Proof of Claim, that will be filed

19  in the bankruptcy court, correct?

20      A.   Yes.

21      Q.   It's not for any other purpose?

22      A.   Say that again.

23          MR. IARIA:  Clarify.

24  BY MR. BACH:

Bret Maloney
July 11, 2014

67

1    Q.   The reason why the information is transmitted
2    from Dovenmuehle to the law firm is to prepare the Proof
3    of Claim, not for any other purpose?
4           MR. IARIA:   Objection, calls for speculation.
5           MR. BACH:   What speculation is there?
6           MR. IARIA:  "Not for any other purpose."
7    BY MR. BACH:
8    Q.   I said, why else would they send information
9    that would be to put together a Proof of Claim than to
10   prepare the Proof of Claim?
11          MR. IARIA:   Just note the objection.
12          THE WITNESS:  It wouldn't.
13   BY MR. BACH:
14   Q.   But there is no other reason to send
15   financial -- "This is how much is owed as of the date of
16   the bankruptcy," correct?
17   A.   I'm sorry.  Say that one more time.
18   Q.   There would be no other reason to send a
19   letter from Dovenmuehle to the law firm and saying,
20   "This is the amount that's owed.  This is the amount of
21   the arrears.  This is the number of payments that they
22   are behind.  These are the other costs and fees," than
23   to prepare the Proof of Claim?
24   A.   It would have been more than just a letter or

Bret Maloney
July 11, 2014

68

1    other documents.  It would be -- With this particular

2    loan, what was sent across would have been anything that

3    has to do with what was owed, what was in arrears, what

4    was assessed to the loan and any other documents that

5    was needed by counsel in order to file a Proof of

6    Claim.

7         Q.   Who is David Allison?

8              MR. IARIA:  Objection.  Build a foundation on

9    that or even --

10   BY MR. BACH:

11        Q.   Do you know David Allison?

12        A.   I do not.

13             MR. IARIA:  I don't know where you're getting

14   the claim at all.

15   BY MR. BACH:

16        Q.   Now, the Proof of Claim on Page 3 of the Proof

17   of Claim, the original part, the original claim had been

18   filed on January -- was filed on January 2nd, but filed

19   on January -- it's signed, according to this, on January

20   3rd, and filed on January 2nd.  I can tell it's January

21   2nd, because if you look at the top of the page, it has

22   the file stamp.  I am not asking you why the difference

23   in date.  You didn't prepare the document.  I get that.

24   Okay?

Bret Maloney
July 11, 2014

69

1     **A.**    Okay.

2     Q.    What I am asking -- and if you go back to Page

3  1, you can see that the claimant is LNV Corporation,

4  correct?

5     **A.**    Correct.

6     Q.    And according to the letter that we discussed,

7  which was Deposition Exhibit 5, the loan was transferred

8  effective December 31st.  How is that possible?

9     **A.**    Because DMI, nor was counsel aware, that the

10  entity was being changed at that time.  The letter that

11  went out to notify everybody was January 20, 2013.  So

12  counsel and DMI filed the claim on behalf of LNV

13  Corporation at that point in time because that was

14  who -- they were advising, the investor was, at that

15  point in time.  Also, the original note, when counsel

16  filed the claim, it had been in their office since June

17  2011, they filed the claim on behalf of LNV Corporation

18  because that's who they knew to be in ownership at the

19  time.

20     Q.    Go ahead.  I'm sorry.

21        MR. IARIA:  I just wanted to make one

22  distinction.  Well, I am going to withdraw any -- That's

23  fine.

24  BY MR. BACH:

Bret Maloney
July 11, 2014

70

1    Q.   But you would agree, based upon what you have

2    told me already, that on the date the proof of claim was

3    filed, LNV did not own the loan?

4    **A.   Ownership was transferred to Beal Bank U.S.A.**

5    Q.   Okay.  Now, if -- now the proof of claim has

6    several different parts and was filed.  The first one,

7    Page 4 of 4, is just the Proof of Claim form itself.

8    Then there is a mortgage attached.  And we are going to

9    talk more about the mortgage.  I promise we will get to

10    it, okay?  And then we get a couple more questions

11    about -- then we have the note that we took that we have

12    been talking about for a long time, which is also

13    Maloney Deposition Exhibit No. 2, correct?

14    **A.   Correct.**

15    Q.   Okay.  Now, my question to you is -- and we

16    are going to need the original -- Can I see the original

17    note again real quick?  Can I see it real quick?  It may

18    take care of my question.

19              And then at the end, we have -- and after

20    the note, we have some detail about amounts that are due

21    the date of the filing of the Petition, correct,

22    Mortgage Proof of Claim attachment?

23    **A.   Correct.**

24    Q.   Which is two pages long, correct?

Bret Maloney
July 11, 2014

71

1    A.    Correct.

2    Q.    The information that we were discussing

3 earlier that would have been provided by Dovenmuehle, is

4 this information correct?

5    A.    Yes.

6    Q.    Now, as part of the Proof of Claim process,

7 and again, it maybe my being -- not knowing the process

8 at all -- once the Proof of Claim is prepared, does the

9 law firm just file it or does it get reviewed by someone

10 at Dovenmuehle or the people that own the loan?

11    A.    It would have been reviewed prior to being

12 submitted for -- to the court.

13    Q.    So is that part of the normal process that

14 that would have happened?

15    A.    Yes.

16    Q.    If a Proof of Claim was filed without being

17 reviewed, would you see that as a problem?

18        MR. IARIA:  Can you specify?  Reviewed by

19 anyone or --

20        MR. BACH:  Reviewed by someone at

21 Dovenmuehle.  I am talking about at Dovenmuehle or MGC

22 or someone related to -- that was the owner of the loan?

23    A.    Say the again one more time.

24    Q.    I will restate it.  I am just trying to --

Bret Maloney
July 11, 2014

72

1  let's just go back for a second.  Normally how many days

2  does it take for a Proof of Claim to be reviewed once

3  it's prepared?

4     **A.   That, I don't know.**

5     Q.   That was part -- I was trying to think of an

6  easier way of asking the question.  So if it was -- So

7  it could have been -- my question is, if it was reviewed

8  -- and let's just say it was January 3rd, right after

9  the first of the year, okay -- I think you said sometime

10  in December that there hadn't been a decision made to

11  transfer the loan, although it was effective December

12  31st.  Fine.  Would that -- How long -- Wouldn't someone

13  at Dovenmuehle have picked up the fact that the loan

14  was -- that it had the wrong claimant on it at some

15  point before it was reviewed?

16     MR. IARIA:  Objection, you're making a legal

17  conclusion in your statement or in your question.

18     THE WITNESS:  DMI would have only known about

19  the change when we actually informed them of the

20  change.  When we did notify them of the change, there

21  was a transfer of claim that was filed from LNV to Beal

22  Bank U.S.A.

23  BY MR. BACH:

24     Q.   Okay.  Well, that's a different issue.  But at

Bret Maloney
July 11, 2014

73

1   the time you're saying that prior to December 31st, no

2   one told Dovenmuehle that the loan had been

3   transferred?  That's really what the answer to the

4   question is.

5        **A.   Dovenmuehle was not aware at that time.**

6        Q.   That was the answer to my question.  We can

7   talk about legal semantics another time.

8        **A.   No.  That's fine.**

9        Q.   That was the answer to the question I was

10  looking for.

11            Now, there are two assignments, correct?

12       **A.   Correct, one from MERS to LNV Corporation and**

13  **then from LNV Corporation to Beal Bank U.S.A.**

14            MR. IARIA:  Paul, if you can distribute the

15  copies, I don't have extras.  One copy of the Assignment

16  of Mortgage was a certified copy, and one was an

17  original that was brought.

18            MR. BACH:  The last page is the certification,

19  so you can tell which one is which.

20       Q.   This which this one goes with this is actually

21  the problem.  That's exactly what it is. I've got it

22  now.  I will distribute -- Let me just -- so this is the

23  original mortgage.  I have this here, okay?  The

24  certified one that we talked about.  I think we talked

Bret Maloney
July 11, 2014

74

1   about the fact that we're going to make this a

2   deposition exhibit, correct?

3          MR. IARIA:  If you would like to, that's

4   fine.  That would be 7, correct?

5                          (WHEREUPON, Deposition Exhibit

6                           No. 7 was marked for

7                           Identification as of this

8                           date.)

9          MR. IARIA:  After this line of questioning

10  with regards to Exhibit 7, can we take a break?

11         MR. BACH:  I was going to try and get through

12  the mortgage and take a break.

13         MR. IARIA:  Perfect.  All right.

14         MR. BACH:  I was going to talk about the

15  mortgage and then we will talk about the accounting and

16  other issues after lunch.  That was my plan.

17     **A.    Okay.**

18     Q.    So this assignment is from -- so this would

19  be 8.  This would be 9.

20                          (WHEREUPON, Deposition Exs.

21                           Nos. 8-9 were marked for

22                           Identification as of this

23                           date.)

24  BY MR. BACH:

Bret Maloney
July 11, 2014

75

1      Q.   Okay.  For the record, we have a certified

2   copy of a mortgage, which is Maloney Deposition Exhibit

3   No. 7.  There is an Assignment from MERS, Mortgage

4   Electronic Registration System, to LNV Corporation,

5   which was recorded 9-3 of 2008, which is Maloney

6   Deposition Exhibit No. 8, and I will give you a copy of

7   that so you have that.  And then there is another

8   Assignment of Mortgage, which is Maloney Deposition

9   Exhibit No. 9, which is from LNV Corporation to Beal

10  Bank U.S.A., and it was recorded on March 13th of 2013.

11  And, Counsel, you have copies of them.

12         MR. IARIA:  Correct.  Just for the record, I

13  am going to object to the entire line of questioning as

14  to the Assignment of Mortgage.  It has no bearing on the

15  specifically endorsed note under Illinois law.  You know

16  with that said, that is my objection for the record.

17  BY MR. BACH:

18     Q.   Now, you were not able to bring with you today

19  a copy of the original mortgage.  Why is that?

20     A.   **I did bring a copy of the original mortgage.**

21     Q.   Okay.  You don't have the original mortgage

22  itself?

23     A.   **That's correct.**

24     Q.   Okay.  That was really my question.  You don't

Bret Maloney
July 11, 2014

76

1  have it.  Why were you not able to bring that original

2  mortgage with you?

3      A.   **We never received it.**

4      Q.   So you never received it from GMAC?

5      A.   **We received -- not the original mortgage, no.**

6      Q.   Is that typical?

7      A.   **No, but it does happen.**

8      Q.   There is no notes anywhere in your system

9  which indicate receiving the original mortgage?  Is that

10  how you're able to say that?

11      A.   **That would be in the Master Track system.**

12  **That's where we document the receipt of the original**

13  **loan documents.**

14      Q.   That's a system that CLMG has?

15      A.   **Correct.**

16      Q.   Not MGC, correct, at that time?

17      A.   **At that time MGC was custodian of the original**

18  **records, then shifted over to CMG.  It's the same system**

19  **just being managed by CLMG.**

20      Q.   What did you say it was called?

21      A.   **Master track.**

22      Q.   And then the assignment, which I have been

23  provided, and you just -- and all that was done was that

24  someone went to the Recorder of Deeds Office of Kane

Bret Maloney
July 11, 2014

77

1   County, Illinois and asked them to certify a copy.  This

2   is the copy as they have it, correct?

3        **A.   Correct.**

4        Q.   Okay.  And the same thing can be said of

5   Maloney Deposition Exhibit No. 8, correct?  This is the

6   one from MERS to LNV Corporation, correct?  That's

7   Maloney Deposition Exhibit 8?

8        **A.   The original assignment I have brought with me**

9   **today.**

10       Q.   And you also have the assignment from --

11  that's Maloney Deposition No. 9 as well, correct?

12       **A.   The one from LNV to Beal Paying U.S.A.,**

13  **correct.**

14       Q.   Now, let's talk about Maloney Deposition

15  Exhibit No. 8, which is the one assignment that went

16  from MERS to LNV Corporation.  Okay.  Now, is it typical

17  that the person who assigns the mortgage is different

18  from the person who endorses the note?

19            MR. IARIA:  Objection, calls for speculation

20  and objection to the relevancy.

21  BY MR. BACH:

22       Q.   If you know, you know.  If you don't, you

23  don't.

24       **A.   I don't know.**

Bret Maloney
July 11, 2014

78

1      Q.   I just note that Michael Mead signed this one,

2   and a different person signed the other one.  I am

3   wondering if you know why.

4      A.   I do not know.

5      Q.   Okay.  Now let's go to the last one, which I

6   think is Maloney Deposition Exhibit No. 9, which you

7   will know probably more because this one was also signed

8   by Allison Martin, correct?

9      A.   Correct.

10     Q.   Okay.  Is there a system in place -- is there

11  a reason why the mortgages would have been assigned

12  earlier than the note was endorsed?

13     A.   That would have been at or around the same

14  time.  I mean, the allonge was documented in there as of

15  5-3-2003.  Depends on when they are working on the

16  loans, when they get to doing the assignments and the

17  allonges, if they are doing them simultaneously, that

18  would be a question for the Document Control Department

19  with regards to their procedures as to the assignments

20  and the allonges.

21     Q.   So you have no explanation why the mortgage

22  was assigned almost two months before the note was

23  endorsed?

24          MR. IARIA:  Objection to mischaracterizing the

Bret Maloney
July 11, 2014

79

1    testimony.  I don't know -- based on -- I assume you're

2    referring to Exhibit 4 for the date, but I don't know if

3    it's been testified that that's the specific date that

4    it was endorsed.

5            MR. BACH:  He testified earlier that May 3,

6    2013, which may have been based upon Deposition Exhibit

7    No. 4, was the date that the note was endorsed.

8        A.   I said at or around that date.

9        Q.   Around that time.

10       A.   Around that time.

11       Q.   I note that the mortgage -- Assignment of

12   Mortgage was recorded almost two months earlier on 3-13

13   of 2013 and is dated on there of March 5, 2013.  And I

14   am wondering why there would be a difference of almost

15   two months?

16       A.   I don't know.  I don't know.

17           MR. BACH:  I think that's all we have on the

18   mortgage.  I promised we would take a break now.

19                       (Recess taken.)

20   BY MR. BACH:

21       Q.   We are not going to mark this as an exhibit,

22   but I have been handed the original collateral file from

23   the lender, correct?

24       A.   Correct.

Bret Maloney
July 11, 2014

80

1     Q.   That's what this is?

2     **A.   Yes.**

3     Q.   And it's in a red folder with -- I am guessing

4 it's a loan number on the side, 628243, correct?

5     **A.   That's the bar code loan number for when they**

6 **pull it up in the system.  That's how they look at the**

7 **file.**

8     Q.   Okay.  Now, there is a left and a right side

9 of this file.  The right side appears to have copies of

10 all the assignments and a copy of the note and a copy of

11 the mortgage, not the original one, but it has those

12 things there.  On the left side, it has a statement from

13 something called Home Connect Lenders Services, LLC.  It

14 looks like a bill for like $752.50.  What is that for?

15 I am just wondering what it is.  It's dated in 2007, so

16 I suspect it's from the original loan maybe?

17     **A.   I don't know.  It's something that GMAC was**

18 **handling.**

19     Q.   So you have no idea on that side of the folder

20 what those three documents are, correct?

21     **A.   I don't.**

22     Q.   It didn't look like it had anything to do with

23 anything.  That's why I was trying to figure out why

24 they are there.  And the other thing is, it says on

Bret Maloney
July 11, 2014

81

1  there, it says, "This loan may be pledged to the FRB San

2  Francisco, LNV." What does that mean?

3       A.   We have particular loans that are in our

4  portfolio that are pledged to the Federal --

5       Q.   Reserve Bank?

6       A.   Reserve Bank, yeah.

7       Q.   Why would that be?

8       A.   Because we draw a lot of our funding from the

9  Federal Home Loan Bank when we go out and acquire

10  loans.

11       Q.   It says, "May be pledged." Why doesn't it

12  say, "Would be pledged?"

13            MR. IARIA:  Objection.

14            MR. BACH:  I am just trying to figure out what

15  it is.  It shows a receive date of -- an enter date of

16  March 17th of 2010 it looks like.  Any idea what that

17  date would be?

18       A.   No.  You know, correction.  Nautilus would

19  have scanned the following with document imaging.  So

20  the documents that are in there, some of them come out

21  of the origination file or the original collateral

22  file.

23       Q.   Then this is the file which is kept in the

24  vault, right?

Bret Maloney
July 11, 2014

82

1    **A.    No.    This is the file that's kept in one of**
2    **the file rooms.    The one that's kept in the vault is the**
3    **actual note jacket which would have housed the original**
4    **note for this.**
5        Q.    So the note is kept separately from the
6    collateral file?
7    **A.    That's correct.**
8        Q.    Now here's some documents which I am going to
9    hold the original for me to look at because it has the
10   -- I am going to give you a copy for the time being.
11   We're going to look at that, but what this -- and it has
12   the POC Breakdown Summary.    It has a whole bunch of
13   documents, it looks like, that you brought with you
14   today that we had not previously seen, correct?
15   **A.    That's correct.**
16       Q.    So why don't we just call this Group, and call
17   it -- it will be No. 10.
18            MR. IARIA:    10, yes.
19                            (WHEREUPON, Deposition Exhibit
20                             No. 10 was marked for
21                             Identification as of this
22                             date.)
23   BY MR. BACH:
24       Q.    I think we're done with documents.    That's the

Bret Maloney
July 11, 2014

83

1  stuff you brought with you, correct?

2      **A.  Yes.**

3      Q.  Did you prepare what's being called Maloney

4  Deposition Exhibit No. 10?

5      **A.  No.  Chris Whiteley.**

6      Q.  Which is one of the two people you mentioned

7  that helped you prepare?

8      **A.  Correct. There should be a dark green.**

9      Q.  I don't see a dark green.  That's why I was

10  trying to match it up.

11      **A.  I'm sorry.**

12      Q.  You're fine.  I am just trying to understand

13  it.

14          MR. IARIA:  I'm sorry.  That's the late

15  charges.  That's not going to have an invoice attached.

16  BY MR. BACH:

17      Q.  So if I start with pink, I am going to start

18  right here for filing fees and court costs.  Okay.  I

19  think I've got idea.  Okay.  I have been handed what has

20  been labeled as Maloney Deposition Exhibit No. 10

21  today.  And what it appears to be is -- the original is

22  colored and has a color associated with copies of -- it

23  looks like internal invoices -- that are labeled LPS

24  Desktop Invoice Management for each one of the sections

Bret Maloney
July 11, 2014

84

1  of the Proof of Claim. Does that sound about right?

2      **A.**   **Each one of the sections of the Proof of Claim**

3  **as it relates to fees and costs on Page --**

4      Q.   The last two pages of the Proof of Claim, the

5  last two?

6      **A.**   **Not the last two. It's only the first page.**

7  **Actually you're right, the last two.**

8      Q.   Because of the way they filed it?

9      **A.**   **Right.**

10     Q.   Let me ask you another question. We talked

11 about this a little earlier. We talked about a little

12 bit earlier when we're talking about, let's just say an

13 amount for the foreclosure process, $410 at the bottom

14 of the first page. Then we go to the yellow I think it

15 is?

16     **A.**   **I think the darker of the yellow, so it should**

17 **be advertised cost.**

18     Q.   Advertisement costs, which is foreclosure

19 process server, but that's fine. So it goes --

20     **A.**   **I think you're grabbing the wrong tab. Flip to**

21 **that page right there.**

22     Q.   If you can just explain to me what this is,

23 maybe that's the best way of doing it.

24     **A.**   **This is the breakdown of the fees and costs**

Bret Maloney
July 11, 2014

85

1   that have been assessed of this loan and the

2   corresponding invoices for each one of the different

3   charges that have been assessed.  The color coding on

4   here corresponds with the tabs that are also -- that

5   match the same color and it gives you that actual fee,

6   when it was billed, and when it was, you know, to the

7   loan, and what it was billed for.

8       Q.   Now as I page through here, it looks like the

9   documents that are attached to the Summary Document,

10  that are attached, looks like LPS Desktop Invoice

11  Management Invoice Detail, okay?  That is not the actual

12  invoice.  Are there actual invoices as well?

13      A.   There are, but some of those wouldn't be

14  included in here.  I wasn't able to bring those and get

15  those in time, but there are actual invoices in there,

16  if you flip to like the safeguard properties, which

17  actually shoes the invoice and what was actually -- you

18  know, what they actually charge for.

19      Q.   Okay.  So let's just go with the safeguard.

20  That's going to have some questions for me to begin

21  with.

22      A.   Okay.

23      Q.   Which is a page -- for the Safeguard one, just

24  to help you, starts with, this says "LPS Loan Results"

Bret Maloney
July 11, 2014

86

1   it looks like.  Did you find it?

2        A.   Yes.  I think it's the same one.  I am just

3   looking, 6-4-2013?

4        Q.   Now we have this.  And it looks like there is

5   a whole -- that's probably the most documents of

6   anything in this document.  It goes on for quite a while

7   with different invoices.  And it appears that this range

8   in date all the way up to 2011 it looks like, near the

9   back, and most of these invoices appear to be for like

10  $10 it appears.  Is that the case?

11       A.   It's broken out $9 to $10.

12       Q.   Can you describe what this is?

13       A.   This is a property inspection.  They go out to

14  make sure that the property hasn't been vacated.  So

15  it's just an on-site visual to make sure that there is

16  no visible damage and the property hasn't been vacated.

17       Q.   Exactly.

18       A.   It's done on a monthly basis.

19       Q.   So why do you do that?

20       A.   To protect our interest in the security for

21  the loan.

22       Q.   Now, it appears -- we will get to that in a

23  second upon the spread sheet that you gave me.  Those

24  inspections continue.  Does that typically continue?

Bret Maloney
July 11, 2014

87

1  Does that -- do you do that for every single property

2  even if it's in default or it's not in default?

3      A.    Only on properties in default.

4      Q.    Okay.  Why would that distinction be made?

5      A.    Because we are not receiving payments and we

6  want to make sure that the property hasn't been vacated

7  or damaged in any way or harmed, our security interest

8  is, you know, being harmed in any way.

9      Q.    For $9 or $10, what does the person do?

10     A.    They go out, take pictures, report back any

11 visible damage, if there is any damage they can see from

12 the curb, from the street, and to check to see if the

13 property has been vacated.

14     Q.    Okay.  It appears that these are invoices, and

15 it does not appear whether there is an actual report.

16 Is the report only like this or does it actually have

17 some writing on it?

18     A.    Which one are you looking at?

19     Q.    I am speaking on a random.  It says Page 53 at

20 the bottom.  I just picked one out at random.

21     A.    Each one is different.  I mean, you know --

22          MR. IARIA:  Paul, I make a general objection

23 on relevance.  Could we bring it back to this case?

24          MR. BACH:  I am talking about this case.

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

88

1    MR. IARIA:  I know, but issues pertaining to

2 the bankruptcy case.

3    MR. BACH:  This is an issue related to the

4 bankruptcy case.  They are charging them money.

5   **A. Yeah.  They went out, they took pictures of**

6 **the property and they reported back whether it was**

7 **vacant or secured.**

8   Q. Where do they report that it's vacant or

9 secured?

10    MR. IARIA:  Paul, I am going to object for the

11 record.  Your client is talking on the record again.  I

12 couldn't hear what you said.

13 BY MR. BACH:

14   Q. Where does it say that -- the information that

15 you just said, it says -- I can see the invoice.  It

16 says, "Verify if vacant."  Where does it say it wasn't

17 vacant or anything like that?

18   **A. That's not actually stated on the invoice.**

19   Q. So right here, is there another document,

20 another report that we're missing?

21   **A. Not a report.  It would be electronically**

22 **transferred onto the system and it would be documented**

23 **whether or not it was vacant or occupied.**

24   Q. So it's just an e-mail is what it is?

Bret Maloney
July 11, 2014

89

1    A.   No.  It's some type of data coding that's

2  transported on to DMIs system from Safeguard.

3    Q.   Because it just would seem to me if they are

4  transmitting pictures, that information should be along

5  with it.  That's what it seems to me.

6    A.   Again, this is a vendor used by DMI and how

7  that information is reported is between DMI and

8  Safeguard.

9    Q.   Okay.  Page 54 of that.  Did you find it?

10    A.   Mm-hmm.

11    Q.   This invoice appears to be for 12-18-2011.  It

12  looks like it's billed $40,445.

13    A.   It's not -- this one for this particular

14  property for this order is $10.  That is for mass

15  inspections that were recorded across the portfolio.

16    Q.   This is the part of the total bill for

17  everybody?

18    A.   Correct.

19    Q.   I see they all have numbers that are very

20  high, lots of money.  Some are $38,000, some are -- the

21  next one is $47,000?

22    A.   That's for the portfolio in its entirety.

23  What was billed on this loan was actually the $10.  It

24  shows up at the top of the section.  Not $40,000.

Bret Maloney
July 11, 2014

90

1  Q.  Okay.  And then let's call this Maloney

2  Deposition Exhibit No. 11.

3                          (WHEREUPON, Deposition Exhibit

4                          No. 11 was marked for

5                          Identification as of this

6                          date.)

7        MR. IARIA:  The one starting 1-31-2007.

8        THE WITNESS:  There is two.

9        MR. IARIA:  Those two look the same.

10        MR. BACH:  I thought they were the same.  I

11  apologize.

12        MR. IARIA:  They continue.

13  BY MR. BACH:

14      Q.  They are different documents though.

15      A.  It's a continuation.

16        MR. IARIA:  The transaction date, Paul, it

17  starts 1-31-2007 on one, and it starts on 10-17-11 on

18  the other.

19  BY MR. BACH:

20      Q.  Is this from GMAC is what this one is?

21      A.  When it was originated.

22      Q.  1-31-07?

23      A.  Yeah.  So this is from origination on until

24  the claim was filed and then --

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

91

1       MR. IARIA:  For the purposes of

2  identification, if you want to start with '07.

3       MR. BACH:  I think you're absolutely right.

4  Thank you for pointing that out.  I didn't realize they

5  were two different documents.

6       MR. IARIA:  11 and  12.

7              (WHEREUPON, Deposition Exhibit

8              No. 12 was marked for

9              Identification as of this

10             date.)

11  BY MR. BACH:

12    Q.  Yeah.  Let's do this one first.  Okay we have

13  Maloney Deposition Exhibit No. 11 and 12.  11, it looks

14  like, starts 1-31-07, and 12 looks like it starts 10-17

15  of'11, correct?

16    A.  Correct.

17    Q.  Could you explain to me what these documents

18  are, how they are generated?

19    A.  Sure.  This was put together by me and my

20  staff, and this is just a reconciliation of the payment

21  histories from when the loan was originated until now.

22    Q.  And how was this generated?

23    A.  This was actually generated from the payment

24  history screens, both GMAC and MGC.

Bret Maloney
July 11, 2014

92

1     Q.    Did someone go through and actually do this

2   spread sheet?

3     A.    Yes.

4     Q.    Or can the LPS Desktop generate it

5   automatically?

6     A.    No.  This was done by my individual on my

7   staff.

8     Q.    It's just a standard spread sheet that you use

9   to figure out defaults I am guessing, correct?

10    A.    Just to put it in more easily readable format

11  than trying to go through all the histories and each one

12  are different.  So this is just -- This is a

13  reconciliation of that.

14    Q.    We will get to that when we -- in a second.

15  We will talk about the one that I was given previously.

16  This was meant to be a more clear definition of what was

17  provided in that because as I looked at loan histories

18  that are on those things, they are very difficult to

19  read, correct?

20    A.    Correct.

21    Q.    And you were just trying to make it -- it

22  basically replaces that, correct?

23    A.    Yes.

24    Q.    Supplements it?

Bret Maloney
July 11, 2014

93

1    **A.**    **Supplemental, yes.**

2    Q.    It's a better word for it.

3    **A.**    **Yes.**

4    Q.    But the information on that document and these

5  two documents is exactly the same?

6    **A.**    **Yes.**

7    Q.    Okay.  Which one of your assistants prepared

8  this?

9    **A.**    **Chris Whiteley.**

10    Q.    If you go through the category -- I know some

11  of these answers, but let me make sure -- when we look

12  through the top, and I am looking down, there is nothing

13  in the column that's Debtors and Trustees Reference

14  Number.  Does that have a purpose?  It's the first

15  column.  I am going through columns.

16    **A.**    **Yeah.  There is nothing in there.  We didn't**

17  **put anything in there.  We didn't feel it was relevant**

18  **for just showing how the payments were and everything**

19  **was assessed to this account during this time period.**

20    Q.    So that would -- would that normally be used

21  for determining which goes to the pre-petition and which

22  goes to the post petition when you're dealing with a

23  Chapter 13?

24    **A.**    **No.  Actually it's kind of broken out over**

Bret Maloney
July 11, 2014

94

1    here as far as pre-petition funds and post petition.

2       Q.   I am trying to understand what it's normally

3    used for.  What does Transaction Date mean?

4       A.   That would have been when the actual

5    transaction occurred on the system.

6       Q.   Okay.

7       A.   Or when the -- if you notice in there, too, we

8    have in there referencing to the bankruptcies, you know,

9    the Chapter 13, when it was filed.  The date of 7-17-07,

10   and then we had the Motion of Relief, Order of Granting

11   Relief, Order Effective Date, and when it was actually

12   dismissed.

13      Q.   Contractual, I assume, means the date it was

14   applied to on a contractual basis?

15      A.   Correct.

16      Q.   Now, when you have a Chapter 13, does it

17   divide between post petition and pre-petition?

18      A.   It does.  In this instance though, when the

19   borrower filed Chapter 13 bankruptcy, they were --

20      Q.   It was post petition?

21      A.   Yeah, it was post petition.

22      Q.   But normally does it differentiate between

23   what is post petition, current funds, and what is

24   trustee funds typically?

Bret Maloney
July 11, 2014

95

1    A.    Yes, it would.

2    Q.    Does it keep a running total of what the

3  arrears would be?

4    A.    Yes.

5    Q.    Now, it says, "Post Petition paid through

6  date."  I assume that -- well, what is that column used

7  for?

8    A.    It would show post petition, when it was paid

9  through, if there were payments being applied with

10  regards to the post petition.

11    Q.    And the Installment Payment is just the amount

12  that's technically due, correct?

13    A.    The principal interest, taxes and insurance,

14  yes.

15    Q.    It's the amount you're looking for

16  essentially?

17    A.    Correct.

18    Q.    And then the Total Funds would be to keep

19  track if something is short so some portion has to go

20  into a suspense account?

21    A.    Or more.

22    Q.    Or more.  And the other part would into the

23  suspense account?

24    A.    Or the whole amount may go into suspense or a

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

96

1  holding because a suspense account is a holding

2  account.  Then it would be redirected to be applied to

3  the payments if it was enough to make a full monthly

4  payment.

5      Q.   Just so I understand, I can look at a lot of

6  this stuff later on and figure it out.  I don't want to

7  lose you.  So if you have on this instance, just to make

8  an example, and sometimes there was $3,530.35, because

9  that was the amount of the payment.  The payment would

10  be shown immediately as being current because it's

11  exactly the correct amount.  If it's above or below

12  that, that's when the problem starts, correct?

13      A.   What do you mean by, "problem starts?"

14      Q.   Meaning how to account for it.

15      A.   Well, if you would, and bear with me, we could

16  go to a specific example regarding this loan.  If you

17  look down on Line 36 -- 35, Funds to suspense, 12-21-08,

18  $7368.92, which would have been enough to cover two

19  payments, which the payment at the time was $3684.46.

20  So when that was received, it went into suspense on

21  12-21-08.  12-23-08, it got applied to the September and

22  August 2008 payments.

23      Q.   Thank you.  That does help.

24      A.   That's the only time there was any funds in

Bret Maloney
July 11, 2014

97

1  suspense with regards to this loan.

2      Q.    We kind of touched on this earlier.  On that

3  particular transaction, the money comes in.  Does it get

4  deposited -- well, that would be because it was still

5  GMAC.  Let's just take the example that it came into

6  MGC.  Would MGC deposit it into its own account then and

7  then make payments out when it applies it?

8      A.    Makes payments to what?

9      Q.    To the investor, to the company that actually

10  owns the loan.

11          MR. IARIA:  Objection, relevance.

12          THE WITNESS:  The funds would come in, they

13  would be documented as far as the transaction was when

14  they were received, they would be documented when they

15  were applied, and then I think they would remit it the

16  investor on a monthly basis.

17          MR. IARIA: Counsel, just for the record, I

18  have been just handed these documents that may explain a

19  lot of the questions you may even have to ask.  I don't

20  know if you want to go through your remaining material

21  and then go through the questions you have for the sake

22  of time and then potentially issue a second set of

23  interrogatories based on these, or something else, so

24  we're not at -- I mean, so you're not going through them

Bret Maloney
July 11, 2014

98

1  while we're waiting for you.

2        MR. BACH:  I have never seen it before, so --

3        MR. IARIA:  I understand that.  But I think

4  they probably do explain many of the -- many of the

5  questions that you did plan on asking.

6  BY MR. BACH:

7     Q.   Now, I see here as part of the GMAC, so you

8  may not know, but it looks like the principal balance

9  doesn't go down.  Is there a reason for that?

10    **A.   This is an adjustable rate note, and the first**

11 **so many years, based on the terms of the note, would go**

12 **directly to interest.  And I think when it becomes --**

13 **after the interest only period, then it would start**

14 **being applied to principal balance.**

15    Q.   Interest first loan?

16    **A.   Yes.**

17    Q.   It didn't look right.  That's why I looked at

18 that.  When it says, "Late fees and other charges," what

19 is other charges?

20    **A.   The other charges would be reflective on**

21 **here.**

22        MR. IARIA:  For the record, he is pointing to

23 Group Exhibit 10.

24        MR. BACH:  This is Exhibit No. 12.  Here's

Bret Maloney
July 11, 2014

99

1   the -- do you have it?  Response to Discovery?  I have

2   another copy if you want it.  You don't want to help me

3   kill trees, huh?

4                    Have you ever seen this before?

5        A.   I have.

6        Q.   Did you help in its preparation?

7        A.   I did not.

8        Q.   Now, I just want to go through with you, if

9   you go back near the end of the legal part of it when

10  they respond, and there should be a page after the Proof

11  of Service by Mail where it talks about descriptions,

12  payee transactions.

13       A.   Okay.

14       Q.   Do you know what this document is?

15       A.   This would be the coding for the payee

16  transactions I think for -- this would be for June now

17  because it's dated Training Manual 2-14-2005.

18       Q.    This is not part of the system that you use?

19  Is that what it is or is there another one for you?

20  Because it looks like then we have the pay history that

21  you were referring to that says Dovenmuehle Mortgage on

22  the top of it as part of it.

23       A.    Yeah.  The key for Dovenmuehle Mortgage

24  payment history that's here, if you turn to Page -- they

Bret Maloney
July 11, 2014

100

1    are not numbered -- it says Page at the top, A2155.

2        Q.    A2?

3        A.    Yeah, A2155.  It would have been dated

4    12-30-2011.  I think you went too far.  There you go.

5    Right here.  There is the codes and what the codes

6    actually represent.  So if you see those, like a FHA

7    penalty, (K) Interest due, paid.

8        Q.    So you're saying the first page is for GMAC?

9        A.    I think these Description Payee Transaction

10   Codes are for --

11       Q.    Are for GMAC?

12       A.    Are for GMAC Payment History.  For the

13   Dovenmuehle, it's actually on --

14       Q.    The bottom is what you're saying.

15       A.    The bottom of the pages.

16       Q.    These all look to say Dovenmuehle at the top.

17   That's why I am a little confused, I guess.

18       A.    Dovenmuehle is the subservicer for MGC.  So

19   these would have been the payment histories from 2010 to

20   current.

21       Q.    So I don't have here the ones that GMAC

22   prepared, correct?

23       A.    It's not attached.

24       Q.    Payment codes don't match up to what's here is

Bret Maloney
July 11, 2014

101

1   what my question really is, correct?  The payment codes

2   are kind of irrelevant?

3       A.   **Yes, irrelevant for this history, correct.**

4       Q.   Which is why I couldn't use it to read that

5   when I went through it the first time, right?

6       A.   **Right.**

7       Q.   That makes sense.  If we go beyond that, we

8   have the note, right?

9       A.   **Correct.**

10      Q.   With the additional allonges which you said is

11  not valid, correct?

12      A.   **The one that had LNV, Inc.?**

13      Q.   Yes.

14      A.   **Yes.**

15      Q.   It has an Assignment of Mortgage, correct?

16      A.   **It has the Assignment of Mortgage from LNV**

17  **Corporation.**

18      Q.   Then we have some Desktop LPS Invoice

19  Management, that was a series of them, which looks like

20  it's some of the ones we have here, but not all the ones

21  that were attached to Deposition Exhibit No. 10.  Would

22  that be correct?

23      A.   **I would agree to that.**

24      Q.   Then below that, we have the mortgage,

Bret Maloney
July 11, 2014

102

1    correct?

2        A.   Correct.

3        Q.   Do you need a copy of that?  Those are all the

4    documents that were attached to the Answers, Request for

5    Production.  We basically described what they were?

6        A.   Correct.

7        Q.   Basically the loan, the note, the pay history

8    and these couple -- and all the invoice ones that you

9    produced today invoice details, correct?

10           MR. IARIA:  I'm sorry, can you reclarify

11   that?  I lost you.

12   BY MR. BACH:

13       Q.   Attached to the Answers to the Request For

14   Production is the loan -- is the note, the mortgage, the

15   assignments, the allonges that we discussed already,

16   okay?  Then also is the pay history that we discussed,

17   the payment codes that don't apply to what is described

18   which you have now supplemented with Deposition Exhibit

19   No. 12 and 12.  And then besides that are some of the

20   invoice details, but not all.  That's what's attached to

21   here, correct?

22       A.   What I see attached to here is the payment

23   history where the loan was at DMI, a copy of the note

24   with the allonges, Assignment of -- one Assignment of

Bret Maloney
July 11, 2014

103

1    Mortgage.  The only one that's on there is from LNV to

2    Beal Bank U.S.A., some of the invoices, not necessarily

3    would be all of them that was presented in Exhibit 10,

4    and a copy of the mortgage.

5        Q.   I think we said a lot of the same things, but

6    maybe said it a different way.

7        A.   There is a couple things left out.

8        Q.   But that's the basic idea of what I was trying

9    to get across.  Okay.  So now, if you would come back

10   with me and let us go through some of my questions, if

11   we go to the Answers to the Request for Document

12   Request, which is about Page 1, 2, 3, 4, 5, it looks

13   like 6, okay?  Now, No. 3 was objected to, but you have

14   now given me that spread sheet, so that's what you're

15   sufficing for that, correct?  No. 3?  It was unduly

16   burdensome.  Now you have produced that, correct?

17       A.   Yes.

18       Q.   I am going through charges and debits.  Exact

19   things I was looking for.  That's fine.  No. 4 has an

20   XLS Form Spread Sheet.  That's kind of what Exhibit 11

21   and 12 are, deposition exhibits.  If you go to No. 4,

22   which is right there, which I asked for a spread sheet.

23       A.   That's what that is, yes.

24       Q.   I just want to make sure, you say "Collection

Bret Maloney
July 11, 2014

104

1  notes are available as part of the LPS."  Collection

2  notes, can those be printed out easily?

3      **A.    Yes.**

4      Q.    Is there a reason why you didn't bring those

5  with you today?

6      **A.    I wasn't aware that you didn't have them**

7  **already.**

8      Q.    I don't.  I would like them.  But they aren't

9  hard to print out at all, correct?

10      **A.    No.**

11      Q.    So the fact that it says that that request is

12  unduly burdensome in time and scope --

13          MR. IARIA:  Objection.  I mean, you're trying

14  to have him speak to legal objections that are made as a

15  part of it, be it relevancy -- but for the sake of this

16  case, if you want to go through collection notes as

17  well, I would have to review them with my client and see

18  if there is any material that can't be produced as part

19  of it.

20          MR. BACH:  But the point you made in this

21  objection was it was too difficult to produce, and

22  you're telling me now that it's not too burdensome to

23  produce.  All you have to do is print it out.

24          MR. IARIA:  I don't know what's on these, so

Bret Maloney
July 11, 2014

105

1   we would have to review the notes.  So I may have a

2   separate objection based on that.

3           MR. BACH:  That's what it says right here.  It

4   doesn't say anything about the fact it is privileged or

5   any other information.  It says it was unduly burdensome

6   to print it out.

7           MR. IARIA:  It sure does.

8   BY MR. BACH:

9       Q.   Now, the insurance that was before, is that

10  regular?

11          MR. IARIA:  Objection.  Can you

12  specify, "before?"

13  BY MR. BACH:

14      Q.   On the 11th and 12th, it showed, I think, that

15  you were - at least recently when I was going through

16  it, that there were some escrow payments for insurance.

17  Is that or regular insurance?

18      A.   **Regular insurance.**

19          MS. BACH:  Clarification question.  If I am

20  looking at the late fees and other charges on what's

21  labeled as Exhibit 11, and I compare it to what was

22  Group Exhibit 10, I will be able to get the

23  clarification what all of those are?  So the column

24  that's labeled Balance of Late Fees or Other Charges,

1  not the balance, the actual late fee and charge

2  assessments?

3      A.   Yes.  You can compare that to what was

4  actually on Exhibit 10, and that should be the invoices

5  that match those to these charges.

6          MS. BACH:  I will not ask anything about those

7  and look at the two comparisons.

8  BY MR. BACH:

9      Q.   Is there something that if someone looks at

10  the computer system, it tells them where the note is, in

11  terms of custody of the note?

12     A.   No, not on the system.

13     Q.   Okay.  So when you went to go prepare for

14  today, how did you know where the note was or were you

15  told or?

16     A.   Well, I reviewed the note jacket and I saw all

17  the sheets that showed that it was sent to counsel, and

18  then I verified with counsel to make sure they actually

19  had it in their possession.

20     Q.   You checked the note jacket, which is really

21  the answer my question?

22     A.   Yes.

23     Q.   But the note jacket is really what the answer

24  to the question -- That's how you keep track of the

Bret Maloney
July 11, 2014

107

1  custody of that, because the note jacket stays no matter

2  if the note leaves the building?

3      **A.    That's correct.**

4      Q.   Now, if you sell a loan or the loan gets paid

5  off, what happens to the note jacket?

6          MR. IARIA:  Objection to relevance to this

7  case.  Try and keep this moving.

8          THE WITNESS:  The note, if it's sold, the note

9  jacket would go to the original note, to the new owners

10 and we would have a copy that we would archive.  If it

11 was paid in full, we would stamp the note, "Paid in

12 full," make a copy of it, and send the original note

13 back to the borrower.

14     Q.   Is Allison Martin the only one who is

15 authorized to sign allonges and assignments?

16         MR. IARIA:  Objection to relevance to this

17 case.  Not even a question that would lead to

18 permissible evidence in this matter.

19         THE WITNESS:  I am unaware.

20 BY MR. BACH:

21     Q.   You would agree that the mortgage -- that the

22 note is not blank.  It is endorsed to a specific party,

23 correct?

24     **A.    Correct.**

Bret Maloney
July 11, 2014

108

1    Q.   Is that normally how the Beal Companies hold

2  notes or are some blank?

3          MR. IARIA:  Objection, relevance.

4          THE WITNESS:  We would normally have it

5  assigned to a specific entity.  However, I have seen

6  some in the past that have been endorsed in blank.

7          MR. BACH:  Let's take a break for about five

8  minutes.  I may be done pretty quickly.

9          MR. IARIA:  Okay.  Off the record.

10                  (Off the record.)

11                  EXAMINATION

12                  BY MS. BACH:

13   Q.   Back on the record.  I have Exhibit 4 and

14  Exhibit 9 in my possession.  I am going to hand them to

15  you so you can see so we don't have to go digging.

16          If you look at the second page of Exhibit

17  4 and the second page of Exhibit 9, those are the two

18  pages that are signed by Allison --

19   A.   Martin?

20   Q.   Allison Martin, correct?

21   A.   Correct.

22   Q.   If you look at these signature pages, just a

23  really quick question.  There is a mark here.  There is

24  a mark there.  There is a mark there.  I pointed right

The mark was a floating j

Bret Maloney
July 11, 2014

1    next to the LNV Corporation, next to like the signature

2    block on Exhibit 9, and then Exhibit 4, just next to the

3    LNV Corporation.  Do you know what those are?

4         A.   No.

5              MR. BACH:  Is that on the original, too?

6              MS. BACH:  It's on the originals, too.

7         Q.   Have you ever seen those types of marks

8    before?

9         A.   No.

10        Q.   There is a couple people that I believe work

11   with you.  I just want to know what their positions

12   are?  Do you know who Burton Brillhart is?

13        A.   Explain.

14        Q.   What was his position while he worked there?

15             MR. IARIA:  Objection, relevance to this

16   case.

17             THE WITNESS:  I don't recall.

18        Q.   Is there a Tom Montgomery that works with

19   you?

20             MR. IARIA:  Objection, relevance.

21             THE WITNESS:  No.

22   BY MS. BACH:

23        Q.   Tim Taylor?

24             MR. IARIA:  Objection, foundation, relevance.

Bret Maloney
July 11, 2014

110

1    If we could explain even where these names are coming

2    from?

3            MS. BACH:  From their website and the links on

4    people.  These are people my clients talked to and asked

5    about the specific account.

6        A.    **Tim Taylor is, I think, CFO.**

7    BY MS. BACH:

8        Q.    For which corporation?

9        A.    **For Beal.**

10       Q.    For Beal in general?

11       A.    **Yeah.**

12           MS. IARIA:  I'm sorry, Counsel.  You said your

13   client has talked to those individuals?

14           MS. BACH:  Talked to them or have received

15   correspondence from them -- I should clarify what I

16   said -- with their names on them.

17       Q.    Randy Leverette?

18           MR. IARIA:  Objection, relevance.

19           THE WITNESS:  He is an ex-employee, used to be

20   VP of loss mitigation.

21   BY MS. BACH:

22       Q.    Of which corporation?

23       A.    **MGC.**

24       Q.    MGC.  And when did he leave?

Bret Maloney
July 11, 2014

111

1       MR. IARIA:  Objection, relevance.

2       THE WITNESS:  I don't recall when he was

3 actually -- He was let go prior to, I think, or he left

4 on his own prior to 2010.

5    Q.  Is there an Erica Thomas at MGC?

6    **A.  Say that again.**

7    Q.  Erica Thomas?

8    **A.  No.**

9       MR. IARIA:  Objection, relevance.

10 BY MS. BACH:

11   Q.  Was there ever an Erica Thomas that worked

12 with you?

13   **A.  Yes.**

14   Q.  When did she leave?

15      MR. IARIA:  Objection, relevance.

16      THE WITNESS:  Sometime within the last two

17 years.

18      MR. IARIA:  Counsel, if we could get this to

19 the actual -- anything to do with this case at all?

20      MS. BACH:  Every one of these people have

21 something to do with this case.

22      MR. IARIA:  With Beal Bank.

23      MS. BACH:  These are MGC employees who have

24 communications with them.

Bret Maloney
July 11, 2014

112

1          MR. IARIA:  Also, we're talking about a

2    bankruptcy filing, amounts due and owing and maybe

3    standing issues.  You're just going through and reading

4    a list of names of employees.

5          MR. BACH:  There is no harm in just asking if

6    they are employees.

7          MR. IARIA:  I am making my objection for the

8    record.

9    BY MS. BACH:

10       Q.   Rob Ackerman?

11         MR. IARIA:  Objection, relevance.

12         THE WITNESS:  Yes.

13       . MS. BACH:  If you want to stipulate you're

14    going to object to all of these names.

15         MR. IARIA:  Sure.  We can do that.  If there

16    is a series of 30 postcards with names on them, then I

17    will make a blanket objection to the specific names.

18         MR. BACH:  That's fine.

19    BY MS. BACH:

20       Q.   Does Rob Ackerman work with you?

21       A.   Yes.

22       Q.   What is his title?

23       A.   I believe his title is chief litigation, but

24    he is also SVP.  He is on the CLMG side.

Bret Maloney
July 11, 2014

113

1    Q.   Do you know -- Strike that.  Bill Sowerman?

2    (phonetic).

3    A.   That's Bill Sowerman, yes.  He was the -- is

4    SVP over CLMG.  He is no longer with the company.

5    Q.   Do you know when he left?

6    A.   Beginning of this year.

7    Q.   Monthly I can you recall?

8    A.   She is also an ex-employee, used to be SVP for

9    Beal.  She is no longer with the company.  She left a few

10   years ago.

11   Q.   James Irwin?

12   A.   James Irwin is the president of CMG and he is

13   still there.

14   Q.   Jacob Cherner?  (phonetic).

15   A.   Jacob Cherner is the president of the

16   company.  He is over all of the entities and he is still

17   there.

18   Q.   When you say, "the company," you mean Beal?

19   A.   Beal, yeah.

20   Q.   Steven Costas?

21   A.   No.  He used to be chief litigation.  He is no

22   longer with the company.  He has been gone for at least

23   a year.

24   Q.   And Michael Brown?

Bret Maloney
July 11, 2014

114

1     A.   Michael Brown was SVP of our accounting and he

2  has been gone within the last year as well.

3     Q.  I only have one more name for you.  Connie

4  Johnson?

5     A.   Connie Johnson was over on the CLMG side.  She

6  was a portfolio manager and she is no longer with the

7  company as of this year.

8     Q.  Way earlier today you mentioned there is a

9  Scott Burns.  I just want to clarify.  He is the

10  bankruptcy manager from DMI?

11     A.   I believe Scott is over bankruptcy.  I believe

12  he is foreclosure.  If not, I can supply who was under

13  bankruptcy with DMI.

14     Q.  Does MGC have many bank accounts?

15       MR. IARIA:  Objection, vague.

16       THE WITNESS:  I'm sorry.  What?

17  BY MS. BACH:

18     Q.  Does MGC have many -- Strike that.  Does all

19  payments to MGC go to the same account?

20     A.   I don't know.

21     Q.  Are there multiple addresses and locations for

22  MGC?

23     A.   There are.

24     Q.  Are there different addresses for payments for

Bret Maloney
July 11, 2014

115

1  MGC and LNV than there are offices?

2      A.   Let me get some clarification.   There is going

3  to be different -- e-mail address or the address I gave

4  you for where I am located out of is the corproate

5  office, the 7195 Dallas Parkway.   There is some that

6  are -- where you send correspondence and payments to is

7  an Illinois address.   That's because it's going to DMI

8  who is our subservicer.   There is also different

9  addresses for correspondence and payments for Cinlar,

10  which is in New Jersey.   So that's the difference

11  between the different addresses and such.   The loan is

12  being subserviced by DMI.   The payments are to be

13  directed to that address here in Illinois.

14      Q.   Do you know how many addresses DMI may have

15  for payments?

16      A.   For us, one.

17      Q.   Do those addresses for payments change or has

18  it been stagnant since the inception of this loan?

19      A.   I don't recall.

20      Q.   Do you know what the Illinois address is?

21      A.   It's on one of the letters, I believe.

22      MR. IARIA:   Lake Zurich address.

23      THE WITNESS:   One Corporate Drive, 3360 Lake

24  Zurich, Illinois.

Bret Maloney
July 11, 2014

116

1     Q.   To the best of your knowledge, that's the only

2 payment address they had?

3             MR. IARIA:  Can you specify a time line?

4             MS. BACH:  From the inception of this loan.

5     **A.   Well, this loan has only been subserviced by**

6 **DMI since April 2010.  This is the customer service**

7 **department's address for correspondence.  The overnight**

8 **payments are also sent to One Corporate Drive, Lake**

9 **Zurich, is the only one I am aware of.**

10     Q.   Do you have any procedures in place to verify

11 the notes and mortgages to make sure they are not

12 fraudulent?

13             MR. IARIA:  Objection, the question

14 presupposes a whole slue of potentially -- well, I don't

15 know what you're getting at in this question.  If you

16 could -- just procedures on whether or not things are

17 fraudulent is the question?

18             MS. BACH:  I will strike the question.  Let me

19 rephrase it.

20     Q.   Are there procedures in place, when a new loan

21 is acquired, to verify that the documents are true and

22 correct?

23     **A.   Is there a procedure in place?  I don't know.**

24     Q.   To your knowledge, has Beal or any of its

Bret Maloney
July 11, 2014

117

1  subsidiaries been sued?

2          MR. IARIA:  Sued at all?

3          MS. BACH:  I am finishing the sentence.  I am

4  figuring out the right way of phrasing it.  To your

5  knowledge, has Beal Companies or any other entities been

6  sued for fraudulent notes or mortgages?

7          MR. IARIA:  Objection, relevance.

8          THE WITNESS:  Not that I am aware of.

9  BY MS. BACH:

10     Q.   Have they been sued from any of the parties --

11  Strike that.  Has Beal Companies or its subsidiaries to

12  your knowledge been sued by the parties they purchased

13  their debts from?

14          MR. IARIA:  Objection, relevance to this

15  case.

16          THE WITNESS:  Not that I am aware of.

17          MS. BACH:  We're going to strike that

18  question.  I will come up with a better way of phrasing

19  it.

20     Q.   Are you aware of a complaint that was filed in

21  accordance with this mortgage in July of 2008 with the

22  Attorney General's Office?

23          MR. IARIA:  Objection, relevance.  There is a

24  bankruptcy proceeding.

Bret Maloney
July 11, 2014

118

1        THE WITNESS:  I am not aware.

2   BY MS. BACH:

3        Q.   Are you aware that at one point this loan was

4   supposed to go from GMAC to Aurora Loan?

5        A.   No.

6        Q.   Do you know the EIN numbers for the various

7   corporations under Beal Bank?

8        A.   No.

9        Q.   How many --

10       MR. IARIA:  Counsel, I don't want to keep

11  going with the blanket objection.  If you would kindly

12  get this back on track to reality here.

13  BY MS. BACH:

14       Q.   How many affidavits do you sign?

15       MR. IARIA:  Objection, relevance to this

16  case.

17       MS. BACH:  Let me finish the question.

18       Q.   How many affidavits do you sign in accordance

19  with either foreclosure proceedings or proof of claims?

20       MR. IARIA:  Do you have a time line, Counsel?

21  Ever?

22  BY MS. BACH:

23       Q.   I am just thinking about it for since 2012.

24  In a typical month.  I will make it easier.  A typical

Bret Maloney
July 11, 2014

119

1  month.

2          MR. IARIA:  Objection.  It has no bearing at

3  all to this case and we're almost at the end of this.  I

4  don't want to threaten to walk out, but we've got to get

5  this back on track to relevant information pertaining to

6  this bankruptcy proceeding.

7          THE WITNESS:  On average, one a month.

8  BY MS. BACH:

9      Q.   When you -- Do you make the determination

10 yourself whether there is going to be mortgage insurance

11 on a claim?

12     A.   I do not.

13     Q.   Do you have a copy of the servicing

14 agreement?

15          MR. IARIA:  Could you specify?

16 BY MS. BACH:

17     Q.   Between LNV and GMAC?

18     A.   LNV and GMAC?

19     Q.   MGC.

20     A.   There is one that is out there.  I don't

21 currently have one with me.

22     Q.   Would you be able to get a copy of that?

23          MR. IARIA:  Objection, relevance to this

24 case.

Bret Maloney
July 11, 2014

120

1           THE WITNESS:  Yes.

2  BY MS. BACH:

3      Q.  Do you use Pfizer?

4           MR. IARIA:  Objection.  For the record, the

5  debtor's client or the actual debtor is asking the

6  questions at the deposition now, just for the record.

7           THE WITNESS:  We used to.

8  BY MS. BACH:

9      Q.  Do you remember when the last time you used

10  them was?

11     **A.   It would have been prior to the service**

12  **transfer to DMI, which would have been around April**

13  **2010.**

14     Q.  Is GMAC themselves licensed in Illinois?

15     **A.   GMAC?**

16     Q.  I am getting my letters mixed.

17     **A.   MGC, and I don't know.**

18     Q.  Is DMI?

19     **A.   I don't know.**

20     Q.  I only have a couple more questions left.  One

21  of the names that I missed earlier is did you work with

22  a Jeffrey Shearhart?

23     **A.   CLNG litigation.**

24     Q.  Charles King?

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

121

1    A.    Charles King is a DMI employee.

2    Q.    Do you know which department he is in?

3    A.    I believe they are their litigation

4 department.

5         MR. IARIA:  For the record, the debtor is now

6 talking on the record and asking additional questions.

7         MR. BACH:  She is talking to counsel.  She is

8 allowed and she should be.

9         MR. IARIA:  It seems like she is running the

10 deposition at this point.  Could I engage in brief

11 redirect?

12         MS. BACH:  I have one final question.

13    Q.    Have you ever been convicted of a crime?

14         MR. IARIA:  Objection.  I think you should

15 focus it to a felony for the purposes of testimony, but

16 that's --

17         THE WITNESS:  I have had a DWI back in 1999,

18 which I served two years on probation, which I completed

19 the probation.  That's it.

20         MS. BACH:  I have nothing further of this

21 witness.

22         MR. IARIA:  Counsel, are you all set?  Some

23 brief, brief redirect.

24

Bret Maloney
July 11, 2014

122

1                         EXAMINATION

2                      BY MR. IARIA:

3          Q.    Would a specific person be assigned to one

4    specific case at DMI, to the best of your knowledge, or

5    would a group of individuals potentially work on one

6    case?

7          A.    I believe it would be a group of individuals.

8          Q.    Previously you testified as to the custodian

9    division, and there was a chart outlining the name.

10   Does MGC, Beal, LNV, do they all have equal access to

11   the custodian recordkeeping and notes?

12         A.    Yes.

13         Q.    At the time the Proof of Claim was filed, how

14   did the original note exist and what were the specific

15   endorsements on that?

16         A.    The original note was with counsel back in

17   June of 2011.  What the note was at the time, the owner

18   was LNV Corporation.

19         Q.    In regards to Exhibit 4, the green cover sheet

20   that was previously entered into the record, that

21   document had a specific date on it.  Does that mean that

22   the allonge was created on that date or would it have

23   been around that date?

24         A.    It could have been either/or.

Bret Maloney
July 11, 2014

123

1      Q.   One of the later questions -- I am going to

2  briefly touch on this -- you showed little marks on the

3  allonges and you said you have never seen them before.

4  Could it be have you ever even looked for those kinds of

5  marks before?

6      A.   No.

7      Q.   LNV and Beal Bank, do they share the same

8  address?

9      A.   **They share the same location, LNV though is**

10  **shown as being 7195 Dallas Parkway.  6000 Legacy Drive**

11  **is actually the same physical address.**

12      Q.   If ownership was transferred from LNV to Beal,

13  and say it wasn't an active foreclosure or bankruptcy,

14  would the note stay in the same custodian spot?  Would

15  it move at all?

16      A.   **It would not move.**

17      Q.   One last issue.  Counsel briefly touched on

18  payments information for DMI.  Just to clarify, we

19  pointed out a Lake Zurich address.  Could there be a

20  P.O. Box address for payments accepted, do you know?

21      A.   **I don't recall.**

22          MR. IARIA:  And that's all I have for

23  redirect.

24          MR. BACH:  Nothing.

Bret Maloney
July 11, 2014

124

1          MR. IARIA:  I am going to reserve for the

2   transcript.

3          * * * * FURTHER DEPONENT SAITH NOT * * * *

Bret Maloney
July 11, 2014

125

1          I, WENDY M. STRICKLER, a Certified
Shorthand Reporter of the State of Illinois, CSR License
2   No. 084-003257, do hereby certify:
3          That previous to the commencement of the
examination of the aforesaid witness, the witness was
4   duly sworn by me to testify the whole truth concerning
the matters herein;
5
          That the foregoing deposition transcript
6   was stenographically reported by me and was thereafter
reduced to typewriting under my personal direction and
7   constitutes a true and accurate record of the testimony
given and the proceedings had at the aforesaid
8   ·deposition;
9          That the said deposition was taken before
me at the time and place specified;
10
          That I am not a relative or employee or
11  attorney or counsel for any of the parties herein, nor a
relative or employee of such attorney or counsel for any
12  of the parties hereto, nor am I interested directly or
indirectly in the outcome of this action.
13          IN WITNESS WHEREOF, I do hereunto set my
hand at Chicago, Illinois this 5TH day of August, 2014.
14
15

16                    _____
                      WENDY M. STRICKLER, CSR
                      CSR License No. 084-003257
17
18
19
20
21
22
23
24

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

126

1                           ERRATA SHEET
2            I, BRET MALONEY, have read the foregoing
  transcript of my deposition taken on July 11, 2014 and,
3  except for any corrections noted below, it is a true and
  correct transcript of my deposition given on the date
4  aforesaid.
5                CORRECTIONS BASED ON ERRORS IN
6  PAGE    LINE                REPORTING OR TRANSCRIPTION

7  ____    ____        _____

8  ____    ____        _____

9  ____    ____        _____

10 ____    ____        _____

11 ____    ____        _____

12 ____    ____        _____

13 ____    ____        _____

14 ____    ____        _____

15 ____    ____        _____

16 ____    ____        _____

17 ____    ____        _____

                       _____
18                               BRET MALONEY
19 STATE OF ILLINOIS  )
   COUNTY OF DUPAGE   )
20
   subscribed and sworn to before me
21 this_____day of_____,2014.
22
23
24

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

**A**

a.m 1:8  4:5
A2 100:2
A2155 100:1
  100:3
able 6:15
  31:19
  32:2
  34:19
  40:4
  75:18
  76:1,10
  85:14
  105:22
  119:22
absolutely
  91:3
Acceptance
  10:10,17
  10:20
accepted
  123:20
accepts
  12:3
access 15:4
  22:11,20
  22:24
  122:10
accessed
  22:13
accessible
  24:18
  25:14
account
  22:17,17
  93:19
  95:20,23
  96:1,2,14
  97:6
  110:5
  114:19
accounting
  21:24
  74:15
  114:1

accounts
  114:14
accurate
  37:3
  125:7
Ackerman
  112:10,20
acquire
  81:9
acquired
  48:13
  49:3
  116:21
acquisit...
  62:19
action 66:4
  125:12
active
  123:13
actual 7:8
  24:8
  38:13
  41:18
  59:20
  82:3  85:5
  85:11,12
  85:15
  87:15
  94:4
  106:1
  111:19
  120:5
add 53:8
added 39:18
  41:19,20
additional
  25:17
  26:19
  35:13,14
  101:10
  121:6
address 4:3
  4:22  13:6
  31:6
  115:3,3,7
  115:13,20

115:22
116:2,7
123:8,11
123:19,20
addresses
  114:21,24
  115:9,11
  115:14,17
adjustable
  98:10
Administ...
  13:24
advertised
  84:17
Advertis...
  84:18
advising
  69:14
affidavits
  118:14,18
affiliated
  4:2  8:15
  10:12,15
aforesaid
  125:3,7
  126:4
ago 5:19
  6:7  16:2
  113:10
agree 40:8
  46:24
  70:1
  101:23
  107:21
agreed 16:2
agreement
  11:11,14
  11:14,19
  12:6,16
  19:9,9,21
  20:2,20
  33:3
  48:21
  59:2
  119:14
agreements

12:11
19:14
ahead 27:11
69:20
allison
  47:16,18
  55:9,10
  56:8,12
  68:7,11
  78:8
  107:14
  108:18,20
allonge
  33:23
  35:14
  38:18
  39:5
  40:20,22
  41:1,5,17
  41:24
  47:5,21
  47:23
  53:20
  55:1,9
  58:13
  61:10
  78:14
  122:22
allonges
  39:3,17
  42:5  43:7
  50:13
  58:21
  78:17,20
  101:10
  102:15,24
  107:15
  123:3
allowed
  121:8
allows 6:11
  6:13
ambiguous
  8:7  18:4
amount
  65:11,12

65:13,15
65:22,23
67:20,20
84:13
95:11,15
95:24
96:9,11
amounts
  64:23
  65:1
  70:20
  112:2
analyst
  29:22,22
  30:4
and/or
  24:12
angle 51:12
  51:15
Anselmo 2:2
  34:7
  36:24
  64:22
answer 6:16
  57:10
  73:3,6,9
  106:21,23
answers
  93:11
  102:4,13
  103:11
anticipa...
  66:17
anybody
  12:10
  29:8,16
  29:18
  54:22
apologize
  47:21
  53:6
  63:22
  90:11
appear 86:9
  87:15
appeared

1:22  2:5
appears
  47:24
  54:5  80:9
  83:21
  86:7,10
  86:22
  87:14
  89:11
applicat...
  21:4
applied
  94:14
  95:9  96:2
  96:21
  97:15
  98:14
applies
  97:7
apply
  102:17
appreciate
  16:13
  28:1
Approxim...
  56:2
April 33:1
  33:12,15
  33:16
  116:6
  120:12
archive
  107:10
areas 21:6
  21:9
arrangem...
  16:21
arrearages
  65:22
arrears
  67:21
  68:3  95:3
arrive
  16:18
asked 5:20
  16:1  77:1

Bret Maloney
July 11, 2014

128

103:22
110:4
**asking**
52:18
53:5 58:3
59:1 65:9
65:10
68:22
69:2 72:6
98:5
112:5
120:5
121:6
**assess** 26:3
26:10,11
**assessed**
65:24
68:4 85:1
85:3
93:19
**assessments**
106:2
**asset** 48:21
58:15
59:2
**assets**
19:22
**assigned**
32:1,10
34:3
78:11,22
108:5
122:3
**assignment**
36:7,8,9
58:21
61:22
73:15
74:18
75:3,8,14
76:22
77:8,10
77:15
79:11
101:15,16
102:24,24

**assignments**
7:2 50:13
73:11
78:16,19
80:10
102:15
107:15
**assigns**
77:17
**assist** 29:9
**assistants**
93:7
**associated**
31:3
83:22
**assume** 15:8
28:8 43:5
54:22
79:1
94:13
95:6
**attach**
34:14
**attached**
38:16,19
38:21
39:6
40:22
42:8 47:4
54:17,19
65:2 70:8
83:15
85:9,10
100:23
101:21
102:4,13
102:20,22
**attachment**
70:22
**attachments**
63:11
**attend** 5:20
**attorney**
32:4
36:20
53:3

117:22
125:11,11
**attorney...**
55:13,15
55:20
**attorneys**
18:12
**August**
14:11
15:10,12
15:13
96:22
125:13
**Aurora**
118:4
**Austin**
13:24
**authorized**
107:15
**authorizes**
55:19
**automati...**
26:1 92:5
**available**
31:20
104:1
**average**
119:7
**aware** 5:24
10:18
11:3,7
29:4
60:16
69:9 73:5
104:6
116:9
117:8,16
117:20
118:1,3

_____
B
_____
**B** 3:7 37:17
**B-R-E-T**
4:21
**B-U-R-R-I-S**
64:18

**Bach** 1:19
1:20 3:4
3:4 4:8
4:17 5:11
8:9 12:2
14:17
17:22
18:7 20:7
20:23
22:14
27:2 30:9
30:13
34:8,14
34:18,21
35:5,8,12
35:22
36:12,17
37:7,10
38:5
40:14
42:13
43:4
46:13
47:16
48:24
49:16
52:9,17
53:2,9,14
56:1,7,11
57:10,19
57:23
59:10
61:8 63:5
63:14
65:6,9
66:1,24
67:5,7,13
68:10,15
69:24
71:20
72:23
73:18
74:11,14
74:24
75:17
77:21

79:5,17
79:20
81:14
82:23
83:16
87:24
88:3,13
90:10,13
90:19
91:3,11
98:2,6,24
102:12
104:20
105:3,8
105:13,19
106:6,8
107:20
108:7,12
109:5,6
109:22
110:3,7
110:14,21
111:10,20
111:23
112:5,9
112:13,18
112:19
114:17
116:4,18
117:3,9
117:17
118:2,13
118:17,22
119:8,16
120:2,8
121:7,12
121:20
123:24
**Bachelor**
13:23
**Bachelor's**
14:3
**back** 14:13
14:21
15:24
23:2

26:13
27:24
34:19
36:17
39:19,21
43:18,21
50:16
51:10
56:17
58:8
59:11,11
63:13
69:2 72:1
86:9
87:10,23
88:6 99:9
103:9
107:13
108:13
118:12
119:5
121:17
122:16
**background**
62:11
**balance**
98:8,14
105:24
106:1
**bank** 8:3,3
8:7,10,11
8:13 9:3
9:7,9
11:2,10
11:12
12:18
17:14
19:22
20:10
35:15
36:8
40:21
58:16,18
59:6 60:3
60:6
62:13

Bret Maloney
July 11, 2014

129

| | | | | | |
|---|---|---|---|---|---|
| 70:4 | 98:11 | 60:6,23 | **big** 55:8 | 4:19 | **Burris** |
| 72:22 | 105:2 | 70:4 | **bill** 24:16 | 126:2,18 | 64:18 |
| 73:13 | 126:5 | 72:21 | 80:14 | **brief** | **Burris'** |
| 75:10 | **basic** 26:16 | 73:13 | 89:16 | 121:10,23 | 64:21 |
| 81:5,6,9 | 27:24 | 75:9 | 113:1,3 | 121:23 | **Burton** |
| 103:2 | 28:2 | 77:12 | **billed** 85:6 | **briefly** | 109:12 |
| 111:22 | 103:8 | 103:2 | 85:7 | 123:2,17 | **business** |
| 114:14 | **basically** | 108:1 | 89:12,23 | **Brillhart** | 4:22 9:20 |
| 118:7 | 21:10,18 | 110:9,10 | **bit** 18:23 | 109:12 | 13:23 |
| 123:7 | 28:16 | 111:22 | 26:15 | **bring** 75:18 | 60:22 |
| **banking** | 65:14 | 113:9,18 | 62:3 | 75:20 | **buyer** 49:21 |
| 15:1,5 | 92:22 | 113:19 | 84:12 | 76:1 | |
| **bankrupt...** | 102:5,7 | 116:24 | **blank** | 85:14 | **C** |
| 94:8 | **basis** 21:1 | 117:5,11 | 107:22 | 87:23 | **C-E-N-L-A-R** |
| **bankruptcy** | 29:6 | 118:7 | 108:2,6 | 104:4 | 20:17 |
| 1:1,10 | 86:18 | 122:10 | **blanket** | **bringing** | **C.S.R** 1:12 |
| 4:9 5:6 | 94:14 | 123:7,12 | 112:17 | 44:22 | **calculate** |
| 7:5,5 | 97:16 | **bear** 96:15 | 118:11 | **broken** | 65:15 |
| 21:7 27:8 | **Beal** 8:1,2 | **bearing** | **block** 109:2 | 86:11 | **call** 14:9 |
| 29:21 | 8:2,10,13 | 75:14 | **blunt** 22:16 | 93:24 | 40:1 |
| 30:12,14 | 8:16 9:3 | 119:2 | **borrower** | **Brook** 1:14 | 42:13 |
| 31:16 | 9:4,5,7,9 | **Beginning** | 94:19 | 1:21 | 60:24 |
| 32:8,15 | 11:2,10 | 113:6 | 107:13 | **brought** | 63:19 |
| 32:18,20 | 11:12 | **behalf** 1:22 | **bottom** | 27:6,11 | 82:16,16 |
| 37:16 | 12:18 | 2:5 10:24 | 84:13 | 36:20,20 | 90:1 |
| 45:16 | 13:8 14:8 | 12:4 66:9 | 87:20 | 37:13,13 | **called** 1:9 |
| 63:17,23 | 14:18,24 | 69:12,17 | 100:14,15 | 63:11 | 4:14 8:10 |
| 64:15 | 15:14,18 | **believe** | **bought** | 73:17 | 45:7 |
| 66:19 | 17:1,14 | 9:13 13:8 | 19:22 | 77:8 | 76:20 |
| 67:16 | 20:10 | 51:16 | 33:12 | 82:13 | 80:13 |
| 88:2,4 | 28:24 | 53:20 | **Boulevard** | 83:1 | 83:3 |
| 94:19 | 29:8 | 55:18 | 1:14,20 | **Brown** 29:17 | **calls** 46:11 |
| 112:2 | 32:22 | 64:18 | 4:5 | 113:24 | 55:16 |
| 114:10,11 | 35:14 | 109:10 | **Box** 123:20 | 114:1 | 65:4,19 |
| 114:13 | 36:8 | 112:23 | **boxes** 49:24 | **Build** 68:8 | 65:20 |
| 117:24 | 40:20 | 114:11,11 | **break** 74:10 | **building** | 67:4 |
| 119:6 | 41:12,14 | 115:21 | 74:12 | 13:10,17 | 77:19 |
| 123:13 | 42:18 | 121:3 | 79:18 | 13:19 | **card** 28:4 |
| **bar** 50:9 | 46:6 | 122:7 | 108:7 | 57:13 | **care** 21:10 |
| 52:4,4,22 | 47:14 | **best** 84:23 | **breakdown** | 107:2 | 21:14,18 |
| 53:8,17 | 53:23 | 116:1 | 27:16 | **bunch** 82:12 | 21:24 |
| 80:5 | 54:12 | 122:4 | 82:12 | **burdensome** | 28:17,18 |
| **based** 26:8 | 56:17 | **better** 93:2 | 84:24 | 103:16 | 64:10 |
| 66:4 70:1 | 58:4,5,16 | 117:18 | **Bret** 1:7 | 104:12,22 | 70:18 |
| 79:1,6 | 58:18 | **beyond** 14:2 | 3:3 4:6 | 105:5 | **Carol** 1:3 |
| 97:23 | 59:6 60:3 | 101:7 | 4:10,13 | **Burns** 114:9 | **carried** |

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

130

8:22
case 5:23
  7:19
  12:18
  16:11
  20:6
  30:10,11
  31:11
  37:16
  39:18
  48:23
  49:15,21
  66:3
  86:10
  87:23,24
  88:2,4
  104:16
  107:7,17
  109:16
  111:19,21
  117:15
  118:16
  119:3,24
  122:4,6
Cassling
  4:12
cataloged
  25:11
  43:12
  49:8,24
  50:11
categories
  39:4
category
  93:10
CCO 28:23
Cenlar
  19:12,13
  20:4,11
  20:17
certain
  11:1 20:4
  60:19
certific...
  73:18
certified

35:18
73:16,24
75:1
125:1
certify
  77:1
  125:2
CFO 110:6
chain 28:9
  49:19
  51:3
change
  15:16,18
  15:20
  62:23
  72:19,20
  72:20
  115:17
changed
  50:20
  60:2
  69:10
Chapter 1:5
  45:15
  93:23
  94:9,16
  94:19
charge 26:1
  62:14
  64:13
  85:18
  106:1
charges
  27:17,19
  83:15
  85:3
  98:18,19
  98:20
  103:18
  105:20,24
  106:5
charging
  88:4
Charles
  120:24
  121:1

chart 33:9
  50:16
  122:9
charts
  26:20
check 12:5
  12:17
  24:3
  25:11
  87:12
checked
  106:20
checks
  24:12
Cherner
  113:14,15
Chicago
  30:18
  125:13
chief
  112:23
  113:21
choose
  24:23
Chris 2:2
  6:2 29:13
  29:21
  83:5 93:9
CHRISTOPHER
  1:4
Cinlar
  115:9
Civil 1:10
  6:8
claim 37:16
  37:17
  38:13,19
  38:24
  44:4
  52:10
  54:18,19
  62:24
  63:8,23
  65:23
  66:9,18
  67:3,9,10

67:23
68:6,14
68:16,17
68:17
69:12,16
69:17
70:2,5,7
70:22
71:6,8,16
72:2,21
84:1,2,4
90:24
119:11
122:13
claimant
  69:3
  72:14
claims 25:5
  64:6
  118:19
clarific...
  105:19,23
  115:2
clarify
  18:6 19:6
  66:23
  110:15
  114:9
  123:18
clear 7:11
  60:2
  92:16
clearer
  54:4,7
client 65:8
  88:11
  104:17
  110:13
  120:5
clients
  110:4
CLMG 9:24
  10:2,3,4
  13:3,5
  33:11
  35:23

50:18,21
58:1,2,4
76:14,19
112:24
113:4
114:5
CLNG 120:23
close 57:7
closing
  58:7
CMG 76:18
  113:12
coated
  27:17
code 52:4,4
  52:22
  53:8,17
  80:5
coded 50:9
codes 100:5
  100:5,10
  100:24
  101:1
  102:17
coding 85:3
  89:1
  99:15
collateral
  36:5 41:7
  41:18,23
  42:1,4
  43:6,10
  45:22
  50:6,23
  50:24
  51:6
  79:22
  81:21
  82:6
collection
  103:24
  104:1,16
color 27:17
  83:22
  85:3,5
colored

83:22
column
  93:13,15
  95:6
  105:23
columns
  93:15
come 14:21
  16:16
  26:13
  39:21
  50:1
  59:11
  65:14
  66:11,12
  66:14
  81:20
  97:12
  103:9
  117:18
comes 97:3
coming
  110:1
command
  28:9
commence...
  125:3
commercial
  10:3 13:2
  15:22
  17:4
  63:19
commissi...
  1:13
communic...
  65:7
communic...
  111:24
companies
  8:15
  10:16
  12:4,19
  12:22
  14:8,24
  17:1 20:2
  29:9

Bret Maloney
July 11, 2014

131

41:14
54:13
108:1
117:5,11
**company** 9:6
10:12
15:17
33:8,9
44:18
45:7,11
45:12
46:5,6
48:2
53:19,23
97:9
113:4,9
113:16,18
113:22
114:7
**compare**
38:8
105:21
106:3
**comparisons**
106:7
**complaint**
117:20
**completed**
121:18
**compliance**
28:22
31:3
**computer**
17:3,12
17:13,17
18:2,8,11
26:4
60:19
106:10
**concerned**
7:10
**concerning**
125:4
**conclude**
21:20
**conclusion**

55:17
72:17
**condesce...**
32:7
**condolences**
16:12
**confine**
17:10
**confirm**
60:9
**confused**
100:17
**Connect**
80:13
**Connie**
114:3,5
**constitutes**
125:7
**consumer**
17:6
**contact**
5:22 29:5
**contained**
36:23,23
**Contd** 2:1
**continua...**
90:15
**continue**
86:24,24
90:12
**continuing**
16:10
**contract**
11:5,8
**contractual**
94:13,14
**control**
29:21
33:6 50:2
55:12,14
78:18
**convicted**
121:13
**copies** 22:4
23:3 27:5
27:6,16

35:3
36:13
40:1 42:4
50:6
73:15
75:11
80:9
83:22
**copy** 5:14
23:11
24:3,16
33:22
34:15,21
35:18
37:14,15
37:15
38:12
39:2 40:5
40:16
41:17,20
42:17
43:8 44:3
51:8 52:5
52:8
61:14
63:7,10
66:6
73:15,16
75:2,6,19
75:20
77:1,2
80:10,10
82:10
99:2
102:3,23
103:4
107:10,12
119:13,22
**copying**
35:11
**corner**
13:18
**Corp** 8:1,2
9:24 10:2
10:3,4
50:18

**corporate**
8:16,24
10:4,13
115:23
116:8
**corporation**
7:13,18
8:17 9:9
10:11,17
10:21
14:18
15:14,19
35:23
36:9
38:16,23
39:20
45:10
48:7
49:22
51:13,23
54:11
55:9
58:18
60:23
69:3,13
69:17
73:12,13
75:4,9
77:6,16
101:17
109:1,3
110:8,22
122:18
**corporat...**
118:7
**corproate**
115:4
**correct**
8:18 9:11
14:3,4
15:5,9,22
16:3,6,22
17:15,16
17:24
18:1,9,21
19:15,17

19:18,23
19:24
20:13
21:12
22:1,2
24:15,19
24:24
27:20
28:5,6,10
30:2,22
30:23
31:7,8,11
33:18
34:10,11
35:7,19
37:8
38:20
40:23,24
41:23
42:9 44:7
44:9,10
44:12,14
44:18,19
44:23
45:8,17
45:18
46:6,7,10
46:12
47:11,18
48:7,8,21
49:5
50:18
51:15
52:23
53:12
54:1,5,6
54:8,10
54:20,21
54:23,24
59:23
62:2
64:11,23
64:24
66:13,19
67:16
69:4,5

70:13,14
70:21,23
70:24
71:1,4
73:11,12
74:2,4
75:12,23
76:15,16
77:2,3,5
77:6,11
77:13
78:8,9
79:23,24
80:4,20
82:7,14
82:15
83:1,8
89:18
91:15,16
92:9,19
92:20,22
94:15
95:12,17
96:11,12
100:22
101:1,3,9
101:11,15
101:22
102:1,2,6
102:9,21
103:15,16
104:9
107:3,23
107:24
108:20,21
116:22
126:3
**correction**
56:16
81:18
**corrections**
126:3,5
**correctly**
30:15
**correspo...**
7:4 22:9

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

132

110:15
115:6,9
116:7
**correspo...**
27:18
85:2
**corresponds**
85:4
**cost** 84:17
**Costas**
113:20
**costs** 65:23
67:22
83:18
84:3,18
84:24
**counsel**
1:18  2:1
5:14  31:3
65:17
66:3,5
68:5  69:9
69:12,15
75:11
97:17
106:17,18
110:12
111:18
118:10,20
121:7,22
122:16
123:17
125:11,11
**county** 4:2
4:3  35:18
77:1
126:19
**couple** 5:19
6:7  16:2
27:24
63:18
70:10
102:8
103:7
109:10
120:20

**course**
25:22
34:20
50:8
**court** 1:1
1:11  4:2
16:11
40:4,6
66:19
71:12
83:18
**cover** 96:18
122:19
**created**
34:12
122:22
**creditors**
63:18
**crime**
121:13
**critical**
45:16
**CSR** 125:1
125:16,16
**curb** 87:12
**curiosity**
14:20
**current**
94:23
96:10
100:20
**currently**
119:21
**custodian**
10:5  34:6
50:19,21
76:17
122:8,11
123:14
**custody**
49:19
51:1,1,4
106:11
107:1
**customer**
116:6

**cut** 26:18

_____

D

**D** 3:1
**d/b/a** 45:2
45:10
**daily** 21:22
**Dallas** 4:23
13:7,12
13:16,18
115:5
123:10
**damage**
86:16
87:11,11
**damaged**
87:7
**dark** 83:8,9
**darker**
84:16
**data** 89:1
**date** 4:4
5:10  34:2
37:7  38:4
40:13
41:1,5,9
41:15
42:19
43:3,9
47:10,13
47:22,22
48:14
49:4,6,6
50:10
58:9,10
58:19
60:5,19
61:7
62:22
63:4
67:15
68:23
70:2,21
74:8,23
79:2,3,7
79:8

81:15,15
81:17
82:22
86:8  90:6
90:16
91:10
94:3,9,11
94:13
95:6
122:21,22
122:23
126:3
**dated** 41:2
41:3
60:12
79:13
80:15
99:17
100:3
**David** 68:7
68:11
**day** 16:19
16:22
26:9  56:4
59:20
60:17
125:13
126:21
**day-to-day**
19:1  64:5
**days** 26:3
72:1
**deal** 56:15
**dealing**
32:9
93:22
**debits**
103:18
**debtor**
45:15
63:17
120:5
121:5
**debtor's**
120:5
**debtors** 1:5

1:22  32:4
93:13
**debts**
117:13
**December**
14:10
15:6,14
56:17
59:18,19
59:22,24
60:2,5
61:24
62:7,8
69:8
72:10,11
73:1
**decided**
60:17
62:12
**decision**
60:22
62:21
72:10
**Deeds** 76:24
**default** 7:4
28:15
29:22
30:4  32:9
87:2,2,3
**defaults**
92:9
**Defendant**
2:5
**define** 8:6
8:7
**definition**
92:16
**degree** 14:3
**delinque...**
25:18
**delinquent**
25:23
**Dep** 37:20
37:20
38:7  40:1
**department**

31:15,16
32:8  33:6
41:13,13
42:18
50:2
64:16,21
78:18
121:2,4
**departme...**
116:7
**Depends**
78:15
**deponent**
36:19,20
124:3
**deponent's**
4:6
**deposit**
97:6
**deposited**
97:4
**deposition**
1:6  3:8,9
3:9,10,10
3:11,11
3:12,12
3:13,13
3:14  4:10
5:5,7,13
5:15,20
5:22  6:11
6:24  7:10
15:24
27:1
29:10
32:17
34:16
35:1
37:19
38:1  40:9
40:10,16
41:21
42:7,13
42:16,22
43:1,8,22
43:24

Bret Maloney
July 11, 2014

133

47:5
51:10
52:5,7
53:10
54:8,16
55:2 58:8
61:1,4,21
63:1,7
69:7
70:13
74:2,5,20
75:2,6,8
77:5,7,11
77:14
78:6 79:6
82:19
83:4,20
90:2,3
91:7,13
101:21
102:18
103:21
120:6
121:10
125:5,8,9
126:2,3
**depositions**
  1:11
**describe**
  86:12
**described**
  102:5,17
**description**
  55:24
  100:9
**descript...**
  99:11
**designated**
  6:12
**Desktop**
  18:14
  83:24
  85:10
  92:4
  101:18
**detail**

70:20
85:11
**detailed**
  37:5
**details**
  102:9,20
**determin...**
  119:9
**determine**
  31:17
**determining**
  93:21
**develop**
  50:6
**Diehl** 2:3
**difference**
  13:13
  38:12
  52:2,17
  68:22
  79:14
  115:10
**different**
  8:20,21
  8:23 10:8
  11:6 12:1
  13:3,4,10
  17:5 19:5
  19:7,10
  19:11,16
  21:6,8,9
  23:3
  27:19
  32:19
  36:13
  38:9
  39:16
  44:17
  50:5,14
  52:8 70:6
  72:24
  77:17
  78:2 85:2
  86:7
  87:21
  90:14

91:5
92:12
103:6
114:24
115:3,8
115:11
**differen...**
  94:22
**difficult**
  23:17
  37:15
  92:18
  104:21
**digging**
  108:15
**directed**
  115:13
**direction**
  66:8
  125:6
**directly**
  98:12
  125:12
**director**
  6:12
**disbursed**
  24:10
**disclosing**
  6:14
**Discovery**
  99:1
**discussed**
  20:13
  69:6
  102:15,16
**discussing**
  24:7 71:2
**discussion**
  26:14
  53:3
**dismissed**
  27:9
  94:12
**distinction**
  69:22
  87:4

**distribute**
  73:14,22
**DISTRICT**
  1:1
**Ditech**
  44:23,24
  45:3
**Ditech.com**
  45:2,11
**divide**
  94:17
**division**
  1:2 13:2
  122:9
**DMI** 64:4,7
  69:9,12
  72:18
  89:6,7
  102:23
  114:10,13
  115:7,12
  115:14
  116:6
  120:12,18
  121:1
  122:4
  123:18
**DMIs** 89:2
**dobin** 18:20
**dock** 43:14
**docs** 7:5
  36:7
**document**
  5:16,21
  6:4,6
  22:9,20
  23:8,9,13
  23:16
  24:14
  33:6 34:6
  36:24
  37:11,18
  39:1,4
  40:8 41:6
  41:20,22
  43:6 50:2

50:3,10
50:22
51:22
53:20
55:11,14
60:13
63:8
66:18
68:23
76:12
78:18
81:19
85:9 86:6
88:19
93:4
99:14
103:11
122:21
**document...**
  50:23
**documented**
  21:5 33:5
  48:15
  49:7
  60:21
  78:14
  88:22
  97:13,14
**documents**
  7:12 10:5
  10:6 22:4
  23:3,15
  26:19
  27:10
  34:22
  35:6
  36:21
  43:14
  47:20
  49:21
  50:10,20
  52:22
  53:18
  55:21
  57:14
  58:4,6

60:8,9,14
60:18
62:9 68:1
68:4
76:13
80:20
81:20
82:8,13
82:24
85:9 86:5
90:14
91:5,17
93:5
97:18
102:4
116:21
**doing** 40:4
  63:17
  78:16,17
  84:23
**Dovenmuehle**
  18:18
  30:19,20
  31:10,17
  32:16
  64:7,8,12
  65:16
  66:12,15
  66:16
  67:2,19
  71:3,10
  71:21,21
  72:13
  73:2,5
  99:21,23
  100:13,16
  100:18
**Dovenmue...**
  18:19
  65:17
**Doyle** 1:3
**draw** 81:8
**drawn** 38:22
  53:21
**Drive** 13:9
  13:11,19

115:23
116:8
123:10
due 70:20
95:12
100:7
112:2
duly 4:14
125:4
DUPAGE
126:19
DWI 121:17

**E**

E 3:1,7
e-mail
88:24
115:3
earlier
18:23
39:2
48:17
49:11
58:6,9
62:6 71:3
78:12
79:5,12
84:11,12
97:2
114:8
120:21
early 15:20
easier
26:24
72:6
118:24
easily
24:18
25:14
92:10
104:2
EASTERN 1:2
education
14:2
educational
13:22

effective
59:17
60:5
62:22
69:8
72:11
94:11
EIN 118:6
either 46:9
48:10
55:6
56:20
118:19
either/or
122:24
Electronic
75:4
electron...
88:21
elementary
63:21
employed
4:24 7:13
11:10
employee
39:15,18
121:1
125:10,11
employees
30:1 50:2
111:23
112:4,6
employment
14:5
endorsed
75:15
78:12,23
79:4,7
107:22
108:6
endorsement
38:15
44:11,13
45:6,9,17
45:19,21
48:5

endorsem...
122:15
endorses
77:18
engage
121:10
enjoyed
14:18
enter 81:15
entered
22:6
31:24
41:8
60:20
122:20
enters 20:1
entire 6:17
75:13
entirety
89:22
entities
7:16 8:14
8:20,23
9:4 10:8
10:24
11:6 12:1
13:3,4
19:5 58:4
58:5
113:16
117:5
entity 45:7
69:10
108:5
equal
122:10
Erica 111:5
111:7,11
ERRATA
126:1
error 54:19
ERRORS
126:5
escrow
23:21,22
105:10

essentially
95:16
estate
23:23
eventually
16:8
everybody
40:8
69:11
89:17
evidence
107:18
Ex 3:8,9,9
3:10,10
3:11,11
3:12,12
3:13,13
3:14
49:23
ex-employee
110:19
113:8
Exact
103:18
exactly
30:16
73:21
86:17
93:5
96:11
examination
3:4,4,5
4:16
108:11
122:1
125:3
examined
4:15
example
11:9 96:8
96:16
97:5
excellent
35:9
Excuse 39:7
executed

41:5
exhibit 5:7
34:16
35:1
36:14
37:19,20
37:21
38:1,7
40:1,10
40:18
41:21
42:8,14
42:17,23
43:1,8,22
43:24
44:5 47:5
47:13
52:6,8
53:10
54:8,16
55:2 58:8
61:1,4,21
63:2,7,10
69:7
70:13
74:2,5,10
75:2,6,9
77:5,7,15
78:6 79:2
79:6,21
82:19
83:4,20
90:2,3
91:7,13
98:23,24
101:21
102:18
103:3,20
105:21,22
106:4
108:13,14
108:16,17
109:2,2
122:19
exhibits
36:10

40:5
103:21
exist 15:19
122:14
existence
54:20
exists
15:17
expected
14:19
experience
15:5
explain
26:8 32:8
84:22
91:17
97:18
98:4
109:13
110:1
explanation
52:11
78:21
Exs 74:20
extra 38:15
39:5
extras
27:21
73:15

**F**

F 13:24
facility
30:21
fact 72:13
74:1
104:11
105:4
facts 7:12
family 16:3
16:10
Fannie 9:13
9:15,16
9:18
far 7:10
8:3,4 9:1

Bret Maloney
July 11, 2014

135

11:19
14:6
18:20
32:1 36:2
94:1
97:13
100:4
**Farm** 4:3
**father-i...**
16:5
**FCC** 8:8
**FDIC** 19:9
19:21,22
20:1,15
**Fed** 49:23
**Federal** 1:9
4:9 6:8
8:3,7
81:4,9
**fee** 26:1,10
85:5
106:1
**feel** 93:17
**fees** 26:4
65:23
67:22
83:18
84:3,24
98:18
105:20,24
**felony**
121:15
**FHA** 100:6
**figure**
53:14
57:4
80:23
81:14
92:9 96:6
**figuring**
117:4
**file** 22:5
30:6,6,17
32:1 36:5
37:1 41:7
41:8,9,18

41:23
42:1,2,4
43:6,10
43:11
45:22
50:24,24
51:6 68:5
68:22
71:9
79:22
80:7,9
81:21,22
81:23
82:1,2,6
**filed** 30:11
37:16
66:4,9,18
68:18,18
68:18,20
69:12,16
69:17
70:3,6
71:16
72:21
84:8
90:24
94:9,19
117:20
122:13
**files** 34:3
50:3,6
63:23
**filing** 64:6
70:21
83:18
112:2
**final**
121:12
**financial**
8:1,2,16
67:15
**find** 18:12
31:19
35:16
86:1 89:9
**fine** 20:23

26:7 35:5
49:16
69:23
72:12
73:8 74:4
83:12
84:19
103:19
112:18
**finish**
118:17
**finishing**
117:3
**fire-safe**
49:12
**fireproof**
42:2
**firm** 14:21
34:6,10
35:20
51:9
52:14
53:4
63:24
65:8,14
66:12,17
67:2,19
71:9
**firm's** 53:7
**first** 4:14
5:18,19
15:4 16:1
27:8
32:18,20
37:4
44:13
62:1 70:6
72:9 84:6
84:14
91:12
93:14
98:10,15
100:8
101:5
**five** 26:10
27:6

108:7
**flip** 84:20
85:16
**floor** 57:7
57:12
**focus**
121:15
**folder** 34:1
34:12
38:7 80:3
80:19
**follow**
26:24
46:14
**following**
81:19
**follows**
4:15
**foreclosing**
32:5
**foreclosure**
7:4 21:7
24:24
34:3 37:2
51:3 66:4
84:13,18
114:12
118:19
123:13
**foregoing**
125:5
126:2
**forget**
36:10
**forgot** 9:4
**form** 70:7
103:20
**format**
92:10
**formerly**
45:10
**Fort** 14:12
**forward**
42:16
59:7
**foundation**

68:8
109:24
**four** 27:6
44:8
**Francisco**
81:2
**fraudulent**
116:12,17
117:6
**FRB** 81:1
**Freedman**
2:2 34:7
36:24
64:22
**full** 40:5
61:14
96:3
107:11,12
**function**
18:22
21:10
**function...**
9:1 21:7
**functions**
8:21
17:19
18:5 21:1
21:18
28:16
29:20
**funding**
33:1
44:17
45:7,11
46:5 48:2
48:19
51:18,18
53:19,23
81:8
**funds** 12:3
94:1,23
94:24
95:18
96:17,24
97:12
**further**

121:20
124:3

---

**G**

**general**
11:21
21:1 31:3
32:11
65:11
87:22
110:10
**General's**
117:22
**generate**
92:4
**generated**
23:6
91:18,22
91:23
**genuine**
46:9,15
**getting**
15:24
29:9
30:19
51:10
68:13
116:15
120:16
**give** 11:9
13:21
14:7 15:7
34:19,23
40:6
49:13
61:2 75:6
82:10
**given** 4:11
92:15
103:14
125:7
126:3
**gives** 85:5
**GMAC** 32:21
33:12
45:1,4,6

Bret Maloney
July 11, 2014

136

45:6,7,9
45:10,12
46:5
54:13
76:4
80:17
90:20
91:24
97:5 98:7
100:8,11
100:12,21
118:4
119:17,18
120:14,15
go 11:4
14:6 23:2
23:13,15
26:15,22
27:12,23
27:24
30:10
33:20
35:1,4,10
36:14,17
42:3,4,5
43:21,24
49:12
50:3,16
50:24
59:11
62:15
69:2,20
72:1 78:5
81:9
84:14
85:19
86:13
87:10
92:1,11
93:10
95:19,24
96:16
97:20,21
98:9,11
99:8,9
100:4

101:7
103:10,11
103:21
104:16
106:13
107:9
108:15
111:3
114:19
118:4
goes 9:2
25:8
47:17
59:7
73:20
84:19
86:6
93:21,22
going 5:12
16:18
18:5 24:1
26:13,14
32:13
35:3,10
36:12,13
37:18
38:6
39:21,21
40:6,15
42:13
43:21,23
47:2,3,24
50:16
52:2,15
57:9
62:12,22
63:12
64:4 65:9
69:22
70:8,16
74:1,11
74:14
75:13
79:21
82:8,10
82:11

83:15,17
85:20
88:10
93:15
97:24
103:18
105:15
108:14
112:3,14
115:2,7
117:17
118:11
119:10
123:1
124:1
good 56:15
61:9
64:14
grabbing
84:20
grace 25:19
graduated
13:24
Grant 31:1
31:2
Granting
94:10
Gray 44:21
46:8,22
46:23
green 42:17
42:17
83:8,9
122:19
group 1:19
14:8,24
17:1
32:22
48:20
62:9,19
82:16
98:23
105:22
122:5,7
guess 12:15
23:2

100:17
guessed
32:4
guessing
28:5 37:1
41:13
48:18
59:23
64:7 80:3
92:9
guy 26:6

_____
H
_____

H 3:7
half 9:21
61:19
Hamilton
31:1
hand 38:6
40:15
108:14
125:13
handed
33:24
41:12,23
79:22
83:19
97:18
handle 19:1
64:5
handles
19:13
handling
31:10,18
32:16
80:18
happen 25:5
39:7,10
61:20
76:7
happened
39:14
58:10,18
59:15,22
61:10,19
71:14

happens
107:5
hard 46:21
46:23
104:9
harm 112:5
harmed 87:7
87:8
head 64:20
hear 16:9
88:12
heard 6:7
27:3
hearing
5:21
held 11:1
15:8
help 85:24
96:23
99:2,6
helped 83:7
hereto
125:12
hereunto
125:13
high 28:9
89:20
histories
7:3 91:21
92:11,17
100:19
history
13:22
14:5 22:7
24:9
26:15,20
91:24
99:20,24
100:12
101:3
102:7,16
102:23
hold 82:9
108:1
holding
96:1,1

Home 80:13
81:9
Honorable
4:12
hospital
16:7
housed 21:4
23:10
42:2 82:3
huh 99:3
human 26:3

_____
I
_____

Iaria 2:2
3:5 8:6
11:22
14:16
17:20
18:4 20:5
20:21
21:2
22:12
26:18
30:7,12
34:5,11
34:17,20
35:2,7,10
35:20
36:10
37:3,8
42:10
46:11
47:12
48:22
49:14
52:7,11
52:24
53:6,12
55:16,22
56:5,9
57:8,17
57:21
59:8
63:10
65:4,7,19
66:23

Bret Maloney
July 11, 2014

137

67:4,6,11
68:8,13
69:21
71:18
72:16
73:14
74:3,9,13
75:12
77:19
78:24
81:13
82:18
83:14
87:22
88:1,10
90:7,9,12
90:16
91:1,6
97:11,17
98:3,22
102:10
104:13,24
105:7,11
107:6,16
108:3,9
109:15,20
109:24
110:12,18
111:1,9
111:15,18
111:22
112:1,7
112:11,15
114:15
115:22
116:3,13
117:2,7
117:14,23
118:10,15
118:20
119:2,15
119:23
120:4
121:5,9
121:14,22
122:2

123:22
124:1
idea 9:19
11:21
13:21
14:7 15:7
42:16
49:13
80:19
81:16
83:19
103:8
identifi...
5:9 38:3
40:12
43:3
53:24
61:6 63:3
74:7,22
82:21
90:5 91:2
91:9
identify
42:21
ignorance
32:3 39:7
Illinois
1:1,13,15
1:21 2:4
4:3,6
75:15
77:1
115:7,13
115:20,24
120:14
125:1,13
126:19
image 22:21
imaged 23:8
24:5,13
images 22:4
imaging
22:10
23:9,13
24:14
39:1,4

41:13
42:18
81:19
immediately
96:10
important
8:12
16:11
39:13
inception
115:18
116:4
include
12:3
65:10,11
66:8
included
38:23
39:5
54:18
85:14
includes
27:7
52:13
incorrectly
38:23
indicate
46:18
76:9
indirectly
125:12
individual
92:6
individuals
31:24
110:13
122:5,7
informally
59:3
information
21:3
25:11
37:5
45:20,24
52:14
64:22

65:2,5,14
65:18,20
66:16
67:1,8
71:2,4
88:14
89:4,7
93:4
105:5
119:5
123:18
informed
72:19
initial
46:1
initially
16:1
ink 39:19
inquiries
6:13
inside
22:21
inspection
25:7
86:13
inspections
24:23
25:2
86:24
89:15
Installment
95:11
instance
24:21
51:2
94:18
96:7
institution
15:1
instruction
66:11
insurance
95:13
105:9,16
105:17,18
119:10

insured 8:8
intend 6:18
interest
86:20
87:7
95:13
98:12,13
98:15
100:7
interested
17:6
125:12
internal
60:14,18
60:22
83:23
interrog...
97:23
inventory
49:24
investor
11:4
58:20
60:6,7
69:14
97:9,16
investors
12:12
13:5 19:8
39:16
invoice
24:2,15
25:10
83:15,24
85:10,11
85:12,17
88:15,18
89:11
101:18
102:8,9
102:20
invoices
24:12
27:14,18
83:23
85:2,12

85:15
86:7,9
87:14
103:2
106:4
involved
28:3 30:5
62:20
involvement
10:23
irrelevant
101:2,3
Irwin
113:11,12
Israel
29:17,22
Israel's
30:3
issue 72:24
88:3
97:22
123:17
issues
16:15
74:16
88:1
112:3
items 29:2

---
J

J 46:22
48:1
jacket 42:1
51:7 82:3
106:16,20
106:23
107:1,5,9
Jacob
113:14,15
James
113:11,12
January
60:12
68:18,18
68:19,19
68:20,20

Bret Maloney
July 11, 2014

138

69:11
72:8
Jason 48:1
Jeffrey
120:22
Jersey
115:10
job 21:17
29:20
30:3
55:21,23
jobs 15:1,3
Johnson
114:4,5
Jorie 1:14
1:20 4:5
Judge 1:3
4:12
July 1:7
4:4 66:4
66:5
117:21
126:2
June 14:11
15:13,15
16:14,16
16:18
37:7 66:5
69:16
99:16
122:17

**K**

K 100:7
Kane 76:24
keep 10:6
22:4 24:2
27:20
34:18
95:2,18
106:24
107:7
118:10
keeping
40:2
kept 16:10

22:8 23:3
24:15
37:1 51:4
81:23
82:1,2,5
key 99:23
kill 99:3
kind 8:6
21:1
51:14
52:15
93:24
97:2
101:2
103:20
kindly
118:11
kinds 123:4
King 120:24
121:1
knew 58:9
69:18
know 5:2
6:8 9:1,8
10:23
11:8
12:10
13:4,14
18:5,19
20:22
21:6,16
21:16
25:5
26:21
27:11
30:16
32:12,15
32:18
33:2 34:9
34:13
35:23
36:2 41:4
42:21
43:20
45:16,19
45:24

48:9
49:16,23
52:5,15
52:19,21
56:2,6,9
56:12,19
56:24
57:1,3,3
57:5,20
57:20,22
58:12,14
59:4,14
61:10,15
62:21
64:17
68:11,13
72:4
75:15
77:22,22
77:24
78:3,4,7
79:1,2,16
79:16
80:17
81:18
85:6,18
87:8,21
88:1
93:10
94:8
97:20
98:8
99:14
104:24
106:14
109:3,11
109:12
113:1,5
114:20
115:14,20
116:15,23
118:6
120:17,19
121:2
123:20
knowing

71:7
knowledge
31:10
41:4
45:13
46:3,4,9
46:14
48:9 56:2
57:16,20
58:3 65:3
116:1,24
117:5,12
122:4
knowledg...
6:15
known 45:10
56:8,16
72:18
knows 56:10

**L**

L 44:21
46:8,22
labeled
38:7
40:18
83:20,23
105:21,24
labeling
37:19
40:3
LAC 10:17
10:20
Lake 18:20
30:22
115:22,23
116:8
123:19
late 26:2,2
26:4,10
83:14
98:18
105:20,24
106:1
law 1:19
16:11

52:14
53:4,7
63:24
65:8,14
66:12,17
67:2,19
71:9
75:15
lead 45:15
107:17
lease 20:19
leave 14:10
14:21
27:23
110:24
111:14
leaves
107:2
left 14:20
44:11
80:8,12
103:7
111:3
113:5,9
120:20
Legacy 13:9
13:11,19
18:24
19:2,6,17
20:12,13
20:14
123:10
legal 8:20
16:15
55:16
72:16
73:7 99:9
104:14
lender
17:23
45:1
79:23
lenders
63:19
80:13
let's 7:15

22:15
24:22
26:16
27:23
30:10
36:14,17
40:1 41:8
42:15
43:24
55:10
56:12
58:8
59:11
72:1,8
77:14
78:5
84:12
85:19
90:1
91:12
97:5
108:7
letter 7:4
23:5
61:16
67:19,24
69:6,10
letters
22:8,9,18
23:6,11
62:21
115:21
120:16
Leverette
110:17
Lewis 34:4
34:6
License
1:12
125:1,16
licensed
120:14
light 52:16
limiting
44:21
Lindberg

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

139

| | | | | | |
|---|---|---|---|---|---|
| 2:2 34:7 | 11:14 | 32:19,20 | 50:5,14 | 54:2,3,3 | **LPP** 13:9 |
| 36:24 | 33:14 | 32:23,24 | 58:20 | 62:11 | **LPS** 17:18 |
| **line** 26:15 | 35:14 | 33:7,14 | 78:16 | 73:10 | 17:19,23 |
| 26:15 | 36:8,9 | 41:18 | 81:3,10 | 86:3 | 18:9,14 |
| 59:9 74:9 | 38:16,22 | 46:1 | **located** | 87:18 | 20:10,18 |
| 75:13 | 38:23 | 48:13 | 14:1 | 93:12 | 20:24 |
| 96:17 | 39:19 | 49:9,20 | 29:23 | 95:15 | 22:3,11 |
| 116:3 | 40:20 | 50:20 | 115:4 | 103:19 | 22:21 |
| 118:20 | 47:14 | 52:13 | **location** | 105:20 | 23:4 24:6 |
| 126:6 | 48:6 | 53:8 | 123:9 | **looks** 27:3 | 60:21 |
| **links** 110:3 | 49:22 | 58:17,24 | **locations** | 44:15,16 | 83:23 |
| **list** 6:13 | 50:18 | 59:5,14 | 114:21 | 44:20 | 85:10,24 |
| 6:17 7:8 | 51:12,23 | 60:2 | **long** 23:17 | 45:5 48:4 | 92:4 |
| 23:14 | 54:11 | 61:23 | 44:8 56:8 | 51:11,13 | 101:18 |
| 112:4 | 55:9 | 62:13 | 56:16,19 | 51:19 | 104:1 |
| **listed** | 58:16,18 | 65:2,24 | 56:23 | 80:14 | **lunch** 74:16 |
| 13:11,12 | 60:3,6,23 | 68:2,4 | 70:12,24 | 81:16 | |
| 44:23 | 62:13 | 69:7 70:3 | 72:12 | 82:13 | **M** |
| **lists** 47:22 | 69:3,12 | 71:10,22 | **longer** | 83:23 | **M** 1:12,19 |
| 55:13 | 69:17 | 72:11,13 | 15:17 | 85:8,10 | 125:1,16 |
| **litigation** | 70:3 | 73:2 | 113:4,9 | 86:1,4,8 | **M-A-L-O-...** |
| 112:23 | 72:21 | 76:13 | 113:22 | 89:12 | 4:21 |
| 113:21 | 73:12,13 | 80:4,5,16 | 114:6 | 91:13,14 | **Mae** 9:14,15 |
| 120:23 | 75:4,9 | 81:1,9 | **look** 12:6 | 98:8 | 9:18 |
| 121:3 | 77:6,12 | 85:1,7,24 | 26:22 | 99:20 | **Mae-type** |
| **little** | 77:16 | 86:21 | 63:8 | 101:19 | 9:16 |
| 14:21 | 81:2 | 89:23 | 68:21 | 103:12 | **Mail** 99:11 |
| 18:23 | 101:12,16 | 91:21 | 80:6,22 | 106:9 | **making** |
| 26:13,15 | 103:1 | 92:17 | 82:9,11 | **lose** 55:5 | 62:20 |
| 62:3,11 | 109:1,3 | 96:16 | 90:9 | 96:7 | 72:16 |
| 84:11,11 | 115:1 | 97:1,10 | 93:11 | **loss** 20:15 | 112:7 |
| 100:17 | 119:17,18 | 98:15 | 96:5,17 | 21:7 | **Maloney** 1:7 |
| 123:2 | 122:10,18 | 102:7,14 | 98:17 | 110:20 | 3:3 4:6 |
| **LLC** 36:24 | 123:7,9 | 102:23 | 100:16 | **loss-share** | 4:10,13 |
| 44:20 | 123:12 | 107:4,4 | 106:7 | 19:9,20 | 4:19 5:13 |
| 45:1,4,8 | **loan** 10:3,5 | 115:11,18 | 108:16,22 | 20:9 | 37:20 |
| 45:9,11 | 10:6,17 | 116:4,5 | **looked** | **lost** 102:11 | 40:3,9,15 |
| 48:2 | 10:20 | 116:20 | 92:17 | **lot** 7:9,11 | 41:21 |
| 51:18 | 12:5,9,12 | 118:3,4 | 98:17 | 12:11 | 42:16,22 |
| 80:13 | 12:17 | **loans** 9:13 | 123:4 | 13:20 | 51:10 |
| **LLP** 9:9 | 17:14 | 9:16 | **looking** | 54:4 81:8 | 61:21 |
| **LMV** 12:18 | 19:16,17 | 10:24 | 11:21 | 96:5 | 63:6 |
| 13:8 | 21:3,11 | 11:1,4,24 | 22:15,16 | 97:19 | 70:13 |
| 17:15 | 21:22 | 19:4 23:7 | 22:17 | 103:5 | 75:2,5,8 |
| **LNV** 7:12,18 | 23:14 | 25:22 | 44:3,13 | **lots** 89:20 | 77:5,7,11 |
| 9:9 11:2 | 26:12 | 32:9 50:1 | 52:3,24 | **Louis** 34:12 | 77:14 |

Bret Maloney
July 11, 2014

140

83:20
90:1
91:13
126:2,18
managed
41:9
76:19
management
9:5 21:24
28:15
62:20
83:24
85:11
101:19
manager
51:19
64:15
114:6,10
manila 34:1
38:7
Manual
99:17
March 75:10
79:13
81:16
Marcia 1:4
6:1
mark 42:14
79:21
108:23,24
108:24
marked 5:8
5:13 38:2
40:11
43:2 61:5
63:2,6
74:6,21
82:20
90:4 91:8
marks 109:7
123:2,5
Martin
47:16,18
55:9,10
56:8,12
78:8

107:14
108:19,20
mass 49:23
89:14
master 33:5
42:19
76:11,21
match 83:10
85:5
100:24
106:5
material
97:20
104:18
materials
46:18
matter
107:1,18
matters
18:13
125:4
maze 55:7
Mead 78:1
mean 8:7
9:21
12:24
17:23
19:2,3
25:21
31:23
41:16
52:4 57:2
62:5
78:14
81:2
87:21
94:3
96:13
97:24
104:13
113:18
122:21
meaning
9:15
22:15
30:6,14

30:19
96:14
means 6:9
8:11
19:21
94:13
meant 19:19
92:16
mentioned
8:14 9:5
10:9 12:7
12:19,23
14:17
18:23
20:4
31:21
33:9 47:9
48:21
58:9 83:6
114:8
mentions
61:24
merge 13:10
MERS 36:9
73:12
75:3 77:6
77:16
MGC 5:1
7:14,17
9:3,7,18
11:9,12
11:15,24
12:3,8,16
13:1,8
15:9,10
15:20
28:11,14
29:8 30:1
50:19,22
57:24
58:7
71:21
76:16,17
91:24
97:6,6
100:18

110:23,24
111:5,23
114:14,18
114:19,22
115:1
119:19
120:17
122:10
Michael
78:1
113:24
114:1
Michelle
34:4,6,12
minutes 6:7
23:19
34:24
108:8
mischara...
78:24
missed
120:21
missing
36:3
38:18
63:10
88:20
mitigation
21:7
110:20
mixed
120:16
Mm-hmm
23:24
89:10
money 12:13
59:6 88:4
89:20
97:3
Montgomery
109:18
month
118:24
119:1,7
monthly
86:18

96:3
97:16
113:7
months 5:19
16:2
78:22
79:12,15
mortgage
5:1 7:2,2
7:17 9:7
9:9 13:2
14:12
15:13,20
17:18
20:10,18
20:24
21:17
22:3 23:4
24:22
35:16,17
36:4,9
40:7 45:1
45:4,9,10
46:5
50:13
61:23
63:12
66:2,6
70:8,9,22
73:16,23
74:12,15
75:2,3,8
75:14,19
75:20,21
76:2,5,9
77:17
78:21
79:11,12
79:18
80:11
99:21,23
101:15,16
101:24
102:14
103:1,4
107:21

117:21
119:10
mortgages
32:5
58:22
78:11
116:11
117:6
Motion
94:10
move 26:16
42:16
50:7
57:11
60:22
123:15,16
moving
107:7
Mule 18:20
multiple
31:24
58:20
114:21

---

N

N 3:1
Nagodoches
14:1
name 4:1,6
4:18
15:16,18
33:10
44:20
48:1,6
51:18
114:3
122:9
names 18:23
64:19
110:1,16
112:4,14
112:16,17
120:21
Naperville
2:4
Nautilus

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

141

81:18
near 86:8
99:9
necessarily
103:2
need 21:11
21:19
26:10
70:16
102:3
needed
21:21
68:5
never 32:5
76:3,4
98:2
123:3
new 39:15
49:10
107:9
115:10
116:20
normal
52:19
71:13
normally
52:21
53:18
63:20
72:1
93:20
94:2,22
108:1,4
NORTHERN
1:1
Nos 74:21
note 26:9,9
26:11
33:4,18
33:22
36:21,21
36:23
37:11
38:8,17
39:2,6,22
40:7,20

40:23
41:24,24
42:4,8
43:7,11
44:1,8,12
44:22
47:2,4,6
47:22
48:15,19
49:7,10
51:2,6,7
51:8 55:8
63:13
66:2,3
67:11
69:15
70:11,17
70:20
75:15
77:18
78:1,12
78:22
79:7,11
80:10
82:3,4,5
98:10,11
101:8
102:7,14
102:23
106:10,11
106:14,16
106:20,23
107:1,2,5
107:8,8,9
107:11,12
107:22
122:14,16
122:17
123:14
noted 126:3
notes 7:1,3
21:5 22:7
24:10
31:21,23
32:2 42:2
43:7 49:4

49:12
50:7,8
60:20
63:20
76:8
104:1,2
104:16
105:1
108:2
116:11
117:6
122:11
notice 4:11
5:15 52:2
60:11,11
94:7
noticed
52:17
Notifica...
61:22
notify
69:11
72:20
number 9:14
23:14
42:20
52:13
67:21
80:4,5
93:14
numbered
100:1
numbers
26:23
53:8
89:19
118:6

---

O

---

Oak 1:14,21
Oakbrook
4:5
oath 53:3
object
75:13
88:10

112:14
objected
103:13
objection
11:22
14:16
17:20
18:4 20:5
20:21
21:2
22:12
30:7
42:10
46:11
48:22
49:14
52:24
55:16,22
56:5,9
57:8,17
57:21
59:8 65:4
65:19
67:4,11
68:8
72:16
75:16
77:19,20
78:24
81:13
87:22
97:11
104:13,21
105:2,11
107:6,16
108:3
109:15,20
109:24
110:18
111:1,9
111:15
112:7,11
112:17
114:15
116:13
117:7,14

117:23
118:11,15
119:2,23
120:4
121:14
objections
104:14
obvious
17:9
obviously
17:6
18:11
24:1 25:8
28:3
49:11
51:14
62:6
occupied
88:23
occur 4:11
occurred
58:23
94:5
October
30:15
of'11 91:15
offer 52:11
office
29:23
52:12
57:7
69:16
76:24
115:5
117:22
officer
6:12
44:21
offices
115:1
Oh 58:17
okay 5:2,12
6:4 7:8
7:12,17
7:19 9:3
9:19,23

10:14
11:13
12:3,10
12:22
13:23
15:11
16:2,18
16:24
17:11
22:17
23:2 24:6
25:3,4
27:20,23
28:15,24
29:2,16
31:17,20
32:22
34:14
37:10,20
38:18
39:7,21
39:23
40:17
41:4,11
41:19
42:6,23
42:24
43:14
44:2 45:3
46:8 47:9
47:19
48:4,14
52:4,17
54:2,3
55:13
58:12
59:13,21
61:1,3,9
61:17,24
62:3,8,17
62:24
63:14
64:3
66:11
68:24
69:1 70:5

72:9,24
73:23
74:17
75:1,21
75:24
77:4,16
78:5,10
80:8
83:18,19
85:11,19
85:22
87:4,14
89:9 90:1
91:12
93:7 94:6
99:13
102:16
103:9,13
106:13
108:9
**on-site**
86:15
**once** 27:7
71:8 72:2
**ones** 9:11
10:14,18
20:9,12
27:7
53:19
64:5
100:21
101:20,20
102:8
**open** 37:4
**opened** 21:8
**operations**
19:1
21:22
28:22
31:2
**opposite**
57:12
**order** 6:23
51:12,17
63:24
68:5

89:14
94:10,11
**ordered**
4:11
**original**
7:1 10:5
10:6
27:12
33:4,7,18
33:22,23
35:19,21
35:24
36:2,4,7
36:21,23
37:11
38:8,13
38:17,20
39:24
40:2,7,16
41:17,24
43:9,11
44:1,4,8
44:22,23
45:1 49:7
49:12,15
49:20
50:7,8,20
50:21
51:6,8,24
52:1 53:1
53:17
54:3,4,5
55:3 61:2
61:9,11
68:17,17
69:15
70:16,16
73:17,23
75:19,20
75:21
76:1,5,9
76:12,17
77:8
79:22
80:11,16
81:21

82:3,9
83:21
107:9,12
109:5
122:14,16
**originally**
7:12
44:16
45:4 48:5
**originals**
35:4,6
42:3
109:6
**originated**
90:21
91:21
**origination**
27:7
81:21
90:23
**orignal**
36:7
**outcome**
125:12
**outlining**
122:9
**outside**
20:15
**overnight**
116:7
**owed** 64:23
65:13,15
67:15,20
68:3
**owing** 112:2
**owned** 7:21
9:15,18
17:14,15
19:4,7
**owner** 12:17
29:1,2
71:22
122:17
**owners** 20:9
107:9
**ownership**

47:2,3
58:17
60:3,11
60:15
62:7
69:18
70:4
123:12
**owns** 20:18
97:10

————————

**P**

**P.O** 123:20
**page** 3:2
19:20
37:4
44:12
47:4
54:17,17
54:23
68:16,21
69:2 70:7
73:18
84:3,6,14
84:21
85:8,23
87:19
89:9
99:10,24
100:1,8
103:12
108:16,17
126:6
**pages** 44:8
70:24
84:4
100:15
108:18,22
**paid** 25:9
25:19
95:5,8
100:7
107:4,11
107:11
**paper** 34:15
42:7,18

55:7
**paragraph**
62:1
**parent** 9:6
**Parkway**
4:23 13:7
13:12,16
13:18
115:5
123:10
**part** 8:9
20:13
23:20,22
24:6,7
37:17,17
42:11
52:19
53:4 54:9
55:23
58:15
68:17
71:6,13
72:5
89:16
95:22
98:7 99:9
99:18,22
104:1,15
104:18
**particular**
22:5
40:22
58:24
68:1 81:3
89:13
97:3
**parties**
7:22
117:10,12
125:11,12
**parts** 70:6
**party** 6:13
107:22
**passed** 16:8
**Paul** 1:19
26:18

73:14
87:22
88:10
90:16
**pay** 12:11
23:22,23
24:2
26:14,20
51:11,17
99:20
102:7,16
**payee** 44:22
44:23
99:12,15
100:9
**paying**
24:16
60:23
77:12
**payment** 7:3
12:5,9
21:4 22:7
24:9,10
26:2
91:20,23
95:11
96:4,9,9
96:19
99:24
100:12,19
100:24
101:1
102:17,22
116:2
**payments**
67:21
87:5
93:18
95:9 96:3
96:19,22
97:7,8
105:16
114:19,24
115:6,9
115:12,15
115:17

Bret Maloney
July 11, 2014

143

116:8
123:18,20
PDF 53:12
penalty
  100:7
PENNY 1:20
people
  12:12
  62:9
  63:19
  71:10
  83:6
  109:10
  110:4,4
  111:20
percent
  9:21
  26:10
percentage
  9:19
Perfect
  74:13
period
  25:20
  30:8
  93:19
  98:13
permissible
  107:18
person 6:15
  6:15 25:8
  31:12
  32:10
  64:13,14
  77:17,18
  78:2 87:9
  122:3
personal
  125:6
personally
  56:10
perspective
  8:21
pertaining
  1:11 88:1
  119:5

petition
  70:21
  93:22
  94:1,17
  94:20,21
  94:23
  95:5,8,10
Pfizer
  120:3
phonetic
  113:2,14
phrasing
  117:4,18
physical
  123:11
picked
  72:13
  87:20
pictures
  87:10
  88:5 89:4
piece 42:7
  42:17
pink 83:17
place 24:9
  25:8
  45:21
  46:1,2
  78:10
  116:10,20
  116:23
  125:9
placed
  45:19
  48:10
  54:12
placing
  53:4
plan 63:11
  74:16
  98:5
plane 16:15
Plano 4:23
plans 7:5
plat 22:3
platform

17:18
18:2
20:18,24
22:4,11
23:1,3,4
24:6,7
pleadings
  7:5
please 4:18
  4:20 8:18
  29:14
  61:20
pledged
  81:1,4,11
  81:12
POA 55:19
POC 27:16
  64:6
  82:12
point 8:12
  12:16
  14:22
  25:23
  26:12
  50:22
  56:15
  66:6
  69:13,15
  72:15
  104:20
  118:3
  121:10
pointed
  108:24
  123:19
pointing
  91:4
  98:22
policy 53:7
portfolio
  19:1,2,7
  19:8
  20:14
  50:15
  81:4
  89:15,22

114:6
portfolios
  19:6
portion
  61:13
  95:19
position
  28:24
  109:14
positions
  15:8
  109:11
possession
  26:21
  35:20
  106:19
  108:14
possible
  69:8
post 51:18
  58:7
  93:22
  94:1,17
  94:20,21
  94:23
  95:5,8,10
postcards
  112:16
potentially
  65:20
  97:22
  116:14
  122:5
pre-peti...
  93:21
  94:1,17
preparation
  62:4
  66:17
  99:6
prepare
  6:23
  57:14
  62:9
  63:24
  67:2,10

67:23
68:23
83:3,7
106:13
prepared
  6:20 71:8
  72:3 93:7
  100:22
prepares
  58:2
present
  1:18 2:1
  15:10
presented
  103:3
president
  28:4,7,20
  28:21,22
  31:2
  55:11,14
  56:23
  57:2,6
  113:12,15
presiden...
  28:18
presidents
  28:13,19
presume
  34:11
presupposes
  116:14
pretty 28:9
  108:8
previous
  125:3
previously
  4:11 10:9
  82:14
  92:15
  122:8,20
primarily
  55:21
principal
  95:13
  98:8,14
print 25:15

41:15
42:19
104:9,23
105:6
printed
  51:21
  104:2
prior 5:21
  58:19
  59:5,23
  71:11
  73:1
  111:3,4
  120:11
Priority
  34:3
privileged
  65:4,6,20
  105:4
probably
  26:24
  32:4 37:1
  78:7 86:5
  98:4
probation
  121:18,19
problem
  35:12
  42:12
  71:17
  73:21
  96:12,13
problems
  16:3
procedure
  1:10 4:9
  6:8 49:9
  49:13,17
  62:12,14
  63:22
  64:1,3,4
  116:23
procedures
  78:19
  116:10,16
  116:20

Bret Maloney
July 11, 2014

144

proceeding
  117:24
  119:6
proceedings
  118:19
  125:7
process
  35:11
  52:12,20
  71:6,7,13
  84:13,19
Processing
  17:23
processor
  51:20
produce
  104:21,23
produced
  102:9
  103:16
  104:18
product
  65:21
Production
  102:5,14
program
  20:19
programmed
  26:5
promise
  39:22
  40:2 70:9
promised
  79:18
Promissory
  47:6
proof 25:4
  37:16
  38:19,24
  44:4 52:9
  54:18,19
  62:24
  63:7,23
  66:9,18
  67:2,9,10
  67:23

68:5,16
68:16
70:2,5,7
70:22
71:6,8,16
72:2 84:1
84:2,4
99:10
118:19
122:13
properties
  24:23
  85:16
  87:3
property
  10:10
  24:23
  25:2,7,9
  86:13,14
  86:16
  87:1,6,13
  88:6
  89:14
protect
  86:20
protection
  49:11
provided
  38:13
  65:17,18
  66:16
  71:3
  76:23
  92:17
pull 22:19
  23:14
  25:22
  26:14
  80:6
pulled 39:1
  39:2
pulling
  36:6
purchase
  10:24
  33:3

48:21
58:15
59:2
purchased
  32:24
  33:14
  48:19
  49:10
  50:5,14
  59:6
  117:12
purchaser
  49:21
purpose
  7:10
  54:23
  66:21
  67:3,6
  93:14
purposes
  27:1 37:2
  91:1
  121:15
pursuant
  1:9 4:10
  6:6,7
put 23:13
  27:14
  33:8
  41:18
  43:22
  44:16,16
  48:6 50:7
  67:9
  91:19
  92:10
  93:17

    Q
qualified
  1:13
quality
  29:21
question
  17:21
  28:2,12

41:12
57:10
59:9,12
62:10
64:13
70:15,18
72:6,7,17
73:4,6,9
75:24
78:18
84:10
101:1
105:19
106:21,24
107:17
108:23
116:13,15
116:17,18
117:18
118:17
121:12
questioning
  74:9
  75:13
questions
  7:11
  61:12
  63:21
  70:10
  85:20
  97:19,21
  98:5
  103:10
  120:6,20
  121:6
  123:1
quick 70:17
  70:17
  108:23
quickly
  63:9
  108:8
quite 10:22
  25:4
  56:22
  86:6

    R
random
  87:19,20
Randy
  110:17
range 86:7
rate 98:10
read 6:17
  46:21,23
  92:19
  101:4
  126:2
readable
  92:10
reading
  112:3
ready 29:9
real 23:23
  63:9
  70:17,17
reality
  118:12
realize
  91:4
really 8:19
  8:22
  14:19
  41:22
  42:7 73:3
  75:24
  101:1
  106:20,23
  108:23
reason 11:1
  67:1,14
  67:18
  78:11
  98:9
  104:4
reasons
  17:9
recall 6:3
  7:6 59:20
  109:17
  111:2

113:7
115:19
123:21
receipt
  76:12
receive
  33:4
  81:15
received
  33:7
  43:10,13
  48:16
  49:7,10
  50:4,11
  76:3,4,5
  96:20
  97:14
  110:14
receiving
  76:9 87:5
Recess
  79:19
reclarify
  102:10
reconcil...
  91:20
  92:13
record 4:8
  26:22
  34:1
  35:11
  36:14,16
  36:17,18
  36:19,22
  40:7
  46:21
  47:12
  49:8
  50:10
  52:7 75:1
  75:12,16
  88:11,11
  97:17
  98:22
  108:9,10
  108:13

Bret Maloney
July 11, 2014

145

| | | | | | |
|---|---|---|---|---|---|
| 112:8 | reflect 4:8 | 97:11 | report-g... | responsi... | 91:3 |
| 120:4,6 | reflective | 107:6,16 | 25:24 | 29:3 | 98:17 |
| 121:5,6 | 98:20 | 108:3 | reported | responsi... | 100:5 |
| 122:20 | regarding | 109:15,20 | 88:6 89:7 | 32:11 | 101:5,6,8 |
| 125:7 | 7:11 | 109:24 | 125:6 | responsible | 103:22 |
| recorded | 26:20 | 110:18 | reporter | 30:6,16 | 105:3 |
| 36:8 | 43:6,7 | 111:1,9 | 4:1 40:4 | 32:19 | 108:24 |
| 49:24 | 65:2 | 111:15 | 40:6 | restate | 117:4 |
| 75:5,10 | 96:16 | 112:11 | 125:1 | 71:24 | Road 2:3 |
| 79:12 | regards 5:5 | 117:7,14 | Reporters | Results | 4:3 |
| 89:15 | 21:4 43:9 | 117:23 | 4:2 | 85:24 | Rob 112:10 |
| Recorder | 64:5 | 118:15 | reporting | review 6:23 | 112:20 |
| 76:24 | 74:10 | 119:23 | 22:1 | 50:3 | room 43:16 |
| recordke... | 78:19 | relevancy | 126:6 | 104:17 | rooms 82:2 |
| 122:11 | 95:10 | 21:2 | represent | 105:1 | Rule 1:6 |
| records | 97:1 | 77:20 | 18:13 | reviewed | 4:9 |
| 22:6 | 122:19 | 104:15 | 63:16 | 6:4 7:1,1 | Rules 1:10 |
| 76:18 | Registra... | relevant | 100:6 | 7:3,6 | 4:9 6:8 |
| recourse | 75:4 | 93:17 | request | 31:21 | running |
| 51:17 | regular | 119:5 | 102:4,13 | 46:19 | 95:2 |
| red 80:3 | 29:5 | reliance | 103:11,12 | 71:9,11 | 121:9 |
| redact | 105:10,17 | 54:22 | 104:11 | 71:17,18 | |
| 52:14 | 105:18 | Relief | requesting | 71:20 | **S** |
| 53:8,16 | related | 94:10,11 | 23:16 | 72:2,7,15 | S 3:7 4:3 |
| redaction | 22:5 | remaining | require | 106:16 | safe 42:2,5 |
| 52:12 | 71:22 | 97:20 | 26:3 | RFC 38:15 | 49:12 |
| redirect | 88:3 | remember | reserve | 38:22 | safeguard |
| 121:11,23 | relates | 30:15 | 81:5,6 | right 12:14 | 85:16,19 |
| 123:23 | 84:3 | 120:9 | 124:1 | 12:20,21 | 85:23 |
| redirected | relation... | remit 97:15 | residential | 17:8,10 | 89:2,8 |
| 96:2 | 7:16 8:13 | remove | 10:19 | 23:23 | SAITH 124:3 |
| reduced | 9:12,23 | 37:12 | 12:23 | 24:11 | sake 36:19 |
| 44:5 | 11:24 | removing | 13:1 | 36:6 | 97:21 |
| 125:6 | relative | 34:22 | 15:19,22 | 43:16,22 | 104:15 |
| Reference | 125:10,11 | repeat | 17:4,7 | 46:1 52:9 | Sale 61:22 |
| 93:13 | releases | 62:10 | 32:24 | 53:2 | sales 33:3 |
| references | 37:9 | rephrase | 44:17 | 56:20,21 | San 81:1 |
| 62:8 | relevance | 116:19 | 45:7,11 | 61:10 | saw 5:19 |
| referencing | 14:16 | replaces | 46:5 48:2 | 72:8 | 106:16 |
| 94:8 | 20:5,21 | 92:22 | 48:19 | 74:13 | Saxon 14:12 |
| referring | 48:22 | report | 51:17 | 80:8,9 | 15:13 |
| 47:11 | 49:14 | 25:20,21 | 53:19,23 | 81:24 | saying 8:9 |
| 49:6 | 55:22 | 87:10,15 | respond | 83:18 | 11:18 |
| 60:24 | 56:5 57:8 | 87:16 | 99:10 | 84:1,7,9 | 19:14 |
| 79:2 | 57:21 | 88:8,20 | Response | 84:21 | 38:11 |
| 99:21 | 87:23 | 88:21 | 99:1 | 88:19 | 43:18 |

47:23
53:17
65:8
67:19
73:1
100:8,14
**says** 12:16
26:9,11
34:2,4
41:10,12
41:15,15
42:18
44:17
46:22
51:11,12
80:24
81:1,11
85:24
87:19
88:15,16
95:5
98:18
99:21
100:1
104:11
105:3,5
**scan** 22:10
**scanned**
23:8
24:13
50:6
81:19
**scanning**
22:21
23:9
**scheduled**
32:17
**scope**
104:12
**Scott** 64:18
64:21
114:9,11
**screens**
39:1
91:24
**second** 7:9

26:22
30:12,14
31:1
32:15
36:15,18
47:1,13
47:14
51:13
52:1
59:12
72:1
86:23
92:14
97:22
108:16,17
**Seconds**
23:19
**section**
89:24
**sections**
83:24
84:2
**secured**
88:7,9
**security**
86:20
87:7
**see** 5:18
12:6 25:4
25:22
28:3 41:8
52:1 69:3
70:16,17
71:17
83:9
87:11,12
88:15
89:19
98:7
100:6
102:22
104:17
108:15
**seeing** 5:21
**seen** 5:16
7:9 8:2

8:10
39:10
46:17
63:15
82:14
98:2 99:4
108:5
109:7
123:3
**segregated**
19:10
**select**
23:15
**sell** 107:4
**seller**
49:20
**semantics**
73:7
**send** 25:10
25:10
51:2
64:22
67:8,14
67:18
107:12
115:6
**senior** 28:4
28:13,20
**sense** 101:7
**sent** 22:18
23:7 24:3
37:1
38:24
39:5
49:20,23
51:9
61:16
62:8,22
63:24
68:2
106:17
116:8
**sentence**
117:3
**separate**
15:17

22:10
27:7 39:3
40:2 42:1
105:2
**separately**
82:5
**September**
96:21
**series** 60:8
101:19
112:16
**serve** 21:1
**served**
121:18
**server**
84:19
**service** 9:3
15:14,18
21:11
60:11
63:20
99:11
116:6
120:11
**serviced**
9:18
20:11
32:21
**servicer**
7:17 10:3
12:1
**servicers**
24:22
**services**
9:7 17:23
18:11
80:13
**servicing**
7:3,14
9:13
11:11,13
11:14,19
11:24
12:11
17:1
21:22

31:21
60:20
119:13
**set** 13:5
16:14
26:4,8
97:22
121:22
125:13
**share** 17:3
123:7,9
**shared**
19:13
**Shearhart**
120:22
**shed** 52:16
**sheet** 27:2
86:23
92:2,8
103:14,20
103:22
122:19
126:1
**sheets**
106:17
**Shift** 6:1
**shifted**
76:18
**shipping**
49:23
**shoes** 85:17
**short** 95:19
**Shorthand**
125:1
**show** 5:13
24:10
45:20
60:14,19
95:8
**showed**
105:14
106:17
123:2
**showing**
63:6
93:18

**shown** 37:13
96:10
123:10
**shows** 23:5
24:3
27:16
33:6 41:7
43:11
51:1,9
60:8,13
81:15
89:24
**side** 10:19
12:23
13:1,5
15:19
17:4,4,7
32:6 80:4
80:8,9,12
80:19
112:24
114:5
**sides** 57:12
**sign** 55:19
55:21
56:3,4
107:15
118:14,18
**signature**
44:12
46:8,15
51:24
54:5
108:22
109:1
**signed**
44:21
48:1
68:19
78:1,2,7
108:18
**signing**
44:21
**signs** 37:6
**similar**
43:5

Bret Maloney
July 11, 2014

147

| | | | | | |
|---|---|---|---|---|---|
| simultan... | sound 12:19 | 57:18 | starting | 113:1 | 85:9 |
| 58:22 | 32:6 84:1 | 67:4,5 | 90:7 | 114:18 | Suppleme... |
| 78:17 | sounded | 77:19 | starts | 116:18 | 93:1 |
| single 87:1 | 21:19 | spell 4:20 | 85:24 | 117:11,17 | suppleme... |
| Sir 4:18 | sounds 9:5 | 29:14 | 90:17,17 | structure | 102:18 |
| site 51:7 | 12:21 | spent 16:24 | 91:14,14 | 10:13 | Supplements |
| sitting | Sowerman | split 15:21 | 96:12,13 | stuff 27:12 | 92:24 |
| 31:9 | 113:1,3 | spot 123:14 | state 1:13 | 83:1 96:6 | supply |
| sixth 54:17 | speak | spread 27:2 | 4:18 14:1 | styled | 114:12 |
| 54:23 | 104:14 | 86:23 | 125:1 | 39:17 | supposed |
| slue 116:14 | speaking | 92:2,8 | 126:19 | submitted | 39:17 |
| small 9:14 | 87:19 | 103:14,20 | stated | 71:12 | 47:23 |
| 9:22 | spearheaded | 103:22 | 49:11 | subscribed | 59:17,22 |
| software | 62:19 | staff 91:20 | 88:18 | 126:20 | 118:4 |
| 17:18 | special | 92:7 | statement | subseque... | sure 10:22 |
| 18:9 | 28:7 | stagnant | 6:12 37:4 | 27:8 | 19:19 |
| 25:18 | specialized | 115:18 | 72:17 | subserviced | 25:6,9 |
| 26:1 | 20:3 | stamp 44:15 | 80:12 | 115:12 | 35:2 |
| sold 20:19 | specific | 44:17 | statements | 116:5 | 47:22 |
| 107:8 | 21:15 | 48:6,10 | 24:12 | subservicer | 55:4,7 |
| somebody | 31:12 | 51:13,14 | States 1:1 | 18:16,17 | 60:1 |
| 12:9 | 32:10 | 51:16,23 | 1:10 | 19:11 | 61:20 |
| 38:24 | 79:3 | 54:11 | stay 123:14 | 64:9 | 62:15 |
| 39:4 | 96:16 | 68:22 | stays 107:1 | 100:18 | 63:15 |
| sorry 16:9 | 107:22 | 107:11 | stenogra... | 115:8 | 86:14,15 |
| 26:18 | 108:5 | stamps 48:5 | 125:6 | subservi... | 87:6 |
| 30:3,5 | 110:5 | 48:11 | Steven | 18:24 | 91:19 |
| 36:11 | 112:17 | standard | 13:24 | 19:10 | 93:11 |
| 61:2,15 | 122:3,4 | 92:8 | 113:20 | subsidia... | 103:24 |
| 61:18 | 122:14,21 | standing | sticker | 117:1,11 | 105:7 |
| 62:10 | specific... | 112:3 | 34:2,4,5 | sued 117:1 | 106:18 |
| 64:8 | 12:7 32:1 | stands 28:5 | stipulate | 117:2,6 | 112:15 |
| 67:17 | 75:15 | staple | 112:13 | 117:10,12 | 116:11 |
| 69:20 | specifics | 34:22 | stop 42:15 | sufficie... | suspect |
| 83:11,14 | 65:10 | 37:12 | 43:23 | 42:21 | 80:16 |
| 102:10 | specified | start 7:15 | stoppages | sufficing | suspense |
| 110:12 | 125:9 | 14:8 | 42:15 | 103:15 | 95:20,23 |
| 114:16 | specify | 55:10 | street | suggest | 95:24 |
| sort 11:17 | 22:13 | 56:12 | 87:12 | 35:3 | 96:1,17 |
| 11:20 | 30:7 59:8 | 83:17,17 | streets | Suite 1:14 | 96:20 |
| 12:15 | 71:18 | 91:2 | 13:10 | 1:21 2:3 | 97:1 |
| 17:2 27:3 | 105:12 | 98:13 | Strickler | SULAIMAN | SVP 28:5 |
| 49:9 51:3 | 116:3 | started | 1:12 4:1 | 1:19 | 112:24 |
| 58:15 | 119:15 | 14:10,23 | 125:1,16 | summary | 113:4,8 |
| 59:1 | speculation | 50:12 | strike | 27:16 | 114:1 |
| 65:18 | 46:11 | 56:17 | 25:17 | 82:12 | Swift 1:4,4 |

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

148

| | | | | | |
|---|---|---|---|---|---|
| 5:5,23 | **tabs** 85:4 | 110:4,13 | **terms** 11:17 | 46:22 | 111:11 |
| 6:2 | **take** 6:11 | 110:14 | 11:20 | 51:23 | **thought** |
| **Swift/A** | 21:14 | **talking** | 17:1,17 | 63:21 | 90:10 |
| 34:10 | 23:18 | 16:24 | 26:9 47:2 | 80:12 | **threaten** |
| **Swifts** 12:9 | 24:9 | 18:14 | 47:3 | 92:18 | 119:4 |
| **Swifts'** | 26:22 | 27:13 | 49:10 | 103:5,7 | **three** 16:7 |
| 22:16,17 | 27:15 | 42:22 | 98:11 | 103:19 | 31:6 |
| 30:6 | 28:18 | 44:5 45:3 | 106:11 | 116:16 | 80:20 |
| 31:11 | 32:14 | 47:13,17 | **testified** | **think** 7:6 | **ticket** |
| 32:19 | 43:24 | 70:12 | 4:15 | 8:24 | 16:16 |
| **sworn** 4:7 | 63:8 64:9 | 71:21 | 33:13 | 21:21 | **tied** 10:18 |
| 4:15 | 70:18 | 84:12 | 54:16,18 | 28:8 | 27:18 |
| 125:4 | 72:2 | 87:24 | 56:10 | 31:23 | **Tim** 109:23 |
| 126:20 | 74:10,12 | 88:11 | 79:3,5 | 37:3,5,8 | 110:6 |
| **system** 17:3 | 79:18 | 112:1 | 122:8 | 40:8 | **time** 4:4 |
| 17:5,13 | 87:10 | 121:6,7 | **testify** | 42:11,20 | 15:4 |
| 18:8 21:5 | 97:5 | **talks** 11:23 | 52:16 | 47:14 | 16:24 |
| 21:23 | 108:7 | 99:11 | 53:7 | 48:17 | 25:1 |
| 22:8,10 | **taken** 1:14 | **taxes** 23:23 | 57:18 | 51:8,16 | 26:12 |
| 22:10,21 | 4:10 | 23:23 | 125:4 | 56:20 | 27:11 |
| 22:22 | 19:21 | 95:13 | **testimony** | 58:9 | 30:7,10 |
| 23:7,9,10 | 37:14,15 | **Taylor** | 79:1 | 63:12 | 30:11 |
| 23:13,22 | 79:19 | 109:23 | 121:15 | 64:19 | 32:16 |
| 24:14 | 125:9 | 110:6 | 125:7 | 72:5,9 | 39:11 |
| 25:18 | 126:2 | **tech** 26:5 | **Texas** 4:23 | 73:24 | 46:1 |
| 26:5 33:5 | **takes** 21:10 | **technically** | 14:1 | 78:6 | 48:12 |
| 39:4 | 21:18,24 | 15:11 | 29:23 | 79:17 | 50:12 |
| 43:12 | 25:7 | 17:14 | 30:19 | 82:24 | 56:22 |
| 49:8 50:9 | 28:17,19 | 95:12 | 31:4 | 83:19 | 59:5,8 |
| 53:13 | 62:14 | **tell** 8:4 | 43:18 | 84:14,16 | 63:17 |
| 60:19,22 | **talk** 6:18 | 25:18 | **Thank** 16:13 | 84:20 | 66:6 |
| 75:4 76:8 | 6:20 | 32:2 38:9 | 91:4 | 86:2 91:3 | 67:17 |
| 76:11,14 | 39:22 | 40:19 | 96:23 | 97:15 | 69:10,13 |
| 76:18 | 70:9 73:7 | 47:10,10 | **thing** 20:8 | 98:3,12 | 69:15,19 |
| 78:10 | 74:14,15 | 61:21 | 23:17,20 | 99:16 | 70:12 |
| 80:6 | 77:14 | 62:3 | 35:2 47:1 | 100:4,9 | 71:23 |
| 88:22 | 92:15 | 68:20 | 51:1,21 | 103:5 | 73:1,5,7 |
| 89:2 94:5 | **talked** 6:1 | 73:19 | 53:23 | 105:14 | 76:16,17 |
| 99:18 | 10:15 | **telling** | 77:4 | 110:6 | 78:14 |
| 106:10,12 | 20:3 | 7:15 42:6 | 80:24 | 111:3 | 79:9,10 |
| **systems** | 32:13,14 | 60:4 | **things** 17:2 | 121:14 | 82:10 |
| 17:17 | 32:14 | 104:22 | 22:1 | **thinking** | 85:15 |
| | 39:2 40:5 | **tells** | 26:16 | 61:15 | 93:19 |
| **T** | 62:6 | 106:10 | 27:24 | 118:23 | 96:19,24 |
| **T** 1:4 3:7 | 73:24,24 | **templates** | 28:18,20 | **Thomas** | 97:22 |
| **tab** 84:20 | 84:10,11 | 21:8 | 29:3 | 111:5,7 | 101:5 |

Bret Maloney
July 11, 2014

149

```
104:12              97:2                73:3                92:11,21           118:24,24          unduly
116:3               123:17              88:22               94:2               typically           103:15
118:20              track 25:18         123:12              103:8              52:14               104:12
120:9                42:19              transmitted         104:13             86:24               105:5
122:13,17            50:9                23:6 67:1          turn 99:24         94:24               United 1:1
125:9               76:11,21            transmit...         two 7:16                                1:10
times 24:22         95:19                89:4               8:13               ─── U ───           University
title               106:24             transported         13:10              U.S.A 8:3            14:1
 112:22,23          118:12              89:2                19:6 27:7           8:10 9:10          unusual
today 4:12          119:5              travel               34:23              12:18               14:21
 5:2 6:18           tracking            16:21               36:12              17:14              use 17:19
 6:23 31:9          33:5               trees 99:3           38:21              35:15               18:2,3,12
 31:22             training            trouble              48:4               36:8                92:8
 75:18              53:9                55:8                70:24              40:21                99:18
 77:9               99:17             true 8:5             73:11              58:18                101:4
 82:14             transaction          23:20             78:22              60:7,23              120:3
 83:21              24:8,9              24:21             79:12,15            70:4               uses 17:5
 102:9              25:12               44:6 48:2         83:6 84:4            72:22             usually
 104:5              90:16               62:1              84:5,6,7            73:13                8:11
 106:14            94:3,5              116:21             90:8,9              75:10               19:21
 114:8             97:3,13             125:7             91:5 93:5            77:12               63:19
told 7:13          100:9               126:3             96:18              103:2
 46:22            transact...         trustee            106:7             umbrella             ─── V ───
 63:16             22:7                94:24             108:17              8:16,24            vacant 88:7
 70:2 73:2         99:12,16           Trustees           111:16              10:4               88:8,16
 106:15           transcript           93:13             121:18            unaware              88:17,23
Tom 109:18         124:2              truth 125:4        type 15:7            107:19            vacated
top 37:18          125:5             try 35:3            25:11             underneath            86:14,16
 41:9              126:2,3            74:11              28:18              8:16,24              87:6,13
 64:20            TRANSCRI...          107:7            29:3 32:8           10:4,12            vague 11:22
 68:21             126:6             trying 7:6          43:6              understand            17:20
 89:24            transfer            12:8               49:23              8:18,20              21:2
 93:12             58:23              14:22              51:20              12:8                 114:15
 99:22             59:7,17            20:7               53:23              17:13,21           valid 47:6
 100:1,16          60:6,9,12          23:21              89:1               19:20               47:7,8
topics 6:17        60:14              32:6              typed 51:14          20:7                101:11
 6:21              61:23              43:21              51:19,20            23:21             value 54:20
 13:20             62:7,13            47:20,21           51:22              45:5,5            various
total 65:23        62:19              53:6,9,14         types 15:1          59:21               18:13
 89:16             72:11,21           53:15              15:3               83:12               118:6
 95:2,18           120:12             57:3              109:7               94:2 96:5          vault 50:8
totally           transferred         71:24           typewriting          98:3                51:7
 17:5              58:17,20           72:5               125:6            understa...           81:24
touch 34:23        59:15              80:23             typical            53:22               82:2
 123:2             60:18              81:14              76:6            understood            Vecchio
touched            69:7 70:4          83:10,12           77:16            16:3,5               48:1
```

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

150

vendor 89:6
verified
  106:18
verify
  88:16
  116:10,21
version
  26:23
vice 28:4,7
  28:13,18
  28:19,20
  28:21,21
  31:2
  55:11,14
  56:23
  57:2,6
visible
  86:16
  87:11
visual
  86:15
VP 110:20

**W**

W 2:3
W-H-I-T-...
  29:15
waiting
  98:1
walk 119:4
want 9:8
  14:6 24:2
  24:2
  26:21
  27:15,15
  34:14,17
  34:18,19
  36:18
  37:12
  42:11,14
  43:20
  49:16
  55:5 60:1
  63:8,14
  64:12
  87:6 91:2

96:6
97:20
99:2,2,8
103:24
104:16
109:11
112:13
114:9
118:10
119:4
wanted
  23:11
  30:24
  34:9
  61:17
  69:21
wants 25:9
wasn't
  85:14
  88:16
  104:6
  123:13
watch 35:11
way 14:9
  24:4
  26:24
  37:12
  46:15,18
  72:6 84:8
  84:23
  86:8 87:7
  87:8
  103:6
  114:8
  117:4,18
ways 36:13
we're 19:19
  26:13,14
  39:21
  40:3
  42:21
  47:1,2,3
  47:14,17
  74:1
  82:11,24
  84:12

88:20
97:24
98:1
112:1
117:17
119:3
we've 119:4
website
  110:3
week 56:4
weeks 16:7
Wendy 1:12
  4:1 125:1
  125:16
went 16:7
  36:18,22
  69:11
  76:24
  77:15
  88:5
  96:20
  100:4
  101:5
  106:13
weren't
  26:21
Wheaton 4:3
WHEREOF
  125:13
Whiteley
  29:13
  83:5 93:9
wholly 19:7
withdraw
  69:22
witness 1:9
  3:2 4:7
  4:14 5:20
  6:14
  11:23
  20:22
  21:3
  36:11
  46:12
  55:18,23
  56:6

57:22
65:22
67:12
72:18
90:8
97:12
107:8,19
108:4
109:17,21
110:19
111:2,16
112:12
114:16
115:23
117:8,16
118:1
119:7
120:1,7
121:17,21
125:3,3
125:13
wondering
  21:17
  78:3
  79:14
  80:15
word 51:20
  93:2
work 13:1
  14:24
  15:11
  25:10
  57:24
  63:18
  65:20
  109:10
  112:20
  120:21
  122:5
worked
  14:12
  15:9 32:5
  32:5
  56:19
  58:2
  109:14

111:11
working
  14:18,23
  50:12
  78:15
works 58:1
  109:18
Worth 14:12
wouldn't
  32:2 51:5
  55:14
  60:21
  67:12
  72:12
  85:13
write 12:17
writes 12:4
writing
  87:17
written
  18:8,9
  34:10
wrong 8:19
  41:19
  72:14
  84:20

**X**

X 3:1,7
  44:4,6
XLS 27:2
  103:20

**Y**

yeah 25:21
  27:21
  31:13
  46:24
  49:18
  57:5
  59:24
  81:6 88:5
  90:23
  91:12
  93:16
  94:21

99:23
100:3
110:11
113:19
year 14:11
  20:16
  56:4
  59:23
  72:9
  113:6,23
  114:2,7
years 98:11
  111:17
  113:10
  121:18
yellow 34:1
  84:14,16

**Z**

Zurich
  18:20
  30:22
  115:22,24
  116:9
  123:19

**0**

07 91:2
084-003257
  1:12
  125:2,16

**1**

1 3:8 5:8
  5:13 69:3
  103:12
1-31-07
  90:22
  91:14
1-31-2007
  90:7,17
10 3:13
  82:17,18
  82:20
  83:4,20
  86:10,11

County Court Reporters, Inc.
630.653.1622

Bret Maloney
July 11, 2014

151

| | | | | | |
|---|---|---|---|---|---|
| 87:9 | 94:19 | 33:16 | 40:1,9,11 | 103:21 | 601 87 4:4 |
| 89:14,23 | 13th 75:10 | 48:16 | 40:16 | 108:13,17 | 605 23 1:21 |
| 98:23 | 14 44:4 | 49:3 | 41:10,21 | 109:2 | 605 63 2:4 |
| 101:21 | 15 26:2 | 50:19 | 42:11 | 122:19 | 61 3:10 |
| 103:3 | 15-day | 75:5 | 54:17 | 40 3:9 | 628 243 80:4 |
| 105:22 | 25:19 | 96:22 | 55:2 58:8 | 40,000 | 63 3:11 |
| 106:4 | 150 1:14,21 | 117:21 | 58:11,12 | 89:24 | |
| 10-17 91:14 | 16 26:9 | 2010 81:16 | 58:13,24 | 40,445 | **7** |
| 10-17-11 | 17-1 37:17 | 100:19 | 68:16 | 89:12 | 7 3:11 74:4 |
| 90:17 | 17105086 | 111:4 | 79:5 | 410 84:13 | 74:6,10 |
| 10:00 1:8 | 42:20 | 116:6 | 103:12,13 | 43 3:10 | 75:3 |
| 10:05 4:4 | 1771 2:3 | 120:13 | 103:15 | 47,000 | 7-17-07 |
| 108 3:4 | 17th 81:16 | 2011 37:7 | 3-13 79:12 | 89:21 | 94:9 |
| 11 1:7 3:13 | 1993 13:24 | 66:5 | 3-4 34:2 | 4th 16:18 | 7195 4:23 |
| 4:4 44:6 | 1999 121:17 | 69:17 | 3,530.35 | | 13:6,12 |
| 45:15 | 1st 59:19 | 86:8 | 96:8 | **5** | 13:16,18 |
| 90:2,4 | | 122:17 | 30 112:16 | 5 3:8,10 | 115:5 |
| 91:6,13 | **2** | 2012 30:15 | 30 (b) (6) | 48:16 | 123:10 |
| 91:13 | 2 3:9 37:19 | 34:2 | 1:6 4:9 | 49:3 61:1 | 7368.92 |
| 103:20 | 37:20,21 | 50:20 | 6:8,11 | 61:5,21 | 96:18 |
| 105:21 | 38:2,7 | 59:18,23 | 31st 61:24 | 69:7 | 74 3:11,12 |
| 126:2 | 43:8,24 | 59:24 | 62:8 69:8 | 79:13 | 3:12 |
| 11th 105:14 | 47:5 | 60:2,5 | 72:12 | 103:12 | 75024 4:23 |
| 123:14 | 51:10 | 62:1 | 73:1 | 5-3 41:15 | 752.50 |
| 37:17 | 52:6,8 | 118:23 | 3360 115:23 | 5-3-2003 | 80:14 |
| 91:6,8,13 | 53:10 | 2013 41:10 | 35 96:17 | 78:15 | |
| 91:14 | 54:8 | 41:16 | 3590 37:17 | 5-3-2013 | **8** |
| 98:24 | 70:13 | 58:11,12 | 36 96:17 | 42:19 | 8 3:12 |
| 102:19,19 | 103:12 | 58:13,24 | 3684.46 | 53 87:19 | 74:19 |
| 103:21 | 2-14-2005 | 59:16 | 96:19 | 54 89:9 | 75:6 77:5 |
| 12-18-2011 | 99:17 | 60:12 | 38 3:9 | 5th 16:14 | 77:7,15 |
| 89:11 | 2,000 12:10 | 69:11 | 38,000 | 16:16 | 8-1/2 44:4 |
| 12-21-08 | 20 37:7 | 75:10 | 89:20 | 59:15 | 44:6 |
| 96:17,21 | 69:11 | 79:6,13 | 3rd 68:20 | 125:13 | 8-9 74:21 |
| 12-23-08 | 2000 14:10 | 79:13 | 72:8 | | 83 3:13 |
| 96:21 | 14:23 | 2014 1:7 | | **6** | |
| 12-30-2011 | 15:5,6,14 | 4:4 | **4** | 6 3:11 | **9** |
| 100:4 | 56:18 | 125:13 | 4 3:4,10 | 62:24 | 9 3:12 |
| 12-35690 | 66:5 | 126:2,21 | 42:8,11 | 63:2,7 | 74:19 |
| 1:4 | 2007 14:11 | 20th 60:12 | 42:14,17 | 103:13 | 75:9 |
| 120 2:3 | 15:13,15 | 29 60:12 | 42:23 | 6-4-2013 | 77:11 |
| 122 3:5 | 80:15 | 2nd 68:18 | 43:2 | 86:3 | 78:6 |
| 12th 105:14 | 2008 14:12 | 68:20,21 | 47:13 | 600 4:3 | 86:11 |
| 131 1:5 60:1 | 15:10,12 | | 70:7,7 | 6000 13:9 | 87:9 |
| 93:23 | 15:13,20 | **3** | 79:2,7 | 13:11,18 | 108:14,17 |
| 94:9,16 | 33:1,12 | 3 3:9 37:18 | 103:12,19 | 123:10 | 109:2 |

Bret Maloney
July 11, 2014

152

**9-3** 75:5
**90** 3:13
**900** 1:14,20
  4:5
**91** 3:14

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Judge Carol A. Doyle |
| | ) | |
| CHRISTOPHER T. SWIFT and | ) | No 12-35690 |
| MARCIA A. SWIFT, | ) | |
| | ) | |
| Debtors. | ) | Chapter 13 |

**DEBTORS CHRISTOPHER T. SWIFT AND MARCIA A SWIFT'S NOTICE FOR A RULE 30(B)(6) DEPOSITION OF A CORPORATE OFFICER OR EMPLOYEE OF LNV CORPORATION**

**TO: LNV Corporation C/O Freedman Anselmo Lindberg LLC, 1807 W. Diehl Road Suite 333, Naperville, Illinois 60566**

**TAKE NOTICE** that pursuant to Rule 7036 of the Bankruptcy Rules and Federal Rule of Civil Procedure 30(b)(6) that the Plaintiffs will take the deposition of a designated officer, director, managing agent or other party designated by LNV Corporation and/or its successors and assigns as to the matters and things designated herein and reasonably known and available to LNV Corporation  The said deposition will be taken before an officer duly authorized by law to administer oaths and another party designated to video-tape the proceeding.

**TAKE FURTHER NOTICE** that the deposition shall take place on September 12, 2013 at 10:00 am at 900 Jorie Blvd, Naperville, Illinois or at such other time and place as counsel for the parties shall agree.

**TAKE FURTHER NOTICE** that the following topics for examination of the person so designated to be deposed by the Plaintiffs.  This person should have actual and personal knowledge of the following:

### I.    INITIAL AREAS OF INQUIRY

1. A discussion of the factual allegations of the Objection to Proof of Claim Seventeen.

2. A discussion of the legal claims made in the Objection to Proof of Claim Seventeen

3. A discussion of the deponent's employment history and experience.



EXHIBIT
Malone dep.
1

4. A discussion of the deponent's qualifications to testify regarding the specific areas of inquiry.

5. The deponent's definition of default.

6. Any documents or responses to discovery items by the deponent.

7. A complete discussion of employee rolls, organizational charts and flow charts used by the deponent during the term of the Mortgagor's account which is descriptive and reflective of the deponent's residential mortgage servicing department;

8. Discussion of any efforts to respond to this notice, including the following:

   a. Investigation and research done on behalf of deponent in a fair attempt to provide the information requested in this notice;

   b. Name, address and position of each person who on behalf of deponent gathered information or sought to gather information sought in this notice;

   c. Name, address and position of each person contacted in an attempt to obtain the information requested in this notice;

## II.    MORTGAGE SERVICING ISSUES

9. A discussion of the industry standards recognized by the deponent governing each of the following areas:

   a. Mortgage Servicing.

   b. Application of payments to the Mortgagor's account.

   c. Priority of application of payments to the Mortgagor's account.

   d. The use of Suspense accounts by the Deponent.

   e. The policies and procedures in place for determining when to place funds into a suspense account.

   f. The policies and procedures in place for determining how, why and when to post funds from a suspense account to the Mortgagor's account.

2

    g.  The policies and procedures of the deponent with respect to the administration, accounting, posting, and reconciliation of unapplied funds to the mortgagor's account.

    h.  The use, accounting, administration and reconciliation of any escrow accounts including a full discussion of the legal and regulatory requirements governing escrow accounts imposed upon the deponent.

10.  A discussion of the deponent's policies, procedures, or protocols which are currently in place and/or were in place within the last ten (10) years relative to residential mortgage servicing regarding any of the areas of inquiry listed in the previous heading including its subparts number 5(a)-(h).

11.  A discussion of the deponent's policies, procedures, or protocols which are currently in place and/or were in place within the last ten (10) years relative to authorizing or setting forth the booking, logging, tracking, tacking and/or collection of any fees or charges including but not limited to property preservation fees, broker opinion fees, appraisal fees, attorneys fees, inspection fees, statutory expenses, bankruptcy monitoring fees or other similar fees and expenses, corporate advances or any other charges and fees which the deponent contends are authorized by the consumer mortgage agreements and which were assessed, booked, logged, tracked, and/or processed in any way for collection against the loan of the plaintiff in this case.

12.  A complete discussion of every document or image stored electronically or in a paper file regarding the mortgagor or the mortgagor's account serviced by the deponent.

13.  A complete and full description and discussion of the loan history and all entries regardless of whether the same were intended for collection or not of any amounts to the loan of the mortgagor.

14.  The complete and full description and discussion of any responses to any Qualified Written Requests received by the deponent regarding the Mortgagor's account.

15.  A complete discussion of each software system used by the deponent in its mortgage servicing operations. The deponent should be prepared to discuss each of the following with regards to the software so identified:

    a.  The name of the software.

    b.  The vendor, owner or licensor of the program.

    c.  The capabilities and functionalities of the program vis-à-vis mortgage servicing, accounting, management and reporting.

d. Every capacity of the software to retain or catalog images and correspondence related to the Mortgagor.

e. Every part, portion, division, or module of the software.

f. How the software system tracks delinquencies.

g. Any capacity of the software to trigger or assess any fee or charges based upon any claimed delinquency of the mortgagor.

h. The ability of the software to track any charges to the account of the mortgagor.

i. The ability of the software to archive records of all changes to the mortgagor's account.

j. The archived data of the changes to the mortgagor's account maintained on the software.

k. Any codes for the mortgagor's account as well as the definition of those codes.

l. A complete discussion of all the data which is maintained electronically by the deponent regarding the mortgagor or the mortgagor's account serviced by the deponent.

16. A complete and full description and discussion of any and all efforts by or on behalf of the deponent relative to any action involving the Mortgagor including any memorandum, policies, procedures, or protocols currently in place or in place at any time during the term of the Mortgagor's account relative to, authorizing or setting forth the circumstances whereby the deponent or the deponent's attorneys, employees, agents, vendors or contractors file or seek a relief of automatic stay in chapter 13 bankruptcies.

17. A complete discussion of any spreadsheets or other recapitulations which are intended by the deponent to represent the history of the payments to the mortgagor's account as well as their application by the deponent to the mortgagor's account.

18. A complete discussion of the existence of any contractual relationship between the deponent and the outsource provider known as Lender Processing Services aka LPS fka Fidelity National Bankruptcy and Foreclosure Services aka Fidelity aka Fidelity Default or any subsidiary or affiliate of Lender Processing Services. This area of inquiry includes not only the existence of the relationship but the terms of the relationship including the respective rights, duties and obligations of the parties under any contractual relationship between the parties.

4

19. A discussion of the identities, job titles, job duties, flow chart and all specially applicable policies, memorandum, policies, procedures, protocols, of any mortgage servicing representative or employee or personnel who were primarily assigned files which were currently or formerly considered delinquent.

20. A discussion of every department within the deponent's residential mortgage servicing business and their respective duties.

21. A discussion of the persons charged with managing each of the departments of the deponent which are involved in the servicing of residential mortgage loans.

22. A complete discussion of the payoff amounts provided to the mortgagor pursuant to any qualified written request or any other request.

23. A complete discussion of the access rights and related filtering tools that at any time during the term of the mortgagor's account with the deponent have been made available to any outsource vendor or other third party to view by web access or other means your data reflecting the status of individual customer mortgage accounts.

24. A complete discussion of your business rules, software system rules, operational policies, and employee and management responsibilities relating to the submission of claims to investors or master servicers for reimbursement of nonrecoverable advances or other loan-level corporate advances that are expected or deemed not to be recoverable with respect to the mortgagor's account and to the allocating, posting, handling, disbursing, or disposing of funds received in payment of those claims.

## III. MORTGAGE LOAN MODIFICATION AND LOSS MITIGATION ISSUES

25. A complete discussion of all loan modification and loss mitigation issues for the Mortgagor's loan.

26. A complete discussion of each document of the mortgagor which involves or is related to any loan modification or loss mitigation issues.

27. A complete discussion of the voluntary and mandatory loan modification and loss mitigation programs in place at the time that the deponent entered into loss mitigation efforts with respect to the mortgagor's account.

## IV. MORTGAGE FORECLOSURE ISSUES

28. The names of the person or persons who made the decision to begin foreclosure proceedings against the mortgagor.

29.   The names of the persons who prepared the form letters for signing that were sent directly to the Debtors/.

30.   A complete discussion of the persons or parties who prepared any mortgage assignments in this case including the date, time and location of the preparation of that document.

31.   A complete discussion of the persons or parties who prepared any endorsements or allonges to the promissory note in this case including the date, time and location of the preparation of that document.

32.   The deponent's relationship with LPS including any contractual relationship for the provision of default services. This request should be construed broadly enough to include a discussion of the services which are provided to the deponent by LPS when a loan serviced by the deponent enters into foreclosure or bankruptcy status.

33.   A complete discussion of the contents of the information contained in the software program known as LPS Desktop. This category includes discussing all facets of that software program including Process Management, Image Management, Invoice Management or any of the predecessor names of the Software package including New Image Express, New Invoice or any other module in the software by whatever name or delineation.

34.   A complete discussion of the entries in the LPS Desktop software as well as a complete discussion of the images and data stored, made available on or to, or in any linked or connected to the LPS Desktop software such that the data may be used, read, configured, accessed or integrated with the persons or parties actually managing the foreclosure process.

35.   A complete discussion of the deponent's responsibilities with respect to the foreclosure process and a description and discussion of the responsibilities and work items delegated to LPS or any other vendor or contractor.

## V.   STANDING ISSUES

36.   A complete discussion of the complete chain of transfers and assignments of the original mortgage of the mortgagor as provided for in the Document Custodial Agreement.

37.   A complete discussion of the rules and procedures as to who must sign or execute the original assignment of mortgage and each and every subsequent assignment.

38.   A complete discussion of the identification of the officer of any transferring institution that must sign any of the assignments of mortgages.

39. A complete discussion of the policies and procedures for verification that there are no breaks in the chain of assignments of the original mortgage from the original mortgagee of record to present.

40. A complete discussion of the policies and procedures regarding the obligations of the Document Custodian with respect to holding and maintaining all assignments of mortgages with their related mortgage notes.

41. A complete discussion of all policies and rules regarding the assignments of mortgages in blank (e.g., an assignment to no designated assignee).

42. A complete discussion of all policies, rules and procedures regarding any requirements that any assignment of a mortgage must include the legal name of the entity to which the beneficial interest is being assigned.

43. A complete discussion of all policies, rules and procedures regarding the acceptance of blanket assignments of mortgages to any party in the chain of assignments from the original mortgage to the Custodian.

44. A complete discussion of all policies rules and procedures regarding the acceptance or rejection of unrecorded assignments of mortgages by the Custodian.

45. A complete discussion of all policies, rules and procedures regarding the due affixing of a notary stamp and seal to all executed assignments of mortgages.

46. A complete discussion of all policies rules and procedures regarding any requirements that the assigned mortgages must contain original signatures in lieu of stamped signatures.

47. A complete discussion of all policies rules and procedures regarding any requirements that all recorded assignments of mortgages must include the official date of recording by the local office of land records for the jurisdiction in which the real property is situated.

48. A complete discussion of all policies, rules and procedures that prohibit the direct assignment of mortgages from the original mortgagee of record.

49. A complete discussion of all policies, rules and procedures that would prohibit any servicer of the mortgage loans for the Trust from assigning the rights of the Trust in a mortgage to a new lender or third party.

7

## VI.   DOCUMENTS AND IMAGES

50.   A complete discussion of all policies and procedures regarding recording of the original mortgage by the original mortgagee of record.

51.   A complete discussion of all policies and procedures regarding the assignments of the original mortgage after the recording.

52.   A complete discussion of the name and address of the custodian for all of the original loan documents in this case.

53.   A complete discussion of all policies, rules and procedures regarding the form and the custodial requirements for all intervening assignments of mortgages that are executed by parties other than the original mortgagee of record.

54.   A complete discussion of all policies, rules and procedures regarding how the original note must be endorsed by the original lender.

55.   A complete discussion of all policies, rules and procedures regarding how original notes endorsed in blank are transferred from the originator to the intervening parties and finally to the Trust.

56.   A complete discussion of all policies, rules and procedures regarding the endorsement of notes with respect to the use of an allonge.

57.   A complete discussion of all policies, rules and procedures regarding endorsements on notes and the name of the institution making the endorsement as the seller-endorser.

58.   A complete discussion of all policies, rules and procedures regarding whether or not the name of institution endorsing a note as the seller-endorser must be clearly typed or printed.

59.   A complete discussion of all policies, rules and procedures regarding the name and title of the individual authorized to endorse a note for the seller-endorser and proof of such title and authority.

60.   A complete discussion of all policies, rules and procedures as to the whether or not a third-party can act as an attorney-in-fact or pursuant to corporate power of attorney to endorse a note for the seller-endorser.

61.   A complete discussion of all policies, rules and procedures regarding the form of an endorsement in blank on a note by a seller-endorser.

62.   A complete discussion of all policies, rules and procedures for the endorsement of a note by a seller-endorser that is "doing business as" some entity under an assumed name, including the formal corporate name of the entity and the proof of the legal status of the "doing business as" entity.

63.   A complete discussion of all policies, rules and procedures regarding a complete and unbroken chain of transfers and receipts of the note from the original mortgagee to all intervening parties.

64.   A complete discussion of all policies, rules and procedure regarding the necessity for affixing an allonge to the note.

65.   A complete discussion of all policies, rules and procedures as to what constitutes a non-conforming allonge to a note.

66.   A complete discussion of all rules, regulations and policies that allow or prevent a mortgage servicer from making any changes to a note or an allonge to a note.

67.   A complete discussion of all rules, policies and regulations related to the endorsement of a note by a "successor in interest" or "a successor by merger" to the preceding endorser and what proof must be provided to prove the rights of such successor.

68.   A complete discussion of all rules, policies and procedures or regulations related to the endorsement of a note that contains an abbreviation that does not match the formal legal name of the seller-endorser.

69.   A complete discussion of all rules, policies and procedures related to a seller-endorsement that is missing a signature.

70.   A complete discussion of all rules, policies and procedures related to a seller-endorsement that is missing a signature where the institution that should have endorsed the note is no longer in business or is a debtor in a case under Title 11 of the Bankruptcy Code.

71.   A complete discussion of all rules, policies and regulations regarding a seller-endorsement that includes a facsimile signature.

72. A complete discussion of all rules, policies and regulations related to the Asset Purchase Agreements for the sale of the original note by the originator and by all intervening sellers up to and including the final sale..

73. A complete discussion of all rules, policies and regulations related to the True Sale Legal Opinions for the sale of the original note by the originator and by all intervening sellers up to and including the final sale.

74. A complete discussion of all rules, policies and procedures related to an endorsement on a note that has been voided.

75. A complete discussion of all reports that must be filed by the Custodian with respect to the due receipt of the original of all notes, mortgages for all loans acquired including but not limited to all such reports related to an unbroken chain of assignments for the mortgages from originators to all interveners and for the endorsements, transfers and delivery of all original mortgage promissory notes from the original mortgagee to all intervening parties.

76. A complete discussion of all information relevant to this loan published by Fannie Mae as instructions, directions, procedures or guidelines with respect to mortgage loan origination, servicing, sales of loans to Fannie Mae, securitization, document custody and control, first lien insurance on this loan issued by or at the behest of Fannie Mae, any collateral insurance agreements between any parties to any securitization or sale of the subject loan, foreclosure policies, practices, instructions, guidelines, and any other matter published by Fannie Mae relevant to this transaction.

Dated this the 20th day of August, 2013.

_____

Bach Law Offices
Attorney for Debtors
P.O. Box 1285
Northbrook, IL 60065
(847) 564 0808
e-mail: paul@bachoffices.com

10

## CERTIFICATE OF SERVICE

The undersigned certifies that the pleading or paper to which this Certificate is affixed was served upon the other party(s) to this action by hand delivery or by depositing a copy of same, enclosed in a first-class postpaid wrapper properly addressed to the attorney(s) of record for such other party(s), in a post office or official depository under the exclusive care and custody of the United States Postal Service this the 20th day of August, 2013.

_____
Paul M. Bach, Attorney for the Debtors

LNV Corporation                         BY FIRST CLASS AND CERTIFIED MAIL
C/O Freedman Anselmo Lindberg LLC
1807 W. Diehl Road Suite 333
Naperville, Illinois 60566

Glenn B. Stearns                        BY FIRST CLASS MAIL
801 Warrenville Road, Suite 650
Lisle, IL 60532

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ .86 |
| Certified Fee | 3.10 |
| Return Receipt Fee (Endorsement Required) | 2.55 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 6.51 |

Postmark Here

Sent To *LNV c/o Fredman Anselmo Lindberg*
Street, Apt. No.; or PO Box No. *1807 W. Diehl Road Suite 333*
City, State, ZIP+4 *Naperville IL 60566*

PS Form 3800, August 2006 — See Reverse for Instructions

7011 3500 0003 3253 5417

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*LNV Corporation*
*c/o Freedman Anselmo Lindberg*
*1807 W. Diehl Road Suite 333*
*Naperville, IL 60566*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
*(Transfer from service label)*   7011 3500 0003 3253 5417

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

17

Bach Law Offices
PO Box 1285
Northbrook, IL 60065

Bach Law Offices
PO Box 1285
Northbrook, IL 60065

LNV Corporation
C/O Freedman Anselmo Lindberg LLC
1807 W. Diehl Road Suite 333
Naperville, IL 60566

Glenn B. Stearns
801 Warrenville Road, Suite 650
Lisle, IL 60532



UNITED STATES POSTAGE
PITNEY BOWES
$006.51⁰
0002894408 AUG 20 2013
02 1P
MAILED FROM ZIP CODE 00623

UNITED STATES POSTAGE
PITNEY BOWES
$000.86⁰
0002894408 AUG 20 2013
02 1P
MAILED FROM ZIP CODE 00623

13

## InterestFirst℠ ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published in *The Wall Street Journal*) - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

January 26, 2007                    Costa Mesa                    California
*[Date]*                           *[City]*                      *[State]*

601 Sennett St, Batavia, IL  60510-7715
                            *[Property Address]*

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 449,500.00      (this amount is called "Principal"), plus interest, to the order of Lender.  Lender is GMAC Mortgage, LLC dba ditech.com

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note.  Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of 6.875          %.  The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will make a payment on the first day of every month, beginning on   March 1, 2007

Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on   February 1, 2037          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   P.O. Box 9001719, Louisville, KY 40290-0001
                                                 or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

My monthly payment will be in the amount of U.S. $  2,575.26                before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date.  The Note Holder will notify me prior to the date of change in monthly payment.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of   February      2017      , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.  The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE -
One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3530 11/01
(Page 1 of 4)          Initials: _____
GMACM-CNM.1328 (0207)

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C)  Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two & 25/100 percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D)  Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than    11.875 % or less than    2.250 %.  Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    11.875 %.

(E)  Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F)  Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G)  Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment after the first Change Date.

5.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.  BORROWER'S FAILURE TO PAY AS REQUIRED

(A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of my monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE – One-Year LIBOR Index – Single Family –
Fannie Mae Uniform Instrument Form 3636  11/01
GMACM-CNM.1326 (0207)                              (Page 2 of 4)                              Initials: _____

(D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)     Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)     When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

PAY TO THE ORDER OF
RESIDENTIAL FUNDING COMPANY, LLC
WITHOUT RECOURSE

_____
L. GRAY
LIMITED SIGNING OFFICER
GMAC MORTGAGE, LLC f/k/a
GMAC MORTGAGE CORPORATION
d/b/a DITECH.COM

_____ (Seal)
Marcia A. Swift                          -Borrower

_____ (Seal)
Chris T. Swift                           -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

*[Sign Original Only]*

MULTISTATE Interest First ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3630  11/01
GMACM-CRM.1326 (0207)                    *(Page 4 of 6)*

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:        0          LOAN ID:

NOTE DATE:     1/26/2007      LOAN AMOUNT:      $449,500.00

BORROWER NAME:  MARCIA SWIFT & CHRIS SWIFT

PROPERTY ADDRESS:   601 SENNETT ST, BATAVIA, IL 60510

PAY TO THE ORDER OF

INV Corporation

WITHOUT RECOURSE

Residential Funding Company, LLC

By: _____

Name: Jason J. Vecchio

Title: Post Funding Manager

Residential Funding Company, LLC

## NOTE ALLONGE

This Allonge is to be attached to and made a part of that certain Promissory Note made by Marcia A. Swift and Chris T. Swift, in the original principal amount of $449,500.00, dated January 26, 2007, and payable to GMAC Mortgage LLC, as amended or modified (the "Note").

Pay to the order of LNV CORPORATION INC., ("Assignee"), without recourse and without representation or warranty whether express, implied or created by operation of law.

RESIDENTIAL FUNDING COMPANY, LLC

By: _____

Name: Carol Chapman

Title: ~~Manager, Records Services~~ _Limited Signing officer_

BC: 628243
CLMG Loan #: 17105086

## NOTE ALLONGE

This Allonge is to be attached to and made a part of that certain INTERESTFIRST ADJUSTABLE RATE NOTE made by MARCIA A SWIFT AND CHRIS T SWIFT in the original principal amount of $449,500.00, dated 01/26/2007 and payable to GMAC MORTGAGE, LLC DBA DITECH.COM, as renewed, extended, amended or modified.

Pay to the order of BEAL BANK USA, without recourse and without representation or warranty whether express, implied or created by operation of law.

LNV CORPORATION

By: _____

Allison Martin
Attorney-In-Fact

**Floating "j" like on the Youngblood's Allonges**

EXHIBIT

3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTICT OF ILLINOIS
EASTERN DIVISION

IN RE:                              )        Judge Carol A. Doyle
                                    )
CHRISTOPHER T. SWIFT and            )        No 12-35690
MARCIA A. SWIFT,                    )
                                    )
                    Debtors.        )        Chapter 13

**DEBTORS CHRISTOPHER T. SWIFT AND MARCIA A SWIFT'S NOTICE FOR A
RULE 30(B)(6) DEPOSITION OF A CORPORATE OFFICER OR EMPLOYEE OF LNV
CORPORATION**

**TO: LNV Corporation C/O Freedman Anselmo Lindberg LLC, 1807 W. Diehl Road Suite
333, Naperville, Illinois 60566**

**TAKE NOTICE** that pursuant to Rule 7036 of the Bankruptcy Rules and Federal Rule of Civil
Procedure 30(b)(6) that the Plaintiffs will take the deposition of a designated officer, director,
managing agent or other party designated by LNV Corporation and/or its successors and assigns
as to the matters and things designated herein and reasonably known and available to LNV
Corporation  The said deposition will be taken before an officer duly authorized by law to
administer oaths and another party designated to video-tape the proceeding.

**TAKE FURTHER NOTICE** that the deposition shall take place on September 12, 2013 at
10:00 am at 900 Jorie Blvd, Naperville, Illinois or at such other time and place as counsel for the
parties shall agree.

**TAKE FURTHER NOTICE** that the following topics for examination of the person so
designated to be deposed by the Plaintiffs. This person should have actual and personal
knowledge of the following:

## I.     INITIAL AREAS OF INQUIRY

1.    A discussion of the factual allegations of the Objection to Proof of Claim Seventeen.

2.    A discussion of the legal claims made in the Objection to Proof of Claim Seventeen

3.    A discussion of the deponent's employment history and experience.


EXHIBIT
tabbies' Malone dep.

4. A discussion of the deponent's qualifications to testify regarding the specific areas of inquiry.

5. The deponent's definition of default.

6. Any documents or responses to discovery items by the deponent.

7. A complete discussion of employee rolls, organizational charts and flow charts used by the deponent during the term of the Mortgagor's account which is descriptive and reflective of the deponent's residential mortgage servicing department;

8. Discussion of any efforts to respond to this notice, including the following:

   a. Investigation and research done on behalf of deponent in a fair attempt to provide the information requested in this notice;

   b. Name, address and position of each person who on behalf of deponent gathered information or sought to gather information sought in this notice;

   c. Name, address and position of each person contacted in an attempt to obtain the information requested in this notice;

## II.   MORTGAGE SERVICING ISSUES

9. A discussion of the industry standards recognized by the deponent governing each of the following areas:

   a. Mortgage Servicing.

   b. Application of payments to the Mortgagor's account.

   c. Priority of application of payments to the Mortgagor's account.

   d. The use of Suspense accounts by the Deponent.

   e. The policies and procedures in place for determining when to place funds into a suspense account.

   f. The policies and procedures in place for determining how, why and when to post funds from a suspense account to the Mortgagor's account.

2

g. The policies and procedures of the deponent with respect to the administration, accounting, posting, and reconciliation of unapplied funds to the mortgagor's account.

h. The use, accounting, administration and reconciliation of any escrow accounts including a full discussion of the legal and regulatory requirements governing escrow accounts imposed upon the deponent.

10. A discussion of the deponent's policies, procedures, or protocols which are currently in place and/or were in place within the last ten (10) years relative to residential mortgage servicing regarding any of the areas of inquiry listed in the previous heading including its subparts number 5(a)-(h).

11. A discussion of the deponent's policies, procedures, or protocols which are currently in place and/or were in place within the last ten (10) years relative to authorizing or setting forth the booking, logging, tracking, tacking and/or collection of any fees or charges including but not limited to property preservation fees, broker opinion fees, appraisal fees, attorneys fees, inspection fees, statutory expenses, bankruptcy monitoring fees or other similar fees and expenses, corporate advances or any other charges and fees which the deponent contends are authorized by the consumer mortgage agreements and which were assessed, booked, logged, tracked, and/or processed in any way for collection against the loan of the plaintiff in this case.

12. A complete discussion of every document or image stored electronically or in a paper file regarding the mortgagor or the mortgagor's account serviced by the deponent.

13. A complete and full description and discussion of the loan history and all entries regardless of whether the same were intended for collection or not of any amounts to the loan of the mortgagor.

14. The complete and full description and discussion of any responses to any Qualified Written Requests received by the deponent regarding the Mortgagor's account.

15. A complete discussion of each software system used by the deponent in its mortgage servicing operations. The deponent should be prepared to discuss each of the following with regards to the software so identified:

a. The name of the software.

b. The vendor, owner or licensor of the program.

c. The capabilities and functionalities of the program vis-à-vis mortgage servicing, accounting, management and reporting.

3

d. Every capacity of the software to retain or catalog images and correspondence related to the Mortgagor.

e. Every part, portion, division, or module of the software.

f. How the software system tracks delinquencies.

g. Any capacity of the software to trigger or assess any fee or charges based upon any claimed delinquency of the mortgagor.

h. The ability of the software to track any charges to the account of the mortgagor.

i. The ability of the software to archive records of all changes to the mortgagor's account.

j. The archived data of the changes to the mortgagor's account maintained on the software.

k. Any codes for the mortgagor's account as well as the definition of those codes.

l. A complete discussion of all the data which is maintained electronically by the deponent regarding the mortgagor or the mortgagor's account serviced by the deponent.

16. A complete and full description and discussion of any and all efforts by or on behalf of the deponent relative to any action involving the Mortgagor including any memorandum, policies, procedures, or protocols currently in place or in place at any time during the term of the Mortgagor's account relative to, authorizing or setting forth the circumstances whereby the deponent or the deponent's attorneys, employees, agents, vendors or contractors file or seek a relief of automatic stay in chapter 13 bankruptcies.

17. A complete discussion of any spreadsheets or other recapitulations which are intended by the deponent to represent the history of the payments to the mortgagor's account as well as their application by the deponent to the mortgagor's account.

18. A complete discussion of the existence of any contractual relationship between the deponent and the outsource provider known as Lender Processing Services aka LPS fka Fidelity National Bankruptcy and Foreclosure Services aka Fidelity aka Fidelity Default or any subsidiary or affiliate of Lender Processing Services. This area of inquiry includes not only the existence of the relationship but the terms of the relationship including the respective rights, duties and obligations of the parties under any contractual relationship between the parties.

4

19. A discussion of the identities, job titles, job duties, flow chart and all specially applicable policies, memorandum, policies, procedures, protocols, of any mortgage servicing representative or employee or personnel who were primarily assigned files which were currently or formerly considered delinquent.

20. A discussion of every department within the deponent's residential mortgage servicing business and their respective duties.

21. A discussion of the persons charged with managing each of the departments of the deponent which are involved in the servicing of residential mortgage loans.

22. A complete discussion of the payoff amounts provided to the mortgagor pursuant to any qualified written request or any other request.

23. A complete discussion of the access rights and related filtering tools that at any time during the term of the mortgagor's account with the deponent have been made available to any outsource vendor or other third party to view by web access or other means your data reflecting the status of individual customer mortgage accounts.

24. A complete discussion of your business rules, software system rules, operational policies, and employee and management responsibilities relating to the submission of claims to investors or master servicers for reimbursement of nonrecoverable advances or other loan-level corporate advances that are expected or deemed not to be recoverable with respect to the mortgagor's account and to the allocating, posting, handling, disbursing, or disposing of funds received in payment of those claims.

**III. MORTGAGE LOAN MODIFICATION AND LOSS MITIGATION ISSUES**

25. A complete discussion of all loan modification and loss mitigation issues for the Mortgagor's loan.

26. A complete discussion of each document of the mortgagor which involves or is related to any loan modification or loss mitigation issues.

27. A complete discussion of the voluntary and mandatory loan modification and loss mitigation programs in place at the time that the deponent entered into loss mitigation efforts with respect to the mortgagor's account.

**IV. MORTGAGE FORECLOSURE ISSUES**

28. The names of the person or persons who made the decision to begin foreclosure proceedings against the mortgagor.

5

29. The names of the persons who prepared the form letters for signing that were sent directly to the Debtors/.

30. A complete discussion of the persons or parties who prepared any mortgage assignments in this case including the date, time and location of the preparation of that document.

31. A complete discussion of the persons or parties who prepared any endorsements or allonges to the promissory note in this case including the date, time and location of the preparation of that document.

32. The deponent's relationship with LPS including any contractual relationship for the provision of default services. This request should be construed broadly enough to include a discussion of the services which are provided to the deponent by LPS when a loan serviced by the deponent enters into foreclosure or bankruptcy status.

33. A complete discussion of the contents of the information contained in the software program known as LPS Desktop. This category includes discussing all facets of that software program including Process Management, Image Management, Invoice Management or any of the predecessor names of the Software package including New Image Express, New Invoice or any other module in the software by whatever name or delineation.

34. A complete discussion of the entries in the LPS Desktop software as well as a complete discussion of the images and data stored, made available on or to, or in any linked or connected to the LPS Desktop software such that the data may be used, read, configured, accessed or integrated with the persons or parties actually managing the foreclosure process.

35. A complete discussion of the deponent's responsibilities with respect to the foreclosure process and a description and discussion of the responsibilities and work items delegated to LPS or any other vendor or contractor.

## V. STANDING ISSUES

36. A complete discussion of the complete chain of transfers and assignments of the original mortgage of the mortgagor as provided for in the Document Custodial Agreement.

37. A complete discussion of the rules and procedures as to who must sign or execute the original assignment of mortgage and each and every subsequent assignment.

38. A complete discussion of the identification of the officer of any transferring institution that must sign any of the assignments of mortgages.

6

39.  A complete discussion of the policies and procedures for verification that there are no breaks in the chain of assignments of the original mortgage from the original mortgagee of record to present.

40.  A complete discussion of the policies and procedures regarding the obligations of the Document Custodian with respect to holding and maintaining all assignments of mortgages with their related mortgage notes.

41.  A complete discussion of all policies and rules regarding the assignments of mortgages in blank (e.g., an assignment to no designated assignee).

42.  A complete discussion of all policies, rules and procedures regarding any requirements that any assignment of a mortgage must include the legal name of the entity to which the beneficial interest is being assigned.

43.  A complete discussion of all policies, rules and procedures regarding the acceptance of blanket assignments of mortgages to any party in the chain of assignments from the original mortgage to the Custodian.

44.  A complete discussion of all policies rules and procedures regarding the acceptance or rejection of unrecorded assignments of mortgages by the Custodian.

45.  A complete discussion of all policies, rules and procedures regarding the due affixing of a notary stamp and seal to all executed assignments of mortgages.

46.  A complete discussion of all policies rules and procedures regarding any requirements that the assigned mortgages must contain original signatures in lieu of stamped signatures.

47.  A complete discussion of all policies rules and procedures regarding any requirements that all recorded assignments of mortgages must include the official date of recording by the local office of land records for the jurisdiction in which the real property is situated.

48.  A complete discussion of all policies, rules and procedures that prohibit the direct assignment of mortgages from the original mortgagee of record.

49.  A complete discussion of all policies, rules and procedures that would prohibit any servicer of the mortgage loans for the Trust from assigning the rights of the Trust in a mortgage to a new lender or third party.

7

## VI. DOCUMENTS AND IMAGES

50. A complete discussion of all policies and procedures regarding recording of the original mortgage by the original mortgagee of record.

51. A complete discussion of all policies and procedures regarding the assignments of the original mortgage after the recording.

52. A complete discussion of the name and address of the custodian for all of the original loan documents in this case.

53. A complete discussion of all policies, rules and procedures regarding the form and the custodial requirements for all intervening assignments of mortgages that are executed by parties other than the original mortgagee of record.

54. A complete discussion of all policies, rules and procedures regarding how the original note must be endorsed by the original lender.

55. A complete discussion of all policies, rules and procedures regarding how original notes endorsed in blank are transferred from the originator to the intervening parties and finally to the Trust.

56. A complete discussion of all policies, rules and procedures regarding the endorsement of notes with respect to the use of an allonge.

57. A complete discussion of all policies, rules and procedures regarding endorsements on notes and the name of the institution making the endorsement as the seller-endorser.

58. A complete discussion of all policies, rules and procedures regarding whether or not the name of institution endorsing a note as the seller-endorser must be clearly typed or printed.

59. A complete discussion of all policies, rules and procedures regarding the name and title of the individual authorized to endorse a note for the seller-endorser and proof of such title and authority.

60. A complete discussion of all policies, rules and procedures as to the whether or not a third-party can act as an attorney-in-fact or pursuant to corporate power of attorney to endorse a note for the seller-endorser.

61. A complete discussion of all policies, rules and procedures regarding the form of an endorsement in blank on a note by a seller-endorser.

62. A complete discussion of all policies, rules and procedures for the endorsement of a note by a seller-endorser that is "doing business as" some entity under an assumed name, including the formal corporate name of the entity and the proof of the legal status of the "doing business as" entity.

63. A complete discussion of all policies, rules and procedures regarding a complete and unbroken chain of transfers and receipts of the note from the original mortgagee to all intervening parties.

64. A complete discussion of all policies, rules and procedure regarding the necessity for affixing an allonge to the note.

65. A complete discussion of all policies, rules and procedures as to what constitutes a non-conforming allonge to a note.

66. A complete discussion of all rules, regulations and policies that allow or prevent a mortgage servicer from making any changes to a note or an allonge to a note.

67. A complete discussion of all rules, policies and regulations related to the endorsement of a note by a "successor in interest" or "a successor by merger" to the preceding endorser and what proof must be provided to prove the rights of such successor.

68. A complete discussion of all rules, policies and procedures or regulations related to the endorsement of a note that contains an abbreviation that does not match the formal legal name of the seller-endorser.

69. A complete discussion of all rules, policies and procedures related to a seller-endorsement that is missing a signature.

70. A complete discussion of all rules, policies and procedures related to a seller-endorsement that is missing a signature where the institution that should have endorsed the note is no longer in business or is a debtor in a case under Title 11 of the Bankruptcy Code.

71. A complete discussion of all rules, policies and regulations regarding a seller-endorsement that includes a facsimile signature.

72. A complete discussion of all rules, policies and regulations related to the Asset Purchase Agreements for the sale of the original note by the originator and by all intervening sellers up to and including the final sale..

73. A complete discussion of all rules, policies and regulations related to the True Sale Legal Opinions for the sale of the original note by the originator and by all intervening sellers up to and including the final sale.

74. A complete discussion of all rules, policies and procedures related to an endorsement on a note that has been voided.

75. A complete discussion of all reports that must be filed by the Custodian with respect to the due receipt of the original of all notes, mortgages for all loans acquired including but not limited to all such reports related to an unbroken chain of assignments for the mortgages from originators to all interveners and for the endorsements, transfers and delivery of all original mortgage promissory notes from the original mortgagee to all intervening parties.

76. A complete discussion of all information relevant to this loan published by Fannie Mae as instructions, directions, procedures or guidelines with respect to mortgage loan origination, servicing, sales of loans to Fannie Mae, securitization, document custody and control, first lien insurance on this loan issued by or at the behest of Fannie Mae, any collateral insurance agreements between any parties to any securitization or sale of the subject loan, foreclosure policies, practices, instructions, guidelines, and any other matter published by Fannie Mae relevant to this transaction.

Dated this the 20th day of August, 2013.

Bach Law Offices
Attorney for Debtors
P.O. Box 1285
Northbrook, IL 60065
(847) 564 0808
e-mail: paul@bachoffices.com

10

## CERTIFICATE OF SERVICE

The undersigned certifies that the pleading or paper to which this Certificate is affixed was served upon the other party(s) to this action by hand delivery or by depositing a copy of same, enclosed in a first-class postpaid wrapper properly addressed to the attorney(s) of record for such other party(s), in a post office or official depository under the exclusive care and custody of the United States Postal Service this the 20th day of August, 2013.

Paul M. Bach, Attorney for the Debtors

LNV Corporation
C/O Freedman Anselmo Lindberg LLC
1807 W. Diehl Road Suite 333
Naperville, Illinois 60566

BY FIRST CLASS AND CERTIFIED MAIL

Glenn B. Stearns
801 Warrenville Road, Suite 650
Lisle, IL 60532

BY FIRST CLASS MAIL

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ .86 |
| Certified Fee | 3.10 |
| Return Receipt Fee (Endorsement Required) | 2.55 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 6.51 |

Postmark Here

Sent To *LNV c/o Freedman Anselmo Lindber*
Street, Apt. No.; or PO Box No. *1807 W. Diehl Road Suite 333*
City, State, ZIP+4 *Naperville IL 60566*

PS Form 3800, August 2006    See Reverse for Instructions

7011 3500 0003 3253 5417

**SENDER: COMPLETE THIS SECTION**

- ☒ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ☒ Print your name and address on the reverse so that we can return the card to you.
- ☒ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*LNV Corporation*
*c/o Freedman Anselmo Lindberg*
*1807 W. Diehl Road Suite 333*
*Naperville, IL 60566*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
*(Transfer from service label)*    7011 3500 0003 3253 5417

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

17

Bach Law Offices
PO Box 1285
Northbrook, IL 60065

Bach Law Offices
PO Box 1285
Northbrook, IL 60065

LNV Corporation
C/O Freedman Anselmo Lindberg LLC
1807 W. Diehl Road Suite 333
Naperville, IL 60566

Glenn B. Stearns
801 Warrenville Road, Suite 650
Lisle, IL 60532



13

Case 12-35690 Doc 39-3 Filed 03/20/13 Entered 03/20/13 22:23:13 Desc Beal
Bank USA Page 1 of 1

# Beal Bank USA

1970 Village Center Circle, Suite 1
Las Vegas, NV 89134

Phone 702-598-3500
Fax 702-598-3570

MARCIA SWIFT
CHRIS SWIFT
601 SENNETT ST
BATAVIA, IL 60510-7715

January 28, 2013

### Notification of Assignment, Sale, or Transfer of Your Mortgage Loan

RE: Borrower Name: MARCIA SWIFT
Original Loan Amount: $449,500
Address of Mortgaged Property: 601 SENNETT ST
BATAVIA, IL 60510

Dear Marcia Swift and Chris Swift:

This letter is to notify you that the ownership of your mortgage loan has been transferred to Beal Bank
USA effective December 31, 2012.

**Customer Service.** Please continue to contact our loan servicing office by calling 877- 471-7888, or by
writing to: MGC Mortgage, Inc., Customer Service Dept., 1 Corporate Drive, Suite 360, Lake Zurich, IL
60047-8945. You may also reach us online at https://www.mgcmortgage.com. The servicing of your
mortgage remains with MGC Mortgage, Inc. ("MGC"). You should send all correspondence and
inquiries concerning your mortgage loan to your servicer, MGC. The servicer has authority to act on
behalf of Beal Bank USA with regard to the administration of your mortgage loan and to respond to any
questions about your mortgage loan.

**Payments.** It is important that you continue to send your monthly payments to MGC Mortgage, Inc., P.O.
Box 660592, Dallas, TX 75266-0592. Overnight payments can be sent to 1 Corporate Drive, Suite 360,
Lake Zurich, IL 60047-8945. Please do not send mortgage payments to Beal Bank USA. Payments
received by Beal Bank USA may be returned to you and this may result in late charges and your account
becoming past due. Beal Bank USA is not responsible for late charges or other consequences of
misdirected payments.

**Terms of Note and Recording.** The assignment, sale, or transfer of your mortgage loan does not affect
any term or condition of your Mortgage, Deed of Trust, or Note. The transfer of ownership of your
mortgage loan to Beal Bank USA has not been publicly recorded. The Mortgage or Deed of Trust that
secures the Note continues to be recorded in the county in which the property is located.

**Questions Relating to Ownership Change.** If you need to contact Beal Bank USA regarding the
ownership of your mortgage, you may send correspondence to Beal Bank USA, 1970 Village Center
Circle, Suite 1, Las Vegas, NV 89134, or you may call 866-669-1503.

Best regards,

Beal Bank USA

Member FDIC

EXHIBIT
Helene Dep
5

*B 10 (Official Form 10) (12/12)*

| United States Bankruptcy Court Northern District of Illinois | | Proof of Claim |
|---|---|---|

**Name of Debtor**
Christopher T Swift; Marcia A Swift;

**Case No.**
12-35690

NOTE: *Do not use this form to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property)
LNV Corporation

**Name and address where notices should be sent (if different from above):**
1 Corporate Center Dr Suite 360
Lake Zurich, Illinois 60047
Telephone number: 800-669-0340        email:

☐ Check this box to indicate that this claim amends a previously filed claim.

C o u r t     C l a i m
Number:_____
    *(If known)*

Filed on:_____

**Name and address where payment should be sent (if different from above):**

☐ Check this box if you are aware that anyone else has filed a proof of claim
relating to your claim. Attach copy of
statement giving particulars.

---

1. **Amount of Claim as of Date Case Filed:**    $583,865.92

X Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

---

2. **Basis for Claim:** Money Loaned

---

| **3. Last four digits of any number by which creditor identifies debtor:** 1869 | **3a. Debtor may have scheduled account as:** Dovenmuehle Mortgage, Inc. | **3b. Uniform Claim Identifier (optional):** |
|---|---|---|

---

4. **Secured Claim**
Check appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents and provide the requested information.

Nature of property or right of setoff: x Real Estate- 601 Sennett St, Batavia, IL ☐ Motor Vehicle ☐ Other

Value of Property: $

Annual Interest Rate 6.87500% ☐ Fixed  or  -Variable
(when case was filed) Amount of arrearage and other charges at time case filed included in            secured claim above, if any:

        $197,236.50

Basis for Perfection: Mortgage/Note

Amount of Secured Claim: $583,865.92

Amount Unsecured:$



B 10 (Official Form 10) (12/12)

---

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier-11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507 (a)(5).

Amount entitled to priority:$_____

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

---

6. **Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

---

7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. (See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

B 10 (Official Form 10) (12/12)

---

**8. Signature:**

Check the appropriate box.

☐ I am the creditor.  ☒ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Annie W. Lopez

Title:  Attorney for Creditor

Company:  Freedman Anselmo Lindberg, LLC

Address and telephone number (if different from notice address above):

1807 W. Diehl Road, Suite 333

Naperville, IL 60563

Telephone number: 866-402-8661/(630) 983-0770  email: bankruptcy@fal-illinois.com

/s/ Annie W. Lopez        1/3/2013
(Signature)              (Date)

---

### INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to the general rules.*

Items to be completed in Proof of Claim form.

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

B 10 (Official Form 10) (12/12)

| Definitions | | Information |
|---|---|---|
| **Debtor**<br>A debtor is the person, corporation, or other entity that has filed a bankruptcy case. | A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff). | **Acknowledgment of Filing of Claim**<br>To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim. |
| **Creditor**<br>A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (10). | **Unsecured Claim**<br>An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien. | **Offers to Purchase a Claim**<br>Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court. |
| **Claim**<br>A claim is the creditor's right to receive payment on a debt owed by the debtor that arose on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured. | **Claim Entitled to Priority Under 11 U.S.C. §507(a)**<br>Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims. | |
| **Proof of Claim**<br>A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed. | **Redacted**<br>A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth. | |
| **Secured Claim Under 11 U.S.C. §506(a)**<br>A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. | **Evidence of Perfection**<br>Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded. | |

Return To:
GMAC Mortgage, LLC dba
ditech.com
3200 Park Center Dr. Suite
150, Costa Mesa, CA 92626

Prepared By:
Vicki Davis
3200 Park Center. Dr.
Suite 150,
Costa Mesa, CA 92626.

2007K018917

**SANDY WEGMAN**
RECORDER - KANE COUNTY, IL

RECORDED: 2/15/2007 2:28 PM
REC FEE: 45.80  RHSPS FEE: 10.80
PAGES: 24

[Space Above This Line For Recording Data]

# MORTGAGE

MIN

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive
St. Paul, MN 55117

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated 01/26/2007
together with all Riders to this document.
(B) "Borrower" is Chris T Swift and Marcia A Swift, husband and wife as
tenants by the entirety

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3014  1/01

-6A(IL) (0010).01

Page 1 of 15    Initials:

VMP Mortgage Solutions, Inc.



(D) "Lender" is GMAC Mortgage, LLC dba ditech.com

Lender is a Residential Mortgage Lender
organized and existing under the laws of Delaware
Lender's address is 3200 Park Center Dr. Suite 150, Costa Mesa, CA 92626

(E) "Note" means the promissory note signed by Borrower and dated 01/26/2007
The Note states that Borrower owes Lender Four Hundred Forty Nine Thousand Five
Hundred                                                                    Dollars
(U.S. $449,500.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than February 1, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [ ] Condominium Rider        [ ] Second Home Rider
[ ] Balloon Rider            [X] Planned Unit Development Rider  [ ] 1-4 Family Rider
[ ] VA Rider                 [ ] Biweekly Payment Rider    [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

-6A(IL) (0010).01                    Page 2 of 15         CS         Form 3014   1/01






(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the [Type of Recording Jurisdiction]
County                                    [Name of Recording Jurisdiction]:
of Kane

The Assessor's Parcel Number (Property Tax ID#) for the Real Property is
          See Attached Legal Description

which currently has the address of
                                              [Street]
Parcel ID Number:
601 Sennett St                    (City), Illinois 60510-7715  [Zip Code]
Batavia
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

-6A(IL) (0010).01                    Page 3 of 15                    Form 3014  1/01



pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

-6A(IL) 0005I.01                    Page 4 of 15                    Form 3034  1/01



due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a Federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(IL) (0010).01                    Page 5 of 16    Initials           Form 3014    1/01

7713



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6A(IL) (0010).01                Page 6 of 15              CS   Form 3014   1/01

7720




the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(IL) (0010).01                    Page 7 of 15           Initials: CS    Form 3014   1/01

7725




attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.





(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender



Page 8 of 15

Form 3014   1/01




to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.




**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check; treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

-6A(IL) (0010).01                    Page 11 of 15        Initials: _CS_        Form 3014   1/01



7725

 

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(IL) (0010).01    Page 12 of 15    Form 3014  1/01





NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. Placement of Collateral Protection Insurance. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.



-6A(IL) (0010).01                    Page 13 of 15                         Form 3014   1/01



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                    Marcia A. Swift          -Borrower

_____    _____ (Seal)
                                    Chris T. Swift           -Borrower

_____ (Seal)    _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)    _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)    _____ (Seal)
                          -Borrower                                -Borrower



STATE OF ILLINOIS,                Kane            County &c.
     I, Judith Ann Berlin            , a Notary Public in and for said county and
state do hereby certify that

     Chris T. Swift and Marcia A. Swift

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.
     Given under my hand and official seal, this    26th    day of    January, 2007.

My Commission Expires:
          3/12/11                           Judith Ann Berlin
                                                    Notary Public

```
┌─────────────────────────────────┐
│         OFFICIAL SEAL           │
│       JUDITH ANN BERLIN         │
│  NOTARY PUBLIC - STATE OF ILLINOIS │
│   MY COMMISSION EXPIRES:03/12/11 │
└─────────────────────────────────┘
```

Initials  CS MS      Form 3014    1/01

Page 15 of 16



## FIXED/ADJUSTABLE RATE RIDER

(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 26th day of January 2007 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to GMAC Mortgage, LLC dba ditech.com

("Lender") of the same date and covering the property described in the Security Instrument and located at:

601 Sennett St, Batavia, IL  60510-7715

*(Property Address)*

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of 6.875 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of February, 2017 and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER
WSJ One-Year LIBOR Single Family - Fannie Mae
UNIFORM INSTRUMENT    Form 3187 6/01

(Page 1 of 3)
GMACM-CRM.1380 (0204)                    Initials: YS  CS



**(B)  The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.*  The most recent Index figure available as of date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Two & 25/100

percentage points (    2.250         %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than   11.875         % or less than    2.250         %.  Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months.  My interest rate will never be greater than 11.875         %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change.  The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER – WSJ One Year LIBOR – Single Family – Fannie Mae
UNIFORM INSTRUMENT  Form 3187  6/01
GMACM-CRM-1386 (0206)              *(Page 2 of 3)*              Initials ___




**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR – Single Family – Fannie Mae
UNIFORM INSTRUMENT   Form 3187   6/01                        Initials: _____
GMACM-CRM.1380  (0304)                        (Page 3 of 3)

7733




If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument unless Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

THIS SPACE LEFT INTENTIONALLY BLANK

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR - Single Family - Fannie Mae
UNIFORM INSTRUMENT   Form 3187 6/01
GMACM-CRM.1368 (0264)                          (Page 4 of 5)                          Initials: _____

7704



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
Marcia A. Swift                                -Borrower

_____ (Seal)
Chris T. Swift                                  -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR -- Single Family - Fannie Mae
UNIFORM INSTRUMENT  Form 3187 6/01
GMACM-CRM-1328 (0204)                    (Page 5 of 5)

7705




# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this Twenty-Sixth day of January, 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to GMAC Mortgage, LLC dba ditech.com

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: 601 Sennett St, Batavia, IL 60510-7715

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as Windemere

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01
Wolters Kluwer Financial Services                    Page 1 of 3              Initials: _____
VMP®-7R [0411].01

## InterestFirst℠ ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published in *The Wall Street Journal*) - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

January 26, 2007              Costa Mesa              California
*[Date]*                      *[City]*                *[State]*

601 Sennett St, Batavia, IL 60510-7715
                          *[Property Address]*

**1. BORROWER'S PROMISE TO PAY**
   In return for a loan that I have received, I promise to pay U.S. $ 449,500.00   (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GMAC Mortgage, LLC dba ditech.com

I will make all payments under this Note in the form of cash, check or money order.
   I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
   Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.875          %. The interest rate I will pay may change in accordance with Section 4 of this Note.
   The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**
   (A) Time and Place of Payments
   I will make a payment on the first day of every month, beginning on   March 1, 2007
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
   I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on   February 1, 2037        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

   I will make my monthly payments at  P.O. Box 9001719, Louisville, KY 40290-0001
                                      or at a different place if required by the Note Holder.

   (B) Amount of My Initial Monthly Payments
   My monthly payment will be in the amount of U.S. $ 2,575.26          before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

   (C) Monthly Payment Changes
   Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   (A) Change Dates
   The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
February    2017    , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

   (B) The Index
   Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE -
One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3830 11/01
*(Page 1 of 4)*      Initials: [initials]
GMACM-CNM.1328 (0207)

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two &.25/100 percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.875 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment after the first Change Date.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

MULTISTATE Interest-First ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3535  11/01
GMACM-CNM.1326 (0207)                                    (Page 2 of 4)                    Initials: _____

(D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)    Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)    When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

PAY TO THE ORDER OF
RESIDENTIAL FUNDING COMPANY, LLC
WITHOUT RECOURSE

_____
_, GRAY
LIMITED SIGNING OFFICER
GMAC MORTGAGE, LLC f/k/a
GMAC MORTGAGE CORPORATION
d/b/a DITECH.COM

_____ (Seal)
Marcia A. Swift                    -Borrower

_____ (Seal)
Chris T. Swift                     -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

*[Sign Original Only]*

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3630  11/01
GMACM-CRM.1326 (0207)                         (Page 4 of 4)

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS
ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:        0        LOAN ID:

NOTE DATE:    1/26/2007    LOAN AMOUNT:    $449,500.00

BORROWER NAME:  MARCIA SWIFT & CHRIS SWIFT

PROPERTY ADDRESS:    601 SENNETT ST, BATAVIA, IL  60510

PAY TO THE ORDER OF

LNV Corporation

WITHOUT RECOURSE

Residential Funding Company, LLC

By:

Name: Jason J. Vecchio
Title: Post Funding Manager
Residential Funding Company, LLC

NOTE ALLONGE

This Allonge is to be attached to and made a part of that certain Promissory Note made by Marcia A. Swift and Chris T. Swift, in the original principal amount of $449,500.00, dated January 26, 2007, and payable to GMAC Mortgage LLC, as amended or modified (the "Note").

Pay to the order of LNV CORPORATION INC., ("Assignee"), without recourse and without representation or warranty whether express, implied or created by operation of law.

RESIDENTIAL FUNDING COMPANY, LLC

By: _____

Name: Carol Chapman

Title: ~~Manager, Records Services~~
Limited Signing Officer

*B 10 (Official Form 10) (12/12)*

## Mortgage Proof of Claim Attachment

If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See Bankruptcy Rule 3001(c)(2).

Name of debtor:  Christopher T Swift; Marcia A Swift;                                          Case number: 12-35690
Name of creditor:  LNV Corporation
Last four digits of any number you use to identify the debtor's account: 1869

## Part 1: Statement of Principal and Interest Due as of the Petition Date

Itemize the principal and interest due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on your Proof of Claim form).

1. Principal due                                                                                       (1)  $449,500.00

| 2. Interest due | Interest rate | From mm/dd/yyy | To mm/dd/yyyy | Amount |
|---|---|---|---|---|
|  | 6.87500% | 8/1/2008 | 9/9/2012 | $126,999.14 |

Total interest due as of the petition date          $126,999.14 Copy total here (2) + $126,999.14

3. Total principal and
   interest due                                                                                      (3)  $576,499.14

## Part 2: Statement of Pre-petition Fees, Expenses, and Charges

Itemize the fees, expenses, and charges due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on the Proof of Claim form).

| Description | Dates incurred | | Amount |
|---|---|---|---|
| 1. Late charges | 2/16/11,3/16/11,8/16/10,9/16/10,10/18/10,11/16/10,12/16/10,1/17/11,4/5/10,6/16/10,7/16/10 | (1) | $1,287.60 |
| 2. Non-sufficient funds (NSF) fees | | (2) | $0.00 |
| 3. Attorney's fees | | (3) | $0.00 |
| 4. Filing fees and court costs | 10/17/11,11/22/11,10/4/12,7/15/11,9/21/11 | (4) | $2,781.00 |
| 5. Advertisement costs | 07/15/2011 | (5) | $410.00 |
| 6. Sheriff/auctioneer fees | | (6) | $0.00 |
| 7. Title costs | 07/15/2011 | (7) | $350.00 |
| 8. Recording fees | 07/15/2011 | (8) | $42.00 |
| 9. Appraisal/broker's price opinion fees | 09/03/2010 | (9) | $490.00 |
| 10. Property inspection fees | 2/21/12,3/20/12,4/18/12,5/21/12,6/26/12,8/6/12,8/20/12,9/18/12 | (10) | $270.00 |
| 11. Tax advances (non-escrow) | | (11) | $0.00 |
| 12. Insurance advances (non-escrow) | | (12) | $0.00 |
| 13. Escrow shortage or deficiency (Do not include amounts that are part of any installment payment listed in Part 3.) | | (13) | $0.00 |
| 14. Property preservation expenses. Specify: | | (14) | $0.00 |
| 15. Other. Specify: Bankruptcy Aquisition | 04/07/2010 | (15) | $1,066.18 |
| 16. Other. Specify: Legal Fees | 01/30/2012 | (16) | $545.00 |
| 17. Other. Specify: Loss Mit | 04/11/2011 | (17) | $125.00 |

18. Total pre-petition fees, expenses and charges.  Add all of the amounts listed above.

(18)  $7,366.78

*B 10 (Official Form 10) (12/12)*

## Part 3. Statement of Amount Necessary to Cure Default as of the Petition Date

Does the installment payment amount include an escrow deposit?

X No

| | | | | |
|---|---|---|---|---|
| 1. Installment payments | Date last payment received by creditor | | | |
| | Number of installment payments due | (1) | 49 | |
| 2. Amount of installment payments due | 12 installments @ | $3,684.46 | | |
| | 12 installments @ | $4,589.60 | | |
| | 25 installments @ | $3,623.24 | | |
| | Total installment payments due as of the petition date | $189,869.72 | Copy total here ▶ | (2) $189,869.72 |
| 3. Calculation of cure amount | Add total pre-petition fees, expenses and charges | | Copy total from Part 2 here ▶ | + $7,366.78 |
| | Subtract total of unapplied funds (funds received but not credited to account) | | | - $ |
| | Subtract amounts for which debtor is entitled to a refund | | | - $ |
| | Total amount necessary to cure default as of the petition date | | | (3) $197,236.50 |

Copy total onto Item 4
of Proof of Claim form

NOTE: Debtor(s) executed a promissory note secured by a mortgage or deed of trust. The promissory note is either made payable to Creditor or has been duly indorsed. Creditor, directly or through an agent, has possession of the promissory note. Creditor is the original mortgagee or beneficiary of the assignee of the mortgage or deed of trust.

Return To:
~~GMAC Mortgage, LLC dba~~
~~ditech.com~~
~~3200 Park Center Dr, Suite~~
~~150, Costa Mesa, CA 92626~~

2007K018917

SANDY WEGMAN
RECORDER - KANE COUNTY, IL
RECORDED: 2/15/2007 2:28 PM
REC FEE: 45.00   RHSPS FEE: 10.00
PAGES: 24

Prepared By:
Vicki Davis
3200 Park Center Dr.
Suite 150.
Costa Mesa, CA 92626.

36835669 .

———————————[Space Above This Line For Recording Data]———————————

# MORTGAGE

MIN     100037506564931047

Recording Requested by &
When Recorded Return To:
US Recordings, inc.
2925 Country Drive
St. Paul, MN  55117

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated 01/26/2007
together with all Riders to this document.
**(B) "Borrower"** is Chris T Swift and Marcia A Swift, husband and wife as
tenants by the entirety

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
000656493104

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
-6A(IL) (0010).01                                                           Form 3014  1/01
Page 1 of 15                          Initials: _____ CS
VMP Mortgage Solutions, Inc.


EXHIBIT
Maloney
Dep 7

**(D) "Lender"** is GMAC Mortgage, LLC dba ditech.com

Lender is a Residential Mortgage Lender
organized and existing under the laws of Delaware
Lender's address is 3200 Park Center Dr. Suite 150, Costa Mesa, CA 92626

**(E) "Note"** means the promissory note signed by Borrower and dated 01/26/2007
The Note states that Borrower owes Lender Four Hundred Forty Nine Thousand Five
Hundred                                                                                          Dollars
(U.S. $449,500.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than February 1, 2037
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [ ] Condominium Rider    [ ] Second Home Rider
[ ] Balloon Rider    [X] Planned Unit Development Rider    [ ] 1-4 Family Rider
[ ] VA Rider    [ ] Biweekly Payment Rider    [ ] Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

000656493104

(VMP) -6A(IL) (0010).01      Page 2 of 15      Initials: _CS_    Form 3014 1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
County                                                                    [Type of Recording Jurisdiction]
of Kane                                                                   [Name of Recording Jurisdiction]:
The Assessor's Parcel Number (Property Tax ID#) for the Real Property is 12-17-325-010. See Attached Legal Description

Parcel ID Number: 12-17-325-010                     which currently has the address of
601 Sennett St                                                                    [Street]
Batavia                                        [City], Illinois 60510-7715 [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

000656493104

-6A(IL) (0010).01                    Page 3 of 15              Initials: MS CS   Form 3014  1/01

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

000656493104

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

000656493104

VMP ®-6A(IL) (0010).01                    Page 5 of 15                    Initials: _MS_ CS    Form 3014   1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

000656493104

-6A(IL) (0010).01                                 Page 6 of 15                          Initials: ___ Form 3014  1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

000656493104

VMP® -6A(IL) (0010).01                          Page 7 of 15                    Initials: _____ CS    Form 3014  1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

000656493104

VMP®    -6A(IL) (0010).01    Page 8 of 15    Initials: _____    Form 3014  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

000656493104

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

000656493104

-6A(IL) (0010).01    Page 10 of 15    Initials: ___ CS    Form 3014  1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

000656493104

-6A(IL) (0010).01                    Page 11 of 15                    Initials: CS    Form 3014  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

000656493104

VMP® -6A(IL) (0010).01                          Page 12 of 15                    Initials: _____    Form 3014  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

000656493104

VMP®  -6A(IL) (0010).01          Page 13 of 15          Initials: _SS CS_          Form 3014   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          Marcia A. Swift              -Borrower

_____          _____ (Seal)
                                          Chris T. Swift               -Borrower

_____ (Seal)            _____ (Seal)
                    -Borrower                                         -Borrower

_____ (Seal)            _____ (Seal)
                    -Borrower                                         -Borrower

_____ (Seal)            _____ (Seal)
                    -Borrower                                         -Borrower

000656493104

VMP ®-6A(IL) (0010).01          Page 14 of 15          Form 3014  1/01

STATE OF ILLINOIS, _Judith Ann Berlin_ _Kane_ County ss:
I, _Judith Ann Berlin_ , a Notary Public in and for said county and
state do hereby certify that

_Chris T. Swift and Marcia A. Swift,_
_Husband and wife._

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this _26th_ day of _January, 2007_

My Commission Expires:
_3/12/11_

_____
Notary Public

_Judith Ann Berlin._

```
OFFICIAL SEAL
JUDITH ANN BERLIN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/12/11
```

000656493104

-6A(IL) (0010).01

Page 15 of 15

Initials: _CS_

Form 3014   1/01

# FIXED/ADJUSTABLE RATE RIDER

## (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 26th day of January , 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to GMAC Mortgage, LLC dba ditech.com

("Lender") of the same date and covering the property described in the Security Instrument and located at:

601 Sennett St, Batavia, IL  60510-7715

*[Property Address]*

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.  ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of  6.875 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of February, 2017 , and the adjustable interest rate I will pay many change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER
WSJ One-Year LIBOR Single Family - Fannie Mae
UNIFORM INSTRUMENT  Form 3187 6/01
*(Page 1 of 5)*
GMACM-CRM.1380  (0204)                    Initials: _____ CS

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Two & 25/100
percentage points (      2.250                %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.875                % or less than  2.250                %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875                %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

---

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR — Single Family — Fannie Mae
UNIFORM INSTRUMENT   Form 3187   6/01
GMACM-CRM.1380 (0204)          *(Page 2 of 5)*          Initials

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**THIS SPACE LEFT INTENTIONALLY BLANK**

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR -- Single Family -- Fannie Mae
UNIFORM INSTRUMENT   Form 3187 6/01
GMACM-CRM.1380 (0204)                    *(Page 4 of 5)*                    Initials _____ CS

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
Marcia A. Swift                                    -Borrower

_____ (Seal)
                                                   -Borrower
Chris T. Swift

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR -- Single Family -- Fannie Mae
UNIFORM INSTRUMENT   Form 3187  6/01
GMACM-CRM.1380 (0204)                    (Page 5 of 5)

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this Twenty-Sixth day of January, 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to GMAC Mortgage, LLC dba ditech.com

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: 601 Sennett St, Batavia, IL 60510-7715

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as Windemere

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

000656493104

**MULTISTATE PUD RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3150 1/01
Wolters Kluwer Financial Services          Page 1 of 3          Initials: _____
VMP®-7R (0411).01

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

000656493104

Initials: _[signature]_

VMP®-7R (0411).01                    Page 2 of 3                    Form 3150 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
Marcia A. Swift                    -Borrower

_____ (Seal)
Chris T. Swift                     -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

000656493104

VMP®-7R (0411).01                Page 3 of 3                 Form 3150 1/01

ORDER #:   7013176

## EXHIBIT A

ALL THAT PARCEL OF LAND IN KANE COUNTY, STATE OF ILLINOIS, AS MORE FULLY
DESCRIBED IN DEED INST # 2004K101551, ID# 12-17-325-010, BEING KNOWN AND DESIGNATED
AS FOLLOWS:

LOT 60 IN WINDEMERE, PHASE 3 BEING A SUBDIVISION OF THE SOUTHWEST QUARTER OF
SECTION 17, TOWNSHIP 39 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN,
ACCORDING TO THE PLAT THEREOF RECORDED JANUARY 15, 2004 AS DOCUMENT NO.
2004K008420, IN KANE COUNTY, ILLINOIS.

BY FEE SIMPLE DEED FROM DRH CAMBRIDGE HOMES, INC. AS SET FORTH IN INST # 2004K101551
DATED 07/19/2004 AND RECORDED 07/28/2004, KANE COUNTY RECORDS, STATE OF ILLINOIS.



U36835669-01HC24
MORTGAGE
LOAN# 656493104
US Recordings



*Sandy Wegman*

Sandy Wegman
Kane County Recorder

# CERTIFICATION

I, Sandy Wegman, Recorder for the County of Kane,
State of Illinois, hereby certify this to be a true and
correct copy of Document Number 2007K018917 recorded
Thursday, February 15, 2007 as it appears from the
records and microfilm in my office.

DATE: Tuesday, July 01, 2014

*Sandy Wegman*

by *[signature]*
Deputy, Recorder's Office

Sandy Wegman
Kane County Recorder

719 S. Batavia Avenue
Building C
Geneva, Illinois 60134
630-232-5935          Fax 630-232-5945

2008K069730

SANDY WEGMAN
RECORDER - KANE COUNTY, IL

RECORDED: 9/3/2008 2:16 PM
REC FEE: 25.00  RHSPS FEE: 10.00
PAGES: 3

Prepared By & After Recording Mail to:
**MGC Mortgage Inc**
Document Control, Allison Martin
7195 Dallas Parkway
Plano, Texas 75024

BC428243

RFC Loan Number: 11380185
Seller Loan Number: 656493104

## CORPORATION ASSIGNMENT of MORTGAGE

FOR VALUE RECEIVED, '(MERS) Mortgage Electronic Registration Systems, Inc.'

1595 Spring Hill Road, Suite 310, Vienna, VA 22182

the undersigned hereby grants, assigns and transfers to

LNV Corporation
7195 Dallas Parkway
Plano, Texas 75024

all beneficial interest under that certain Mortgage dated 1/26/2007
executed by Chris T. Swift and Marcia A. Swift, husband
and wife as tenants by the entirety.
TO/FOR: GMAC Mortgage, LLC dba ditech.com

and recorded in Book _n/a_ on Page _n/a_ as Instrument No. 2007K016917 on 1/24/07
of official Records in the County Recorder's Office of _Kane_ County, Illinois.
✗ See attached Exhibit "A" for Legal.

Mortgage Amount:   $449,500.00

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Mortgage.

'(MERS) Mortgage Electronic Registration Systems, Inc.'

BY: _____

NAME: Michael Mead

TITLE: Assistant Vice President

EXHIBIT
Maloney Dep
8

35 -

STATE OF            Minnesota)
COUNTY OF         Hennepin)

On 3/10/2008 before me, the undersigned, a Notary Public in and for said State personally appeared Michael Mead, Assistant Vice President of '(MERS) Mortgage Electronic Registration Systems, Inc.' personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her authorized capacity, and that by his/her signature on the instrument the entity upon behalf of which the person acted, executed the instrument. WITNESS my hand and official seal.

_____
Notary Public in and for said State

Prepared by Diane Meistad

Residential Funding Company, LLC
One Meridian Crossings, Ste. 100
Minneapolis, MN 55423, (952)979-4000

DIANE M. MEISTAD
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2013

Property Address: 601 SENNETT ST BATAVIA, IL 60510

BC 628243

EXHIBIT A

ALL THAT PARCEL OF LAND IN KANE COUNTY, STATE OF ILLINOIS, AS MORE FULLY
DESCRIBED IN DEED INST # 2004K101551, ID# 12-17-325-010, BEING KNOWN AND DESIGNATED
AS FOLLOWS:

LOT 60 IN WINDEMERE, PHASE 3, BEING A SUBDIVISION OF THE SOUTHWEST QUARTER OF
SECTION 17, TOWNSHIP 39 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN,
ACCORDING TO THE PLAT THEREOF RECORDED JANUARY 15, 2004 AS DOCUMENT NO.
2004K008420, IN KANE COUNTY, ILLINOIS.

BY FEE SIMPLE DEED FROM DRH CAMBRIDGE HOMES, INC. AS SET FORTH IN INST # 2004K101551
DATED 07/19/2004 AND RECORDED 07/28/2004, KANE COUNTY RECORDS, STATE OF ILLINOIS.

BC 628243

Parcel ID NO. 02-17-325-410



*Sandy Wegman*
*Kane County Recorder*

# CERTIFICATION

I, Sandy Wegman, Recorder for the County of Kane, State of Illinois, hereby certify this to be a true and correct copy of Document Number 2008K069730 recorded Wednesday, September 03, 2008 as it appears from the records and microfilm in my office.

DATE: Tuesday, July 01, 2014

*Sandy Wegman*

by _____

Deputy, Recorder's Office

Sandy Wegman
Kane County Recorder

719 S. Batavia Avenue
Building C
Geneva, Illinois 60134
630-232-5935          Fax 630-232-5945

Recording Requested By:
CLMG CORP.

When Recorded Return To:
DONNA KOESTNER
CLMG CORP.
POST CLOSING
7195 DALLAS PARKWAY
PLANO, TX 75024

BC #: 628243

**2013K019280**
**SANDY WEGMAN**
RECORDER - KANE COUNTY, IL

RECORDED: 3/13/2013 10:43 AM
REC FEE: 32.00  RHSPS FEE: 10.00
PAGES: 3

## ASSIGNMENT OF MORTGAGE

Kane, Illinois
SERVICING #:17105086 "SWIFT"

THIS ASSIGNMENT OF MORTGAGE (this "Assignment") is made by LNV CORPORATION whose address is 7195 DALLAS PARKWAY, PLANO, TX 75024 ("Assignor"), to and in favor of BEAL BANK USA, whose address is 1970 VILLAGE CENTER CIRCLE, SUITE 1, LAS VEGAS, NV 89134 ("Assignee").

THIS ASSIGNMENT WITNESSES THAT, in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, Assignor hereby assigns, transfers, sets over and conveys to Assignee and its successors and assigns, without recourse and without representation or warranty, whether express, implied or created by operation of law, the following:

1. that certain MORTGAGE from CHRIS T SWIFT AND MARCIA A SWIFT, HUSBAND AND WIFE AS TENANTS BY THE ENTIRETY, Dated: 01/26/2007 Recorded: 02/15/2007 in Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.: 2007K018917, in the recording district of Kane, State of Illinois, which MORTGAGE secures that certain promissory note dated 01/26/2007, in the original principal amount of $449,500.00, made by MARCIA A SWIFT AND CHRIS T SWIFT and payable to the order of GMAC MORTGAGE, LLC DBA DITECH.COM as modified or amended (the "Note");

2. such other documents, agreements, instruments and other collateral that evidence, secure or otherwise relate to Assignor's right, title or interest in and to the MORTGAGE and/or the Note and/or the loan evidenced by the Note, including without limitation the title insurance policies and hazard insurance policies relating thereto that are in effect.

Property Address: 601 SENNETT ST, BATAVIA, IL 60510-7715

Legal: See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed and delivered by its Authorized Representative.

"PE"PEMGCM"02/19/2013 05:09:47 PM" MGCM01MGCMAD00000000000000000028857" ILKANE" 17105086 ILSTATE_MGCM_CRMC_ASSIGN_ASSN "PE"PEMGCM"

EXHIBIT
9

ASSIGNMENT OF MORTGAGE Page 2 of 2

This transfer to be effective December 31, 2012.

LNV CORPORATION
On 2/5/2013

By: _____
Allison Martin, Attorney-In-Fact

Recorded POA February 15, 2013
as Instrument # 2013K012647

STATE OF Texas
COUNTY OF Collin

On  3-5-13  , before me, JO EVANS, a Notary Public in and for Collin County, in the State of Texas, personally appeared Allison Martin, Attorney-In-Fact, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

JO EVANS
Notary Expires: 05/05/2013  #12689043-5

JO EVANS
NOTARY PUBLIC
State of Texas
Comm. Exp. 05-05-2013

(This area for notarial seal)

Prepared By: ALLISON MARTIN, VICE PRESIDENT, CLMG CORP. DOCUMENT CONTROL DEPARTMENT, 7195 DALLAS PARKWAY, PLANO, TX 75024 866-973-3399

*PE*PEMGCM*02/16/2013 06:09:47 PM* MGCM01MGCMA000000000000000028657* ILKANE* 17105096 ILSTATE_MGCM_CRMC_ASSIGN_ASSN *PE*PEMGCM*

BC: 628243

## EXHIBIT "A"

ALL THAT PARCEL OF LAND IN KANE COUNTY, STATE OF ILLINOIS, AS MORE FULLY DESCRIBED IN DEED INST # 2004K101551, ID# 12-17-325-010, BEING KNOWN AND DESIGNATED AS FOLLOWS:

LOT 60 IN WINDEMERE, PHASE 3, BEING A SUBDIVISION OF THE SOUTHWEST QUARTER OF SECTION 17, TOWNSHIP 39 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JANUARY 15, 2004 AS DOCUMENT NO. 2004K008420, IN KANE COUNTY, ILLINOIS.

BY FEE SIMPLE DEED FROM DRH CAMBRIDGE HOMES, INC. AS SET FORTH IN INST # 2004K101551 DATED 07/19/2004 AND RECORDED 07/28/2004, KANE COUNTY RECORDS, STATE OF ILLINOIS.



*Sandy Wegman*
*Kane County Recorder*

# CERTIFICATION

I, Sandy Wegman, Recorder for the County of Kane, State of Illinois, hereby certify this to be a true and correct copy of Document Number 2013K019280 recorded Wednesday, March 13, 2013 as it appears from the records and microfilm in my office.

DATE: Tuesday, July 01, 2014

by *[signature]*
Deputy, Recorder's Office

Sandy Wegman
Kane County Recorder

719 S. Batavia Avenue
Building C
Geneva, Illinois 60134
630-232-5935          Fax 630-232-5945

Recording Requested By:
CLMG CORP.

When Recorded Return To:
DONNA KOESTNER
CLMG CORP.
POST CLOSING
7195 DALLAS PARKWAY
PLANO, TX 75024

BC #: 628243

2013K019280
SANDY WEGMAN
RECORDER - KANE COUNTY, IL

RECORDED: 3/13/2013 10:43 AM
REC FEE: 32.00  RHSPS FEE: 10.00
PAGES: 3

## ASSIGNMENT OF MORTGAGE

Kane, Illinois
SERVICING #:17105086 "SWIFT"

THIS ASSIGNMENT OF MORTGAGE (this "Assignment") is made by LNV CORPORATION whose address is 7195 DALLAS PARKWAY, PLANO, TX 75024 ("Assignor"), to and in favor of BEAL BANK USA, whose address is 1970 VILLAGE CENTER CIRCLE, SUITE 1, LAS VEGAS, NV 89134 ("Assignee").

THIS ASSIGNMENT WITNESSES THAT, in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, Assignor hereby assigns, transfers, sets over and conveys to Assignee and its successors and assigns, without recourse and without representation or warranty, whether express, implied or created by operation of law, the following:

1. that certain MORTGAGE from CHRIS T SWIFT AND MARCIA A SWIFT, HUSBAND AND WIFE AS TENANTS BY THE ENTIRETY, Dated: 01/26/2007 Recorded: 02/15/2007 in Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.: 2007K018917, in the recording district of Kane, State of Illinois, which MORTGAGE secures that certain promissory note dated 01/26/2007, in the original principal amount of $449,500.00, made by MARCIA A SWIFT AND CHRIS T SWIFT and payable to the order of GMAC MORTGAGE, LLC DBA DITECH.COM as modified or amended (the "Note");

2. such other documents, agreements, instruments and other collateral that evidence, secure or otherwise relate to Assignor's right, title or interest in and to the MORTGAGE and/or the Note and/or the loan evidenced by the Note, including without limitation the title insurance policies and hazard insurance policies relating thereto that are in effect.

Property Address: 601 SENNETT ST, BATAVIA, IL 60510-7715

Legal: See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed and delivered by its Authorized Representative.

"PE"PEMGCM"02/19/2013 05:09:47 PM" MGCM01MGCMAD0000000000000000028667" ILKANE" 17105086 ILSTATE_MGCM_CRMC_ASSIGN_ASSN "PE"PEMGCM"



EXHIBIT
Malone Dep.
9

ASSIGNMENT OF MORTGAGE Page 2 of 2

This transfer to be effective December 31, 2012.

LNV CORPORATION
On 2/8/2013

By: _____
Allison Martin, Attorney-In-Fact

Recorded POA February 15, 2013
STATE OF Texas          as Instrument # 2013K012647
COUNTY OF Collin

On _3-5-13_, before me, JO EVANS, a Notary Public in and for Collin County, in the State of Texas, personally appeared Allison Martin, Attorney-In-Fact, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

```
┌─────────────────────────────┐
│   ☆   JO EVANS              │
│       NOTARY PUBLIC         │
│       State of Texas        │
│       Comm. Exp. 05-05-2013 │
└─────────────────────────────┘
```

_____
JO EVANS
Notary Expires: 05/05/2013 #12689043-5

(This area for notarial seal)

Prepared By: ALLISON MARTIN, VICE PRESIDENT, CLMG CORP. DOCUMENT CONTROL DEPARTMENT, 7195 DALLAS PARKWAY, PLANO, TX 75024 866-973-3399

*PE*PEMGCM*02/18/2013 05:09:47 PM* MGCM01MGCMA0XXXXXXXXXXXXXXXX028667* ILKANE* 17105086 ILSTATE_MGCM_CRMC_ASSIGN_ASSN *PE*PEMGCM*

BC: 628243

# EXHIBIT "A"

ALL THAT PARCEL OF LAND IN KANE COUNTY, STATE OF ILLINOIS, AS MORE FULLY DESCRIBED IN DEED INST # 2004K101551, ID# 12-17-325-010, BEING KNOWN AND DESIGNATED AS FOLLOWS:

LOT 60 IN WINDEMERE, PHASE 3, BEING A SUBDIVISION OF THE SOUTHWEST QUARTER OF SECTION 17, TOWNSHIP 39 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JANUARY 15, 2004 AS DOCUMENT NO. 2004K008420, IN KANE COUNTY, ILLINOIS.

BY FEE SIMPLE DEED FROM DRH CAMBRIDGE HOMES, INC. AS SET FORTH IN INST # 2004K101551 DATED 07/19/2004 AND RECORDED 07/28/2004, KANE COUNTY RECORDS, STATE OF ILLINOIS.





*Sandy Wegman*
*Kane County Recorder*

# CERTIFICATION

I, Sandy Wegman, Recorder for the County of Kane, State of Illinois, hereby certify this to be a true and correct copy of Document Number 2013K019280 recorded Wednesday, March 13, 2013 as it appears from the records and microfilm in my office.

DATE: Tuesday, July 01, 2014

by
Deputy, Recorder's Office

Sandy Wegman
Kane County Recorder

719 S. Batavia Avenue
Building C
Geneva, Illinois 60134
630-232-5935         Fax 630-232-5945

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Judge Carol A. Doyle |
| | ) | |
| CHRISTOPHER T. SWIFT and | ) | |
| MARCIA A. SWIFT | ) | |
| | ) | No 12-35690 |
| Debtors. | ) | |
| | ) | Chapter 13 |

## LNV'S RESPONSE TO DEBTORS FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Now comes, Creditor, LNV Corporation, by and through its attorneys, Freedman Anselmo Lindberg, LLC, and hereby responds to Debtors, Christopher T. Swift and Marcia A. Swift's discovery requests.

General Objection 1: Pursuant to Federal Rule of Bankruptcy Procedure 7033, Debtors' discovery requests exceed the limit of interrogatories permitted.

General Objection 2: To the best of its knowledge, information and belief, formed after reasonable inquiry, Creditor's Responses to Debtors' Requests are complete and correct as of the time of this Response. In the event that Creditor learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing, Creditor will supplement this Response as required by Rule 7026.

General Objection 3: Creditor expressly states that (a) it is not raising all objections to Debtors' Requests that could be raised and (b) the failure to raise such objections here is not intended to waive the raising of such objections n the future. Creditor also reserved the right to raise at any hearing or trial in this matter all objections (including relevance objections) to the admission of any (a) document produced, (b) information supplied, or (c) admission made.

General Objection 4: Creditor objects to any directions, definitions or instructions contained in Debtors' Requests that seek to impose upon Creditor obligations in excess of, or different from, those required by Federal Rules of Bankruptcy Procedure or under bankruptcy law, including any obligation to supplement answers, or any discovery orders entered by the Court.

## RESPONSES TO INTERROGATORIES

1. State the name and address of all parties answering or assisting in providing answers to their interrogatories.



EXHIBIT
*Malone dep.*
13

RESPONSE: Grant Hamilton as an officer of MGC, the authorized loan servicer for Beal Bank USA with the assistance of the undersigned counsel.

2. State whether or not you had physical possession of the Note on the date of the filing of bankruptcy petition in this case and the date the Proof of Claim was filed on January 3, 2013.

RESPONSE: Yes

2. If the answer to number 1 is no, then state the full name and address of the person who had such possession.

RESPONSE: N/A

3. State when the Note was actually endorsed to you.

RESPONSE: See Allonge to Promissory Note dated January 26, 2007.

4. State the name of the person or entity making the endorsement of the Note, the date of the endorsement, the name of the endorser, the name of the endorsee, and what happened to the Note after the endorsement was executed.

RESPONSE: Plaintiff objects to the request to the extent it seeks personal identification of individual employees. Subject to and without waiving said objection, the Allonge is dated January 26, 2007 from LNV Corporation to Beal Bank USA.

5. State if the Mortgage was ever assigned to you.

RESPONSE: Yes.

6. State the date of the assignment of the Mortgage, the name of the assignor, the name of the assignee, and who has possession of the original of the Mortgage.

RESPONSE: See Assignment of Mortgage

7. Please state all facts you rely upon to prove that you are the lawful holder of the Note on the date on the date of the filing of bankruptcy petition in this case and the date the Proof of Claim was filed on January 3, 2013.

RESPONSE: Objection, said request is unduly burdensome and overly broad in that said request seeks all facts. Subject to and without waiving said objection, Creditor was in possession of the original endorsed note as of January 2, 2013, the date the Proof of Claim was filed.

8. Was an assignment of the underlying Mortgage ever recorded with the Office of the Recorder of Deeds? If so, state the date the assignment was recorded and the recording

number.

RESPONSE: Yes, recorded in Kane County on March 13, 2013 with recording number: 2013K019280

9. Please state the names and addresses of all entities in the chain of transfer of the Note beginning with the originator of the Note up to and including the current holder.

RESPONSE: Objection, said request is not relevant as it does not relate to a fact of consequence. Subject to and without waiving said objection, see Allonge to Promissory Note and the Promissory Note.

10. Please state the names and addresses of all entities in the chain of transfer of the Mortgage.

RESPONSE: Objection, said request is not relevant as it does not relate to a fact of consequence.

10. Please state all facts upon which you rely that the debt represented by the Note was secured by the Mortgage on the date the subject bankruptcy petition was filed and the date the Proof of Claim was filed on January 3, 2013.

RESPONSE: Objection, said request is unduly burdensome and overly broad in that said request seeks all facts and said request is not relevant as it does not relate to a fact of consequence.
Subject to and without waiving said objection, the security instrument executed by debtors was recorded on March 13, 2013 with recording number: 2013K019280, in the Kane County Recorder's Office.

17. Please state all facts upon which you rely that support any contention that you had possession of the Note on the date of the filing of the bankruptcy petition and the date the Proof of Claim was filed on January 3, 2013.

RESPONSE: Objection, repetitive. Proof of claim was filed on January 2, 2013.

18. Please state whether LNV claims to possess legal or beneficial interest, or both interests, in the note and mortgage or both the note and mortgage of Debtors and if so, explain why LNV so claims identifying any document(s) and clauses therein which gives LNV the interest(s) you claim and specifying whether you claim the rights as an owner or holder of the note or both and specifying any other rights claimed. If LNV does not claim any such interest(s) or rights please explain why you do not claim such interest(s).

RESPONSE: Objection, said request is not relevant as it does not relate to a fact of consequence. Subject to and without waiving said objection, LNV was the holder of the note and the mortgagee as that term is defined by the Illinois Mortgage Foreclosure Law (IMFL). Although the mortgage was assigned from LNV to Beal Bank USA on December

31, 2012 and the Proof of Claim was filed on January 2, 2013 in the name of Beal Bank USA, it is irrelevant to the Debtor's bankruptcy and resulted in no harm to the Debtors.

19. Please state the basis the assessment on 2/16/11, 3/16/11, 8/16/10, 09/16/10, 10/18/10, , 11/16/10, 12/16/10,, 1/17111, 4/5/10, 6/16/10 & 7/16/10 as "Late charges" in the sum of $1,287.60 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

RESPONSE: See Promissory Note and attached payment history. Per the Note, late charges will be assessed at the end of 15 calendar days after the date the mortgage payment is due.

20. Please state the basis the assessment on 10/17/11, 11/22/11, 10/4/12, 7/15/11 & 9/21/11 as "Filing Fee & Court Costs" in the sum of $2, 781.00 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

RESPONSE: See Mortgage ¶14 and attached pay history

21. Please state the basis the assessment on 7/15/2011 as "Advertisement costs" in the sum of $410.00 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

RESPONSE: See Mortgage ¶14 and attached pay history

22. Please state the basis the assessment on July 15, 2011 as "Title Costs" in the sum of $350.00 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

RESPONSE: See Mortgage ¶14 and attached pay history

23. Please state the basis the assessment on July 15, 2011 as "Recording fees" in the sum of $42.00 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

RESPONSE: This represents the cost to record the Lis Pendens which is found in the attached invoices dated 6/23/2011

24. Please state the basis the assessment on September 3, 2010 as "Appraisal/broker's price opinion fees" in the sum of $490.00 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

RESPONSE: Mortgage ¶14 payment history page 31556 and 82154

25. Please state the basis the assessment on 2/21/12, 3/20/12, 4/18/12, 5/21/12, 6/26/12,

8/6/12, 8/20/12 & 9/20/12 as "Property inspection fees" in the sum of $270.00 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

**RESPONSE: Mortgage ¶14. Defendant has requested the property inspection invoices and will submit them to Plaintiff once received.**

26. Please state the basis the assessment on 04/07/2010 as "Bankruptcy Acquisition" in the sum of $1,066.18 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

**RESPONSE: Mortgage ¶14 and payment history page 31556. Bankruptcy Acquisition fees are from the prior servicer and upon transfer they become Bankruptcy Acquisition fees, which are outstanding at the time of the transfer. These fees are from a prior Chapter 13 bankruptcy (Case #07-12787).**

27. Please state the basis the assessment on 01/30/12 as "Legal fees" in the sum of $545.00 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

**RESPONSE: Note and mortgage. It appears the total legal fees should be $310.00 and therefore Defendant will be filing an amended POC to change the amount from $545.00 to $310.00.**

28. Please state the basis the assessment on 4/11/11 as "Loss Mit" in the sum of $125.00 to the Debtors' account as stated on the Mortgage Proof of Claim Attachment as well as provide Supporting Documents justifying this assessment.

**RESPONSE: Note and mortgage and attached payment history page 31557**

29. Identify by name, position, address and phone number all witnesses LNV proposes to call to trial.

**RESPONSE: None yet, as the request is premature. Defendant will support with Rule 30(b)(6) witness at such time as the court enters a discovery scheduling order.**

30. Identify each person whom the Defendant expects to call as an expert witness at trial, state the subject matter on which the expert is expected to testify and the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

**RESPONSE: Defendant has not yet identified any witnesses at this time; discovery continues and creditor will seasonably supplement pursuant to any discovery scheduling order.**

31. List all exhibits LNV proposes to introduce at trial.

**RESPONSE: In addition to any documents mentioned herein, Defendant reserves the right to supplement this request, discovery continues**

32. State each and every contention that you will present at the hearing in this matter as to why Defendant may have an allowable secured claim regarding its claim for the mortgage loan on the subject real estate.

**RESPONSE: Per the Assignment of Mortgage Beal Bank is a secured creditor. Pursuant to the ILL UCC and the IMFL, creditor is the mortgagee because it holds the evidence of indebtedness.**

## VII

### DOCUMENT REQUESTS

1. Please produce each and every exhibit or other document that you will seek to introduce into evidence at the trial or hearing of this matter.

**In addition to any documents mentioned herein, Defendant reserves the right to supplement this request, discovery continues**

2. Please identify and produce each and every document that is relevant to your answers to Plaintiffs First Set of interrogatories and Plaintiffs First Request for Admissions served contemporaneously herewith.

**In addition to any documents mentioned herein, Defendant reserves the right to supplement this request, discovery continues**

3. Please produce a detailed payment history of the plaintiffs' account from the date of the origination of the loan to January 26, 2007 including, but not limited to:

**Objection: Debtors are not disputing every payment they made, and the request is overly broad, and unduly burdensome. Subject to and without waiving said objection, charges and debits are listed on the payment history and the invoices that are attached.**

    a. Charges and Debits: Each and every monetary amount by which you charged to or debited to any and all of Debtor's accounts with you, whether concerning principal, interest, late charges, appraisal fees, insurance, taxes, foreclosure fees, attorney fees, legal costs, property inspections, property preservation, NSF check charges, escrow, appraisal or otherwise, including:

        i.    Requested Information for all charges and debits:

            (1) The date of each and every charge or debit;
            (2) The amount of each and every charge or debit;

(3) The resulting principal balance due and owing on the account;

(4) The nature and purpose of each such charge or debit;

(5) Identification of the provision under the Deed of Trust and/or note that authorizes charging each and every such fee against the loan of the Debtors.

(6) The name, address and telephone number of the payee of any type of disbursement related to this account; and

(7) the actual amount paid to such payee.

ii.  Requested information for specific charges and debits:

(1) Attorneys Fees: A summary of all fixed or standard legal fees approved for any form of legal services rendered in connection with this account.

(2) Escrow Accounts: A complete and itemized statement from the date of the origination of the loan to the date of this request of any escrow accounts and expenses related thereto, related in any way to this loan, including:

(a) Copies of any and all communications with the Debtors regarding such accounts;

(b) The dates of any escrow analysis performed; and

( c) The results of any such escrow analysis.

(3) Forced-Placed Insurance: A complete and itemized statement from the date of the origination of the loan to the date of this request of any forced-placed insurance and expenses related thereto, related in any way to this loan.

( 4) Loan Modification/Forbearance/Satisfaction Fees: A complete and itemized statement from the date of the origination of the loan to the date of this request of any fees incurred to modify, extend, or amend the loan or to defer any payment due under the terms of the loan or satisfaction fees, including copies of all communications with the Debtors.

(5) Proof of Claim Fees: A complete and itemized statement of the amount, payment date, purpose and recipient of all fees, whether actually charged or merely assessed, for the preparation and filing of the original proof of claim, any amended proofs of claim, or any supplemental proofs of claim in this case.

(6) Property Inspections: Please attach copies of all property inspection reports and appraisals and all digital photographs.

(7) Real Property Taxes: A complete and itemized statement from the date of the origination of the loan to the date of this request of any real property taxes paid by you and the expenses related thereto, related in any way to this loan.

(8) Suspense Accounts: A complete and itemized statement from the

date of the origination of the loan to the date of this request of any suspense account entries and/or any corporate advance entries related in any way to this loan, including, but not limited to, the balance in any such account or accounts and the nature, source and date of any and all funds deposited in such account or accounts.

(9) Broker Price Opinions: Please attach copies of all Broker Price Opinions and digital photographs of the subject property and of the comparable properties used by the appraiser.

b. Payments and Credits:

    i. Each and every payment made by or on behalf of the Debtors to you from the date of the origination of the loan to the date of this request, including:

        (1) The date of each and every payment;

        (2) The amount of each and every payment; and

        (3) The resulting principal balance due and owing on the account;

        (4) The manner of payment, whether by personal check, money order, cashier's check, bank check or otherwise; and

        (5) Any number or other information in your control that would further identify the payment, as for instance, and without limitation to the type of payment or type of information, check numbers, money order number, etc.

    ii. Each and every amount, other than payments made by or on behalf of the Debtors, by which you credited the Debtors' account, from the date of the origination of the loan to the date of this request, including:

        (1) The date of each and every payment;

        (2) The amount of each and every payment; and

        (3) The resulting principal balance due and owing on the account;

        (4) The nature and purpose of each such payment.

4. Please produce a bankruptcy worksheet in an XLS Format for the Debtors' account.

**Objection, the Defendant is under no duty to prepare an aid in explanation of its payment histories to Plaintiff and the request is oppressive and unduly burdensome.**

5. Please produce all collection notes made in connection with the servicing of Debtors' account.

**Objection, said request is not relevant as it does not relate to a fact of consequence, and said request is unduly burdensome in time and scope**

6. Please provide all documents related to the assessment on 2116111,3/16/11, 8/16/10, 09/16/10, 10/18/10, 11/16/10, 12/16/10,, 1/17/11, 4/5/10, 6/16/10 & 7/16/10 as "Late charges" in the sum of $1,287.60 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

Please see attached payment history

7. Please provide all documents related to the the assessment on I 0/17 /11, 11/22/11, 10/4/12, 7/15111 & 9/21/11 as "Filing Fee & Court Costs" in the sum of$2,781.00 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

Please see attached payment history

8. Please provide all documents related to the assessment on 7/15/2011 as "Advertisement costs" in the sum of $410.00 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

Please see attached payment history

9. Please provide all documents related basis the assessment on July 15, 2011 as "Title Costs" in the sum of $350.00 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

Please see attached payment history

10. Please provide all documents related to the assessment on September 3, 2010 as "Appraisal/broker's price opinion fees" in the sum of $490.00 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

Please see attached payment history

11. Please provide all documents related to the assessment on 2/21/12, 3/20/12, 4/18/12, 5/21112, 6/26/12, 8/6/12, 8/20/12 & 9/20/12 as "Property inspection fees" in the sum of $270.00 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

Defendant has requested the invoices for the property inspection fees and will submit them to Plaintiff once received.

12. Please provide all documents related to the assessment on 04/07/2010 as "Bankruptcy Acquisition" in the sum of$1,066.18 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

**Please see attached payment history**

13. Please provide all documents related to the assessment on *04/0712010* as "Bankruptcy Acquisition" in the sum of $1,066.18 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

**Please see attached payment history**

14. Please provide all documents related to the assessment on 01/30/12 as "Legal fees" in the sum of $545.00 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

**Please see attached payment history**

15. Please provide all documents related to the assessment on 4/11/11 as "Loss Mit" in the sum of $125.00 including, but not limited to, copies of all billings received by LNV related thereto, copies of all memos of LNV concerning same, and copies of all payments made by LNV thereupon.

**Please see attached payment history**

17. Please provide all documents related to the entry on the Proof of Claim attachment entitled Itemization of Claim and Summary of Supporting Documents for "Other amounts for Inspection Fees, Appraisal Fees, NSF Check Charges, and Other Charges" of $634.17.

**Please see attached payment history**

18. Please provide all documents related to the entry on the Proof of Claim attachment entitled Itemization of Claim and Summary of Supporting Documents for "Other Monthly Installments October 24, 2007, through June 24, 2008" of $4533.63.

**Please see attached payment history**

19. Please provide all documents related to the entry on the Proof of Claim attachment Part 3. Statement of Amount Necessary to Cure Default as of the Petition Date specifically relating to paragraph 1 (Installment payments) and paragraph 2 (Amount of installment payments due) entitled of $189,869.72.

**Please see attached payment history**

20. Please provide copies of any attorneys fees billings received by LNV for the Debtors' account.

**Please see attached invoices.**

21. Please provide copies of Force Placed Insurance Policies obtained by LNV for the Debtors' account.

**Objection, unduly burdensome**

22. Please provide copies of billings received by LNV for force placed insurance upon the Debtors' account.

**Please see payment history**

23. Please provide copies of any payments made by LNV for force placed insurance 15 premiums upon the Debtors' account.

**Objection, unduly burdensome, overly broad, and unlimited as to time and scope.**

24. Please provide copies of any ad valorem tax bills received by LNV for the Debtors' account.

**Objection, document is easily and readily available to Plaintiff and also at the Assessor's website**

25. Please provide copies of any payments made by LNV for ad valorem real property taxes upon the Debtors' account.

**Please see payment history**

26. Please produce the original Note.

**The requested document is available for inspection at the request of Plaintiff's attorney and for copy at the Plaintiff's expense.**

27. Please produce the original of all endorsements of the Note including any alleged Allonges.

**The requested documents are available for inspection at the request of Plaintiff's attorney and for copy at the Plaintiff's expense.**

28. Please produce the original of the Mortgage.

**The requested document is available for inspection at the request of Plaintiff's attorney and for copy at the Plaintiff's expense.**

29. Please produce all original assignments of the Mortgage.

The requested documents are available for inspection at the request of Plaintiff's attorney and for copy at the Plaintiff's expense

30. Please produce the originals of all endorsements of the Note.

The requested documents are available for inspection at the request of Plaintiff's attorney and for copy at the Plaintiff's expense.

31 Please produce the originals of all assignments of the Mortgage.

Objection, repetitive and covered by other discovery requests.

32. Please produce any documents, notes, or records related to your possession of the Note and the Mortgage and the assignment and/or endorsement of both documents.

Objection, irrelevant, unduly burdensome, and vague.

33. Please produce all documents you rely upon in your claim that you had possession of the Note on the date of the petition was filed in this bankruptcy case.

Please see copy of original note that was in Defendant's possession.

34. For each denial in your answer, please identify and provide all documents you rely upon in support of your denial( s ).

N/A

35. Please identify and provide any and all other documents, memos, notes, and records, otherwise associated with or related to the Note, the Mortgage, or the servicing of the account related to payments made under the Note.

Objection, unduly burdensome, not relevant, does not specify with reasonable particularity each item.

36. Please identify and provide a copy of your Articles of incorporation, Partnership Agreement, or Membership Agreement.

Objection, said request is not relevant as it does not relate to a fact of consequence.

37. Please identify and provide all written agreements regarding the creation and assignment and/or endorsement of the Note and Mortgage and all such documents related to the Servicing of the financial obligations created by the Note.

Objection, said request is not relevant as it does not relate to a fact of consequence and is overly burdensome. Subject to and without waiving said objection, see attached note and mortgage.

38. Please identify and attach all documents which evidence you are the actual holder of the Note.

**See copy of original note**

39. All documents in your possession regarding Debtors and Debtor's Account.

**Objection, too broad**

40. The entire Collateral File.

**Objection, too broad, not relevant, unduly burdensome in both time and scope, not reasonably calculated to lead to credible or admissible evidence regarding creditor's POC.**

LNV Corporation

/s/ Nisha B. Parikh
One of its Attorneys

FREEDMAN ANSELMO LINDBERG LLC
1771 W. Diehl Rd, Ste 120
Naperville, IL 60563
630-453-6960   866-402-8661
630-428-4620 (fax)

## PROOF OF SERVICE BY MAIL

THE UNDERSIGNED, being first duly sworn on oath, deposes and says that he served a copy of the completed discovery by mailing a copy to the below named parties at the above named addresses and depositing the same in the U.S. Mail at Naperville, Illinois 60563, with postage prepaid, on March 6, 2014.

TO:   Christopher T & Marcia A Swift, 601 Sennett Street, Batavia, IL 60510
       Paul M. Bach, 900 Jorie Boulevard, Suite 150, Oak Brook, IL 60523
       Glenn B. Stearns 801 Warrenville Road, Suite 650, Lisle, IL 60532

/s/ Thomas Girard

# Descriptions Payee Transactions

032 Late Charge Adjustment
052 Late Charge Assessed
066 Special Escrow Deposit

**Cash**

1 46 NSF Reversal/Stop Payment
1 47 Misapplied Reversal
1 48 NSF Reversal/Stop Payment
1 56 Transfer Out
1 60 Escrow Interest
1 61 Escrow Advance
1 62 Loan Guaranty Refund
1 63 Hazard Insurance Refund
1 64 Tax Refund
1 65 Lien Refund
1 66 Special Escrow Deposit
1 67 Other Deposit (HUD) subsidy funds
1 68 Escrow Advance Repayment
1 69 Restricted Escrow Deposit
1 70 Initial Interest/Escrow Deposit
1 71 Lock Box Payment with Coupon
1 72 Payments (Lock Box or In-House Ck Batch)
1 73 Multiple Payments (Auto Draft)
1 74 Irregular Payments (In-House Cash Sheet)
1 75 Principal Curtailment
1 79 Special Optional Insurance Payment
1 81 Paid in Full (181 w/pif 2 is FC transcode)
1 82 Paid in Full

**Disbursements**

301 Miscellaneous
302 HUD Refund
303 Replacement Reserve
304 Disb if already made, Disb if not collecting
304 Restricted Escrow Insurance
305 Escrow Refund to Homeowner
306 Excess Escrow/Refund
307 Escrow to Mortgagor/Reimbursement
310 MIP/FHA disbursement
311 School Tax disb
312 County tax disb
313 City Tax disb
314 Lien assessment disb
315-329 Other Tax
351 Hazard insurance disb
352 Flood Insurance disb
353 Insurance on 2nd dwelling, liability, windstorm
354 Earthquake
355 Liability, windstorm. condo (contents)

**Loan Types**

11 FHA
12 VA
13 CONV with no PMI
14 Commercial
15 FHA Commercial
16 CONV with PMI
17 HUD 235/265
18 Other
19 Farm

**Hazard Coverages**

351 F - Fire, Rental Dwelling
351 H - Homeowners
352 W - Flood
354 Q - Earthquake Only
351 C - Condominium (Master)
355 H - Contents
353/355 L - Liability
353/355 S - Windstorm, Hurricane
351 M - Mobile Home

**Overrides**

1 - Foreclosure
2 - PIF, Disb Stops
3 - PIF, Foreclosure, Disb
4 - Disb Stop - Cust Serv
C - Overdrawn Escrow
D - Overdrawn Escrow
F - Disb if not Collecting
Disb if not already made
M - Overrides everything
(Supervisor Required)
N - Overdrawn Escrow
Foreclosure Stops

## STATES ACCEPTING LOWER INSURANCE COVERAGE
CA, MD, VA, WA, PA, MA, NY

# Descriptions Payee Transactions Con't

**Cash**

1 10 Attorney Advance Repayment
1 11 Property Preservation Repayment
1 12 Statutory Expense Repayment
1 13 Miscellaneous Repayment
1 14 Inventory Aadvance Deposit
1 42 Initial Principal Balance
1 43 Non-Cash Transaction/Advance Due Date
1 53 Interest rate change on non-ARM loan (non-cash)
1 56 Transfer (Service release (tran 058) non cash
1 60 Interest on Escrow
1 83 Interest Adjustment
1 85 Payment in full with delinquent payments (cash payoff)
1 86 Full settlement on foreclosed loans

**Lien/assessment disbursements**

3 30 Attorney Advance
3 31 Property Preservation
3 32 Statutory Expense
3 33 Miscellaneous Expenses
4 93 ARM interest rate adjustment
  55 Repurchase
7 14 Foreclosure Investor Repayment


326 Duplicate Bill Fee
327 Tax Collector Processing Fee
328 Tax Penalty


601 Misc. Corporate Advance
630 Corporate Advance For Attorney Fees
631 Corporate Advance for Property Preservation
632 Corporate Advance for Statutory Expenses
633 Corporate Advance misc. Expenses

DOVENMUEHLE MORTGAGE, INC.    LOAN HISTORY Y-T-D INV ▮▮▮▮▮  INV▮ ▮▮▮▮  12/31/10
                                                  PAGE 31556
                                            ARM PLAN JDFO
                                            EMP 0  POFO

LN▮ ▮▮▮▮ MARCIA A SWIFT      CHRIS T SWIFT         BATAVIA        IL 60510
                       601 SENNETT ST

1ST MTGE PRIN 2ND MTGE PRIN  ESC BAL    REST ESC    SUSPENSE - ADV BAL   REPL RES HUD BAL   LC BAL  INT DUE DUE DATE HUD PRT OF H
  449,500.00       .00     .00       .00     .00 25,691.07      .00    .00   901.32     .00 09-01-08  .00 TT 6

 P & I 1ST  P&I 2ND  CO TAX CITY TAX  HAZ INS   M I P   LIEN  BSC A & H   LIFE    MISC  REF RES  TOT PAYMT INT RATE DT BW
  2575.26    .00   992.53      .00  116.67   .00   .00  .00 .00    .00 0   .00 0    .00   3684.46 .0687500 1 9

 1ST ORIG MTG 2ND ORIG MTG    PRIN BAL BEG INT IND  CAP FLAG MTGR SSN    DEF INT BAL PRIOR YR PPD INT PPD INT IND GPM ORG
  449,500.00      .00   449,500.00             324 72 9827      0.00        0.00       0

ASSUM-DT XFER-DEED FHA-SEC/NUM  LIF PAYOFF FO-TRK-SW YE-ACQ-RPT/DATE   SALE-ID EXEMPT PLGD-LN PMT-OPT CALC-METH ELOC BNKRPCY CH/DT
                                      N/04-01-10  MGC0430

PMT PERIOD 1098-DET-HIST  POINTS-PAID/RPTG YR  SUPPR-MICR-STMT  DI-WDT-RPT-YR  REAS CAUS  RI-HDR-SW 1ST-DUE-DT   REO STAT/COMPL DT
  12     Y                                                        03-07

IOS CREDIT YTD/W-H SW/W-H BALANCE   IORE CREDIT YTD/W-H SW/W-H BALANCE   CONSTR CD  NO FORGE FLAG/YR  BNKRPT STAT  LAST DEF DUE
      .00           .00         .00          .00                                       02-37

REC CORP ADV BAL  3RD REC CORP ADV BAL  FORECL WKST CODE/REINSTATE DATE   INIT ESC STMT CODE / DATE  LOSS MIT STATUS/COMPL DATE
  1,621.18          .00                                                            A

| DUE DATE | PROC DATE | TP TR | SQ NO | AMOUNT RECEIVED | PRINCIPAL PAID | PRINCIPAL BALANCE | INTEREST PAID | ESCROW PAID | ESCROW BALANCE | ADVANCE BALANCE | STATUS AMOUNT | STATUS BALANCE | UNEARNED INT-BAL. | OTHER AMOUNTS | CFD DCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 449500.00 | | | 12683.17- | .00 | | | | | 1 |
| BAL-FWD | | | | | | 449500.00 | .00 12683.17 | | .00 12683.17 | .00 | .00 | .00 | .00 | | |
| 09-08 | 04-06 | 1 61 | 1 | 12683.17 | .00 | 449500.00 | | | | | BATCH 905 EDIT-SEQ 999999 | | | 150.00 | AR |
| 00-00 | 04-07 | 7 45 | 1 | 150.00 PROCES JKN REASON CHECK # | | | aquisition 0410 | | CORP:SEQ | PAYEE | | ORIG PAY | | 150.00 | AR |
| 00-00 | 04-07 | 7 45 | 2 | 500.00 PROCES JKN REASON CHECK # | | | aquisition 0410 | | CORP:SEQ | PAYEE | | ORIG PAY | | 500.00 | AR |
| 00-00 | 04-07 | 7 45 | 3 | 150.00 PROCES JKN REASON CHECK # | | | aquisition 0410 | | CORP:SEQ | PAYEE | | ORIG PAY | | 150.00 | AR |
| 00-00 | 04-07 | 7 45 | 4 | 100.00 PROCES JKN REASON CHECK # | | | aquisition 0410 | | CORP:SEQ | PAYEE | | ORIG PAY | | 100.00 | AR |
| 00-00 | 04-07 | 7 45 | 5 | 166.18 PROCES JKN REASON CHECK # | | | aquisition 0410 | | CORP:SEQ | PAYEE | | ORIG PAY | | 166.18 | AR |
| 00-00 | 04-07 | 7 45 | 6 | 235.00 PROCES JKN REASON CHECK # | | | aquisition 0410 | | CORP:SEQ | PAYEE | | ORIG PAY | | 235.00 | AR |
| 09-08 | 04-20 | 1 32 | 1 | .00 | .00 | 449500.00 | .00 | .00 | .00 12683.17 | | BATCH V90 EDIT-SEQ 014371 | | | 128.76 | W11 |
| 05-10 | 05-12 | 3 12 | 1 | CHECK #143602 | | | 5557.55- | 5557.55- | | PAYEE CD 12099 | .00 | .00 | .00 | | 1 |
| 09-08 | 05-12 | 1 61 | 2 | 5557.55 | .00 | 449500.00 | .00 | .00 | .00 18240.72 | | .00 | .00 | .00 | 128.76- | 11 |
| 09-08 | 06-16 | 1 52 | 1 | .00 | .00 | 449500.00 | .00 | .00 | .00 18240.72 | | .00 | .00 | .00 | 128.76- | 11 |
| 00-00 | 07-16 | 1 52 | 1 | .00 PROCES NIV REASON BPON BROKER PRICE OPN | | | | | CORP:SEQ | PAYEE 02R03 | ORIG PAY REAL 666 | | | 95.00 | AR |
| 00-00 | 07-27 | 6 33 | 1 | CHECK #204931 | | | 60.52- | 60.52- | | PAYEE CD 1379Z | | | .00 | | 1 |
| 11-10 | 07-30 | 3 51 | 1 | CHECK #208728 | | | .00 | .00 | | .00 18301.24 | | | .00 | | |
| 09-08 | 07-30 | 1 61 | 2 | 60.52 | .00 | 449500.00 | .00 | .00 | 5557.55- | PAYEE CD 12089 | | | | | |
| 08-10 | 08-05 | 3 12 | 1 | CHECK #213000 | | | 5557.55- | 5557.55- | | .00 23858.79 | | | | 128.76- | 11 |
| 09-08 | 08-05 | 1 61 | 2 | 5557.55 | .00 | 449500.00 | .00 | .00 | .00 23858.79 | | .00 | .00 | .00 | 150.00 | AR |
| 09-08 | 08-16 | 1 52 | 1 | .00 | .00 | 449500.00 | .00 | .00 | CORP:SEQ | PAYEE 02R03 | ORIG PAY REAL 666 | | | 150.00 | AR |
| 00-00 | 09-03 | 6 33 | 1 | .00 PROCES NIV REASON BPON BROKER PRICE OPN | | | | | CORP:SEQ | PAYEE 02R03 | ORIG PAY REAL 666 | | | | |

DOVENMUEBLE MORTGAGE, INC.

LOAN HISTORY Y-T-D INV ███████ INV# ████████
PAGE 31557
12/31/10

LOAN-NO (CONT\D)

LN# ████████

EMP 0  POF0

MARCIA A SWIFT          CHRIS T SWIFT

| DUE DATE | PROC DATE | TP TR | SQ NO | AMOUNT RECEIVED | PRINCIPAL PAID | PRINCIPAL BALANCE REASON BPON | INTEREST PAID BROKER | ESCROW PAID PRICE OPN | ESCROW BALANCE CORP:SEQ | ADVANCE BALANCE PAYEE 02R03 | STATUS AMOUNT ORIG PAY | STATUS BALANCE REAL 666 | UNEARNED INT-BAL. | OTHER CFD AMOUNTS DCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00-00 | 09-14 | 6 33 | 1 | .00 PROCES NIV | .00 | 449500.00 | .00 | .00 | .00 23856.79 | .00 | .00 | .00 | 150.00 AR 128.76- 11 |
| | | | | CHECK #248265 | | | | | 1832.28- | PAYEE CD 1379Z | | | 1 |
| 09-08 | 09-16 | 1 52 | 1 | .00 | .00 | 449500.00 | .00 | 1832.28- | 1832.28- | | | | |
| 11-10 | 10-04 | 3 51 | 1 | CHECK #268418 | | | | 1832.28 | .00 25691.07 | PAYEE 02R03 | | | 125.00 AR |
| 09-08 | 10-04 | 1 61 | 2 | 1832.28 | .00 | 449500.00 | .00 | 1832.28 | CORP:SEQ | ORIG PAY TTTL 024 | | | |
| 00-00 | 10-11 | 6 33 | 1 | .00 PROCES JMH | | REASON TMCT LOSSMIT COSTS | | | | | | | |
| | | | | CHECK #275564 | | | | | | | | | |
| 09-08 | 10-18 | 1 52 | 1 | .00 | .00 | 449500.00 | .00 | .00 | .00 25691.07 | .00 | .00 | .00 | 128.76- 11 |
| 09-08 | 11-16 | 1 52 | 1 | .00 | .00 | 449500.00 | .00 | .00 | .00 25691.07 | .00 | .00 | .00 | 128.76- 11 |
| 09-08 | 12-16 | 1 52 | 1 | .00 | .00 | | | .00 | .00 25691.07 | .00 | | | 1,048.62 |

REQ-BY TOTALS     25,691.07           25,691.07
Y/E

OTHER AMOUNT CODES:
A=FBA-PENALTY          G=SER=INTEREST-PAID TO POOL    K=INT-DUE-PD          P=ACCRUED-IOE/IORE      U=REAPLICATION-FEE        Y=HUD-FUND
B=RSC                                                 L=PD-THRU-DY          R=UE-INT-AMT            V=ESCROW-ADVANCE          Z=RESTRICTED-ESCROW
C=235-FEE              I-A-M-PD                        M=ADVANCE-EFF-DATE    S=CR-LIFE-AMT           W=SUSPENSE                DI=DEFERRED-INT-BAL
F=MISC                 O=LIFE-PD                       N=ADVANCE-MEMO-AMT    T=ORIG-FEE-AMT          X=REPLACEMENT-RESERVE
AR=SER-FEE-PD          AB=DEFERRED-INT-PD              AC=LIFE-DEF-INT-PD.   AD=CHECK-NO   AE=DEFERRED-INT-LTD-PD   AF=LIFE-DEFERRED-INT-LTD-PD
AG=SUB-CODE            AJ=DEF-INT-ADJ-YLAG   AK=ADV-AMT-RECD   AL=TRAN-SOURCE   AM=IOC-SPEC-INT-PD   AN=NON-REC-CORP-ADV   AP=DATE-STAMP   AQ=TIME-
STAMP  AR=MTGR-REC-CORP-ADV   AS=PREV-POSTED   AT=3RD-REC-CORP-ADV   AY=ADJ YE 1098 IND   AZ=CHOICES-PD
FEE CODES:    1=LATE-CHARGE   2=BRD-CK-FEE   3=CBG-OWNER   $=ELOU-FEEX-ADJ YE 1098 IND   AZ=CHOICES-PD

```
                    DOVENMUEHLE MORTGAGE, INC.          LOAN HISTORY Y-T-D INV          INV#              12/30/11
                                                                                                           PAGE 82154
                                                                                              ARM PLAN JDFD
                                                                                              EMP 0   POFZ

LN#            MARCIA A SWIFT            CHRIS T SWIFT            BATAVIA            IL 60510
                                         601 SENNETT ST

1ST MTGE PRIN  2ND MTGE PRIN  BSC BAL   REST ESC    SUSPENSE   ADV BAL   REPL RES  HUD BAL    LC BAL   INT DUE DUE DATE HUD PRI OF M
449,500.00                                 .00      37,668.28        .00       .00   1287.60     .00  09-01-08    .00 TT M

  P & I 1ST  P&I 2ND  CO TAX CITY TAX  HAZ INS    M I P    LIEN   BSC  A & H    LIFE      MISC     REP RES  TOT PAYMT INT RATE DT EW
  2575.26      .00    992.53            116.67      .00      .00    .00   .00     .00        .00          3684.46 .0687500  1 0

  1ST ORIG MTG   2ND ORIG MTG     PRIN BAL BEG  INT IND  CAP FLAG  MTGR SSN    DEF INT BAL   PRIOR YR PPD INT   PPD INT IND  GPM ORG
    449,500          0            449,500.00                       324 72 9827      0.00              .00

ASSUM-DT XFER-DEED FHA-SEC/NUM    LIP PAYOFF FC-TRK-SW YR-ACQ-RPT/DATE    SALE-ID EXEMPT FLGD-LN PMT-OPT CALC-METH ELOC BNKRPCY CB/DT
                                                       N/04-01-10   MGC0410

ASSUM-DT XFER-DEED FHA-SEC/NUM                                                REAS CAUS RI-HDR-SW  1ST-DUE-DT   REO STAT/COMPL DT
                                                                                                    03-07

PMT PERIOD  1098-DET-HIST  POINTS-PAID/RPTG YR  SUPPR-MICR-STMT  DI-NOT-RPT-YR  REAS CAUS RI-HDR-SW  1ST-DUE-DT  LAST DEF DUE
    12            Y                   .00                                                                          02-37

IOE CREDIT YTD/W-H SW/W-H BALANCE       IORE CREDIT YTD/W-H SW/W-H BALANCE     CONSTR CD   NO PURGE FLAG/YR  BNKRPT STAT  LAST DEF DUE
        .00              .00                    .00              .00                                   R                  05-16-11

REC CORP ADV BAL   3RD REC CORP ADV BAL    FORECL WKST CODE/REINSTATE DATE    INIT ESC STMT CODE / DATE    LOSS MIT STATUS/COMPL DATE
    5,542.93           230.00                            A

DUE   PROC  TP  SQ   AMOUNT    PRINCIPAL   PRINCIPAL   INTEREST   ESCROW    ESCROW    ADVANCE  STATUS   STATUS   UNEARNED   OTHER   CTD
DATE  DATE  TR NO .  RECEIVED    PAID       BALANCE      PAID      PAID    BALANCE   BALANCE   AMOUNT  BALANCE   INT-BAL.  AMOUNTS DCT
BAL-FWD                                   449500.00                         .00  25691.07                                128.76- 11
09-08 01-17 1 52  1     .00        .00     449500.00       .00       .00    .00  25691.07                 .00        .00  128.76- 11
00-00 01-28 6 33  1     .00 PROCES NIV     REASON BPON BROKER PRICE OPN    CORP:SEQ   PAYEE 02R03   ORIG PAY REAL 665      95.00 AR
                 CHECK #427471

09-08 02-16 1 52  1     .00        .00     449500.00       .00       .00    .00  25691.07        .00      .00        .00  128.76- 11
09-08 03-16 1 52  1     .00        .00     449500.00       .00       .00    .00  25691.07        .00      .00        .00  128.76- 11
00-00 04-11 6 33  1     .00 PROCES KOG     REASON LMTF LOSSMIT ATTY FEE    CORP:SEQ 01 PAYEE 02T03    ORIG PAY ATTY 852    230.00 AT
                 CHECK #494858

05-11 05-06 3 12  1               5471.83-           5471.83-                        PAYEE CD 12089                            1
09-08 05-06 1 61  2     .00        .00     449500.00    5471.83   5471.83    .00  31162.90        .00      .00        .00   650.00 AR
00-00 07-15 6 30  1     .00 PROCES NIV     REASON FCLF FCL ATTY FEES       CORP:SEQ   PAYEE 02R03   ORIG PAY ATTY G257     410.00 AR
                 CHECK #584682

00-00 07-15 6 32  2     .00 PROCES NIV     REASON FSRV FCL SERVICE COST    CORP:SEQ   PAYEE 02R03   ORIG PAY ATTY G257      42.00 AR
                 CHECK #584731

00-00 07-15 6 32  3     .00 PROCES NIV     REASON RECD FCL RECORDING       CORP:SEQ   PAYEE 02R03   ORIG PAY ATTY G257     286.00 AR
                 CHECK #584731

00-00 07-15 6 32  4     .00 PROCES NIV     REASON FILE FCL FILING FEES     CORP:SEQ   PAYEE 02R03   ORIG PAY ATTY G257     350.00 AR
                 CHECK #584731

00-00 07-15 6 32  5     .00 PROCES NIV     REASON TITL FCL TITLE WORK              PAYEE CD 12089                            1
                 CHECK #600731
08-11 08-02 3 12  1               5471.83-           5471.83-                        PAYEE CD 12089                            1
09-08 08-02 1 61  2     .00        .00     449500.00       .00    5471.83    .00  36634.73        .00      .00        .00   266.25 AR
00-00 09-21 6 30  1     .00 PROCES NIV     REASON FCLF FCL ATTY FEES       CORP:SEQ   PAYEE 02R03   ORIG PAY ATTY G257     222.50 AR
                 CHECK #648066

00-00 10-17 6 30  1     .00 PROCES NIV     REASON FCLF FCL ATTY FEES       CORP:SEQ   PAYEE 02R03   ORIG PAY ATTY G257     175.00 AR
                 CHECK #675443
                 CHECK #675270          1033.55-           1033.55-                  PAYEE CD 13792                            1
11-11 10-17 3 51  2               1033.55  449500.00       .00    1033.55    .00  37668.28    PAYEE 02R03   ORIG PAY ATTY G257     175.00 AR
09-08 10-17 1 61  3  1033.55       .00     449500.00       .00    1033.55   .00  37668.28   CORP:SEQ   PAYEE 02R03   ORIG PAY ATTY G257     175.00 AR
00-00 11-22 6 30  1     .00 PROCES NIV     REASON FCLF FCL ATTY FEES
                 CHECK #720009
```

DOVENMUEHLE MORTGAGE, INC.  LOAN HISTORY Y-T-D INV  INV#  12/30/11
PAGE 82155

LOAN-NO (CONT\D)

LN#  ▮▮▮▮▮  MARCIA A SWIFT  CHRIS T SWIFT  EMP 0  TOF2

| DUE DATE | PROC DATE | TP TR | SQ NO | AMOUNT RECEIVED | PRINCIPAL PAID | PRINCIPAL BALANCE | INTEREST PAID | ESCROW PAID | ESCROW BALANCE | ADVANCE BALANCE | STATUS AMOUNT | STATUS BALANCE | UNEARNED INT-BAL. | OTHER AMOUNTS | CFD DCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00-00 | 11-22 | 6 30 | 2 | .00 | | PROCES NIV REASON FCLF FCL ATTY FEES | | | CORP:SEQ | | PAYEE 02R03 | ORIG PAY ATTY G257 | | 1137.50 | AR |
| | | | | CHECK #720009 | | | | | | | | | | | |
| 00-00 | 11-22 | 6 30 | 3 | .00 | | PROCES NIV REASON FCLF FCL ATTY FEES | | | CORP:SEQ | | PAYEE 02R03 | ORIG PAY ATTY G257 | | 43.75 | AR |
| | | | | CHECK #720009 | | | | | | | | | | | |
| 00-00 | 12-01 | 6 30 | 1 | .00 | | PROCES NIV REASON LEGF LEGAL FEE EXPENS | | | CORP:SEQ | | PAYEE 02R03 | ORIG PAY ATTY G257 | | 43.75 | AR |
| | | | | CHECK #730862 | | | | | | | | | | | |

REQ-BY TOTALS  11,977.21  .00  .00  11,977.21  .00  3,565.47
Y/E

OTHER AMOUNT CODES:
A=FHA-PENALTY   G=SER-INTEREST-PAID TO POOL   K=INT-DUE-PD       P=ACCRUED-IOE/IOEB   U=REAPPLICATION-FEE          Y=HUD-FUND
B=RSC          B=FEE-AMT                       L=PD-THRU-DT       R=UE-INT-AMT         V=ESCROW-ADVANCE             Z=RESTRICTED-ESCROW
C=235-FEE      I=A-R-PD                        M=ADVANCE-EFF-DATE S=CR-LIFE-AMT        W=SUSPENSE                   DI=DEFERRED-INT-BAL
F=MISC         J=LIFE-PD                       H=ADVANCE-MEMO-AMT T=ORIG-FEE-AMT       X=REPLACEMENT-RESERVE
AA=SER-FEE-PD  AB=DEFERRED-INT-PD              AC=LIFE-DEF-INT-PD AD=CHECK-NO AE=DEFERRED-INT-LTD-PD  AF=LIFE-DEFERRED-INT-LTD-PD
AG=SUB-CODE    AJ=DEF-INT-ADJ-FLAG  AK=ADV-AMT-RECD  AL=TRAN-SOURCE  AM=IOC-SPEC-INT-PD  AN=NON-REC-CORP-ADV  AP=DATE-STAMP  AQ=TIME-
STAMP  AR=MTGR-REC-CORP-ADV  AS=PREV-POSTED  AT=3RD-REC-CORP-ADV  AY=ADJ YE 1098 IND  AZ=CHOICES-PD
FEE CODES:  1=LATE-CHARGE  2=BAD-CK-FEE  3=CHG-OWNER  $=ELOC-FEEY-ADJ YE 1098 IND  AZ=CHOICES-PD

DOVENMUEHLE MORTGAGE, INC.        LOAN HISTORY Y-T-D INV ██████ INV ██████  12/31/12
                                                                 PAGE 75962
                                                               ARM PLAN JDF0
                                                               EMP 0  POF0

LN# ██████  MARCIA A SWIFT       CHRIS T SWIFT      BATAVIA      IL 60510
                                601 SENNETT ST

1ST MTGE PRIN  2ND MTGE PRIN  ESC BAL   REST ESC   SUSPENSE · ADV BAL  REPL RES   HUD BAL   LC BAL  INT DUE DUE DATE HUD PRT OP M
449,500.00           .00          .00        .00         .00 51,378.34     .00        .00     1287.50   .00 09-01-08  .00 TT W

P & I 1ST   P&I 2ND  CO TAX CITY TAX  HAZ INS   H I P   LIEN   BSC  A & H    LIFE     MISC    REP RES  TOT PAYMT INT RATE DT BM
2575.26       .00     992.53   .00    116.67    .00     .00   .00 0         0         .00 0      0      3684.46 .0687500  1 7

1ST ORIG MTG  2ND ORIG MTG     PRIN BAL BEG  INT IND  CAP FLAG  MTGR SSN      DEF INT IND  PRIOR YR PPD INT   PPD INT IND  GPM ORG
449,500       0             449,500.00                         324 72 9827           0.00              0.00          0

ASSUM-DT XFER-DEED FHA-SEC/NUM   LIP PAYOFF FC-TRK-SW YE-ACQ-RPT/DATE    SALE-ID EXEMPT PLGD-LN PMT-OPT CALC-METH BLOC BNKRPCY CH/DT
                                          N/04-01-10  MGC0410                                                              13/09-09-12

PMT PERIOD  1098-DET-HIST  POINTS-PAID/RPTG YR  SUPPR-MICR-STMT  DI-NOT-RPT-YR  REAS CAUS  RI-HDR-SW  1ST-DUE-DT  REO STAT/COMPL DT
12          I                      .00                                                               03-07

IOE CREDIT YTD/W-H SW/W-H BALANCE  IORE CREDIT YTD/W-H SW/W-H BALANCE   CONSTR CD   NO PURGE FLAG/YR  BNKRPT STAT  LAST DEF DUE
.00               .00             .00              .00                                                A            02-37

RBC CORP ADV BAL  3RD REC CORP ADV BAL  FORECL WRST CODE/REINSTATE DATE   INIT ESC STMT CODE / DATE  LOSS MIT STATUS/COMPL DATE
6,410.18            230.00             S                                                             R         05-16-11

| DUE DATE | PROC DATE | TP TR | SQ NO | AMOUNT RECEIVED | PRINCIPAL PAID | PRINCIPAL BALANCE | INTEREST PAID | ESCROW PAID | ESCROW BALANCE | ADVANCE BALANCE | STATUS AMOUNT | STATUS BALANCE | UNEARNED INT-BAL. | OTHER AMOUNTS | CFD DCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BAL-FWD | | | | | | 449500.00 | | | .00 37668.28 | | | .00 | .00 | | |
| 00-00 | 01-11 | 6 30 | 1 | .00 PROCES NIV | REASON LEGF LEGAL FEE EXPENS | | | | CORP:SEQ | PAYEE 02R03 | ORIG PAY ATTY G257 | | | 191.25 AR | |
| | | | | CHECK #804105 | | | | | | | | | | | |
| 00-00 | 01-30 | 6 30 | 1 | .00 PROCES NIV | REASON LEGF LEGAL FEE EXPENS | | | | CORP:SEQ | PAYEE 02R03 | ORIG PAY ATTY G257 | | | 67.50 AR | |
| | | | | CHECK #835471 | | | | | | | | | | | |
| 00-00 | 03-27 | 6 30 | 1 | .00 PROCES NIV | REASON LEGF LEGAL FEE EXPENS | | | | CORP:SEQ | PAYEE 02R03 | ORIG PAY ATTY G257 | | | 67.50 AR | |
| | | | | CHECK #903951 | | | | | | | | | | | |
| 05-12 | 05-29 | 3 12 | 1 | | | | | 5658.35- | 5658.35- | | PAYEE CD 12089 | | | | 1 |
| 09-08 | 05-29 | 1 61 | 2 | 5658.35 | .00 | 449500.00 | .00 | 5658.35 | .00 43326.63 | | | .00 | .00 | | |
| | | | | CHECK #104366 | | | | | | | | | | | |
| 08-12 | 08-29 | 3 12 | 1 | 5658.35 | | | | 5658.35- | 5658.35- | | PAYEE CD 12089 | | | | 1 |
| 09-08 | 08-29 | 1 61 | 2 | 5658.35 | .00 | 449500.00 | .00 | 5658.35 | .00 48984.98 | | | .00 | .00 | | |
| | | | | CHECK #144015 | | | | | | | | | | | |
| 11-12 | 09-27 | 3 51 | 1 | 2393.36 | | | | 2393.36- | 2393.36- | | PAYEE CD 13792 | | | | 1 |
| 09-08 | 09-27 | 1 61 | 2 | 2393.36 | .00 | 449500.00 | .00 | 2393.36 | .00 51378.34 | | | .00 | .00 | | |
| 00-00 | 10-04 | 6 30 | 1 | .00 PROCES NIV | REASON FCLF FCL ATTY FEES | | | | CORP:SEQ | PAYEE 02R03 | ORIG PAY ATTY G257 | | | 520.00 AR | |
| | | | | CHECK #152137 | | | | | | | | | | | |
| 00-00 | 10-04 | 6 30 | 2 | .00 PROCES NIV | REASON FCLC FCL ATTY COSTS | | | | CORP:SEQ | PAYEE 02R03 | ORIG PAY ATTY G257 | | | 6.00 AR | |
| | | | | CHECK #152200 | | | | | | | | | | | |
| 00-00 | 11-14 | 6 30 | 1 | .00 PROCES NIV | REASON BNKF BNK ATTY FEES | | | | CORP:SEQ | PAYEE 02R03 | ORIG PAY ATTY G257 | | | 75.00 AR | |
| | | | | CHECK #220561 | | | | | | | | | | | |

▆▆▆▆▆▆    DOVENMUEHLE MORTGAGE, INC.    LOAN HISTORY Y-T-D INV ▆▆▆▆ INV# ▆▆▆▆▆ ▆▆ 12/31/12
                                                              PAGE  75963

LOAN-NO (CONT'D) ▆▆▆▆▆

RPQ-BY TOTALS    13,710.06         .00           .00         13,710.06            .00          867.25
Y/E

OTHER AMOUNT CODES:
A=FHA-PENALTY    G=SER-INTEREST-PAID TO POOL    K=INT-DUE-PD    P=ACCRUED-IOE/IORE    U=REAPPLICATION-FEE    Y=HUD-FUND
B=BSC    H=FEE-AMT    L=PD-THRU-DT    R=UE-INT-AMT    V=ESCROW-ADVANCE    Z=RESTRICTED-ESCROW
C=235-FEE    I=A-H-PD    M=ADVANCE-EFF-DATE    S=CR-LIFE-AMT    W=SUSPENSE    DI=DEFERRED-INT-BAL
F=MISC    J=LIFE-PD    N=ADVANCE-MEMO-AMT    T=ORIG-FEE-AMT    X=REPLACEMENT-RESERVE
AA=SER-FEE-PD    AB=DEFERRED-INT-PD    AC=LIFE-DEF-INT-PD    AD=CHECK-NO    AE=DEFERRED-INT-LTD-PD    AF=LIFE-DEFERRED-INT-LTD-PD
AG=SUB-CODE    AJ=DEF-INT-ADJ-FLAG    AK=ADV-AMT-RECD    AL=TRAN-SOURCE    AM=IOC-SPEC-INT-PD    AN=NON-REC-CORP-ADV    AP=DATE-STAMP    AQ=TIME-
STAMP    AR=MTGR-REC-CORP-ADV    AS=PREV-POSTED    AT=3RD-REC-CORP-ADV    AY=ADJ YE 1098 IND    AZ=CBOICES-PD
FEE CODES:    1=LATE-CHARGE    2=BAD-CK-FEE    3=CHG-OWNER    $=ELOC-FEE

Page: 1 Document Name: Untitled

```
                          CUSTOMER SERVICE  INV  ███████  03/03/14  09:48:58
SER1 ███████████              XXX-XX-███  0D  TYPE CONV. RES.      ARM     MAN W
MARCIA A SWIFT               XXX-XX-            IR  6.87500  BR TT      630-406
CHRIS T SWIFT                BATAVIA IL 60510-0000                  O 630-406  ███████
601 SENNETT ST
_____                < RECEIVED FORECLOSURE/BANKRUPTCY DOCUMENTS VIA    >: 12/19/13
-----HIST------------------* END  OF LOAN HISTORY *----------------------(MORE)
PROC-DT  DUE-DT  TRAN  TRAN-DESCRIPTION                   TRAN-EFFECTIVE-DATE
    TRAN-AMT   PRINCIPAL    INTEREST    ESCROW    AMOUNT/CD/DESCRIPTION
01-30-13 00-00  766  MISCELLANEOUS REPAYMENT
    1,301.18        0.00        0.00      0.00    1,301.18  MTGR REC CORP ADV BA
11-14-12 00-00  630  ATTORNEY ADVANCES
       75.00        0.00        0.00      0.00       75.00  MTGR REC CORP ADV BA
10-04-12 00-00  632  STATUTORY EXPENSES
        6.00        0.00        0.00      0.00        6.00  MTGR REC CORP ADV BA
10-04-12 00-00  630  ATTORNEY ADVANCES
      520.00        0.00        0.00      0.00      520.00  MTGR REC CORP ADV BA
09-27-12 09-08  161  ESCROW ADVANCE
    2,393.36        0.00        0.00  2,393.36
09-27-12 11-12  351  HAZARD INSURANCE DISBURSEMENT (PRIMARY POLICY)
    2,393.36-       0.00        0.00  2,393.36-              PAYEE =  1379Z
---* PF2 FOR ADDL MESSAGES *-----------------------------------------------------
ACTIVE CH 13 BANKRUPTCY            DIST-TYPE = 1 INTEREST-ONLY LOAN
REMOVED LOSS MITIGATION           SUSPENDED FORECLOSURE
LOSS MIT IND = Q REMOVED/DECLINED  PROC STOP = 8  MORTGAGE DISPOSITION
```

Date: 3/4/2014  Time: 8:50:40 AM

Page: 2 Document Name: Untitled

SER1   █████████   _____    CUSTOMER SERVICE   INV █████    03/03/14  09:48:58
MARCIA A SWIFT       XXX-XX-██   OD  TYPE CONV. RES.      ARM      MAN W
CHRIS T SWIFT        XXX-XX-██   IR  6.87500  BR TT     630-406-
601 SENNETT ST      BATAVIA IL 60510-0000           0 630-406-██
_____       < RECEIVED FORECLOSURE/BANKRUPTCY DOCUMENTS VIA    >: 12/19/13
-----HIST------------------* END  OF LOAN HISTORY *---------------------(MORE)
PROC-DT  DUE-DT  TRAN  TRAN-DESCRIPTION             TRAN-EFFECTIVE-DATE
   TRAN-AMT  PRINCIPAL  INTEREST · ESCROW    AMOUNT/CD/DESCRIPTION
08-21-13  08-13  312  COUNTY TAX
   5,747.85-      0.00      0.00  5,747.85-        PAYEE =    12089
                                  62,874.04-
07-12-13  00-00  630  ATTORNEY ADVANCES
   200.00      0.00      0.00     0.00     200.00  MTGR REC CORP ADV BA
05-08-13  09-08  161  ESCROW ADVANCE
   5,747.85      0.00      0.00  5,747.85
05-08-13  05-13  312  COUNTY TAX
   5,747.85-      0.00      0.00  5,747.85-        PAYEE =    12089
                                  57,126.19-
03-28-13  00-00  630  ATTORNEY ADVANCES
   425.00      0.00      0.00    0.00     425.00  MTGR REC CORP ADV BA
---* PF2 FOR ADDL MESSAGES *-------------------------------------------------
ACTIVE CH 13 BANKRUPTCY       DIST-TYPE = 1 INTEREST-ONLY LOAN
REMOVED LOSS MITIGATION       SUSPENDED FORECLOSURE
LOSS MIT IND = Q REMOVED/DECLINED    PROC STOP = 8  MORTGAGE DISPOSITION

Date: 3/4/2014 Time: 8:50:40 AM

3 Document Name: Untitled

```
                          CUSTOMER SERVICE   INV ████     03/03/14  09:48:58
████████████            XXX-XX-████  0D  TYPE CONV. RES.    ARM       MAN W
IA A SWIFT              XXX-XX-████       IR  6.87500  BR TT    630-406-
S T SWIFT                 BATAVIA IL 60510-0000                 0 630-406-████
SENNETT ST
          < RECEIVED FORECLOSURE/BANKRUPTCY DOCUMENTS VIA    >: 12/19/13
-HIST----------------* END  OF LOAN HISTORY *---------------------(MORE)
-DT  DUE-DT  TRAN  TRAN-DESCRIPTION                   TRAN-EFFECTIVE-DATE
TRAN-AMT    PRINCIPAL    INTEREST    ESCROW    AMOUNT/CD/DESCRIPTION
5-14  00-00  633  MISC FORECLOSURE AND BANKRUPTCY EXPENSES
   100.00        0.00        0.00        0.00     100.00   MTGR REC CORP ADV BA
6-13  00-00  630  ATTORNEY ADVANCES
    75.00        0.00        0.00        0.00      75.00   MTGR REC CORP ADV BA
.8-13  09-08  161  ESCROW ADVANCE
 2,523.32        0.00        0.00   2,523.32
.8-13  11-13  351  HAZARD INSURANCE DISBURSEMENT (PRIMARY POLICY)
 2,523.32-       0.00        0.00   2,523.32-         PAYEE =   1379Z
                                   65,397.36-
21-13  09-08  161  ESCROW ADVANCE
 5,747.85        0.00        0.00   5,747.85

* PF2 FOR ADDL MESSAGES *------------------------------------------
IVE CH 13 BANKRUPTCY              DIST-TYPE = 1 INTEREST-ONLY LOAN
OVED LOSS MITIGATION             SUSPENDED FORECLOSURE
3 MIT IND = Q REMOVED/DECLINED   PROC STOP = 8  MORTGAGE DISPOSITION
```

Page: 4 Document Name: Untitled

```
BNKH  ████████████       MMYY BANKRUPTCY HIST   CH 13   INV      03/04/14 09:50:33
MA SWIFT         DUE 09/01/08 PMT    3,684.46   TYPE CONV. RES     ARM
601 SENNETT ST                 BATAVIA IL 60510
---------------------------------------------------------------PRO B13 ----
ACT    DATE     · AMOUNT     DUE DATE
A
  _    05/07/13                        BNK ADDED CHAP 13 PROC B13
  _    04/01/13                        REMOVE -
  _    04/01/13                        03   03/21/13  DISMISSAL
  _    09/14/12                        BNK ADDED CHAP 13 PROC B13
```

Date: 3/4/2014 Time: 8:50:40 AM

# InterestFirst℠ ADJUSTABLE RATE NOTE

## (One-Year LIBOR Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

January 26, 2007                    Costa Mesa                    California
[Date]                                   [City]                          [State]

801 Sennott St, Batavia, IL 60510-7715
                          [Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 345,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GMAC Mortgage, LLC dba ditech.com

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment on the first day of every month, beginning on March 1, 2007. Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on February 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 9001719, Louisville, KY 40290-0001
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,573.26 before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payments.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of February, 2012, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

ADJUSTABLE InterestFirst℠ ADJUSTABLE RATE NOTE -
One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 5830 1/01
[Page 1 of 4]          Initials: ___
DMACN-CNM.1126 (0207)

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding

Two & 250/100 percentage point ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.875 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment after the first Change Date.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payment consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows: —

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED:

PAY TO THE ORDER OF
RESIDENTIAL FUNDING COMPANY, LLC
WITHOUT RECOURSE

_____ (Seal)
Marcia A. Swift                          -Borrower

J. GRAY
LIMITED SIGNING OFFICER
GMAC MORTGAGE, LLC f/k/a
GMAC MORTGAGE CORPORATION
d/b/a DITECH.COM

_____ (Seal)
Chris T. Swift                          -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

[Sign Original Only]

MULTISTATE Adjustable Rate NOTE ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3520 - 1/01
DRAACM-CNM.1226 (0301)                         Page 4 of 4

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE.

POOL:       0          LOAN ID:

NOTE DATE:   1/26/2007    LOAN AMOUNT:       $449,500.00

BORROWER NAME:  MARCIA SWIFT & CHRIS SWIFT

PROPERTY ADDRESS:   601 SENNETT ST, BATAVIA, IL  60510

PAY TO THE ORDER OF

LNV Corporation

WITHOUT RECOURSE

Residential Funding Company, LLC

By:

Name: Jason J. Vecchio
Title: Post Funding Manager
Residential Funding Company, LLC

## NOTE ALLONGE

This Allonge is to be attached to and made a part of that certain Promissory Note made by Marcia A. Swift and Chris F. Swift, in the original principal amount of $449,500.00, dated January 26, 2007, and payable to GMAC Mortgage LLC, as amended or modified (the "Note").

Pay to the order of LNV CORPORATION INC., ("Assignee"), without recourse and without representation or warranty, whether express, implied or created by operation of law.

RESIDENTIAL FUNDING COMPANY, LLC

By: _____

Name: Carol Chapman

Title: Manager, Records Services

*Limited Signing Officer*

BC: ▮▮▮▮
CLMG Loan #: ▮▮▮▮

## NOTE ALLONGE

This Allonge is to be attached to and made a part of that certain INTERESTFIRST ADJUSTABLE RATE NOTE made by MARCIA A SWIFT AND CHRIS T SWIFT in the original principal amount of $449,600.00, dated 01/26/2007 and payable to GMAC MORTGAGE, LLC DBA DITECH.COM, as renewed, extended, amended or modified.

Pay to the order of BEAL BANK USA, without recourse and without representation or warranty whether express, implied or created by operation of law.

LNV CORPORATION

By: _____
Allison Martin
Attorney-In-Fact

Recording Requested By:
CLMG CORP.

When Recorded Return To:
DONNA KOESTNER
CLMG CORP.
POST CLOSING
7195 DALLAS PARKWAY
PLANO, TX 75024

BC #: 628243



2013K019280
SANDY WEGMAN
RECORDER - KANE COUNTY, IL

RECORDED: 1/11/2013 10:45 AM
REC FEE: 32.00  RHSPS FEE: 10.00
PAGES: 3

## ASSIGNMENT OF MORTGAGE

Kane, Illinois
SERVICING #:17105035 "SWIFT"

THIS ASSIGNMENT OF MORTGAGE (this "Assignment") is made by LNV CORPORATION whose address is 7195 DALLAS PARKWAY, PLANO, TX 75024 ("Assignor"), to and in favor of BEAL BANK USA, whose address is 1970 VILLAGE CENTER CIRCLE, SUITE 1, LAS VEGAS, NV 89134 ("Assignee").

THIS ASSIGNMENT WITNESSES THAT, in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, Assignor hereby assigns, transfers, sets over and conveys to Assignee and its successors and assigns, without recourse and without representation or warranty, whether express, implied or created by operation of law, the following:

1. that certain MORTGAGE from CHRIS T SWIFT AND MARCIA A SWIFT, HUSBAND AND WIFE AS TENANTS BY THE ENTIRETY, Dated: 01/26/2007 Recorded: 02/15/2007 in Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.: 2007K018917, in the recording district of Kane, State of Illinois, which MORTGAGE secures that certain promissory note dated 01/26/2007, in the original principal amount of $449,500.00, made by MARCIA A SWIFT AND CHRIS T SWIFT and payable to the order of GMAC MORTGAGE, LLC DBA DITECH.COM as modified or amended (the "Note");

2. such other documents, agreements, instruments and other collateral that evidence, secure or otherwise relate to Assignor's right, title or interest in and to the MORTGAGE and/or the Note and/or the loan evidenced by the Note, including without limitation the title insurance policies and hazard insurance policies relating thereto that are in effect.

Property Address: 601 SENNETT ST, BATAVIA, IL, 60510-7715

Legal: See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed and delivered by its Authorized Representative.

*PE*PENDOM*01/15/2013-05:09:47 PM NOGMETMOENA1XXXXXXXXXXXXXXX2I047- KANE* 17105035 ILSTATE_MOOM_GMMC_ASSIGN_ASSN *PE*PENDOM*

3                                                                              42

ASSIGNMENT OF MORTGAGE Page 2 of 2

This transfer to be effective December 31, 2012.

LNV CORPORATION
On 3/25/2013

By: _____
Allison Martin, Attorney-in-Fact

Recorded POA February 15, 2013
as Instrument # 2013K012647

STATE OF Texas
COUNTY OF Collin

On 3-5-13 before me, JO EVANS, a Notary Public in and for Collin County, in the State of Texas, personally appeared Allison Martin, Attorney-in-Fact, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
JO EVANS
Notary Expires: 05/05/2013 #12669043-5

JO EVANS
NOTARY PUBLIC
State of Texas
Comm. Exp. 05-05-2013

(This area for notarial seal)

Prepared By: ALLISON MARTIN, VICE PRESIDENT, CLMG CORP, DOCUMENT CONTROL DEPARTMENT, 7195 DALLAS PARKWAY, PLANO, TX 75024 866-973-3398

BC: 628243

## EXHIBIT "A"

ALL THAT PARCEL OF LAND IN KANE COUNTY, STATE OF ILLINOIS, AS MORE FULLY DESCRIBED IN DEED INST # 2004K101551, ID# 11-17-325-010, BEING KNOWN AND DESIGNATED AS FOLLOWS:

LOT 40 IN WINDEMERE, PHASE 1 BEING A SUBDIVISION OF THE SOUTHWEST QUARTER OF SECTION 17, TOWNSHIP 39 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JANUARY 15, 2004 AS DOCUMENT NO. 2004K008410, IN KANE COUNTY, ILLINOIS.

BY FEE SIMPLE DEED FROM ORH CAMBRIDGE HOMES, INC. AS SET FORTH IN INST # 2004K101551 DATED 07/19/2004 AND RECORDED 07/23/2004, KANE COUNTY RECORDS, STATE OF ILLINOIS.

3

LPS Desktop-Invoice Management – Invoice Detail                    Page 1 of 1

| | | | |
|---|---|---|---|
| Vendor | LSI (Lenders Services Inc) | Regarding: | Invoice Number: |
| Address: | P.O. BOX 809352 | SWIFT MARCIA A | Invoice Status: |
| | Chicago, IL 60680-9352 | 601 SENNETT ST | Loan No.: |
| Payee Code: | | BATAVIA, IL 60510 | Loan Type: |
| Vendor Contact: | Vera Vandiver | | Acquisition Date: |

Invoice Status: **Check Confirmed**
Loan Type: Conventional
Acquisition Date:
Type: Non-Judicial
Referral Date : 1/19/2011
Loan Location: TT
Submitted Date: 1/27/2011
Vendor Invoice Date: 1/19/2011
Paid In Full Date: N/A
Foreclosure Removal Date: N/A
MS Status: N/A
Relief Requested Date: N/A
Protection Begin Date: N/A
Protection End Date: N/A

Vendor Ref #:
Servicer: Dovenmuehle Mortgage Inc
Inv. ID / Cat. ID
Investor Name LKY CORPORATION
Invoice ID

BPO – BPO Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 01/27/2011 | | | | 02/27/2011 | 01/28/2011 | 01/29/2011 | 1 |

Dept ] [ Comments ] [ Line Items ] [ Description ] [ Edit Summary ] [ Adj. Summary ] [ Chronology ] [ Order ] [ Service Analyst ] [ Guideline ] [ Invoice Mapping ] [ History ] [ Payments ] [ Reconciliation

| Costs | Total: | $95.00 | IM Prev. Billed: | $395.00 | Exc. Loan Allw: | | Exc Ord Allw: |
|---|---|---|---|---|---|---|---|
| | | | | | Exc. Loan Total Fees/Costs Allow: | | |
| Totals | Inv Amt: | $95.00 | Prev. Billed: | $395.00 | Loan Total Fees/Costs Prev.Billed: | $395.00 | Exc Ord Allw: |

| Costs Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Valuation Costs | BPO with pictures – Exterior | 01/19/11 | 1 | $95.00 | $95.00 | $0.00 | $95.00 |
| | Note: BP | | | | | | |

Total: $95.00   $0.00   $95.00
Invoice Total: $95.00   $0.00   $95.00

LPS Desktop-Invoice Management – Invoice Detail                    Page 1 of 1

| Vendor | LSI (Lenders Services Inc) | Regarding: | Invoice Number: | ▮▮▮▮ |
| Address | P.O. BOX 809382 | SWIFT MARCIA A | Invoice Status: | Check Confirmed (Exc) |
| | Chicago, IL 60680-9382 | 601 SENNETT ST | Loan No.: | |
| Payee Code: | ▮▮▮ | BATAVIA, IL 60510 | Loan Type: | Conventional |
| Vendor Contact: | Vera Vandiver | | Acquistion Date: | |
| Vendor Ref #: | | | Type: | Non-Judicial |
| Servicer: | Dovenmuehle Mortgage Inc | | Referral Date : | 9/1/2010 |
| Inv. ID / Cat. ID | ▮▮▮▮ | | Loan Location: | |
| Investor Name | REAL BANK USA | | Submitted Date: | 9/13/2010 |
| Invoice ID | ▮▮▮▮▮ | | Vendor Invoice Date: | 9/1/2010 |
| | | | Paid In Full Date: | N/A |
| | | | Foreclosure Removal Date: | N/A |
| | | | MS Status: | N/A |
| | | | Relief Requested Date: | N/A |
| | | | Protection Begin Date: | N/A |
| | | | Protection End Date: | N/A |

BPO - BPO Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
| 09/13/2010 | 09/14/2010 | 01/14/2013 | | 09/14/2010 | 09/14/2010 | 09/15/2010 | 2 |

[ Dept ][ Comments ][ Line Items ][ Exceptions ][ Edit Summary ][ Am Summary ][ Chronology ][ Quote ][ Service Request ][ Guideline ][ Invoice Mapping ][ History ][ Payments ][ Reconciliation ]

| Costs | Total: | $150.00 | IM Prev. Billed: | $245.00 | Exc. Loan Allow: | | Exc Ord Alw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | |
| Totals | Inv Amt: | $150.00 | Prev. Billed: | $245.00 | Loan Total Fees/Costs Prev.Billed: | $245.00 | Exc Ord Allw: |

Costs

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
| Valuation Costs | BPO with pictures - Exterior | 09/01/10 | 1 | $150.00 | $150.00 | $0.00 | $150.00 |
| Note: BP | | | | | | | |
| | | | | Total: | $150.00 | $0.00 | $150.00 |
| | | | | Invoice Total: | $150.00 | $0.00 | $150.00 |

LPS Desktop-Invoice Management - Invoice Detail                    Page 1 of 1

| | | | |
|---|---|---|---|
| Vendor | LSI (Lenders Services Inc) | Invoice Number: | ▮▮▮▮ |
| Address: | P.O. BOX 809382 | Invoice Status: | Check Confirmed |
| | Chicago, IL 60680-9382 | Loan No.: | |
| | | Loan Type: | Conventional |
| Payee Code: | ▮▮▮ | Acquisition Date: | |
| Vendor Contact: | Vera Vandiver | Type: | Non-Judicial |
| Vendor Ref #: | | Referral Date : | 8/22/2010 |
| Inv. ID / Cat. ID | Downeasshile Mortgage Inc | Loan Location: | |
| Investor Name | ▮▮▮▮ | Submitted Date: | 9/2/2010 |
| Invoice ID | BEAL BANK USA | Vendor Inv. Date: | 8/22/2010 |
| | ▮▮▮▮ | Paid In Full Date: | N/A |
| | | Foreclosure Removal Date: | N/A |
| | | MS Status: | N/A |
| | | Relief Requested Date: | N/A |
| | | Protection Begin Date: | N/A |
| | | Protection End Date: | N/A |

Regarding:
SWIFT MARCIA A
601 SENNETT ST
BATAVIA, IL 60510

BPO – BPO Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 09/02/2010 | | | | 09/02/2010 | 09/03/2010 | 09/04/2010 | 1 |

[ Dept ] [ Comments ] [ Line Items ] [ Exceptions ] [ Edit Summary ] [ Adj. Summary ] [ Chronology ] [ Quote ] [ Service Request ] [ Guideline ] [ Invoice Mapping ] [ History ] [ Payments ] [ Reconciliation ]

| Costs | Total: | $150.00 | IM Prev. Billed: | $95.00 | Exc. Loan Allow: | | Exc Ord Allw |
|---|---|---|---|---|---|---|---|
| | | | | | Exc. Loan Total Fees/Costs Allow: | | |
| Totals | Inv Amt: | $150.00 | Prev. Billed: | $95.00 | Loan Total Fees/Costs Prev. Billed: | $95.00 | Exc Ord Allw: |

| Costs Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Valuation Costs | BPO with pictures – Exterior | 08/22/10 | 1 | $150.00 | $150.00 | $0.00 | $150.00 |
| | Note: BP | | | | | | |
| | | | | Total: | $150.00 | $0.00 | $150.00 |
| | | | | Invoice Total: | $150.00 | $0.00 | $150.00 |

LPS Desktop-Invoice Management - Invoice Detail

Page 1 of 1

| | |
|---|---|
| Vendor | LSI (Lenders Services Inc) |
| Address: | P.O. BOX 808382 |
| | Chicago, IL 60680-9382 |
| Payee Code: | ▮ |
| Vendor Contact: | Vera Vandiver |
| Vendor Ref #: | |
| Servicer: | Dovenmuehle Mortgage Inc |
| Inv. ID / Cat. ID | ▮ |
| Investor Name | BEAL BANK USA |
| Invoice ID | ▮ |

Regarding:
SWIFT MARCIA A
601 SENNETT ST
BATAVIA, IL 60510

| | |
|---|---|
| Invoice Number: | ▮ |
| Invoice Status: | Check Confirmed |
| Loan No.: | |
| Loan Type: | Conventional |
| Acquisition Date: | |
| Type: | Non-Judicial |
| Referral Date : | 7/15/2010 |
| Loan Location: | |
| Submitted Date: | 7/27/2010 |
| Vendor Invoice Date: | 7/15/2010 |
| Paid In Full Date: | N/A |
| Foreclosure Removal Date: | N/A |
| MS Status: | N/A |
| Relief Requested Date: | N/A |
| Protection Begin Date: | N/A |
| Protection End Date: | N/A |

BPO - BPO Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 07/27/2010 | | | | 07/27/2010 | 07/27/2010 | 07/28/2010 | 1 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Quote || Service Indexes || Guideline || Invoice Mapping || History || Payments || Reconciliation

| Costs | Total: | $95.00 | YM Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw |
|---|---|---|---|---|---|---|---|
| | | | | | Exc. Loan Total Fees/Costs Allow: | | |
| Totals | Inv Amt: | $95.00 | Prev. Billed: | $0.00 | Loan Total Fees/Costs Prev.Billed: | $0.00 | Exc Ord Allw |

Costs
| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Valuation Costs | BPO with pictures - Exterior | 07/15/10 | 1 | $95.00 | $95.00 | $0.00 | $95.00 |

Note: BP

| | Total: | $95.00 | $0.00 | $95.00 |
|---|---|---|---|---|
| | Invoice Total: | $95.00 | $0.00 | $95.00 |

LPS Desktop-Invoice Management - Invoice Detail

Page 1 of 1

| | |
|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC |
| Address: | P.O. Box 3228 |
| | Naperville, IL 60566-3228 |
| Payee Code: | |
| Vendor Contact: | Deana Koons |
| Vendor Ref #: | F11050399 |
| Servicer: | Dovenmuehle Mortgage Inc |
| Inv. ID / Cat. ID | |
| Investor Name | LNV CORPORATION |
| Invoice ID | |

| | |
|---|---|
| Regarding: | |
| SWIFT MARCIA A | |
| 601 SENNETT ST | |
| BATAVIA, IL 60510 | |

| | |
|---|---|
| Invoice Number: | |
| Invoice Status: | Check Confirmed |
| Loan No.: | |
| Loan Type: | Conventional |
| Acquisition Date: | |
| Type: | Non-Judicial |
| Referral Date : | 5/1/2011 |
| Loan Location: | TT |
| Submitted Date: | 3/16/2012 |
| Vendor Invoice Date: | 3/16/2012 |
| Paid In Full Date: | N/A |
| Foreclosure Removal Date: | N/A |
| MS Status: | N/A |
| Relief Requested Date: | N/A |
| Protection Begin Date: | N/A |
| Protection End Date: | N/A |

### Litigation - Litigation Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 03/16/2012 | 03/27/2012 | 03/27/2012 | | 03/27/2012 | 03/27/2012 | 03/28/2012 | 12 |

Dept || Comments || Line Items || Invoice Docs || Edit Summary || Adj. Summary || Chronology || Costs || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fees | Total: | $67.50 | IM Prev. Billed: | $242.50 | Exc. Loan Allow: | | Exc Ord Allw: |
| Costs | Total: | $0.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | |
| Totals | Inv Amt: | $67.50 | Prev. Billed: | $242.50 | Loan Total Fees/Costs Prev.Billed: | $4,315.50 | Exc Ord Allw: |

| Fees Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 02/22/12 | 1 | $67.50 | $67.50 | $0.00 | $67.50 |
| | | | | | Total: | $67.50 | $0.00 | $67.50 |
| | | | | | Invoice Total: | $67.50 | $0.00 | $67.50 |

$510

LPS Desktop-Invoice Management - Invoice Detail                    Page 1 of 1

| Vendor: | Freedman, Anselmo, Lindberg LLC | Regarding: | | Invoice Number: | ████████ |
|---|---|---|---|---|---|
| Address: | P.O. Box 3228 | SWIFT MARCIA A | | Invoice Status: | Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | | Loan No.: | |
| | | BATAVIA, IL 60510 | | Loan Type: | Conventional |
| Paym. Code: | ████ | | | Acquisition Date: | |
| Vendor Contact: | Donna Koons | | | Type: | Non-Judicial |
| Vendor Ref #1 | f11050399 | | | Referral Date : | 5/1/2011 |
| Services: | Dovenmuehle Mortgage Inc | | | Loan Location: | TT . |
| Inv. ID / Cat. ID | ████████ | | | Submitted Date: | 1/26/2012 |
| Investor Name | LNV CORPORATION | | | Vendor Invoice Date: | 1/26/2012 |
| Invoice ID | ████████ | | | Paid In Full Date: | N/A |
| | | | | Foreclosure Removal Date: | N/A |
| | | | | MS Status: | N/A |
| | | | | Relief Requested Date: | N/A |
| | | | | Protection Begin Date: | N/A |
| | | | | Protection End Date: | N/A |

·Litigation - Litigation Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 01/26/2012 | 01/30/2012 | 01/30/2012 | | 01/30/2012 | 01/30/2012 | 01/31/2012 | 5 |

|| Dept || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Chain || Service Retrmt || Guideline || Invoice Mapping || History || Payments || Reconciliation ||

| Fees | Total: | $67.50 | IM Prev. Billed: | $175.00 | Exc. Loan Allow: | | Exc Ord Allw: | |
|---|---|---|---|---|---|---|---|---|
| Costs | Total: | $0.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw: | |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | | |
| Totals | Inv Amt: | $67.50 | Prev. Billed: | $175.00 | Loan Total Fees/Costs Prev.Billed: | $4,245.00 | Exc Ord Allw: | |

Fees

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 01/09/12 | 1 | $67.50 | $67.50 | $0.00 | $67.50 |
| | | | | | Total: | $67.50 | $0.00 | $67.50 |

| | | | Invoice Total: | $67.50 | $0.00 | $67.50 |
|---|---|---|---|---|---|---|

LPS Desktop-Invoice Management - Invoice Detail                                    Page 1 of 1

| Vendor | Freedman, Anselmo, Lindberg LLC | Regarding: | | Invoice Number: | [redacted] |
|---|---|---|---|---|---|
| Address: | P.O. Box 3228 | SWIFT MARCIA A | | Invoice Status: | Check Confirmed |
| | Naperville, IL 61566-3228 | 601 SENNETT ST | | Loan No.: | [redacted] |
| | | BATAVIA, IL 60510 | | Loan Type: | Conventional |
| Payee Code: | [redacted] | | | Acquisition Date: | |
| Vendor Contact: | Donna Koons | | | Type: | Non-Judicial |
| Vendor Ref #: | F11090399 | | | Referral Date : | 5/3/2011 |
| Services: | Doverwnhite Mortgage Inc | | | Loan Location: | TT |
| Inv. ID / Cat. ID | [redacted] | | | Submitted Date: | 1/9/2012 |
| Investor Name | LNV CORPORATION | | | Vendor Invoice Date: | 1/9/2012 |
| Invoice ID | [redacted] | | | Paid In Full Date: | N/A |
| | | | | Foreclosure Removal Date: | N/A |
| | | | | MS Status: | N/A |
| | | | | Relief Requested Date: | N/A |
| | | | | Protection Begin Date: | N/A |
| | | | | Protection End Date: | N/A |

Litigation - Litigation Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 01/09/2012 | 01/11/2012 | 01/30/2012 | | 01/11/2012 | 01/11/2012 | 01/12/2012 | 3 |

[ Dept ][ Comments ][ Line Items ][ Exception ][ Edit Summary ][ Adj. Summary ][ Chronology ][ Costs ][ Service Reviews ][ Guideline ][ Invoice Mapping ][ History ][ Payments ][ Reconciliation ]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fees | Total: | $131.25 | IM Prev. Billed: | $43.75 | Exc. Loan Allow: | | Exc Ord Allw: |
| Costs | Total: | $0.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | |
| Totals | Inv Amt: | $131.25 | Prev. Billed: | $43.75 | Loan Total Fees/Costs Prev.Billed: | $4,116.75 | Exc Ord Allw: |

| Fees Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 11/18/11 | 1 | $131.25 | $131.25 | $0.00 | $131.25 |
| | | | | Total: | $131.25 | $0.00 | $131.25 |
| | | | | Invoice Total: | $131.25 | $0.00 | $131.25 |

LPS Desktop-Invoice Management - Invoice Detail                              Page 1 of 1

| | | | | |
|---|---|---|---|---|
| **Vendor** | Freedman, Anselmo, Lindberg LLC | **Regarding:** | **Invoice Number:** | |
| **Address:** | P.O. Box 3228 | SWIFT MARCIA A | **Invoice Status:** | ▮▮▮ Check Confirmed |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | **Loan No.:** | ▮▮▮ |
| | | BATAVIA, IL 60510 | **Loan Type:** | Conventional |
| **Payee Code:** | ▮▮▮ | | **Acquisition Date:** | |
| **Vendor Contact:** | Donna Koons | | **Type:** | Non-Judicial |
| **Vendor Ref #:** | F11050399 | | **Referral Date :** | 5/1/2011 |
| **Servicer:** | Dovenmuehle Mortgage Inc | | **Loan Location** | TT |
| **Inv. ID / Cat. ID** | | | **Submitted Date:** | 11/30/2011 |
| **Investor Name** | LNV CORPORATION | | **Vendor Invoice Date:** | 11/30/2011 |
| **Invoice ID** | ▮▮▮ | | **Paid In Full Date:** | N/A |
| | | | **Foreclosure Removal Date:** | N/A |
| | | | **MS Status:** | N/A |
| | | | **Relief Requested Date:** | N/A |
| | | | **Protection Begin Date:** | N/A |
| | | | **Protection End Date:** | N/A |

Litigation - Litigation Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 11/30/2011 | 12/01/2011 | 01/30/2012 | | 12/01/2011 | - | 12/02/2011 | 2 |

[ Dept ][ Comments ][ Line Items ][ Exceptions ][ Edit Summary ][ Adj. Summary ][ Chronology ][ Query ][ Service Request ][ Guideline ][ Invoice Mapping ][ History ][ Payments ][ Reconciliation ]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Fees** | Total: | $43.75 | IN Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| **Costs** | Total: | $0.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | Exc Ord Allw: |
| **Totals** | Inv Amt: | $43.75 | Prev. Billed: | $0.00 | Loan Total Fees/Costs Prev. Billed: | $4,973.00 | Exc Ord Allw: |

| Fees Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 11/21/11 | 1 | $43.75 | $43.75 | $0.00 | $43.75 |
| | | | | Total: | $43.75 | $0.00 | $43.75 |
| | | | | Invoice Total: | $43.75 | $0.00 | $43.75 |

LPS Desktop-Invoice Management - Invoice Detail

Vendor Address: Freedman, Anselmo, Lindberg LLC
P.O. Box 3228
Naperville, IL 60566-3228

Payee Code: [redacted]
Vendor Contact: Ruth Upham
Vendor Ref #: F11050399
Servicer: Dovenmuehle Mortgage Inc
Inv. ID / Cat. ID [redacted]
Investor Name LNV CORPORATION
Outsource Firm: LPS Default Solutions
Invoice ID [redacted]

Regarding:
SWIFT MARCIA A
601 SENNETT ST
BATAVIA, IL 60510

Invoice Number: [redacted]
Invoice Status: Check Confirmed (Exc)
Loan No.: [redacted]
Loan Type: Conventional
Acquisition Date:
Type: Judicial
Referral Date: 5/27/2011
Loan Location: TT
Submitted Date: 6/23/2011
Vendor Invoice Date: 6/23/2011
Paid In Full Date: N/A
Foreclosure Removal Date: N/A
MS Status: N/A
Relief Requested Date: N/A
Protection Begin Date: N/A
Protection End Date: N/A

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 06/23/2011 | 06/30/2011 | 07/15/2011 | | 06/30/2011 | 07/15/2011 | 07/15/2011 | 07/16/2011 | 23 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Quote || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

Fees Total: $650.00 IM Prev. Billed: $0.00 Exc. Loan Allow: Exc Ord Allw:
Costs Total: $1,088.00 IM Prev. Billed: $0.00 Exc. Loan Allow: Exc Ord Allw:
Exc. Loan Total Fees/Costs Allow:
Totals Inv Amt: $1,738.00 Prev. Billed: $0.00 Loan Total Fees/Costs Prev. Billed: $450.00 Exc Ord Allw:

Fees

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Allowable | 06/15/11 | 1 | $650.00 | $650.00 | $0.00 | $650.00 |
| | | | | Total: | $650.00 | $0.00 | $650.00 |

Costs

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Title Costs | Title Search | 05/27/11 | 1 | $350.00 | $350.00 | $0.00 | $350.00 |
| | Note: NOT A FNMA LOAN<br>Exceptions: Exceeds Life of Loan Total Allowable | | | | | | |
| Filing Costs | Filing Fee Complaint | 06/01/11 | 1 | $286.00 | $286.00 | $0.00 | $286.00 |
| Recording Costs | Lis Pendens/NOPA | 06/09/11 | 1 | $42.00 | $42.00 | $0.00 | $42.00 |
| Service Costs | Service of Process | 06/15/11 | 1 | $410.00 | $410.00 | $0.00 | $410.00 |
| | | | | Total: | $1,088.00 | $0.00 | $1,088.00 |
| | | | | Invoice Total: | $1,738.00 | $0.00 | $1,738.00 |

LPS Desktop-Invoice Management - Invoice Detail

| | | | |
|---|---|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC | Regarding: | Invoice Number: |
| Address: | P.O. Box 3228 | SWIFT MARCIA A | Invoice Status: ▮▮▮ Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENRETT ST | Loan No.: |
| Payee Code: ▮▮ | | BATAVIA, IL 60510 | Loan Type: Conventional |
| Vendor Contact: | Ruth Upham | | Acquisition Date: |
| Vendor Ref #: | F11050999 | | Type: Judicial |
| Services: | Dovenmuehle Mortgage Inc | | Referral Date 1: 5/27/2011 |
| Inv. ID / Cat. ID | LNV CORPORATION | | Loan Location: TT |
| Investor Name | LNV CORPORATION | | Submitted Date: 11/9/2011 |
| Outsource Firm: | LPS Default Solutions | | Vendor Invoice Date: 11/9/2011 |
| Invoice ID ▮▮▮ | | | Paid In Full Date: N/A |
| | | | Foreclosure Removal Date: N/A |
| | | | MS Status: N/A |
| | | | Relief Requested Date: N/A |
| | | | Protection Begin Date: N/A |
| | | | Protection End Date: N/A |

Foreclosure – Foreclosure Services – Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 11/09/2011 | 11/13/2011 | 11/22/2011 | | 11/13/2011 | 11/22/2011 | 11/22/2011 | 11/23/2011 | 14 |

Deot || Comments || Line Items || Exceptions || Edit Summary || Agn. Summary || Chronology || Notes || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| | | | | | | |
|---|---|---|---|---|---|---|
| Fees | Total | $43.75 | IM Prev. Billed: | $2,451.25 | Exc. Loan Allow: | $1,195.00 | Exc Ord Allw: |
| Costs | Total | $0.00 | IM Prev. Billed: | $1,088.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | |
| Totals | Inv Amt: | $43.75 | Prev. Billed: | $3,539.25 | Loan Total Fees/Costs Prev.Billed: | $4,029.25 | Exc Ord Allw: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Other | 10/31/11 | 0.25 | $175.00 | $43.75 | $0.00 | $43.75 |
| | Note: CONTESTED SEE ATTACHED | | | | | | |
| | | | | | Total: $43.75 | $0.00 | $43.75 |
| | | | | | Invoice Total: $43.75 | $0.00 | $43.75 |

LPS Desktop-Invoice Management - Invoice Detail

| | | | | |
|---|---|---|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC | **Regarding:** | **Invoice Number:** | ▮▮▮ Check Confirmed (Exc) |
| Address: | P.O. Box 3228 | SWIFT MARCIA A | **Invoice Status:** | |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | **Loan No.:** | ▮▮▮ |
| | | BATAVIA, IL 60510 | **Loan Type:** | Conventional |
| Payee Code: | | | **Acquisition Date:** | |
| Vendor Contact: | Daniel Contreras | | **Type:** | Judicial |
| Vendor Ref #: | F11050399 | | **Referral Date :** | 5/22/2011 |
| Services: | Deverneuhle Mortgage Inc | | **Loan Location:** | TT |
| Inv. ID / Cat. ID | ▮▮▮ | | **Submitted Date:** | 11/3/2011 |
| Investor Name | LNV CORPORATION | | **Vendor Invoice Date:** | 11/3/2011 |
| Outsource Firm | LPS Default Solutions | | **Paid In Full Date:** | N/A |
| Invoice ID | ▮▮▮ | | **Foreclosure Removal Date:** | N/A |
| | | | **MS Status:** | N/A |
| | | | **Relief Requested Date:** | N/A |
| | | | **Protection Begin Date:** | N/A |
| | | | **Protection End Date:** | N/A |

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 11/03/2011 | 11/10/2011 | 11/22/2011 | | 11/10/2011 | 11/22/2011 | 11/22/2011 | 11/23/2011 | 20 |

[ Dept ] [ Comments ] [ Line Items ] [ Exceptions ] [ Exit Summary ] [ Adj. Summary ] [ Chronology ] [ Quote ] [ Service Request ] [ Guideline ] [ Invoice Mapping ] [ History ] [ Payments ] [ Reconciliation ]

| | | | | | | |
|---|---|---|---|---|---|---|
| Fees | Total: | $1,137.50 | IM Prev. Billed: | $1,313.75 | Exc Loan Allow: | $1,151.25 | Exc Ord Allow: |
| Costs | Total: | $0.00 | IM Prev. Billed: | $1,088.00 | Exc Loan Allow: | | Exc Ord Allow: |
| | | | | | Exc Loan Total Fees/Costs Allow: | | |
| Totals | Inv Amt: | $1,137.50 | Prev. Billed: | $2,401.75 | Loan Total Fees/Costs Prev. Billed: | $2,891.75 | Exc Ord Allow: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 10/25/11 | 1 | $1,137.50 | $1,137.50 | $0.00 | $1,137.50 |
| | Note: ATTY FEE CONTESTED- ADDITIONAL LEGAL RESEARCH, REVISED MOTION TO STRIKE, RECEIVED AND REVIEWED LETTER, REVIEWED STATUS OF DISCOVERY. | | | | | | |
| | | | | | Totals: $1,137.50 | $0.00 | $1,137.50 |
| | | | | | Invoice Total: $1,137.50 | $0.00 | $1,137.50 |

LPS Desktop-Invoice Management - Invoice Detail

Page 1 of 1

| | | | |
|---|---|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC | Regarding: | Invoice Number: ▓▓▓ |
| Address: | P.O. Box 3228 | SWIFT MARCIA A | Invoice Status: Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | Loan No.: ▓▓▓ |
| Payee Code: | | BATAVIA, IL 60510 | Loan Type: Conventional |
| Vendor Contact: | Denis Contreras | | Acquisition Date: |
| Vendor Ref #: | F11050399 | | Type: Judicial |
| Servicer: | Dovenmuehle Mortgage Inc | | Referral Date : 5/27/2011 |
| Inv. ID / Cat. ID | | | Loan Location: TT |
| Investor Name | 1NV CORPORATION | | Submitted Date: 10/17/2011 |
| Outsource Firm: | LPS Default Solutions | | Vendor Invoice Date: 10/17/2011 |
| Invoice ID | ▓▓▓ | | Paid In Full Date: N/A |
| | | | Foreclosure Removal Date: N/A |
| | | | MS Status: N/A |
| | | | Relief Requested Date: N/A |
| | | | Protection Begin Date: N/A |
| | | | Protection End Date: N/A |

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 10/17/2011 | 10/20/2011 | 11/22/2011 | | 10/20/2011 | 11/22/2011 | 11/22/2011 | 11/23/2011 | 37 |

[Dept] [Comments] [Line Items] [Exceptions] [Edit Summary] [Agr. Summary] [Chronology] [Quota] [Service Request] [Guideline] [Invoice Mapping] [History] [Payments] [Reconciliation]

| Fees | Total: | $175.00 | IM Prev. Billed: | $1,138.75 | Exc Loan Allow: | $13.75 | Exc Ord Allw: |
|---|---|---|---|---|---|---|---|
| Costs | Total: | $0.00 | IM Prev. Billed: | $1,088.00 | Exc Loan Allow: | | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | |
| Totals | Inv Amt: | $175.00 | Prev. Billed: | $2,226.75 | Loan Total Fees/Costs Prev. Billed: | $2,716.75 | Exc Ord Allw: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 10/11/11 | 1 | $175.00 | $175.00 | $0.00 | $175.00 |

Note: ATTY FEE- CONTESTED LEGAL RESEARCH OF DEFENSES ALLEGED.

| | | Total: | $175.00 | $0.00 | $175.00 |
|---|---|---|---|---|---|
| | | Invoice Total: | $175.00 | $0.00 | $175.00 |

LPS Desktop-Invoice Management - Invoice Detail

Page 1 of 1

| | | | |
|---|---|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC | Regarding: | Invoice Number: ▮▮▮ |
| Address: | P.O. Box 3228 | SWIFT MARCIA A | Invoice Status: Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | Loan No.: |
| | | BATAVIA, IL 60510 | Loan Type: Conventional |
| Payee Code: | | | Acquisition Date: |
| Vendor Contact: | Daniel Contreras | | Type: Judicial |
| Vendor Ref #: | F11050399 | | Referral Date : 5/27/2011 |
| Servicer: | Dovenmuehle Mortgage Inc | | Loan Location: TT |
| Inv. ID / Cat. ID | | | Submitted Date: 9/20/2011 |
| Investor Name | LNV CORPORATION | | Vendor Invoice Date: 9/20/2011 |
| Outsource Firm: | LPS Default Solutions | | Paid In Full Date: N/A |
| Invoice ID | ▮▮▮ | | Foreclosure Removal Date: N/A |
| | | | MS Status: N/A |
| | | | Relief Requested Date: N/A |
| | | | Protection Begin Date: N/A |
| | | | Protection End Date: N/A |

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 09/20/2011 | 09/27/2011 | 10/15/2011 | | 09/27/2011 | 10/15/2011 | 10/17/2011 | 10/18/2011 | 26 |

[ Dept ][ Comments ][ Line Items ][ Exceptions ][ Edit Summary ][ Adj. Summary ][ Chronology ][ Quote ][ Service Request ][ Guideline ][ Invoice Mapping ][ History ][ Payments ][ Reconciliation ]

| | | | | | |
|---|---|---|---|---|---|
| Fees Total: | $222.50 | IM Prev. Billed; | $916.25 | Exc. Loan Allow: | Exc Ord Allw: |
| Costs Total: | $0.00 | IM Prev. Billed; | $1,088.00 | Exc. Loan Allow: | Exc Ord Allw: |
| | | | | Exc. Loan Total Fees/Costs Allow: | |
| Totals Inv Amt: | $222.50 | Prev. Billed | $2,004.25 | Loan Total Fees/Costs Prev.Billed: $2,494.25 | Exc Ord Allw: |

Fees

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 09/13/11 | 1 | $222.50 | $222.50 | $0.00 | $222.50 |

Note: ATTY FEE- CONTESTED- PREPARED FILE FOR COURT, COURT PREP, REVIEW EMAIL CORRESPONDENCE, REVIEW COURT RESULTS.

| | | | |
|---|---|---|---|
| | Total: | $222.50 | $0.00 | $222.50 |
| | Invoice Total: | $222.50 | $0.00 | $222.50 |

LPS Desktop-Invoice Management - Invoice Detail                                    Page 1 of 1

| | | | |
|---|---|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC | Regarding: | Invoice Number: |
| Address | P.O. Box 3228 | SWIFT MARCIA A | Invoice Status: |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | |
| Payee Code: | | BATAVIA, IL 60510 | Loan Type: |
| Vendor Contact: | Daniel Contreras | | Acquistion Date: |
| Vendor Ref #: | F11050309 | | Type: |
| Servicer: | Dovenmuehle Mortgage Inc | | Referral Date : |
| Inv. ID / Cat. ID | | | Loan Location: |
| Investor Name | LNV CORPORATION | | Submitted Date: |
| Outsource Firm: | LPS Default Solutions | | Vendor Invoice Date: |
| Invoice ID | | | Paid In Full Date: |

Invoice Status: Check Confirmed
Loan Type: Conventional
Type: Judicial
Referral Date: 5/27/2011
Loan Location: TT
Submitted Date: 9/8/2011
Vendor Invoice Date: 9/8/2011
Paid In Full Date: N/A
Foreclosure Removal Date: N/A
MS Status: N/A
Relief Requested Date: N/A
Protection Begin Date: N/A
Protection End Date: N/A

### Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 09/08/2011 | 09/16/2011 | 09/21/2011 | | 09/16/2011 | 09/21/2011 | 09/21/2011 | 09/22/2011 | 14 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Ath. Summary || Chronology || Logs || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| | | | | | |
|---|---|---|---|---|---|
| Fees | Total: | $266.25 | IM Prev. Billed: | $650.00 | Exc. Loan Allow: |
| Costs | Total: | $0.00 | IM Prev. Billed: | $1,088.00 | Exc. Loan Allow: |
| | | | | | Exc. Loan Total Fees/Costs Allow: |
| Totals | Inv Amt: | $266.25 | Prev. Billed: | $1,738.00 | Loan Total Fees/Costs Prev.Billed: $2,228.00 |

Exc Ord Allw:
Exc Ord Allw:
Exc Ord Allw:

### Fees

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 08/15/11 | 1 | $266.25 | $266.25 | $0.00 | $266.25 |

Notes ATTY FEE CONTESTED- REVIEW BORROWERS ANSWER AND AFFIRMATIVE DEFENSES, FORMATTED DISCOVERY REQUEST.

| | | | |
|---|---|---|---|
| | Total: | $266.25 | $0.00 | $266.25 |
| | Invoice Total: | $266.25 | $0.00 | $266.25 |

Return To:
GMAC Mortgage, LLC dba
ditech.com
3200 Park Center Dr. Suite
150, Costa Mesa, CA 92626

2007K018917

SANDY WEGMAN
RECORDER - KANE COUNTY, IL
RECORDED: 2/15/2007 1:28 PM
REC FEE: 45.00 RHSPS FEE: 10.00
PAGES: 24

Prepared By:
Vicki Davis
3200 Park Center Dr.
Suite 150,
Costa Mesa, CA 92626.

[Space Above This Line For Recording Data]

# MORTGAGE

MIN

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive
St. Paul, MN 55117

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated 01/26/2007
together with all Riders to this document.
(B) "Borrower" is Chris T Swift and Narcia A Swift, husband and wife as
tenants by the entirety

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc, MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3014 1/01
-6A(IL) (0010).01
Page 1 of 15          Initials:
VMP Mortgage Solutions, Inc.



(D) "Lender" is GMAC Mortgage, LLC dba ditech.com

Lender is a Residential Mortgage Lender
organized and existing under the laws of Delaware
Lender's address is 3200 Park Center Dr. Suite 150, Costa Mesa, CA 92626

(E) "Note" means the promissory note signed by Borrower and dated 01/26/2007
The Note states that Borrower owes Lender Four Hundred Forty Nine Thousand Five
Hundred                                                                    Dollars
(U.S. $449,500.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than February 1, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [ ] Condominium Rider          [ ] Second Home Rider
[ ] Balloon Rider            [X] Planned Unit Development Rider  [ ] 1-4 Family Rider
[ ] VA Rider                 [ ] Biweekly Payment Rider     [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.





(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
[Type of Recording Jurisdiction]
County                                                                    [Name of Recording Jurisdiction]
of Kane
The Assessor's Parcel Number (Property Tax ID#) for the Real Property is
                                    See Attached Legal Description

which currently has the address of
                                                                          [Street]
Parcel ID Number:                      [City], Illinois 60510-7715  [Zip Code]
601 Sennett St
Batavia
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

-6A(IL) (0010)01                        Page 3 of 15                              CS  Form 3014  1/01



pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts



due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



WASH-Single Family    Page 5 of 16    Form 3048    1/01



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

 

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(IL) (0010).01                    Page 7 of 16              Initials: SC CS         Form 3014 1/01




attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Page 8 of 15                     Form 3014  1/01




(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender



Initials: SS    Form 3014  1/01

Page 8 of 15



7723



to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA





requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affect the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-EA(IL) (0010).01                               Page 12 of 12                               Form 3014   1/01



**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.



**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                  Marcia A. Swift          -Borrower

_____          _____ (Seal)
                                  Chris T. Swift           -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                          -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                          -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                          -Borrower

-6A(IL) (0010).01          Page 14 of 15          Form 3014   1/01



STATE OF ILLINOIS, _____ Kane _____ County ss:

I, Judith Ann Berlin, a Notary Public in and for said county and state do hereby certify that

Chris T. Swift and Marcia A. Swift

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this 26th day of January, 2007.

My Commission Expires:
3/13/10

Judith Ann Berlin
Notary Public

OFFICIAL SEAL
JUDITH ANN BERLIN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/13/11

-6A(IL) (0010).01

Page 16 of 16

Initials: CS / MS

Form 3014 1/01



## FIXED/ADJUSTABLE RATE RIDER
(LIBOR One-Year Index (As Published In *The Wall Street Journal*) – Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 26th day of January 2007 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to GMAC Mortgage, LLC fka ditech.com

("Lender") of the same date and covering the property described in the Security Instrument and located at:

601 Sennett St, Batavia, IL 60510-7715
*[Property Address]*

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of 6.875 %.
The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of February, 2017 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER
WSJ One-Year LIBOR-Single Family–Fannie Mae
UNIFORM INSTRUMENT    Form 3187 6/01
(Page 1 of 3)
GMACM-CRM.1380 (0204)    Initials [signature]



**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index, which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two & 25/100 percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.875 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR - Single Family - Fannie Mae UNIFORM INSTRUMENT     Form 3187    6/01
GMACM-CRM.1359 (0104)     (Page 2 of 3)     Initials: JS CS




**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER – WSJ One-Year LIBOR – Single Family – Fannie Mae
UNIFORM INSTRUMENT   Form 3187 6/01
GMACM-CRM.1380 (0104)                        (Page 2 of 3)                  Initials: _____




If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

THIS SPACE LEFT INTENTIONALLY BLANK

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR -- Single Family - Fannie Mae
UNIFORM INSTRUMENT   Form 3187 6/01
GMACM-CRM.1382 (0204)          (Page 4 of 5)          Initials: 

7732




BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in
this Fixed/Adjustable Rate Rider.

_____ (Seal)
                        -Borrower
Marcia A. Swift

_____ (Seal)
                        -Borrower
Chris T. Swift

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER — WSJ One Year LIBOR — Single Family — Fannie Mae
UNIFORM INSTRUMENT    Form 3187 6/01
GMACM-CRM.1380 (0306)         (Page 5 of 5)




## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this Twenty-Sixth day of January, 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to GMAC Mortgage, LLC dba ditech.com

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: 601 Sennett St, Batavia, IL 60510-7715

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as Windemere

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01
Wolters Kluwer Financial Services          Page 1 of 3          Initials: _____
VMP®-7R (0411).01

Paul M. Bach

900 Jorie Blvd., Ste. 150

Oak Brook, IL 60523